**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

VOITH PAPER GMBH & CO. KG        :
       :
       :    C. A. 07-226 JJF
       Plaintiff,        :
       :
       v.        :
       :
JOHNSONFOILS, INC.        :
       :
       Defendant.        :

**COMPENDIUM OF UNREPORTED CASES CITED IN DEFENDANT'S
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO STAY THE
PROCEEDINGS PENDING REEXAMINATION OF THE PATENTS IN SUIT
OR IN THE ALTERNATIVE FOR LEAVE TO FILE A MOTION FOR
SUMMARY JUDGMENT PRIOR TO AUGUST 20, 2008 THAT
U.S. PATENTS 5,718,805 AND 5,972,168 ARE INVALID**

**SEITZ, VAN OGTROP & GREEN, P.A.**

George H. Seitz, III (DE #667)
gseitz@svglaw.com
Patricia P. McGonigle (DE #3126)
pmcgonigle@svglaw.com
222 Delaware Avenue, Suite 1500
P.O. Box 68
Wilmington, DE 19801
(302) 888-0600

Dated:  August 28, 2007

60744 v1

## CASES

*Abbott Diabetes Care, Inc. v. DexCom, Inc.*, 2006 U.S. Dist.
LEXIS 57469 (D. Del. Aug. 26, 2006) .................................................................A

*Alloc., Inc. v. Unilin Decor N.V.*, 2003 U.S. Dist. LEXIS 11917
(D. Del. July 11, 2003) ...................................................................................B

*Braintree Lab., Inc. v. Nephro-Tech, Inc.*, 1997 U.S. Dist.
LEXIS 2372 (D. Kan. Feb. 26, 1997) ...............................................................C

*Emhart Indus., Inc. v. Sankyo Seiki Mfg. Co.*, 1987 U.S. Dist.
LEXIS 15033 (N.D. Ill. Jan. 30, 1987).............................................................. D

*Grayling Indus. v. GPAC, Inc.*, 2991 U.S. Dist. LEXIS 16750
(N.D. Ga. Mar. 25, 1991)...................................................................................E

*Hamilton Indus., Inc. v. Midwest Folding Prods. Mfg. Corp.*,
1990 WL 37642 (N.D. Ill. Mar. 20, 1990) .........................................................F

*In re Trans Texas Holding Corp.*, 2007 U.S. App. LEXIS 19909
(Fed. Cir. Aug. 22, 2007) ................................................................................ G

*Pegasus Dev. Corp. v. Directv, Inc.*, 2003 U.S. Dist. LEXIS 8052
(D. Del. May 14, 2003) .....................................................................................H

*St. Clair Intellectual Prop. Consultants, Inc. v. Sony Corp.*,
2003 U.S. Dist. LEXIS 27397 (D. Del. Jan. 30, 2003) .........................................I

*Softview Computer Prods. Corp. v. Haworth, Inc.*, 2000 U.S. Dist.
LEXIS 11274 (S.D.N.Y. Aug. 9, 2000).............................................................. J



LEXSEE 2006 U.S. DIST. LEXIS 57469

**ABBOTT DIABETES CARE, INC., Plaintiff, v. DEXCOM, INC., Defendants.**

**C.A. No. 05-590 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2006 U.S. Dist. LEXIS 57469*

**August 16, 2006, Decided**

**COUNSEL:** [*1] For Abbott Diabetes Care Inc. a Delaware corporation, Plaintiff: Mary B. Graham, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE; James F. Hurst, Stephanie S. McCallum, Pro Hac Vice; James Walter Parrett, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For DexCom Inc. a Delaware corporation, Defendant: John W. Shaw, Melanie K. Sharp, Young, Conaway, Stargatt & Taylor, Wilmington, DE; Brian M. Kramer, David C. Doyle, M. Andrew Woodmansee, Morgan S. Adessa, Pro Hac Vice.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION**

**MEMORANDUM**

**I. INTRODUCTION**

On August 11, 2005, Abbott Diabetes Care, Inc. ("Abbott") brought this declaratory judgment (Count I) and patent infringement (Count II) action against Dex-Com, Inc. ("DexCom"). Presently before the court are the following motions: (1) DexCom's Motion to Dismiss Abbott's Complaint (D.I. 5); (2) DexCom's Motion to Strike the "Amended Complaint" and Renewed Motion to Dismiss Abbott's Complaint (D.I. 61); and (3) Dex-Com's Motion to Stay Pending Reexamination of the Patents-in-suit (D.I. 25). For the reasons that follow, the court will grant in part and deny in part DexCom's motion [*2] to dismiss. The court will grant the motion to dismiss Abbott's declaratory judgment count and will deny the motion to dismiss the infringement count. Additionally, the court will grant DexCom's motion to strike the "amended complaint," deny the renewed motion to dismiss the complaint as moot, and grant the motion to stay pending reexamination of Abbott's patents.

**II. BACKGROUND**

Abbott owns *U.S. Patent Nos. 6,175,752* (the "'752 patent"), 6,284,478 (the "'478 patent"), 6,329,161 (the "'161 patent"), and 6,565,509 (the "'509 patent") (collectively, the "patents-in-suit"). The patents-in-suit are directed to methods, systems, and devices for continuously monitoring glucose levels in humans. (Compl. P 7.) The patented technology at issue offers an alternative monitoring system for diabetics, who currently monitor their glucose levels by pricking their fingers to draw blood several times a day. (D.I. 32, at 3; see *'752 patent*, Col. 1, ll. 21-26; '509 patent Col. 1, ll. 21-26.) According to the background of the invention sections of the *'752* and '509 patents, the pricking technique does not permit the continuous monitoring of glucose, is painful and inconvenient, and results [*3] in inconsistencies in monitoring among individuals with diabetes. (See *'752 patent*, Col. 1, ll. 26-38; '509 patent, Col. 1. ll. 26-38.) Therefore, the technology described in the patents-in-suit was invented to address the need for a small and comfortable device that could continuously monitor glucose levels for days at a time, while permitting a patient to engage in normal activities. (*'752 patent*, Col. 2, ll. 1-4; '509 patent, Col 2., ll. 5-8.) Each of the patents-in-suit relate to an aspect of the continuous glucose monitor, which involves implanting a glucose sensor in a patient and monitoring signals over the life of the sensor. [1] (D.I. 32, at 3.) The monitoring device provides patients with feedback regarding their glucose levels, and may even include an alarm to warn patients of dangerous glucose levels. (Id. at 3-4.)

1 The *'752* and '509 patents relate to glucose monitoring devices and their methods of use, while the '478 and '161 patents relate to subcutaneous glucose sensors.

Case 1:07-cv-00226-JJF    Document 29    Filed 08/28/2007    Page 5 of 33

Page 2
2006 U.S. Dist. LEXIS 57469, *

Abbott alleges that DexCom [*4] intends to market its STS<TM> Continuous Glucose Monitoring System, which will infringe one or more claims of the patents-in-suit. The complaint states that DexCom filed a premarket approval application with the Food and Drug Administration (the "FDA") in March 2005, seeking approval to sell its product. (Compl. P 12.) The complaint further states that DexCom expects FDA approval by the second quarter of 2006. [2] (Id. P 15.) In Count I, Abbott seeks declaratory relief in the form of a judicial declaration that DexCom's product will infringe one or more claims of each of the patents-in-suit. (Id. P 25.)

> 2    As previously mentioned, Abbott filed its complaint on August 11, 2005. The FDA subsequently approved DexCom's glucose monitoring product, in March 2006.

Further, Abbott alleges that, prior to filing its premarket approval application with the FDA, DexCom attended two "trade shows" where it publicized and displayed its glucose monitoring product. (Compl. P 16.) The complaint alleges that the products DexCom [*5] displayed at the trade shows were manufactured for the purpose of showcasing rather than for gathering information for submission to the FDA. (Id. P 17.) Abbott alleges that DexCom's manufacture and display of its product constitutes an act of patent infringement. (Id. P 28.)

On August 31, 2005, DexCom filed a motion to dismiss Abbott's complaint for lack of subject matter jurisdiction and failure to state a claim. Additionally, on February 22, 2006, DexCom filed a motion to stay the litigation pending reexamination of the patents-in-suit. On June 27, 2006, Abbott filed an amended complaint, which alleges further infringing acts on the part of DexCom and adds several patents to the suit. On July 12, 2006, DexCom filed a motion to strike the "amended complaint" and renewed motion to dismiss.

## III. DISCUSSION

### A. Motion to Dismiss for Lack of Subject Matter Jurisdiction

Dexcom first contends that the court should dismiss Abbott's declaratory judgment claim because there is currently no "accused device" to compare against the claims of the patents-in-suit and, therefore, Abbott's claim is premature. In other words, DexCom contends the court lacks subject matter jurisdiction [*6] over Count I of Abbott's Complaint.

A motion to dismiss under *Rule 12(b)(1) of the Federal Rules of Civil Procedure* contests the jurisdiction of the Court to address the merits of a plaintiff's complaint.

Such a challenge may present either a facial or a factual contest to subject matter jurisdiction. *See Mortensen v. First Fed. Sav. and Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)*. When asserting a facial challenge, a defendant contends that the complaint alleges facts that, even if true, would be insufficient to establish the Court's jurisdiction. *Gould Elecs. Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000)*. The present motion presents a facial challenge to the complaint because the jurisdictional facts are not in dispute. Such a motion requires the court to consider the allegations of the complaint as true and to make all reasonable inferences in the plaintiff's favor. *See id.* Additionally, the court must test the existence of jurisdiction as of the time the complaint was filed. *Lang v. Pacific Marine and Supply Co., 895 F.2d 761, 764 (Fed. Cir. 1990)*.

The Declaratory Judgment Act (the "Act") provides that "[i]n [*7] a case of actual controversy . . . [a court of competent jurisdiction] may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." *28 U.S.C. § 2201(a)*. Thus, before a court may exercise jurisdiction over a declaratory judgment action, the Act requires an "actual controversy between the parties." *Medimmune, Inc. v. Centocor, Inc., 409 F.3d 1376, 1378-79 (Fed. Cir. 2005)* (citing *Teva Pharms. USA, Inc. v. Pfizer, Inc., 395 F.3d 1324, 1331 (Fed. Cir. 2005)*). "If the controversy requirement is met by a sufficient allegation of immediacy and reality . . . a patentee [is able] to seek a declaration of infringement against a future infringer . . . [just as] a future infringer is able to maintain a declaratory judgment action of noninfringement under the same circumstances." *Telectronics Pacing Sys., Inc. v. Ventritrex, Inc., 982 F.2d 1520, 1526 (Fed. Cir. 1992)* (citing *Lang, 895 F.2d at 764*).

However, a district court does not have jurisdiction to hear the action when there is no actual controversy. *Spectronics Corp. v. H.B. Fuller Co., 940 F.2d 631, 634 (Fed. Cir. 1991)*, [*8] *cert. denied, 502 U.S. 1013, 112 S. Ct. 658, 116 L. Ed. 2d 749 (1991)*. Moreover, "even assuming [the existence of] an actual controversy, the exercise of a court's jurisdiction over a declaratory judgment action is discretionary." *Telectronics, 982 F.2d at 1526* (citations omitted).

Two elements must be present in order to meet the controversy requirement in a declaratory judgment action brought by a patentee against an alleged future infringer: (1) the defendant must be engaged in an activity directed toward making, selling, or using subject to an infringement charge under *35 U.S.C. § 271(a)*, or be making meaningful preparation for such activity; and (2) acts of the defendant must indicate a refusal to change the course of its actions in the face of acts by the patentee sufficient to create a reasonable apprehension that a suit

will be forthcoming. *Lang, 895 F.2d at 764.* In addition, the declaratory judgment plaintiff bears the burden of proving the existence of facts underlying its allegations of the existence of an actual controversy. *Jervis B. Webb Co. v. S. Sys., Inc., 742 F.2d 1388, 1399 (Fed. Cir. 1984).*

Applying the [*9] above-discussed elements to the present case, it is clear to the court from the record before it that Abbott's complaint did not present an actual controversy under the Act at the time it was filed. That is, Abbott has not demonstrated that DexCom produced or has prepared to produce a product that would be subject to an infringement charge under *35 U.S.C. § 271.* At the time Abbott filed its complaint, the FDA had not approved DexCom's product and Abbott could not predict when, or if, the FDA would approve the product. Indeed, Abbott states as much in its complaint, alleging that "DexCom . . . *expects* FDA approval for marketing by the second quarter of 2006. . . ." (Compl. P 15) (emphasis added). [3] Additionally, Abbott did not, and could not, allege with any certainty that "the device when approved would be the same device that began clinical trials[,]" as "product changes during testing are contemplated by statute, *21 U.S.C. § 360j(g)(2)(C)(iii) (1988)."* *Telectronics, 982 F.2d at 1527.* Most important, Abbott did not allege nor does it now contend that DexCom has distributed sales literature, prepared to solicit [*10] orders, or engaged in any sales or marketing activity with regard to its glucose monitoring product. *See Lang, 895 F.2d at 765; Benitec Australia Ltd. v. Nucleonics, Inc.,* Civil Action No. 04-0174 JJF, 2005 U.S. Dist. LEXIS 22008, at *9 (D. Del. Sept. 29, 2005); *Interdigital Tech. Corp. v. OKI Am., Inc., 845 F. Supp. 276, 284 (E.D. Pa. 1994)* ("Activity directed towards advertising or marketing the accused device is particularly important to a finding of a justiciable controversy.") Therefore, the court concludes that no controversy of sufficient immediacy and reality existed, at the time Abbott filed its complaint, to support declaratory judgment jurisdiction in the present case. As such, the court will dismiss Count I of Abbott's complaint.

> 3   The court agrees with the argument Abbott makes in its answering brief, namely that FDA approval is not the standard by which it should evaluate whether an actual controversy existed at the time the complaint was filed. However, the court finds that the absence of FDA approval is evidence that the dispute between the parties is neither real nor immediate.

[*11] **B. Motion to Strike Abbott's "Amended Complaint"**

DexCom next argues that the court should strike the "Amended Complaint" because Abbott failed to seek leave of court to file what correctly should be termed a "supplemental pleading." Conversely, Abbott asserts that it properly amended its complaint under *Federal Rule of Civil Procedure 15(a)* to allege additional acts of infringement that occurred prior to and after it filed the initial complaint. The court is unpersuaded by Abbott's argument and will, therefore, strike its "Amended Complaint."

As Abbott points out in its briefing, "[a]n amended pleading generally is a modification to incorporate events that were unknown but occurred *prior* to the filing of the original pleading." (D.I. 66, at 7) (emphasis added) (citing 3 James Wm. Moore et al., *Moore's Federal Practice § 15.02* (3d ed. 1999)). On the other hand, "a supplemental pleading refers to additions to include transactions or occurrences that take place *after* the filing of the original pleading." (D.I. 66, at 7.) By Abbott's own words, it amended its complaint "to allege additional acts of infringement that occurred prior to and *after*" its initial complaint. [*12] (Id.) Because Abbott's "Amended Complaint" contains allegations regarding events that occurred after August 11, 2005 -- the filing date of the original complaint -- it is governed by *Federal Rule of Civil Procedure 15(d).* Pursuant to Rule 15(d), "[u]pon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit the party to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented. *Fed. R. Civ. P. 15(d); see GAF Bldg. Materials Corp. v. Elk Corp. of Dallas, 90 F.3d 479, 483 (Fed. Cir. 1996)* (holding that district court did not abuse its discretion when "adhering to the motion requirement of *Rule 15"*); *Bronson v. Horn,* Civil Action No. 02-663, 2006 U.S. Dist. LEXIS 38791, at *5 (W.D. Pa. June 12, 2006) (dismissing supplemental complaint because it was not filed pursuant to a motion). Accordingly, because Abbott did not file a motion to supplement its complaint in the present case, the court will strike it from the docket for failure to comply with *Rule 15(d).*

**C. Motion to Dismiss for Failure to State a Claim**

[*13] Finally, with respect to dismissal, DexCom contends that Count II of Abbott's complaint fails to state a claim for which relief can be granted. According to DexCom, its display of glucose monitoring products at two scientific conferences is exempt under *35 U.S.C. § 271(e)(1).* [4] Therefore, DexCom argues that Abbott has failed to state a claim for patent infringement.

> 4   *Section 271(e)(1)* states, in pertinent part:

Case 1:07-cv-00226-JJF   Document 29   Filed 08/28/2007   Page 7 of 33

Page 4
2006 U.S. Dist. LEXIS 57469, *

It shall not be an act of infringement to make, use, offer to sell, or sell within the United States or import into the United States a patented invention . . . solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs or veterinary biological products.

*35 U.S.C. 271(e)(1)*.

The purpose of a motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)* is to test the sufficiency of a complaint, not to resolve disputed facts or decide [*14] the merits of the case. *See Kost v. Kozakiewicz, 1 F.3d 183 (3d Cir. 1993)*. Thus, in deciding a motion to dismiss, the factual allegations of the complaint must be accepted as true. *See Graves v. Lowery, 117 F.3d 723, 726 (3d Cir. 1997); Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996)*. In particular, the court looks to "whether sufficient facts are pleaded to determine that the complaint is not frivolous, and to provide defendants with adequate notice to frame an answer." *Colburn v. Upper Darby Twp., 838 F.2d 663, 666 (3d Cir.1988)*. However, the court need not "credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3rd Cir.1997)*. A court should dismiss a complaint "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *See Graves, 117 F.3d at 726; Nami, 82 F.3d at 65* (both citing *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957))*. Thus, in order to prevail, a moving party must show "beyond [*15] doubt that the plaintiff can prove no set of facts in support of his claim [that] would entitle him to relief." *Conley, 355 U.S. at 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957))*.

After having reviewed Abbott's complaint, the parties' submissions and relevant case law, the court concludes that DexCom cannot show that "beyond doubt" there exists "no set of facts" in support of Abbott's patent infringement claim. The language of *section 271(e)(1)* exempts potentially infringing activities "if performed solely for uses reasonably related to the development of information for FDA approval." *Telectronics, 982 F.2d at 1523*. Here, Abbott's complaint alleges that "[u]pon information and belief, the [DexCom] products displayed at the [two] trade shows were manufactured for the purpose of showcasing at the trade shows rather than for the purpose of gathering information." (Compl. P 17.) Ab-

bott's complaint, therefore, alleges that DexCom's manufacture and display of products at scientific conferences or trade shows falls outside the safe harbor of *section 271(e)(1)*. Based upon this allegation, and viewing the complaint in the light most favorable to Abbott, the court is unwilling to conclude [*16] at this juncture that no relief could be granted under any set of facts that Abbott could prove consistent with its patent infringement allegations. [5] Therefore, the court will deny DexCom's motion to dismiss Count II of the complaint.

    5 DexCom contends that the facts of the present case are on "all fours" with the facts of *Telectronics*. The court, however, finds that DexCom's reliance on *Telectronics* is misplaced because, in *Telectronics*, the Federal Circuit reviewed a district court's grant of summary judgment for the defendant, whereas here the court must decide a motion to dismiss. As DexCom well knows, the standard for granting a motion to dismiss is markedly different from the summary judgment standard. When deciding a *Rule 56* motion, the court reviews "the pleadings, depositions, answers to interrogatories, and admissions on file, together with [any] affidavits," to determine whether "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)* (emphasis added). In contrast, when deciding a motion to dismiss, the scope of the court's review is limited to the complaint. *See Pryor v. NCAA, 288 F.3d 548, 560 (3d Cir. 2002)* ("As a general rule, the court may only consider the pleading that is attacked by an *FRCP 12(b)(6)* motion in determining its sufficiency.") Therefore, *Telectronics* is distinguishable in that the court made its determination after reviewing a more complete record than that which the court is permitted to review here. That is not to say that DexCom could not successfully attack Abbott's claim at a later stage of these proceedings. For example if, through discovery, DexCom adduces facts indicating that its conduct at the scientific conferences or trade shows falls within the *section 271(e)(1)* safe harbor, the court will likely entertain a motion for summary judgment at the appropriate time.

### [*17] D. Motion to Stay

DexCom has also filed a motion to stay the litigation pending reexamination of the patents-in-suit by the Patent and Trademark Office (the "PTO"). The decision to stay a case is firmly within the discretion of the court. *See Cost Bros., Inc. v. Travelers Indem. Co., 760 F.2d 58, 60 (3d Cir. 1985)*. This authority applies equally to patent cases in which a reexamination by the PTO has

been requested. *Ethicon, Inc. v. Quigg, 849 F.2d 1422, 1426-27 (Fed. Cir. 1988)* (noting that "[c]ourts have inherent power to manage their dockets and stay proceedings, including the authority to order a stay pending conclusion of a PTO reexamination.") (internal citations omitted). In determining whether a stay is appropriate, the court's discretion is guided by the following factors: "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set." *Xerox Corp. v. 3Com Corp., 69 F. Supp. 2d 404, 406 (W.D.N.Y. 1999)* (citing cases); *cf. United Sweetener USA, Inc. v. Nutrasweet Co., 766 F. Supp. 212, 217 (D. Del. 1991)* [*18] (stating a similar test).

In opposing DexCom's motion, Abbott maintains that a stay would prevent it from seeking a preliminary injunction and enforcing its patent rights, thereby unduly prejudicing it and presenting it with a clear tactical disadvantage in the marketplace. The court is not persuaded. First, Abbott's argument is premised on its filing of a motion for preliminary injunction. Abbott, however, did not, and has not, filed any such motion, even though the FDA has recently approved DexCom's glucose monitoring product for marketing. Because Abbott has not filed a motion for preliminary injunction, its arguments relating to the court's rendering of an opinion on such a motion are moot. As such, the only other argument Abbott asserts with respect to undue prejudice is that it will be unable to enforce its patents while in reexamination. Abbott's position, however, assumes that the PTO will leave all of the more than 200 claims of the four patents-in-suit unaltered after reexamination. See *Applera Corp. v. Thermo Electron Corp.,* No. C.A. 04-1230 GMS, (D. Del. Dec. 28, 2005) (04-1230 D.I. 81 P 6). Further, while Abbott may suffer some prejudice from a stay, the court is [*19] not persuaded that a stay would *unduly* prejudice Abbott, or present any clear tactical disadvantage. Accordingly, the first factor militates in favor of granting the requested stay.

With respect to the second factor, Abbott argues that a stay will not simplify the issues, but prolong the litigation. According to Abbott, the only way to avoid prolonging the litigation would be if the reexamination resulted in the PTO invalidating all of the asserted claims of all of the patents-in-suit. The court cannot agree. Contrary to Abbott's position, the court finds that granting the stay will simplify the issues and focus the litigation. For example, if the PTO determines that some or all of the claims of the of the four patents undergoing reexamination are invalid, then many of the issues in the litigation will become moot. Additionally, it is beyond dispute that the court, as well as the parties, would benefit from a

narrowing of the variety of complex issues relating to the numerous claims at issue, which, if clearly defined, would streamline the discovery process and the remainder of the litigation. A stay, therefore, will conserve the resources of the parties and the court, thereby [*20] promoting efficiency. Moreover, the court would not run the risk of inconsistent rulings or issuing advisory opinions. See *Gioello Enters. Ltd. v. Mattel, Inc.,* No. C.A. 99-375 GMS, 2001 WL 125340, at *1 (D. Del. Jan. 29, 2001). The second factor, therefore, weighs in favor of granting the motion to stay.

Finally, the court finds that the third factor it must consider in its determination, i.e. whether discovery is complete and whether a trial date has been set, weighs in favor of granting the motion. In the present case, fact discovery is not scheduled to close until January 31, 2007 and, although already set, the trial is not scheduled to begin until October 9, 2007. [6] Thus, given its findings with respect to the first two factors, the court concludes that the balance of harms weighs in favor of granting a stay of this action. Accordingly, the court will grant DexCom's motion to stay.

6    See Amended Scheduling Order, D.I. 71 PP 2, 8.

Dated: August 16, 2006

/s/ Gregory M. Sleet

UNITED STATES DISTRICT [*21] JUDGE

**ORDER**

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. The defendant's Motion to Dismiss Abbott's Complaint (D.I. 5) is GRANTED in part and DENIED in part. The motion is GRANTED with respect to Count I of Abbott's complaint and DENIED with respect to Count II of Abbott's complaint.

2. The court shall dismiss Count I of Abbott's complaint without prejudice.

3. The plaintiff's Motion For Limited Jurisdictional Discovery and for a Corresponding Extension of the Briefing Schedule on DexCom's Motion to Dismiss (D.I. 9) is DENIED as moot.

4. The defendant's Motion to Strike the "Amended Complaint" and Renewed Motion to Dismiss Abbott's Complaint (D.I. 61) is GRANTED in part and DENIED in part. The motion to strike the

2006 U.S. Dist. LEXIS 57469, *

"amended complaint" is GRANTED and the renewed motion to dismiss is DENIED as moot.

5. The plaintiff's Amended Complaint (D.I. 55) shall be stricken from the court's docket.

6. The defendant's Motion to Stay Pending Reexamination of the Patents-in-suit (D.I. 25) is GRANTED.

Dated: August 16, 2006

/s/ Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

**B**

LEXSEE 2003 U.S. DIST. LEXIS 11917

**ALLOC, INC., a Delaware corporation, et al., Plaintiffs, v. UNILIN DECOR N.V., a Belgian company, et al., Defendants.**

**Civil Action No. 03-253-GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2003 U.S. Dist. LEXIS 11917*

**July 11, 2003, Decided**

**SUBSEQUENT HISTORY:** Motion granted by, Transferred by *Alloc, Inc. v. Unilin Decor N.V., 2006 U.S. Dist. LEXIS 78019 (D. Del., Oct. 26, 2006)*

**DISPOSITION:**    [*1] Defendants' motion to stay litigation granted. Plaintiffs' motion to strike portions of answer and complaint dismissed, without prejudice.

**COUNSEL:** For Alloc Inc, Berry Finance NV, Valinge Aluminium AB, PLAINTIFFS: Francis Digiovanni, Connolly, Bove, Lodge & Hutz, Wilmington, DE USA.

For Unilin Decor NV, Quick-Step Flooring Inc, DEFENDANTS: Richard L Horwitz, David Ellis Moore, Potter Anderson & Corroon, LLP, Wilmington, DE USA.

For Unilin Decor NV, COUNTER-CLAIMANT: Richard L Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE USA.

For Unilin Decor NV, Quick-Step Flooring Inc, COUNTER-CLAIMANTS: David Ellis Moore, Potter Anderson & Corroon, LLP, Wilmington, DE USA.

For Alloc Inc, Berry Finance NV, Valinge Aluminium AB, COUNTER-DEFENDANTS: Francis Digiovanni, Connolly, Bove, Lodge & Hutz, Wilmington, DE USA.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION**

**MEMORANDUM AND ORDER**

**I. INTRODUCTION**

On March 5, 2003, Alloc, Inc. ("Alloc"), Berry Finance N.V. ("Berry"), and Valinge [*2] Aluminum AB, ("Valinge") (collectively "the plaintiffs") filed a complaint against Unilin Decor, N.V. ("Unilin") and Quick-Step Flooring, Inc. ("Quick-Step") (collectively "the defendants") alleging infringement of *U.S. Patent No. 6,516,579* ("the '579 patent"). The '579 patent is the latest in a series of continuation patents that include *U.S. Patent Nos. 5,706,621* ("the *'621 patent*"), 5,860,267 ("the '267 patent"), 6,023,907 ("the '907 patent"), and 6,182,410 ("the '410 patent").

The '621 patent is currently undergoing reexamination in the United States Patent and Trademark Office ("PTO"). Additionally, the Federal Circuit is considering infringement issues with regard to the '267, '907, and '410 patents after the International Trade Commission ("ITC") rendered a non-infringement decision in favor of Unilin and against the plaintiffs.

Presently before the court is the defendant's motion to stay litigation of the '579 patent pending the completion of both the '621 reexamination proceedings and the Federal Circuit's decision on the '267, '907, and '410 patents. After consideration of each of the factors involved, and for the reasons detailed below, the court will grant the motion [*3] to stay.

**II. BACKGROUND**

The parties involved in the present action have attempted to resolve their patent infringement issues in many different forums, both in the United States and in Europe. Specifically, in July 2000, Pergo Inc. ("Pergo"), Unilin's licensee, brought a declaratory action in the District of Columbia with regard to the '267, '907, and '621 patents in response to the plaintiffs' threats of infringement litigation. Pergo additionally filed a request for reexamination of the '621 patent in the PTO. This reexamination is currently ongoing. The plaintiffs subse-

Case 1:07-cv-00226-JJF    Document 29    Filed 08/28/2007    Page 12 of 33

Page 2
2003 U.S. Dist. LEXIS 11917, *

quently filed a complaint in the Eastern District of Wisconsin asserting that Pergo and Unilin infringed the '267 and '907 patents. In response, Unilin filed its own declaratory judgment action in the District of Columbia, alleging that its product did not infringe the '267, '907, and '621 patents.

In December 2000, the plaintiffs initiated a proceeding in the ITC asserting that Unilin infringed the '267, '907, and '410 patents. Upon the filing of the ITC action, all of the district court actions between the two parties concerning the alleged infringement of the '267, '907, and '410 patents were stayed [*4] pursuant to 28 U.S.C. § 1659. In November 2001, an ITC Administrative Law Judge ("ALJ") issued a decision finding that Unilin did not infringe the '267, '907, or '410 patents. The ITC affirmed the ALJ's decision in April 2002. The plaintiffs then appealed to the Federal Circuit, which heard oral argument on that case in March 2003. No decision has yet issued.

In the present case, the '579 patent is the only patent in dispute. However, as the court noted above, it is the latest of the continuation patents that stem from the original '621 patent. The '579 patent has never been reviewed by the PTO, the ITC, or any other court.

## III. DISCUSSION

The decision to stay a case is firmly within the discretion of the court. See Cost Bros., Inc. v. Travelers Indem. Co., 760 F.2d 58, 60 (3d Cir. 1985). This authority applies equally to patent cases in which a reexamination by the PTO has been requested. Ethicon, Inc. v. Quigg, 849 F.2d 1422, 1426-27 (Fed. Cir. 1988) (noting that "courts have inherent power to manage their dockets and stay proceedings, including the authority to order a stay pending conclusion of a PTO reexamination. [*5] ") (internal citations omitted); see also Emhart Indus. v. Sankyo Seiki Mfg., 1987 U.S. Dist. LEXIS 15033, 3 U.S.P.Q.2d 1889, 1890 (N.D. Ill. 1987) (recognizing that, "in passing legislation establishing the reexamination proceeding, Congress stated its approval of district courts liberally granting stays within their discretion."); Gould v. Control Laser Corp., 705 F.2d 1340, 1342 (Fed. Cir. 1983) (citing legislative history of reexamination statute).

In determining whether a stay is appropriate, courts are directed to consider the following factors: "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set." Xerox Corp. v. 3 Comm Corp., 69 F. Supp.2d 404, 406 (W.D.N.Y. 1999) (citing cases); cf. United Sweetner USA, Inc. v. Nu-

trasweet Co., 766 F. Supp. 212, 217 (D. Del. 1991) (stating a similar test).

In opposition to the defendants' motion to stay, the plaintiffs first argue that, since the '579 patent itself is not at issue [*6] in the reexamination proceedings, or in the Federal Circuit appeal, there is no need to stay the case before this court. See D.I. 21 at 7. The court must disagree because the plaintiffs cannot credibly argue that the patents are not alike in subject matter, as well as in many of their claims. This is so because, in general, "a continuing application is one filed during the pendency of another application which contains at least part of the disclosure of the other application and names at least one inventor in common with that application." Transco Products, Inc. v. Performance Contracting, Inc., 38 F.3d 551, 555 (Fed. Cir. 1994). Thus, a continuation application "claims the same invention claimed in an earlier application, although there may be some variation in the scope of the subject matter claimed." Id. Indeed, the plaintiffs themselves admit that the patents in question do have some terms in common. See D.I. 21 at 10. Therefore, even though the '579 patent does not contain precisely the same claims of the other patents that are under review or reexamination, there is a sufficient correlation among all of the patents for the court to conclude that a [*7] stay is appropriate.

Additionally, with regard to the issue of efficiency, it is beyond dispute that the court would benefit from a narrowing of the numerous complex issues relating to claims, which, if clearly defined, would streamline discovery and subsequent litigation. To this end, the reexamination of the '621 patent will greatly serve the purpose of defining the issues in this case. For example, the court will gain the benefit of the PTO's particular expertise in evaluating the prior art. See Pegasus Development Corp. v. DirecTV, Inc., 2003 U.S. Dist. LEXIS 8052, 2003 WL 21105073, *2 (D. Del. May 14, 2003) (citations omitted). Likewise, the court will also benefit from the reexamination process in that (1) many discovery issues relating to prior art may be alleviated; (2) the record of the reexamination likely would be entered at trial; (3) the issues, defenses, and evidence will be more easily limited in pre-trial conferences following a reexamination; and (4) the outcome of the reexamination process may encourage a settlement without further involvement of the court. Id. (citations omitted). Such a refinement of the issues will benefit both parties by reducing litigation costs. [*8] See id. This approach will also best conserve the court's scarce resources. See id. Similar benefits will likewise flow from the Federal Circuit's analysis of the '267, '907, and '410 patents.

The plaintiffs alternatively contend that the motion is premature because the two proceedings that have a potential impact on this case may be decided well before

2003 U.S. Dist. LEXIS 11917, *

this case reaches the claim interpretation stage. *See* D.I. 21 at 5. However, if the decisions of the PTO and Federal Circuit are imminent, as the plaintiffs suggest, a stay at this time would not unduly burden their case as the stay would then be of short duration.

Finally, the court notes that discovery in this case has not yet begun, nor has a discovery schedule been entered at this time. Likewise, the court has not yet set a trial date. Therefore, the stay will be entered before any party incurs substantial litigation-related expenses.

## IV. CONCLUSION

In light of the above considerations, the court concludes that a stay at this point in the case would not unduly prejudice the plaintiffs or create for them a clear tactical disadvantage. Indeed, a stay will allow the issues before the court to be further simplified [*9] and defined to the benefit of the parties, as well as the court.

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. The Defendants' Motion to Stay Pending the Reexamination by the U.S. Patent and Trademark Office and Ruling by the United States Court of Appeals for the Federal Circuit (D.I. 15) is GRANTED.

2. The parties shall advise the court of any decision that results from the PTO's reexamination of the '621 patent and any decision that results from the Federal Circuit's consideration of the '267, '907, and '410 patents within thirty (30) days of the date of each decision.

3. The Plaintiffs' Motion to Strike Portions of the Answer and Complaint (D.I. 11) is DISMISSED, without prejudice, and with leave to re-file should it become necessary following the stay.

Dated: July 11, 2003

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

C

LEXSEE 1997 U.S. DIST. LEXIS 2372

**BRAINTREE LABORATORIES, INC., Plaintiff, v. NEPHRO-TECH, INC., et al., Defendants.**

**Case No. 96-2459-JWL**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS**

*1997 U.S. Dist. LEXIS 2372*

**February 26, 1997, Decided**
**February 26, 1997, FILED; February 27, 1997, ENTERED ON THE DOCKET**

**DISPOSITION:**  [*1] Defendants' motions granted.

**COUNSEL:** For BRAINTREE LABORATORIES, INC., plaintiff: Craig T. Kenworthy, Allen R. Slater, Swanson, Midgley, Gangwere, Kitchin & McLarney, LLC, Overland Park, KS. Arthur A Smith, Jr, Roche, Carens & DeGiacomo, P.C., Boston, MA.

For NEPHRO-TECH, INC., defendant: Mark E. Brown, Litman, McMahon & Brown, Kansas City, MO. Steven H. Mustoe, Kurlbaum, Stoll, Seaman, Reefer, Suter & Mustoe, P.C., Kansas City, MO. For G P GEORGES, III, defendant: Mark E. Brown, (See above). Steven H. Mustoe, (See above). For KIMBERLY J GEORGES, defendant: Mark E. Brown, (See above). Steven H. Mustoe, (See above).

**JUDGES:** John W. Lungstrum, United States District Judge

**OPINION BY:** John W. Lungstrum

**OPINION**

**MEMORANDUM AND ORDER**

This matter is presently before the court on defendants' motion to dismiss plaintiff's Lanham Act and common law unfair competition claims (Doc. 7) and defendants' motion to stay further judicial proceedings in this action (Doc. 9). The court concludes that plaintiff's Lanham Act and common law claims merely allege violations of the federal Food, Drug, and Cosmetic Act (FDCA), *21 U.S.C. §§ 301-395*, which does not allow for a private right of action; the court therefore [*2] grants the motion to dismiss Count II and Count III. The court also grants the motion to stay proceedings to allow reex-

amination of plaintiff's patent, the infringement of which plaintiff alleges in Count I of its complaint. [1]

1 The court concludes, in its discretion, that oral argument is not necessary with respect to these motions. *See* D. Kan. Rule 7.2.

**I. Background**

[2]

2 The facts relevant to the motion to dismiss are derived solely from the complaint.

Plaintiff Braintree Laboratories, Inc. is a Massachusetts corporation. Plaintiff holds *United States Patent No. 4,870,105*, entitled "Phosphorous Binder", issued on September 26, 1989. According to plaintiff's complaint, the patent "claims methods, using calcium acetate, for inhibiting gastrointestinal absorption of phosphorous in an individual."

Plaintiff markets a drug called [*3] Phos-Lo, which implements plaintiff's patented method in the treatment of kidney dialysis patients, who have end-stage renal disease. The calcium acetate in the drug is intended to facilitate the excretion of phosphorous contained in food, a task normally performed by the kidneys. The federal Food and Drug Administration (FDA) approved plaintiff's drug on December 10, 1990, under the FDCA. The FDA also designated the drug an "orphan drug", i.e., a drug for a rare disease or condition, under *21 U.S.C. § 360bb* and accompanying regulations, thereby precluding the FDA from approving similar drugs for a period of seven years.

Defendant Nephro-Tech, Inc. is a Kansas corporation, owned by defendants G.P. and Kimberly Georges. Defendants market a product called Calphron, which uses calcium acetate as a phosphorous binder. The FDA

Case 1:07-cv-00226-JJF    Document 29    Filed 08/28/2007    Page 16 of 33

Page 2
1997 U.S. Dist. LEXIS 2372, *

has not approved the product for marketing as a drug. Calphron is labeled as a "dietary supplement".

In Count I of its complaint, plaintiff alleges that defendants, by marketing Calphron, have infringed its patent, in violation of 35 U.S.C. § 271. On December 13, 1996, defendants filed a request for reexamination of plaintiff's patent by the United States Patent [*4] and Trademark Office (PTO), in accordance with 35 U.S.C. §§ 301-307. Defendants have moved for a stay of judicial proceedings in this action to allow for the resolution of its request with the PTO.

In Count II, plaintiff alleges common law unfair competition by defendants. Specifically, plaintiff's complaint alleges as follows:

> 16. Defendants have violated the U.S. Food, Drug and Cosmetic Act by introducing their drug, CALPHRON, into interstate commerce without submitting its [sic] product to the FDA for its required review authority and approval and without obtaining the statutorily required authority therefor and have, therefore, violated Plaintiff's property rights to seven years exclusivity under the Orphan Drug Act.

> 17. Defendants have intentionally interfered with Plaintiff's contractual and business relations with doctors, patients and others by unlawfully supplying thereto said unauthorized drug in competition with Plaintiff and in violation of Plaintiff's seven-year market exclusivity.

> 18. Defendants' unlawful introduction of their unauthorized drug into interstate commerce constitutes unfair competition, defeats Plaintiff's entitlement to market exclusivity, damages [*5] the market for Plaintiff's patented invention and damages Plaintiff's ability to fairly compete, although it has the only legally required authorization.

In Count III, plaintiff alleges a violation of section 43(a) of the Lanham Act:

> 20. Defendants advertise their CALPHRON product as a "dietary supplement".

> 21. CALPHRON is not a dietary supplement, has not been so allowed by the

FDA and such a claim misbrands the product.

> 22. Defendants, in connection with CALPHRON and/or containers for CALPHRON, are using in commerce false and misleading descriptions and representations of fact which are in commercial advertising and/or promotion and which misrepresent the nature, characteristics and qualities of their CALPHRON product all in violation of 15 U.S.C. 1125(a). Plaintiff is or is likely to be damaged by such acts.

## II. Motion to Dismiss

> 3  Both parties have included exhibits with their briefs. The court concludes that it is more appropriate in this instance to exclude those documents than to convert defendants' motion to one for summary judgment. See Fed. R. Civ. P. 8(b). Accordingly, the court has not considered the parties' submissions in resolving the motion.

### [*6] A. Standard

A court may not dismiss a cause of action for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his theory of recovery that would entitle him or her to relief. Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence, 927 F.2d 1111, 1115 (10th Cir. 1991). The pleadings are liberally construed, and all reasonable inferences are viewed in favor of the plaintiff. Fed. R. Civ. P. 8(a); Lafoy v. HMO Colorado, 988 F.2d 97, 98 (10th Cir. 1993). All well-pleaded facts, as distinguished from conclusory allegations, must be taken as true. Jojola v. Chavez, 55 F.3d 488, 494 n.8 (10th Cir. 1995) (citing Swanson v. Bixler, 750 F.2d 810, 813 (10th Cir. 1984)). The issue in resolving a motion such as this is not whether the plaintiff will ultimately prevail, but whether he or she is entitled to offer evidence to support the claims. Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974).

### B. Count III -- Lanham Act Claim

Plaintiff contends that the "dietary supplement" designation on defendants' [*7] product constitutes a false or misleading description in violation of section 43(a) of

1997 U.S. Dist. LEXIS 2372, *

the Lanham Act. See *15 U.S.C. § 1125(a).* [4] Defendants argue that this claim may not stand because it merely alleges a violation of the FDCA, for which no private right of action exists.

> 4  In its brief, plaintiff also suggests that defendants have violated the Lanham Act by including a National Drug Code listing number on their product and by promoting Calphron as an equal substitute for plaintiff's drug. Plaintiff has not sought to amend its complaint to include such claims, however. Thus, the court addresses the motion to dismiss within the contours of the original complaint.

The FDCA contains the following provision:

> (a) Except as provided in subsection (b) of this section [relating to suits brought by states], all such proceedings for the enforcement, or to restrain violations, of [the FDCA] shall be by and in the name of the United States.

*21 U.S.C. § 337(a).* Although the Tenth Circuit has not considered [*8] the effect of *section 337(a),* every federal court that has addressed the question has held that the FDCA does not create a private right of action to enforce or restrain violations of its provisions. *Bailey v. Johnson, 48 F.3d 965, 967 (6th Cir. 1995); see PDK Labs, Inc. v. Friedlander, 103 F.3d 1105 (2d Cir. 1997); Gile v. Optical Radiation Corp., 22 F.3d 540 (3d Cir.), cert. denied, 130 L. Ed. 2d 342, 115 S. Ct. 429 (1994); Mylan Labs., Inc. v. Matkari, 7 F.3d 1130 (4th Cir. 1993), cert. denied, 510 U.S. 1197 (1994); Pacific Trading Co. v. Wilson & Co., 547 F.2d 367 (7th Cir. 1976).* [5]

> 5  In *Merrell Dow Pharmaceuticals Inc. v. Thompson, 478 U.S. 804, 92 L. Ed. 2d 650, 106 S. Ct. 3229 (1986),* the parties agreed with the lower court's ruling that no federal private cause of action existed for FDCA violations; the Supreme Court therefore assumed that ruling to be correct for purposes of its opinion and expressly refused to consider the question. *Id.* (holding that the presence of a violation of the FDCA as an element of a state cause of action was not sufficient to confer federal question jurisdiction).

[*9] It is significant that Congress, before passing the FDCA, "considered and rejected a version which would have allowed a private right of action for damages." *Bailey, 48 F.3d at 968* (quoting *National Women's Health Network, Inc. v. A.H. Robins Co., 545 F. Supp. 1177, 1179 (D. Mass. 1980)).* If a private right of action

were recognized, "the major advantages of enforcement through the [FDA] would be lost, including expertise, ability to solicit comment from appropriate sources, direct representation of the public interest, and a unitary enforcement policy." *Id.* (quoting *National Women's Health Network, 545 F. Supp. at 1180).* The court concludes that the Tenth Circuit would agree with the analysis of its sibling circuits and hold that violations of the FDCA may not be alleged by private right of action.

Plaintiff does not bring its claims directly under the FDCA. Defendants argue, however, that plaintiff should not be allowed to use the Lanham Act or an unfair competition cause of action merely as a vehicle for the assertion of an FDCA violation. Only a few cases have addressed this issue.

In *Sandoz Pharmaceuticals Corp. v. Richardson-Vicks, Inc., 902 F.2d 222* [*10] *(3d Cir. 1990),* the plaintiff brought a Lanham Act claim, alleging that the defendant manufacturer falsely listed an ingredient as "inactive" on a cough syrup label when the FDA required that the ingredient be labeled as "active". *Id. at 230.* The defendant argued that the plaintiff had merely alleged a misbranding violation of the FDCA, for which there was no private right of action. *Id.*

The Third Circuit affirmed the district court's denial of a preliminary injunction, agreeing with the district court that the plaintiff had not shown a likelihood of success on the merits. *Id. at 232.* The court concluded that the plaintiff had not established that the labeling was false because the FDA had not found conclusively that the ingredient had to be labeled as "active" under its regulations. *Id. at 230-31.* The court stated:

> [The plaintiff's] position would require us to usurp administrative agencies' responsibility for interpreting and enforcing potentially ambiguous regulations. Jurisdiction for the regulation of OTC drug marketing is vested jointly and exhaustively in the FDA and the FTC, and is divided between them by agreement. Neither of these agencies' constituent [*11] statutes creates an express or implied private right of action, and *what the [FDCA] and the FTC Act do not create directly, the Lanham Act does not create indirectly,* at least not in cases requiring original interpretation of these Acts or their accompanying regulations.

*Id. at 231* (emphasis added) (citations omitted). The Third Circuit concluded:

Case 1:07-cv-00226-JJF    Document 29    Filed 08/28/2007    Page 18 of 33

Page 4
1997 U.S. Dist. LEXIS 2372, *

As we have explained, the issue of whether an ingredient is properly labeled "active" or "inactive" under FDA standards is not properly decided as an original matter by a district court case.

*Id. at 232.*

The Fourth Circuit touched on the subject in *Mylan Labs. v. Matkari, 7 F.3d 1130.* There the Fourth Circuit reversed the dismissal of the plaintiff's claim that the defendants had falsely represented that their product was the "bioequivalent" of plaintiff's product; the court concluded that the plaintiff had pleaded facts sufficient to support that claim under the Lanham Act. *Id. at 1138.* The court, however, upheld the dismissal of the plaintiff's claim that the defendants had falsely represented that their drugs had been approved by the FDA. *Id. at 1139.* The court noted that the complaint [*12] did not point to any affirmative representation of FDA approval, and it held that such a "fatal deficiency" could not be cured by a contention that the very marketing of the drug implied such approval:

Such a theory is, quite simply, too great a stretch under the Lanham Act. We agree with the defendants that permitting Mylan to proceed on the theory that the defendants violated § 43(a) merely by placing their drugs on the market would, in effect, permit Mylan to use the Lanham Act as a vehicle by which to enforce the Food, Drug, and Cosmetic Act ("FDCA") and the regulations promulgated thereunder. An attempt, by ingenious pleading, to escape one principle of law by making it appear that another not truly appropriate rule is applicable appears to have been attempted.

*Mylan in short, is not empowered to enforce independently the FDCA.* In order to state a proper claim for relief under . . . the Lanham Act, Mylan was required to point to *some* claim or representation that is reasonably clear form the fact of the defendants' advertising or package inserts. That it did not do.

*Id.* (first emphasis added) (citations omitted) (citing *21 U.S.C. § 337* and *Sandoz, 902 F.2d at 230*). [*13]

In *Grove Fresh Distributors, Inc. v. Flavor Fresh Foods, Inc., 720 F. Supp. 714 (N.D. Ill. 1989),* the court denied the defendants' motion to dismiss the plaintiff's

Lanham Act claim. *Id. at 716.* In *Grove Fresh*, the plaintiff alleged that, because the defendants' product contained additives and adulterants, the representation that the product was "100% orange juice from concentrate" was false. *Id.* The defendants, in seeking dismissal of this claim, argued that the plaintiff was merely attempting to recover damages for a violation of the FDCA, which prohibits the misbranding of food. *Id.* The court concluded that the defendants had mischaracterized the nature of the plaintiff's claim:

The fact that Grove Fresh refers to or relies on an FDA regulation defining orange juice to support its Lanham Act claim is not grounds for dismissal. Although courts have held that there is no private cause of action under the FDCA, Grove Fresh has not brought suit directly under the FDCA or its accompanying regulations. Grove Fresh relies on the FDA regulation merely to establish the standard or duty which defendants allegedly failed to meet. Nothing prohibits [*14] Grove Fresh from using the FDCA or its accompanying regulations in that fashion.

. . . In the instant case . . ., Grove Fresh does not base its claim solely on the FDCA or FDA regulations. Grove Fresh alleges that defendants have violated section 43(a) of the Lanham Act. Even without the FDA regulation defining "orange juice from concentrate," Grove Fresh could attempt to establish a violation of section 43(a). Grove Fresh would simply need to provide other evidence establishing the proper market definition of "orange juice from concentrate." Thus, Grove Fresh has asserted an independent basis for its claim . . . which is sufficient to sustain its cause of action under Count I.

*Id.; See Genderm Corp. v. Biozone Labs., 1992 U.S. Dist. LEXIS 13521, 1992 WL 220638 (N.D. Ill. Sept. 3, 1992)* (relying on *Grove Fresh* in determining that the plaintiff properly alleged a violation of the Lanham Act based on affirmative misrepresentations concerning the chemical make-up of certain ingredients).

In *Summit Technology, Inc. v. High-Line Medical Instruments Co. (Summit I), 922 F. Supp. 299 (C.D. Cal. 1996),* the plaintiff's Lanham Act claim concerned the defendants' failure to disclose that their ophthalmological [*15] laser systems had not been approved by the FDA.

1997 U.S. Dist. LEXIS 2372, *

*Id.* at 306. The court concluded that the plaintiff's "false and misleading advertising allegations circumvent *21 U.S.C. § 337(a)*'s denial of a private right of action to enforce violations of the FDCA." *Id.* The court noted that the FDA had not yet determined whether the defendants' systems needed approval, and it stated that allowing the plaintiff's Lanham Act claim would force the court to rule on the legality of the defendants' conduct before the FDA had had a chance to do so. *Id.* The court cited *Mylan* and *Sandoz,* and concluded that "as such, this would use the Lanham Act as a vehicle for enforcing the requirements of the FDCA." *Id.* The court distinguished *Grove Fresh*:

> Furthermore, *Grove Fresh* involved the affirmative misrepresentation of a fact-- the actual ingredients of the juice. Clearly, under both *Mylan* and *Grove Fresh,* a plaintiff may bring a Lanham Act cause of action for affirmatively misrepresenting facts, even if the truth of those facts may be governed by FDA regulations. By contrast, this case involves the failure to disclose a "fact," the truth of which is *currently* being [*16] reviewed and determined by the FDA.
>
> Therefore, because Plaintiff's Lanham Act action would essentially act as a private vehicle for enforcing FDCA and FDA regulations, it must be dismissed as to all Defendants.

*Id.* at 307 (citation omitted). The court also dismissed the plaintiff's statutory and common law unfair competition claims on this basis. *Id.* at 316.

The court had a chance to refine its analysis after the plaintiff amended its complaint. *See Summit Technology, Inc. v. High-Line Medical Instruments Co. (Summit II), 933 F. Supp. 918 (C.D. Cal. 1996).* The court in *Summit II* first reviewed its prior order, in which it held that "absent an affirmative misrepresentation that a drug had been officially *approved* by the FDA, a Lanham Act claim alleging that the defendant had failed to disclose FDA non-approval could not stand." *Id.* at 933. The court stated, however, that "false statements are actionable under the Lanham Act, even if their truth may be generally within the purview of the FDA." *Id.* The court explained further in a footnote:

> An affirmative misrepresentation that a product has "FDA approval" . . . is actionable because it clearly [*17] misstates a fact and does not require an interpretation

or application of FDA regulations. . . . [A] court can test the truth of the statement "FDA approval" without any need to interpret FDA regulations. The question will simply be whether the FDA official conferred "approval" or not.

*Id.* at 933 n.7.

The court then revisited the caselaw. The court noted that in *Mylan* the court had permitted the "bioequivalence" claim to proceed even though FDA regulations defined that term. *Id.* at 933 (citing *Mylan, 7 F.3d at 1138*). The court also noted that in *Grove Fresh,* the plaintiff's claim survived because, although FDA regulations defined "100% pure orange juice," the commercial definition could be determined "without performing an authoritative interpretation and direct application of FDA regulations." *Id.* (citing *Grove Fresh, 720 F. Supp. at 715. Sandoz,* on the other hand, involved a direct claim of misbranding, and "the matter in question was solely governed by an interpretation of FDA regulations." *Id.* at 933-34 (citing *Sandoz, 902 F.2d at 231*).

The court then considered specific representations by the defendants, which the plaintiff alleged [*18] to be false or misleading in violation of the Lanham Act. The court upheld Lanham Act claims based on representations involving whether the parties' lasers were "identical", whether the defendants' lasers had been approved by the FDA, and whether a defendant's machine was new. *Id.* at 935, 936, 940. Because the questions raised by those claims were factual and could be resolved without interpretation or application of FDA regulations, the court's inquiry did not "tread on the FDA's exclusive domain." *Id.* The court dismissed several other claims, however, based on representations involving descriptions of FDA policy and whether the FDA permitted certain importation, use, and repair of the defendants' lasers. *Id.* at 935-42. Such statements were more "nebulous" than affirmative statements of non-approval, and consideration of those statements would have required original interpretation and application of the FDCA and the regulations. *Id.* Finally, the court concluded that the plaintiff could not bring an unfair competition claim that was, in fact, an attempt to state a claim under the FDCA. *Id.* at 943 n.21.

A general framework may be gleaned from these cases. It is [*19] clear that a plaintiff may not maintain a Lanham Act claim alleging only that the defendant has failed to disclose that the FDA has not approved its product. Affirmative misrepresentations, however, are generally actionable under the Lanham Act, even if the product is regulated by the FDA. Most obviously, a false statement of FDA approval is actionable. It is also clear

that, because no private right of action exists under the FDCA, a plaintiff may not use the Lanham Act as an alternative vehicle by which to seek redress for an FDCA violation. Moreover, claims that require direct interpretation and application of the FDCA are not properly recognized because such matters are more appropriately addressed by the FDA, especially in light of Congress's intention to repose in that body the task of enforcing the FDCA. The court believes that the Tenth Circuit would embrace these general principles.

Here plaintiff has alleged that defendants have affirmatively represented that Calphron is a "dietary supplement." That term is defined in the FDCA. *See 21 U.S.C. § 321(ff)*. Defendants thus argue that plaintiff has merely alleged a misbranding violation and that such claim may not be brought [*20] because it requires application and interpretation of the FDCA definition.

Plaintiff argues that this case should be decided like *Grove Fresh*. Plaintiff contends that, like the plaintiff in *Grove Fresh*, it relies on the statutory definition only to provide a standard, which defendants failed to meet. *See 720 F. Supp. at 716*. Plaintiff argues that it has asserted an independent basis for its claim because it could establish a misrepresentation even without the FDCA definition. For instance, according to plaintiff, Calphron is not a "dietary supplement" in the ordinary sense because the calcium in the product is not intended to be absorbed.

The court concludes, however, that the present case is more analogous to *Sandoz*. There the court held that the issue of whether an ingredient was "active" or "inactive" under the regulations was more properly resolved by the FDA. 902 F.2d at 232. Similarly, it is not for this court to interpret and apply the statutory definition of "dietary supplement". In particular, the court notes that, under the FDCA, a product is misbranded if it is a "dietary supplement" under the FDCA and that term is not used on its label. *21 U.S.C. § 343(s)*. [*21] Thus, even if it were determined in litigation that Calphron did not meet some independent, lay understanding of the term "dietary supplement", defendants might not be able to remove the term from its label without violating the FDCA and risking a suit by the FDA. The possibility of such a dilemma demands that classic misbranding claims, such as the one here at issue, be reserved solely for resolution by the FDA. [6] Therefore, under the principles set forth above, plaintiff cannot maintain its Lanham Act claim, and defendants' motion to dismiss that claim is granted.

[6] The court addressed such a problem in *Summit II*. There the plaintiff alleged that a defendant had advertised a "custom" laser developed by the defendant, when it was actually an altered laser manufactured by the plaintiff. *933 F. Supp. at 941*. The court allowed the claim, even though the FDCA defined "custom". *Id. at 941*. The court concluded that the claim was "purely and unmistakably" one for "reverse palming off," specifically actionable under the Lanham Act; thus, the plaintiff could attempt to establish that the defendant was passing the laser off as his own without reference to the FDCA definition. *Id. at 941, 941 n.18*. The court noted that the defendant could avoid a "Catch-22" situation by continuing the "custom" designation but making the laser's origin clear. *Id. at 941 n.18*.

The instant situation is distinguishable. Here, plaintiff's claim, as alleged by the complaint, does not focus on Calphron's efficacy as a calcium supplement; plaintiff does not point to any other means, other than by use of the FDCA-required term "dietary supplement", by which defendants have allegedly attempted to mislead the consumer in this way. In fact, given plaintiff's allegation that defendants are invading the renal disease community with its own phosphorous binder, it is probable that the other representations on Calphron's label explain the product's intended effect. While in *Summit II*, the plaintiff's claim was, in essence, a Lanham Act claim, plaintiff's claim in the instant case is, at its heart, a misbranding claim, as evidenced by plaintiff's use of the statutory term "misbrand" in the complaint.

### [*22] C. Count II -- Common Law Claim

The same concerns that militate against allowing the Lanham Act to serve as a vehicle for alleging FDCA violations attend the use of a common law cause of action. Therefore, the same general principles discussed above govern plaintiff's common law unfair competition claim. *See Summit II, 933 F. Supp. at 943 n.21; Summit I, 922 F. Supp. at 316; National Women's Health Network, 545 F. Supp. at 1181* ("A private right of action is equally inconsistent with the federal regulatory scheme, whether the right is based in federal or state law."). [7]

[7] Thus, in this context of a claim by a competitor, the personal injury cases cited by plaintiff, in which a violation of the FDCA served as one element of a state cause of action, are inapposite.

In Count II of its complaint, plaintiff alleges that defendants have violated the FDCA by introducing Calphron into the market without seeking FDA approval and that such "unlawful introduction of their unauthorized drug into interstate [*23] commerce constitutes unfair competition, defeats Plaintiff's entitlement to market exclusivity," and causes damages. The crux of this count is defendants' failure to receive FDA approval under the

1997 U.S. Dist. LEXIS 2372, *

FDCA. Thus, plaintiff's claim is unmistakably one for direct enforcement of the FDCA, for which no private right of action exists, either under that statute or the common law.

In its brief, plaintiff argues that it is attempting by this claim to vindicate a property right, namely, its seven-year exclusivity with respect to its "orphan drug". Even if the court were to interpret Count II of plaintiff's complaint to assert such a claim independent of the non-approval charge previously discussed, such claim would fail. The FDCA does not speak of "exclusive rights"; it merely provides that if the FDA approves a drug and designates it an "orphan drug", it may not approve another such drug for seven years. *21 U.S.C. § 360cc(a)*. Plaintiff cannot support a direct violation of the exclusivity provision because plaintiff has not alleged that the FDA wrongfully approved Calphron. Even if the statute created some sort of property interest, plaintiff, in asserting a violation of that interest by defendants, [*24] would have to show that Calphron is a "drug" and therefore subject to the provision. Such a claim would require direct interpretation and application of the FDCA and therefore may not be brought by private civil action. Finally, plaintiff has not cited to any cases recognizing the "orphan drug" exclusivity as a property right, the violation of which by a competitor would be actionable. [8]

> 8   The court may not consider the unpublished case cited by plaintiff in its brief because plaintiff failed to attach a copy of that opinion for the benefit of the court. *See* D. Kan. Rule 7.6(b).

Accordingly, the court grants defendants' motion to dismiss Count II of the complaint.

### III. Motion to Stay

Defendants have also moved for a stay of judicial proceedings pending the PTO's consideration of defendants' request for reexamination of plaintiff's patent. Under the relevant statute, any person may file a request for reexamination of a patent by the PTO based on prior art. *35 U.S.C. §§ 301, 302*. Within three months, [*25] the PTO must decide whether reexamination is warranted. *Id.* § 303. If the request is granted, reexamination proceedings are then conducted "with special dispatch." *Id. § 305*. After reexamination, the original patent claim may be limited or amended to distinguish it from the prior art. *Id. §§ 305, 307*.

"A motion to stay an action pending the resolution of a related matter in the United States Patent and Trademark Office is directed to the sound discretion of the court." *Rosenthal Mfg. Co. v. Thermal Equip., Inc., 1988 U.S. Dist. LEXIS 12241, 1988 WL 383034*, at *1 (D. Kan. Oct. 12, 1988). Here, the court concludes that

the benefits of a stay outweigh any prejudice to plaintiff; accordingly, the court exercises its discretion and grants plaintiff's motion for a stay.

The Federal Circuit Court of Appeals considered such a stay in *Gould v. Control Laser Corp., 705 F.2d 1340* (Fed. Cir.), *cert. denied, 464 U.S. 935, 78 L. Ed. 2d 310, 104 S. Ct. 343 (1983)*. The court first noted the requirement that reexamination proceedings be conducted with "special dispatch." *Id. at 1341* (quoting *35 U.S.C. § 305*). The court then pointed to the following statutory goal:

> One purpose of the reexamination [*26] procedure is to eliminate trial of that issue (when the claim is canceled) or to facilitate trial of that issue by providing the district court with the expert view of the PTO (when a claim survives the reexamination proceeding).

*Id. at 1342*. The court also noted that although early versions of the reexamination statute expressly provided for a stay of judicial proceedings, such provision was deemed unnecessary, as explained in the following excerpt from a House report:

> The bill does not provide for a stay of court proceedings. It is believed by the committee that stay provisions are unnecessary in that such power already resides with the Court to prevent costly pretrial maneuvering which attempts to circumvent the reexamination procedure. It is anticipated that these measures provide a useful and necessary alternative for challengers and for patent owners to test the validity of United States patents in an efficient and relatively inexpensive manner.

*Id.* (quoting H.R. Rep. No. 1307, 96th Cong., 2d Sess. 4 (1980), *reprinted in* 1980 U.S.S.C.A.N. 6460, 6463). The court concluded:

> When a district court stays patent validity proceedings before it until [*27] completion of a reexamination proceeding, that stay must be accepted if the purpose of the reexamination statute is to be preserved.

*Id.*

The Federal Circuit has noted that the benefits of the reexamination procedure, as revealed by the statute's

legislative history, include settling patent validity disputes more quickly and less expensively than often-protracted litigation and allowing courts to rely on the PTO's expertise. *Patlex Corp. v. Mossinghoff, 758 F.2d 594, 602 (Fed. Cir. 1985)*. The Federal Circuit has also cautioned that courts and the PTO apply different standards and may therefore reach opposite results. *Ethicon, Inc. v. Quigg, 849 F.2d 1422, 1427 (Fed. Cir. 1988)*.

"It is clear from the cases . . . that there is a liberal policy in favor of granting motions to stay proceedings pending the outcome of USPTO's reexamination or reissuance proceedings." *ASCII Corp. v. STD Entertainment USA, 844 F. Supp. 1378, 1381 (N.D. Cal. 1994)*. Courts have cited a number of advantages to allowing reexamination before litigation:

    1. All prior art presented to the Court will have been first considered by the PTO, with its particular expertise.

    2. Many [*28] discovery problems relating to prior art can be alleviated by the PTO examination.

    3. In those cases resulting in effective invalidity of the patent, the suit will likely be dismissed.

    4. The outcome of the reexamination may encourage a settlement without the further use of the Court.

    5. The record of reexamination would likely be entered at trial, thereby reducing the complexity and length of the litigation.

    6. Issues, defenses, and evidence will be more easily limited in pre-trial conferences after a reexamination.

    7. The cost will likely be reduced both for the parties and the Court.

*Fisher Controls Co. v. Control Components, Inc., 443 F. Supp. 581, 582 (S.D. Iowa 1977); accord GPAC, Inc. v.*

*D.W.W. Enters., 144 F.R.D. 60, 63 (D.N.J. 1992); Robert H. Harris Co. v. Metal Mfg. Co., 19 U.S.P.Q.2D (BNA) 1786, 1789 (E.D. Ark. 1991); Emhart Indus. v. Sankyo Seiki Mfg. Co., 3 U.S.P.Q.2D (BNA) 1889, 1890 (N.D. Ill. 1987); United Merchants & Mfrs. v. Henderson, 495 F. Supp. 444, 447 (N.D. Ga. 1980)*. A stay would confer these advantages in this case.

Courts have denied stays where undue prejudice would result or one party would suffer a clear tactical [*29] disadvantage; for instance, a stay may not be appropriate if discovery has been completed or the case is otherwise in a late stage. *GPAC, 144 F.R.D. at 63-64*. Such concerns are not present here, however, as this case is only a few months old.

Plaintiff argues that it would suffer irreparable harm from a stay because its seven-year period of exclusivity terminates in December of 1997. As defendants note, however, any such harm results not from a stay, but rather from defendants' marketing activities, which presumably would continue during any stay. Plaintiff's concern would more appropriately have been raised in support of a request for a preliminary injunction against defendants' selling its product during the pendency of this litigation; plaintiff did not seek such relief, however. Moreover, even without a stay, it is not likely that this litigation would be completed by December.

The court thus concludes that a stay is appropriate in this case, and it grants defendants' motion.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' motion to dismiss Count II and Count III is granted.

**IT IS FURTHER ORDERED BY THE COURT THAT** defendants' motion to stay these proceedings [*30] for reexamination of plaintiff's patent is granted.

**IT IS SO ORDERED.**

Dated this 26th day of February, 1997, at Kansas City, Kansas.

John W. Lungstrum

United States District Judge

# D

LEXSEE 1987 U.S. DIST. LEXIS 15033

**EMHART INDUSTRIES, INC., Plaintiff, v. SANKYO SEIKI MFG. CO., LTD., Defendant**

**No. 85 C 7565**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*1987 U.S. Dist. LEXIS 15033; 3 U.S.P.Q.2D (BNA) 1889*

**January 30, 1987, Decided**

**OPINION BY:** [*1] KOCORAS

**OPINION**

*MEMORANDUM OPINION*

CHARLES P. KOCORAS, UNITED STATES DISTRICT JUDGE

This matter comes before the Court on defendant, Sankyo Seiki's motion to stay the proceedings in this litigation pending a final determination regarding reexamination by the Patent and Trademark Office of the patent in suit. For the reasons stated herein, defendant's motion is granted.

*FACTS*

This is an action for patent infringement. Plaintiff, Emhart Industries, Inc. ("Emhart"), filed the complaint on August 28, 1985, alleging that defendant, Sankyo Seiki Mfg. Co., Ltd. ("Sankyo Seiki"), has infringed its patent (the "Voland" patent) for a "cam operated program timer" (*U.S. Patent No. 3,727,015*). No preliminary injunctive relief was sought. The parties have been engaged in discovery for almost one year, including depositions and document production in Japan. The discovery cut-off date of November 30, 1986, has passed, however, no pretrial order is in place and the Court has not considered any trial schedule for this case.

Defendant contends that during recent (September 1986) depositions of plaintiff's in-house patent counsel (Robert F. Meyer) and one of the alleged inventors of the Voland patent [*2] (Kurt Pauker) it discovered that two patents (the "Brown patents") owned by plaintiff, antedated the Voland patent and constituted prior art. The Brown patents were not cited to the Patent and Trademark Office ("PTO") during the prosecution of the Vo-

land patent application. On September 29, 1986, defendant filed a request for reexamination of the Voland patent based, in part, upon the Brown patents. On December 5, 1986, the PTO granted the request on the grounds that it raised "substantial new questions of patentability." Presently pending before the Court is defendant's motion to stay the proceedings in this litigation, filed on December 11, 1986.

*DISCUSSION*

Reexamination is a relatively new procedure by which any person can request that the PTO reexamine or reevaluate the patentability of an unexpired U.S. patent. *35 U.S.C. § 302.* A request for such a reexamination must be based upon prior art patents or publications which raise "a substantial new question of patentability." Typically, the cited prior art patents or printed publications upon which such a request is based are ones which were not considered by the patent examiner during the processing of the patent application [*3] which resulted in the patent-in-suit. Once a reexamination request is granted, a Patent Examiner who is familiar with the technology involved with the patent conducts the reexamination and is obligated to do so "with special dispatch." *37 C.F.R. § 1.550(a).*

Determining the desirability of a staying district court proceedings pending the outcome of a reexamination proceeding before the PTO resides in the discretion of the district court. Rather than terminating the action, a stay operates to shift to the PTO a significant issue, patent claim validity, involved in the dispute before the Court. Shifting the validity issue to the PTO has many advantages, including:

1. All prior art presented to the Court will have been first considered by the PTO, with its particular expertise.

1987 U.S. Dist. LEXIS 15033, *; 3 U.S.P.Q.2D (BNA) 1889

2. Many discovery problems relating to prior art can be alleviated by the PTO examination.

3. In those cases resulting in effective invalidity of the patent, the suit will likely be dismissed.

4. The outcome of the reexamination many encourage a settlement without the further use of the Court.

5. The record of reexamination would likely be entered at trial, thereby reducing the complexity and length of [*4] the litigation.

6. Issues, defenses, and evidence will be more easily limited in pre-trial conferences after a reexamination.

7. The cost will likely be reduced both for the parties and the Court.

*Fisher Controls Co. Inc. v. Control Components Inc., 443 F. Supp. 581, 582, 196 U.S.P.Q. 817, 818-19 (S.D. Iowa 1977).* [1]

> 1  This oft-quoted case was decided under the PTO's reissue proceeding then in effect, which was quite similar to the present reexamination proceeding except that institution of the proceeding could only be requested by the patentee. The advantages of shifting the validity issue to the PTO are the same though in both.

Moreover, in passing the legislation establishing the reexamination proceeding, Congress stated its approval of district courts liberally granting stays within their discretion: [2]

> The bill does not provide for a stay of court proceedings. It is believed by the committee that *stay provisions are unnecessary in that such power already resides with the Court* to prevent costly pre-trial maneuvering which attempts to circumvent the reexamination procedure. It is anticipated that these measures provide a *useful and necessary alternative* [*5] for challengers and for patent owners to test the validity of United States patents in an efficient and relatively inexpensive manner.

H. R. Rep. No. 1307 Part I, 96th Cong., 2d Sess. 4, *reprinted in* [1980] U.S. Code Cong. & Ad. News 6460, 6463. (Emphasis added). *See also Ingro v. Tyco Industries, Inc.,* 227 U.S.P.Q. 69 (N.D. Ill. 1985) (this Court granted a request for a stay of patent litigation pending the outcome of reexamination based, in part, on the above-quoted legislative history); P. Rosenberg, *Patent Law Fundamentals* § 15.09[3] at 15-167 (2d ed 1986) ("In cases which have not progressed beyond . . . initial litigation stages, the reexamination procedure *should be utilized")* (Emphasis added).

> 2  Early versions of what became the reexamination statute expressly provided for a stay of court

proceedings. S. 1679, 96th Cong., 1st Sess. § 310 (1979); H. R. 5075, 96th Cong., 1st Sess. § 310 (1979); S. 2446, 96th Cong., 2d Sess. § 310 (1980).

Plaintiff objects to a stay of the proceedings on four grounds. The Court is not persuaded by any of the plaintiff's arguments. First, plaintiff contends that there exists no adequate legal remedy for the loss of jobs [*6] and the possible destruction of its defrost timer business, which losses will allegedly follow from the delay caused by a reexamination proceeding in this case. The Court notes that, notwithstanding plaintiff's argument that monetary damages will not compensate for its losses, this *is* a suit for money damages and plaintiff has never sought preliminary injunctive relief from the Court. Moreover, it is not altogether clear that an injunction would, in fact, save plaintiff's defrost timer business. Defendant has submitted evidence suggesting that General Electric, defendant's largest customer, terminated Emhart as a supplier of defrost timers for reasons completely unrelated to the present suit.

Plaintiff's second argument is that defendant has delayed unnecessarily in filing its request for reexamination, and thus, its motion for stay should be denied. Plaintiff claims that the facts necessary to establish the defenses set forth in defendant's request for reexamination were known to defendant since November of 1985. In support of this assertion, plaintiff points out that on November 1, 1985, in response to plaintiff's Interrogatory 3(d), defendant indicated that:

> All of the claims [*7] in the patent in suit are unenforceable because the patentees failed to draw to the attention of the Examiner of the application from which the subject issued the *closest prior art* known to the applicants, *including* the United States *Patents Nos. 3,350,606, 3,500,005 [Brown] and 3,553,720 [Brown].* The question of the unenforceability of the patent in suit is under a *continuing investigation,* and hence this response will be supplemented as necessary. (Emphasis added).

Defendant does not deny that it knew of the Brown patents in November of 1985, nor that it suspected that the patents constituted prior art. However, defendant contends that it did not at that time know, nor could it have known, whether the Brown patents antedated the Voland patent and thus were legally available as prior art. Defendant argues that it was only during the depositions of one of the alleged inventors of the Voland patent and of plaintiff's in-house patent counsel that it was established that the Brown patents actually constituted prior art. The record reflects that defendant promptly filed its request for reexamination after the conclusion of these depositions.

As the Court finds that the [*8] benefits of granting a stay in the present proceedings outweigh the burdens, it need not decide whether the defendant could actually have filed its request at an earlier date. The Court notes that the plaintiff has *not* alleged, nor is there any evidence to support a finding, that the defendant's request was made solely for the *purpose* of delaying the litigation. Rather, if defendant is "guilty" of any "crime," it is of dragging its feet in filing its otherwise valid request for reexamination.

Third, plaintiff contends that defendant's motion for stay should not be granted because this case has "substantially progressed." Plaintiff cites to *Digital Magnetic Systems Inc. v. Ansley,* where the court, while granting the requested stay, cautioned that the reexamination process should not be abused "by applying for reexamination after protracted, expensive discovery or trial preparation." *213 U.S.P.Q. 200, 290 (W.D. Okla. 1982).* The Court recognizes that significant, costly discovery has already taken place. However, substantially no trial preparations have been carried out -- there is no pretrial order in place and no trial schedule has been set.

Moreover, it is significant [*9] here that defendant contends that it could not have filed its request for reexamination before it took the depositions of Robert Meyer and Kurt Pauker, whereupon it discovered that the Brown patents actually constituted prior art. The depositions of Pauker and Meyer were originally set for January 28, 1986, and May 19, 1986, respectively, but were postponed, at plaintiff's request, until September 1986. Defendant claims that plaintiff purposely delayed to prohibit defendant from establishing whether or not the Brown patents were legally available as prior art references. Clearly, based on defendant's response to plaintiff's Interrogatory 3(d), plaintiff knew that defendant was investigating the existence of prior art. Whatever plaintiff's reasons were for postponing these depositions, plaintiff will not now be heard to object to defendant's motion for stay on the grounds that too much time has passed since the commencement of this litigation.

Lastly, it should be noted that the same court that decided *Digital,* has subsequently granted a stay pending reexamination in a case that was much further advanced than the instant case. *See Loffland Brothers Co. v. Mid-Western Energy Corp.,* [*10] *225 U.S.P.Q. 886 (W.D. Okla. 1985)* (stay granted after significant discovery, pretrial conference and trial date set). *See also Gould v. Control Laser Corp., 705 F.2d 1340, 217 U.S.P.Q. 985 (Fed. Cir. 1983), cert. denied, 104 S.Ct. 343 (1983)* (stay granted five years after commencement of litigation and only 20 days before scheduled start of trial). In sum, the Court finds that granting a stay 18 months into this litigation, after admittedly significant discovery, but virtually

no trial preparation, will not unduly prejudice the plaintiff, especially in light of the plaintiff's own delay. [3]

> 3  Plaintiff's reliance on the decision in *Antonious Kamata-Ri & Co., Ltd., 205 U.S.P.Q. 294 (D. Md. 1979),* for the assertion that this Court should not stay the proceedings in this case because it has been pending for over a year, is misplaced. *Antonious* may be distinguished from the instant case in that the court in *Antonious* had access to records of two other forums that had previously examined the validity of the patent in suit, making it less likely that the court would need the PTO's expert opinion. *205 U.S.P.Q. at 295.* Moreover, the litigation in *Antonious* did not involve the issue of prior art. In fact, the court noted that where the issue of prior art *was* involved, the PTO's opinion could be "invaluable." *Id. at 296.* Lastly, the court in *Antonious* was primarily concerned with whether or not it should order the owner to file for reissue, rather than whether a stay should be granted pending reissue examination.

[*11] Fourth, and finally, plaintiff claims that reexamination proceedings will not "solve anything with finality" because the PTO's decision on the patent's validity is not binding. Mem. Opp. at 5-6. This is simply not so. "A reexamination proceeding may result in the final cancellation of claims from the patent." *Manual of Patent Examining Procedure* § 2271 (1985). Of course, the patent owner may appeal the PTO's decision to the Board of Appeals and then to the Court of Appeals for the Federal Circuit. *35 U.S.C. § 145.* Clearly, however, the end result of the reexamination proceedings will be to simplify the issues and reduce the complexity of trial.

Moreover, if the patent does survive the reexamination proceedings, the defendant has assured the Court that it will not contest the issues decided by the PTO, assuming that the plaintiff has been forthcoming and has cooperated fully during the proceedings. Reply at 13. Thus, a reexamination proceeding in this case may very well resolve significant issues of this litigation with finality. Based on the foregoing, the Court finds that the benefits of granting defendant's motion to stay outweigh the burdens of delay caused by a reexamination [*12] proceeding in this case. [4] Accordingly, defendant's motion to stay all further activities in connection with this action, pending a final determination in the reexamination proceeding, is granted.

> 4  The Court notes in addition that where litigation has been stayed pending reexamination proceedings, the PTO will attempt to expedite those

1987 U.S. Dist. LEXIS 15033, *; 3 U.S.P.Q.2D (BNA) 1889

proceedings. *Manual of Patent Examining Procedures* § 2286 (1985).

Dated: January 30, 1987

# E

LEXSEE 1991 U.S. DIST. LEXIS 16750

**GRAYLING INDUSTRIES, INC. and KURT HITTLER v. GPAC, INC.**

**Civil No. 1:89-cv-451-ODE**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
GEORGIA, ATLANTA DIVISION**

*1991 U.S. Dist. LEXIS 16750; 19 U.S.P.Q.2D (BNA) 1872*

**March 25, 1991, Decided
March 25, 1991, Filed**

**JUDGES:** [*1] Orinda D. Evans, United States District Judge.

**OPINION BY:** EVANS

**OPINION**

*ORDER*

This action for a declaratory judgment of patent invalidity and non-infringement is before the court on plaintiffs' motion to stay the proceedings during a reexamination procedure by the United States Patent and Trade Office "PTO".

This action has been pending since March 8, 1989, and the pretrial order was submitted February 6, 1991 and signed March 14, 1991. The instant motion was filed February 15, 1991, and Defendant responded on March 5, 1991. Plaintiffs replied on March 19, 1991. The petition for reexamination was filed by Plaintiffs with the PTO on February 6, 1991.

Reexamination of patent validity is allowed under *35 U.S.C. § 301 et seq.* The procedure calls for the petitioner to file a request, allowable at "any time", with the PTO. *35 U.S.C. § 302.* The PTO then must determine, within three months of filing of the request, "whether a substantial new question of patentability affecting any claim of the patent concerned is raised by the request, with or without consideration of other patents or printed publications." *35 U.S.C. § 303(a).* If the PTO finds that a substantial new question of patentability exists, [*2] that order must "include an order for reexamination of the patent for resolution of the question." *35 U.S.C. § 304.* The ultimate result of a reexamination procedure is an order either cancelling the patent as unpatentable, confirming the patent, or amending the patent. Orders of confirmation or amendment carry the usual presumption of validity accruing to patents and patent reissues. *See, 35 U.S.C. § 282; Patlex Corp. v. Mossinghoff, 758 F.2d 594, 603* (Fed. Cir.), *modified on other grounds, 771 F.2d 480 (1985).*

The intent behind the patent reexamination procedure, passed in 1981, clearly was to provide the federal courts with the expertise of the PTO. As the Federal Circuit has stated:

The bill's proponents foresaw three principal benefits. First, the new procedure could settle validity disputes more quickly and less expensively than the often protracted litigation involved in such cases. Second, the procedure would allow courts to refer patent validity questions to the expertise of the Patent Office. *See Senate Hearings* at 1, wherein Senator Bayh said that reexamination would be "an aid" to the trial court "in making an informed decision [*3] on the patent's validity". Third, reexamination would reinforce "investor confidence in the certainty of patent rights" by affording the PTO a broader opportunity to review "doubtful patents".

*Patlex, 758 F.2d at 602* (referring to *Patent Reexamination: Hearings on S. 1679 Before the Comm. on the Judiciary,* 96th Cong., 1st Sess. 1 (1979)) (other citation omitted) (dicta). The decision whether to stay proceedings in district court while a reexamination by the PTO takes place, while not vested expressly in the discretion of the district court by the statute, has been recognized to be within the district court's inherent discretionary power. *Gould v. Control Laser Corp., 705 F.2d 1340, 1342 (Fed. Cir. 1983)* (citing H.R.Rep. No. 1307 Part I, 96th Cong., 2d Sess. 4 (1980), U.S.Code Cong. & Admin. News 1980, p 6460, 6463).

Plaintiffs argue that all three of the interests set forth by the Federal Circuit are implicated here. First, plaintiffs contend that, although only trial remains in this case, that trial itself would be "prohibitively expensive." Sec-

1991 U.S. Dist. LEXIS 16750, *; 19 U.S.P.Q.2D (BNA) 1872

ond, plaintiffs emphasize that they have set forth numerous instances of prior art upon which [*4] the petition for reexamination is based. Review of this prior art, plaintiffs assert, is perfectly suited to the PTO's function as envisaged by the reexamination procedure. Finally, staying the proceedings while giving the PTO an opportunity to reconsider its prior determination will strengthen respect for the patent system by allowing the agency to address its purported mistake.

Defendant argues that the first contention is inaccurate because very substantial expense has already gone into this litigation. Defendant characterizes Plaintiffs' extremely late petition for reexamination as merely dilatory. Defendant attacks the second contention on two grounds. First, Defendant contends that a stay of these proceedings before a determination that a substantial new question of patentability exists is premature. Defendant cites several district court cases in which petitions for reexamination filed after the close of discovery did not result in a stay of district court proceedings. *E.g., Digital Magnetic Systems v. Ansley, 213 U.S.P.Q. 290 (W.D. Okla. 1982)*. The potential for abuse inherent in granting a stay where the petition for reexamination comes very late and [*5] without explanation is apparent. Second, Defendant contends that a determination of a substantial new issue of patentability by the PTO is unlikely. Finally, Defendant stresses the prejudice which will be caused it by the delay in determining whether Plaintiffs are in violation of its patents.

Plaintiffs reply to each of these responses. First, Plaintiffs note that six depositions remain to be taken, representing an expense avoidable if the stay is granted. Second, Plaintiffs note that the pendency of this discovery (which Defendant has refused to allow to proceed during the pendency of this motion) distinguishes this case from *Digital Magnetic,* cited by Defendant. At least one district court has refused to follow *Digital Magnetic* on similar grounds. *Emhart Ind., Inc., v. Sankyo Seiki Mfg. Co., Ltd., 3 U.S.P.Q.2d 1889, 1987 WL 6314 (N.D.Ill. 1987)*. The Western District of Oklahoma has also granted a stay after substantial discovery, a pretrial conference, and the setting of a trial date. *Loffland Bros. Co. v. Mid-Western Energy Corp., 225 U.S.P.Q. 886,*

*1985 WL 1483 (W.D.Okla. 1985)*. Third, Plaintiffs explain the late filing of the petition [*6] for reexamination by asserting that the prior art on which the petition is based was uncovered during discovery. Fourth, Plaintiffs reemphasize the efficiency of gaining a PTO order on the issue of this prior art, which will narrow the issue for trial. Finally, Plaintiffs note that the initial PTO determination is due by May 11, 1991. Even if, therefore, Defendant is correct and no substantial new question of patentability is presented by the petition for reexamination, the delay will be under two months.

The court finds Plaintiffs' reasoning persuasive. The added expense arising from a stay of this proceeding is greatly outweighed by the increase in efficiency which any PTO determination would bring. On the one hand, if the patents are declared unpatentable, this action would be moot. On the other hand, even though Plaintiffs have not agreed to be bound by a PTO finding of a valid patent, such a finding would be admissible and carries a presumption of validity. Moreover, the arguments which Plaintiffs would make at trial will have been explicitly reviewed and rejected by the PTO, adding to the persuasiveness of the PTO determination. Finally, although it is not clear that Plaintiffs [*7] had good reason for the delay in petitioning the PTO for reexamination, neither has Defendant shown such egregiously dilatory conduct as would justify short-circuiting the reexamination procedure now that Plaintiffs have invoked it.

The interests underlying the reexamination procedure doubtlessly would have been served better by an earlier filing of the petition for reexamination. However, they are better served by granting a stay at this point than by denying it and allowing the trial on the merits to continue parallel to the reexamination procedure. This action will be stayed until the PTO either determines that no substantial new question of patentability exists, *35 U.S.C. § 303(a)*, or renders a final certificate of patentability or unpatentability, *35 U.S.C. § 307(a)*.

Accordingly, Plaintiffs' motion for a stay of proceedings, including discovery, is GRANTED.

SO ORDERED, this *25* day of March, 1991.

# F

Westlaw.

Not Reported in F.Supp.                                                    Page 1
Not Reported in F.Supp., 1990 WL 37642 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

**C**
Hamilton Industries, Inc. v. Midwest Folding
Products Mfg. Corp.
N.D.Ill., 1990.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
HAMILTON INDUSTRIES, INC., an Illinois
Corporation, Plaintiff,
v.
MIDWEST FOLDING PRODUCTS MFG. CORP.,
an Illinois Corporation, Defendant.
**No. 89 C 8696.**

March 20, 1990.

MEMORANDUM OPINION AND ORDER
ASPEN, District Judge:
*1 This matter is before us on the defendant
Midwest Folding Products' motion for a stay
pending reexamination of U.S. Patent No.
4,819,569 by the Patent and Trademark Office
("PTO"). The plaintiff, Hamilton Industries,
opposes the motion. For the following reasons we
grant the defendant's motion and dismiss this action
with leave to reinstate subsequent to the patent
reexamination.

In passing the legislation establishing the
reexamination proceeding, Congress stated its
approval of district courts liberally granting stays
within their discretion as a means of preventing
"costly pre-trial maneuvering which attempts to
circumvent the reexamination procedure [and to]
provide a useful and necessary alternative for
challengers and for patent owners to test the
validity of United States patents in an efficient and
relatively inexpensive manner." H.R.Rep. No 1307
Part I, 96th Cong., 2d Sess. 4, reprinted in 1980
U.S. Code Cong. & Ad. News 6460, 6463.

With this in mind we turn to Hamilton's three
reasons for opposing the motion. First, Hamilton
claims that the defendant is seeking a stay simply
for the sake of delay in an attempt to "frustrate the

judicial process and Hamilton's right to exclude
[Midwest Folding] from use of its property."
Midwest Folding, however, is entitled by law to
request a reexamination of the patent. 35 U.S.C. §§
302-307; 37 CFR § 1.525. The reexamination
procedure was created to promote speedy and less
costly review of the validity of patents in certain
limited situations. The fact that the PTO granted
Midwest Folding's request for reexamination
indicates that the PTO deems it worthy of further
consideration. Even assuming there has been some
strategic behavior in this case (of which it is not
readily apparent that Hamilton is not also guilty), it
occurred fairly contemporaneously and was well
within the rights of Midwest Folding. Midwest
Folding invoked the reexamination procedure on
December 7, 1989, after learning that Hamilton was
threatening suit, after first notifying Hamilton that
it intended to make the request on November 19,
1989, and only two weeks after Hamilton ultimately
filed suit in this Court. Midwest Folding's decision
to request reexamination did not occur so late in the
proceedings as to warrant the conclusion that it was
solely pursued for the purposes of delay.

Second, Hamilton claims that the reexamination
will not affect this action or facilitate its
prosecution. We disagree. The issue of the patent's
validity is clearly one that will have to be resolved
in this case. We believe that shifting the validity
issue to the PTO in this case will provide the many
advantages found by courts as grounds for a stay:
1. All prior art presented to the Court will have
been first considered by the PTO with its particular
expertise.
2. Many discovery problems relating to prior art
can be alleviated by the PTO examination.
3. In those cases resulting in effective invalidity of
the patent, the suit will likely be dismissed.
*2 4. The outcome of the reexamination may
encourage a settlement without the further use of
the Court.
5. The record of reexamination would likely be
entered at trial, thereby reducing the complexity
and length of the litigation.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 2
Not Reported in F.Supp., 1990 WL 37642 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

6. Issues, defenses, and evidence will be more easily limited in pre-trial conferences after a reexamination.

7. The cost will likely be reduced both for the parties and the Court.

See, e.g., Emhart Indus., Inc. v. Sanyo Seiki Mfg. Co., No. 85 C 7565, slip op. (N.D. Ill. January 30, 1987). Further, once a request for reexamination has been granted, the Commissioner lacks the power to stay the reexamination pending the outcome of an overlapping proceeding in federal court. See Ethicon Inc. v. Quigg, 849 F.2d 1422 (Fed. Cir. 1988). We see no reason why parallel proceedings should be required here and we believe that this litigation may materially benefit from the PTO's disposition of the validity issue.

Finally, Hamilton argues that it will suffer harm from a stay. The only harm which Hamilton contends will occur as a result of the stay is that the stay will delay the imposition of an injunction and thereby deny Hamilton its "right to exclude." The question whether or not an injunction will issue in this case, however, will turn upon resolution of the patent's validity. Thus, any delay occasioned by that determination will occur regardless of the forum in which that issue is considered. And we find that, given Congress's mandate that the PTO conduct the patent reexamination expeditiously--that is, "with special dispatch"--it is likely that resolution of the validity issue will occur more swiftly than it would here. Hamilton additionally contends that piecemeal resolution of the validity and infringement issues would increase Hamilton's costs. We see no basis for this contention. To the contrary, we believe that an increase in costs is more likely to result from the inevitable parallel proceedings that would occur were we to refuse to stay this action. As we discussed above, the Commissioner lacks the authority to stay the reexamination. Thus, even if by some chance we were to reach the validity issue before the PTO does, and even if the PTO then exercised its discretion in deferring to our ruling (which the PTO is by no means bound to do), increased costs nevertheless would be incurred in both forums

during the race to the patent validity determination. We will concede that race to the PTO.[FN1]

> FN1 Hamilton also contends that Midwest Folding "will likely seek another reexamination upon completion of the present reexamination." We disregard that contention as having no basis at this time.

We grant the defendant's motion and order this action dismissed with leave to reinstate in the event issues remain after the PTO's consideration of Midwest Folding's request for reexamination. If such be the case, these issues will be disposed of promptly by the Court. It is so ordered.

N.D.Ill., 1990.
Hamilton Industries, Inc. v. Midwest Folding Products Mfg. Corp.
Not Reported in F.Supp., 1990 WL 37642 (N.D.Ill.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

G

1 of 348 DOCUMENTS

### IN RE TRANS TEXAS HOLDINGS CORP.

### 2006-1599, 2006-1600

### UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

*2007 U.S. App. LEXIS 19909*

### August 22, 2007, Decided

**PRIOR HISTORY:** [*1]
Appealed from: United States Patent and Trademark Office Board of Patent Appeals and Interferences. (**Reexamination** Nos. 90/005,841 and 90/005,842).

**DISPOSITION:** AFFIRMED.

**COUNSEL:** David L. Parker, Fulbright & Jaworski L.L.P., of Austin, Texas, argued for appellant. With him on the brief was Marcy Hogan Greer. Of counsel was Shafeeqa Watkins Giarratani.

William LaMarca, Associate Solicitor, United States Patent and Trademark Office, of Arlington, Virginia, argued for the Director of the United States Patent and Trademark Office. With him on the brief was Thomas L. Stoll, Associate Solicitor. Of counsel was Stephen Walsh, Acting Solicitor.

**JUDGES:** Before MICHEL, Chief Judge, MAYER and DYK, Circuit Judges.

**OPINION BY:** DYK

**OPINION**

DYK, *Circuit Judge.*

Appellant Trans Texas Holdings Corp. ("Trans Texas") appeals the decision of the Board of Patent Appeals and Interferences ("Board") in **Reexamination** Nos. 90/005,841 and 90/005,842. The Board affirmed the examiner's rejection of all of the claims of *U.S. Patent No. 5,832,461* (filed Oct. 23, 1991) ("'461 patent") and *U.S. Patent No. 6,052,673* (filed Nov. 2, 1998) ("'673 patent") as obvious under *35 U.S.C. § 103*. We affirm.

BACKGROUND

I

Trans Texas is the assignee of both the *'461 patent* and the *'673 patent*. [*2] The *'673 patent* is a continuation of the *'461 patent*. The patents' specifications, which are nearly identical, describe a system of inflation-adjusted deposit and loan accounts. *'461 patent* col.2 ll.55-59; *'673 patent* col.2 ll.55-59. By adjusting the interest paid on deposit accounts, or received on loan accounts, to compensate for inflation, the patented system purports to insulate the value of assets from inflationary fluctuations. In addition, the patented system seeks to match, or "hedge," any increased interest a financial institution must pay to depositors as a result of inflation adjustments with the increased inflation-adjusted interest payments it receives from borrowers, thereby providing stability to the financial institution. *'461 patent* col.3 ll.27-37; *'673 patent* col.2 ll.27-37 ("[D]uring times of inflation . . . negative cash flows attributable to . . . deposit accounts will be compensated for by incoming payments on loan accounts.").

A

The *'461 patent* has three independent claims, claims 1, 24, and 36. Independent claim 1 claims "[a]n investment system for providing an improved capital structure for an institution" composed, basically, of a deposit account and an account [*3] management data processor. *'461 patent* col.25 l.64-col.26 l.51. The claimed deposit account has a principal component representing the initial cash investment of the depositor and an accrual component representing interest paid that has both a fixed interest and a variable interest component. *Id.* col.26 ll.39-42. Claim 1 notes that the "deposit accrual component" is adjusted "in a manner *responsive to the rate of inflation*," *id.* (emphasis added), which the specification defines as "directly responsive to a market indicator of prior actual inflation and it is not meant to include the market's expectation of future inflation," *id.* col.3 ll.12-14 (emphasis added). [1] Claim 1 also specifies that the data processor includes means for "retiring the fixed interest component" and "paying the deposit principal

2007 U.S. App. LEXIS 19909, *

component" according to schedules over the term of the deposit account. *Id.* col.26 ll.48-51. [2]

1    The specification definition states in full: "Responsive to the rate of inflation, as used herein, means directly responsive to a market indicator of prior actual inflation and it is not meant to include the market's expectation of future inflation." *'461 patent* col.3 ll.11-14.

2    Claim 1 states [*4] in full:

An investment system for providing an improved capital structure for an institution comprising:

means for establishing data representative of at least one deposit account for a term, the deposit account having a deposit principal component and a deposit accrual component, the deposit accrual component having a fixed interest component and a variable interest component; and

an account management data processor for servicing the deposit account over the term, including:

means for determining the rate of inflation;

means for adjusting the amount in the deposit accrual component in a manner responsive to the rate of inflation;

means for retiring the fixed interest component by a first schedule over the term; and

means for paying the deposit principal component according to a second schedule over the term.

*'461 patent* col.25 l.64-col.26 l.51.

Independent claim 24 is generally similar to claim 1 for purposes of this appeal and includes the "responsive to the rate of inflation" limitation. *Id.* col.28 ll.47-59. It excludes claim 1's reference to retiring the fixed interest and paying the principal according to schedules. *Id.* Independent claim 36 is similar to claim 1 for purposes of this  [*5] appeal but covers both deposit and loan accounts. *Id.* col.29 l.25-col.30 l.9. Similar to claim 1, it claims a "means for adjusting the amount in the deposit account in a manner *responsive to the rate of inflation*" and a "means for determining the amount in the loan accrual component in a manner *responsive to the rate of inflation.*" Id. col.29 l.37-col.30 l.3 (emphases added). Most of the *'461 patent*'s dependent claims were not argued separately on appeal and thus stand or fall with their corresponding independent claim. *See In re Dance, 160 F.3d 1339, 1340 n.2 (Fed. Cir. 1998).* Some of the dependent claims include other limitations described below.

B

The *'673 patent* has four independent claims, claims 1, 9, 22, and 25. Claim 1 claims a "method of managing financial accounts" by providing deposit and loan accounts that are adjusted "as a function of a rate of inflation," "paying the deposit accounts," and "receiving repayment of the loan account." *'673 patent* col.25 l.60-col.26 l.42. Claim 1 also recites the use of "an account data processor." *Id.* col.26 l.37. [3] Claim 9 claims a method whereby an institution provides a deposit account to a depositor, uses a portion of the funds deposited [*6] to obtain a financial instrument "whose *rate of return adjusts with inflation,*" and pays the "depositor a rate of return on funds . . . *based on a rate of inflation.*" *Id.* col.26 l.61-col.27 l.7 (emphases added). [4] Claim 22 is nearly identical to claim 9, except that it calls for the institution to obtain "a mortgage secured by real estate," rather than "a financial instrument." *Id.* col.27 l.41-col.28 l.10. Claim 25 is also similar to claim 9 for purposes of this appeal, except that it specifies that the financial instrument pays "the inflation-adjusted principal component at the end of the term," which the parties refer to as "balloon payments." *Id.* col.28 l.16-35. None of the dependent claims of the *'673 patent* was argued separately on appeal, and they therefore stand or fall with their independent claim. *See Dance, 160 F.3d at 1340 n.2.*

3    Claim 1 states in full:

A method of managing financial accounts comprising:

providing a plurality of deposit accounts with a financial institution;

adjusting the amount in each deposit account as a function of a rate of inflation;

providing at least one loan account with said financial institution using funds deposited with the financial institution;

adjusting [*7] the amount in the loan account as a [f]unction of a rate of inflation using an account data processor,

paying the deposit accounts; and

receiving repayment of the loan account by said financial institution in a manner where the funds in the loan account obtain a rate of return responsive to a rate of inflation.

*'673 patent* col.25 l.60-col.26 l.42.

4  Claim 9 states in full:

A method for an institution to manage at least part of a program to provide a depositor of funds a rate of return on said funds variable with a rate of inflation, comprising:

providing a deposit account by the institution for receiving said funds from said depositor;

allocating at least a portion of said funds for obtaining an asset whose rate of return adjusts with inflation;

using said allocated funds to obtain said asset whose return adjusts with inflation and is determined using a dataprocessor, said asset comprising a financial instrument having an obligated rate of return indexed to a rate of inflation; and

paying said depositor a rate of return on funds relived based on a rate of inflation.

*'673 patent* col.26 l.61-col.27 l.7.

On October 6, 2000, Trans Texas requested **reexamination** of the *'461* and *'673 patents* based [*8] on a substantial new question of patentability. The United States Patent and Trademark Office ("PTO") granted this request on December 6, 2000, and initiated separate **reexamination** proceedings for each patent.

II

A

In the course of the **reexamination** proceeding, Trans Texas urged that the PTO was bound by a claim construction rendered in an earlier infringement proceeding to which the PTO was not a party. On October 12, 1999, Trans Texas had filed a complaint against Pimco Advisors, L.P. in the United States District Court for the Western District of Texas, alleging infringement of the *'461* and *'673 patents*. On August 28, 2000, the district court had issued its claim construction ruling, which adopted the definition of the term "responsive to the rate of inflation" found in the specification, that is, it held that the term should be defined as "directly responsive to a market indicator of prior actual inflation and is not meant to include the market's expectation of future inflation." *Trans Texas Holdings Corp. v. Pimco Advisors, L.P.*, No. 99-CA-658, slip op. at 10 (W.D. Tex. Aug. 28, 2000) ("*Markman Order*"). Relying on language in the accompanying district court opinion, Trans Texas urges [*9] that the district court also interpreted the "responsive to the rate of inflation" language to require a continuous, one-to-one relationship between inflation and adjustments. *See id.* at 12 ("The *'461 patent* uses the phrase 'responsive to the rate of inflation' which more clearly imparts a one-to-one correlation."). For purposes of this appeal, we will assume that Trans Texas's interpretation of the district court order is correct. The district court also held that the term "as a function of the rate of inflation" in claim 1 of the *'673 patent* had the same meaning as the term "responsive to the rate of inflation." *Id.* at 12. The district court construed the term "based on the rate of inflation" in claims 9 and 25 of the *'673 patent* "to require the rate of return to be directly related to the rate of inflation." *Id.* at 12-13.

The parties then reached a settlement before trial, and the district court issued an "Order of Dismissal with Prejudice" on January 8, 2001.

B

On February 11, 2002, the examiner mailed final office actions in the **reexamination** proceedings rejecting all of the claims of the *'461* and *'673* patents as obvious under *35 U.S.C. § 103.* The primary issue before the examiner [*10] was the construction of the terms "responsive to the rate of inflation" and "as a function of a rate of inflation." In holding the claims unpatentable, the examiner principally relied on Santosh Mukherjee & Claire Orlans, *Indexation in an Inflationary Economy: A Case Study in Finland,* Vol. XL, Broadsheet No. 551, PEP The Social Science Institute, April 1975, at 50-73, 106-111 ("Mukherjee"). Mukherjee discusses the decision of banks in Finland in the 1950s to "adjust both their loans and deposits for inflation, on the basis of quarterly inspections of the cost-of-living index." *Id.* Among other accounts, it describes "A" deposit accounts, which provided "100 per cent index compensation" for every one percent increase in the cost of living. [5] That is, for every one percent increase in the cost of living index, the capital was increased by one percent. Mukherjee also discloses that banks charged an inflation-adjusted "surcharge" on their loans in order to provide the funds needed for fully inflation-adjusted deposit accounts. It notes that "[t]he amount of the surcharge was usually fixed according to the proportion of the bank's deposits benefiting by index adjustment, so that the [*11] bank could just balance its commitments." *Id.* Although Mukherjee "lacks[] an explicit recitation of the data-processor for account management," the examiner concluded that *U.S. Patent No. 4,774,663* (filed Nov. 21, 1983) ("Musmanno") "demonstrates that it was notoriously well-known to employ data-processors to manage plural accounts" and therefore it would have been obvious to a person of ordinary skill in the art to apply Musamanno's data processor to Mukherjee.

> [5] The predecessor of "A" accounts had required an initial cost-of-living index value of 106 before compensation was paid and had only paid compensation for every two percent increase in the cost-of-living index. However, since the 106 value was reached at the beginning of 1956, this requirement no longer existed when A accounts were made "more sensitive" than the predecessor accounts, paying compensation for one percent increases in the cost-of-living index.

On March 25, 2002, Trans Texas appealed the examiner's decisions on both the *'461* and *'673* patents to the Board. Trans Texas first argued that under our decision in *In re Freeman, 30 F.3d 1459 (Fed. Cir. 1994),* issue preclusion bound the Board to apply the district court's [*12] claim construction of the terms "responsive to the rate of inflation" and "as a function of a rate of inflation." The Board, in similar but separate opinions for each **reexamination** proceeding, rejected this argument.

The Board held that a different claim construction standard applies in PTO proceedings, giving claims "their broadest reasonable interpretation consistent with the specification." *See Ex Parte Trans Texas Holdings Corp.*, No. 2005-2642, **Reexamination** No. 90/005,841, slip op. at 4 (B.P.A.I. May 26, 2006) ("*'461 Board Decision*"); *Ex Parte Trans Texas Holdings* were first offered in January 1957. Similarly, the A accounts *Corp.*, No. 2005-2643, **Reexamination** No. 90/005,842, slip op. at 4 (B.P.A.I. May 26, 2006) ("*'673 Board Decision*"). The Board also concluded that the district court's claim construction was not "necessary to the judgment rendered in the previous action" in light of the pre-trial settlement and dismissal. *'461 Board Decision* at 5-6; *'673 Board Decision* at 5-6.

Alternatively, Trans Texas argued that, even apart from issue preclusion, "the claims require a continuous (i.e., nonstepped) relationship such that different amounts of prior actual inflation will result [*13] in different inflation adjustments." *'461 Board Decision* at 7; *see also '673 Board Decision* at 7. The Board disagreed. It noted the specification's definition of "responsive to the rate of inflation"--"directly responsive to a market indicator of prior actual inflation and it is not meant to include the market's expectation of future inflation." *'461 Board Decision* at 7. The Board concluded that this "was meant to emphasize that the calculations of inflation adjustments must be based *on* the market indicator data which represents prior actual inflation." *Id.* (emphasis in original). Relying as well on the dictionary definition of "directly," the Board concluded that the claims were broad enough to cover non-continuous adjustments. *'461 Board Decision* at 7-8; *'673 Board Decision* at 9.

The Board upheld the examiner's obviousness rejection of all of the claims of the *'461* and *'673 patents* based on these constructions and its interpretation of other claim terms. It concluded that claims 24-26, 28-32, 34-37, and 38-44 of the *'461 patent* and claims 1-24 of the *'673* were unpatentable over Mukherjee in view of Musmanno. The Board rejected the remaining claims of the *'461* and *'673 patents* over [*14] Mukherjee in view of Musmanno and additional references.

Trans Texas timely appealed the decisions, and we consolidated the appeals. We have jurisdiction pursuant to *28 U.S.C. § 1295(a)(4)(A) (2000).* We review questions of issue preclusion and claim construction without deference. *See Shell Petroleum, Inc. v. United States, 319 F.3d 1334, 1338 (Fed. Cir. 2003)* (issue preclusion); *Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1455 (Fed. Cir. 1998)* (claim construction).

DISCUSSION

I

Trans Texas first argues that the Board erred in construing the term "responsive to the rate of inflation" in the *'461 patent* and the related terms "as a function of a rate of inflation" and "based on a rate of inflation" in the *'673 patent*. Trans Texas has treated these terms as equivalent and focused on the "responsive to the rate of inflation" limitation, and we will do likewise.

A

Trans Texas primarily argues that the Board should have given preclusive effect to the district court's *Markman* order, which construed "responsive to the rate of inflation" to mean "directly responsive to a market indicator of prior actual inflation and is not meant to include the market's expectation of future inflation." *Markman Order* at 15. [*15] As discussed above, we assume, as Trans Texas argues, that the district court construed the term to require a "continuous, one-to-one correlation with the inflation rate." Appellant's Br. 20; *see also Markman Order* at 12.

Traditionally, issue preclusion, also known as collateral estoppel, applied only where the same parties to an earlier proceeding were involved in later litigation involving the same issue. *See Restatement (Second) of Judgments § 27* (1982); *Id. § 29* Reporter's Note. More modern decisions in some circumstances apply issue preclusion even where the parties to the subsequent suit are not the same. *See Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326-33, 99 S. Ct. 645, 58 L. Ed. 2d 552 (1979)*; *Restatement (Second) Judgments § 29*. The latter doctrine is known as non-mutual collateral estoppel, and it is this latter doctrine that Trans Texas relies on here.

Issue preclusion is not warranted in this case because the PTO was not a party to the earlier litigation. Our case law has identified four prerequisites to the application of issue preclusion: "(1) identity of the issues in a prior proceeding; (2) the issues were actually litigated; (3) the determination of the issues was necessary to the [*16] resulting judgment; and, (4) *the party defending against preclusion had a full and fair opportunity to litigate the issues*." *Jet, Inc. v. Sewage Aeration Sys., 223 F.3d 1360, 1365-66 (Fed. Cir. 2000)* (emphasis added).

The PTO as "the party against whom the earlier decision is asserted" thus must have been accorded "a 'full and fair opportunity' to litigate that issue in the earlier case." *Allen v. McCurry, 449 U.S. 90, 95, 101 S. Ct. 411, 66 L. Ed. 2d 308 (1980)*; *Freeman, 30 F.3d at 1467 (Fed. Cir. 1994)*. However, the PTO was not even a party to the earlier district court litigation and cannot be bound by its outcome. Trans Texas nevertheless argues that this requirement should somehow be excused because the PTO proceedings were ex parte. This argument simply makes no sense. The PTO is plainly a party to these appeal proceedings, and if it were not treated as a party,

there would be no basis for even considering the application of issue preclusion in the first place.

We have never applied issue preclusion *against* a non-party to the first action. In fact, the Supreme Court has specifically held that "litigants . . . who never appeared in a prior action[] may not be collaterally estopped without litigating the issue. . [*17] . . Due process prohibits estopping them despite one or more existing adjudications of the identical issue which stand squarely against their position." *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found., 402 U.S. 313, 329, 91 S. Ct. 1434, 28 L. Ed. 2d 788 (1971)*; *see also Parklane Hosiery, 439 U.S. at 327 n.7* ("It is a violation of due process for a judgment to be rendered binding on a litigant who was not a party or a privy and therefore has never had an opportunity to be heard."); *Restatement (Second) of Judgments § 29* Reporter's Note ("The proposition that a non-party cannot be bound by a judgment, unless he is represented by a party or has interests that are derivative from a party, is a rule of Constitutional law."). [6]

> 6    While the *Due Process Clause of the Fifth Amendment* does not apply to the government, *see South Carolina v. Katzenbach, 383 U.S. 301, 323-24, 86 S. Ct. 803, 15 L. Ed. 2d 769 (1966)*, the procedural protections afforded to private parties in the res judicata and collateral estoppel context also apply to the government, *see United States v. Stauffer Chem. Co., 464 U.S. 165, 170, 104 S. Ct. 575, 78 L. Ed. 2d 388 (1984)*.

Recognizing the general rule against collaterally estopping a non-party, Trans Texas asserts that it somehow represented the PTO's interests in the district [*18] court action. However, the "presumption that nonparties are not bound by a judgment" can only be rebutted in limited circumstances, such as when the non-party was in privity with a party, has interests that are derivative from a party, or "participate[d] in an active and controlling way" in the litigation. *See 18A Charles Alan Wright, et al., Federal Practice & Procedure § 4449 (2d ed. 2002)*; *Restatement (Second) of Judgments § 29* Reporter's Note. The PTO's interests were not represented in the earlier litigation even though Trans Texas urged that the district court reject the construction that the district court adopted. Since the PTO was not a party to the district court litigation, issue preclusion does not apply.

Contrary to Trans Texas's argument, our decision in *Freeman* does not require the application of issue preclusion. In *Freeman*, we held that a patentee in a PTO proceeding was barred by issue preclusion from asserting a claim construction already rejected in a district court infringement action brought by the patentee against a third party. *30 F.3d at 1469*. Nothing in *Freeman* suggests that issue preclusion could be applied against the

PTO or another non-party to the [*19] infringement proceeding. [7]

> 7   In light of our resolution of Trans Texas's issue preclusion argument, we have no need to decide whether non-mutual collateral estoppel against the government would be permissible at all in the circumstances of this case. *See United States v. Mendoza, 464 U.S. 154, 104 S. Ct. 568, 78 L. Ed. 2d 379 (1984).*

## B

Alternatively, Trans Texas urges that the Board erroneously rejected its proposed claim construction and that the claims require continuous, one-to-one adjustments. It is not entirely clear what Trans Texas means by "continuous" or "one-to-one." Any inflation-adjustment is subject to the available inflation data. That is, it is limited by the way in which inflation data are reported, both in terms of the frequency of reporting (e.g., monthly, quarterly, yearly, etc.) and the specificity of reporting (i.e., how many decimal places the rate of inflation is carried out). Thus, no inflation-adjustment system can truly be "continuous" and "one-to-one" with the true rate of inflation. Instead, as best we can understand it, Trans Texas's argument is that for every increase in the reported rate of inflation, there must be an immediate and equal inflation adjustment. We understand this argument [*20] to be an attempt to distinguish the Mukherjee prior art reference, which did not disclose an immediate inflation adjustment to deposit accounts for every increase in the rate of inflation. Instead, increases were only made when the increase in the rate of inflation reached one percent. [8]

> 8   Trans Texas also points out that some of the deposit accounts in Mukherjee had features requiring: (1) that a threshold value be exceeded before any inflation-adjustment was made; (2) a proportional adjustment (i.e., every one point inflation increase leads to a one-half percent inflation-adjustment). Trans Texas argues that these accounts were not "directly responsive" to the rate of inflation. This is beside the point given the disclosures described in the text above with respect to other accounts that did not include such limiting features.

Trans Texas's argument is not persuasive. Claims are given "their broadest reasonable interpretation, consistent with the specification, in **reexamination** proceedings." *In re Yamamoto, 740 F.2d 1569, 1571 (Fed. Cir. 1984).* The term "responsive to the rate of inflation" is defined in the specification as "mean[ing] directly responsive to a market indicator of prior [*21] actual inflation and it is not meant to include the market's expectation of future

inflation." *'461 patent* col.3 ll.11-14. As the Board noted, the specification's definition only requires that the inflation adjustment be "directly responsive" to a market indicator of inflation. There is nothing in the specification or the prosecution history that requires an immediate inflation-adjustment every time the rate of inflation increases. Trans Texas argues that immediate responsiveness is the only construction consistent with the specification because "each of the examples in the '461 specification . . . [is] adjusted on a one-for-one basis." Appellant's Br. 19. Even if the examples are so limited (which the PTO disputes), Trans Texas's argument conflicts with our decision in *Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005)* (en banc). In *Phillips,* we held that while "the specification [should be used] to interpret the meaning of a claim," courts must not "import[] limitations from the specification into the claim." *Id. at 1323.* We specifically noted that it is improper to "confin[e] the claims to th[e] embodiments" found in the specification, as Trans Texas asks us to do. *Id.*

Under *Phillips,* [*22] dictionary definitions are also pertinent. *See id. at 1318* ("[T]he court has observed that dictionaries . . . can be useful in claim construction."). The dictionary definition of "directly" confirms that the specification's requirement that the adjustment be "directly responsive" to a market indicator does not require that an inflation-adjustment occur immediately after any increase in the reported rate of inflation. While some definitions define "directly" as "simultaneously and exactly or equally" or "immediately," other definitions define it as "after a little: in a little while: shortly, presently." *Webster's Third New International Dictionary Unabridged* 641 (2002). In view of the latter definitions, we conclude that the *broadest* reasonable interpretation of "directly responsive" is not limited to situations in which the inflation-adjustment occurs immediately after any increase in the reported rate of inflation, but also includes situations in which the inflation-adjustment occurs "a little while" after an increase in the reported rate, such as when the increase reaches one percent. The Board did not err in concluding that the broadest reasonable interpretation of the term "responsive [*23] to the rate of inflation" (and related terms) is not limited to a continuous, one-to-one relationship but also includes a delayed relationship, in which adjustments are made in one percent increments.

## II

Turning to the Board's obviousness determination, Trans Texas has relied only on its erroneous claim construction in arguing that claims 24-30, 32, and 34-35 of the *'461 patent*, relating to deposit accounts, are nonobvious. [9] We therefore affirm the Board's determination that these claims would have been obvious. *See Smith-Kline Beecham Corp. v. Apotex Corp., 439 F.3d 1312,*

*1319 (Fed. Cir. 2006)* ("[A]rguments not raised in the opening brief are waived.").

> 9    Trans Texas does argue that Mukherjee "teaches away" from inflation-adjusted accounts because it describes how these accounts were abolished in Finland following a "stabilization agreement" between trade unions and employers meant to quell a price surge. It is unclear if this argument was raised before the Board. In any event, the political decision to abolish these accounts as part of a trade agreement is not in any way related to any deficiency in the utility of the invention itself.

Trans Texas also argues that additional limitations [*24] appearing in other claims render those claims non-obvious. We cannot agree.

First, Trans Texas argues that claims 36-44 of the *'461 patent* and claims 1-8 of the *'673 patent* are non-obvious because, even if Mukherjee discloses deposit accounts responsive to the rate of inflation, Mukherjee does not disclose loan accounts that were fully adjusted with the market indicator of inflation (i.e., the inflation adjustment was equal to the increase in the market indicator of inflation), but instead only discloses loan accounts that were adjusted on a proportional basis with inflation (for example, a one percent increase in the market indicator would only result in a one-half or one-fourth percent inflation adjustment). Trans Texas is correct that the loan accounts Mukherjee describes as having actually been implemented in Finland at most imposed an inflation adjustment of one-half the increase in the rate of inflation. However, Mukherjee also discloses that banks would find the money needed to provide inflation-adjusted deposit accounts by "imposing an 'index surcharge' on *all* loans. . . . fixed according to the proportion of the bank's deposits benefiting by index adjustment, so that the balance [*25] could just balance its commitments." Mukherjee at 50-51. Further, Mukherjee discloses "A" deposit accounts with "100 per cent index compensation" for every one percent increase in inflation. *Id.* at 52. Thus, when a bank's deposits were all in inflation-adjusted accounts, the surcharge on loans would equal the full amount of the rate of inflation. *Compare id.* at 68 ("[I]n a year when the index rose by 10 per cent, a bank with one fifth of its deposits in fully index-linked accounts would place an index surcharge of 2 per cent on all its outstanding loans."). Substantial evidence supports the Board's conclusion that Mukherjee discloses fully adjusting loan accounts based on increases in the rate of inflation.

Second, Trans Texas argues that claims 1-23, 31, 33, and 44 [10] of the *'461 patent* are non-obvious because these claims include a requirement for annuities. The Board relied on the prior art Zvi Bodie reference, *An innovation for stable real retirement income*, Portfolio Management, Fall 1980, 5 ("Bodie"). Bodie describes a "purchasing power annuity" linked to consumer price levels. *Id.* Trans Texas argues that Bodie in fact taught away from indexed annuities because it stated that [*26] inflation-adjusted annuities "were not commercially available" and noted a "reluctance, if not outright opposition" within certain segments of the market to price-indexed bonds. But, as the Board found, Bodie never indicated that such proposals would not work and in fact noted that proposals for price-indexed bonds "have abounded." *Id.* The Board's decision as to what the prior art discloses is reviewed for substantial evidence. *See In re Gartside, 203 F.3d 1305, 1308 (Fed. Cir. 2000)* (noting that Board factual findings are reviewed for substantial evidence); *Para-Ordnance Mfg., Inc. v. SGS Importers Int'l, Inc., 73 F.3d 1085, 1088 (Fed. Cir. 1995)* ("What the prior art teaches and whether it teaches toward or away from the claimed invention . . . is a determination of fact."). Substantial evidence supports the Board's conclusion as to what Bodie discloses.

> 10    Claim 31, dependent on claim 24, requires that the principal component be retired by making payments to the depositor over a series of "iteration periods." *'461 patent* col.29 ll.11-14. Claim 33, also dependent on claim 24, specifies that the "index correspond[s] generally to the consumer price index." *Id.* col.29 ll.19-20. Claim 44, [*27] dependent on claim 36, requires that "the means for paying out the deposit account includes means for paying out the deposit principal component by a schedule over the term and means for paying out the deposit accrual component by a schedule over the term." *Id.* col.30 ll.33-38.

Third, Trans Texas argues that independent claim 9 of the *'673 patent* and its dependent claims 10-14 and 16-21 are non-obvious because Mukerjee does not teach the limitation "obtaining an asset whose rate of return adjusts with inflation." Appellant's Br. 47. Trans Texas argues that, even if deposit accounts responsive to the rate of inflation were disclosed in the prior art, securities with rates responsive to the rate of inflation were not. We conclude that the Board's finding that the prior art disclosed such securities was supported by substantial evidence. For example, Mukherjee describes the desire of institutional buyers to purchase "[inflation] index-linked securities" and specifically notes that "[b]anks and cooperative credit societies" sought to buy inflation-adjusted bonds "to help pay compensation on indexed deposit accounts." Mukherjee at 59.

Fourth, Trans Texas asserts that Mukherjee does not teach [*28] the limitation "obtaining . . . a mortgage

2007 U.S. App. LEXIS 19909, *

secured by real estate" (responsive to the rate of infla-tion) of independent claim 22 of the *'673 patent* and its dependent claims (23 and 24). The Board did not err in concluding that it would have been obvious to combine the indexed loan accounts disclosed in Mukherjee with the well-known practice of offering loans secured by mortgaged real estate. *See KSR Int'l Co. v. Teleflex Inc., 127 S. Ct. 1727, 1739, 167 L. Ed. 2d 705 (2007)* ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.").

Finally, Trans Texas argues that claims 15 and 25-28 of the *'673 patent* were non-obvious because the prior art does not teach obtaining an inflation-adjusted finan-cial instrument that makes "balloon" payments (i.e., pay-ing the inflation-adjusted principal component at the end of the term). Trans Texas admits that G. Weiner, *Choos-ing a Home Equity Plan*, Restaurant Business, (Feb. 10, 1985), "does appear to describe loans where the interest is repaid monthly and the principal in a lump sum." Ap-pellant's Br. 50. The Board did not err in concluding that it would have been obvious to combine the [*29] known inflation-adjusted loan accounts of Mukherjee with the known balloon payments of Weiner.

CONCLUSION

We conclude that the Board was not bound by the district court's claim construction and properly construed the term "responsive to the rate of inflation" and related terms. The Board did not err in holding that claims 1-44 of the *'461 patent* and claims 1-28 of the *'673 patent* would have been obvious over the prior art.

*AFFIRMED*

**H**

LEXSEE 2003 U.S. DIST. LEXIS 8052

**PEGASUS DEVELOPMENT CORPORATION and PERSONALIZED MEDIA COMMUNICATIONS, L.L.C., Plaintiffs v. DIRECTV, INC., HUGHES ELECTRONICS CORPORATION, THOMPSON CONSUMER ELECTRONICS, INC., and PHILIPS ELECTRONICS NORTH AMERICA CORPORATION, Defendants. AND RELATED COUNTERCLAIMS**

**Civil Action No. 00-1020-GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2003 U.S. Dist. LEXIS 8052*

**May 14, 2003, Decided**

**SUBSEQUENT HISTORY:**    As Amended September 4, 2003.

**PRIOR HISTORY:** *Pegasus Dev. Corp. v. Directv, Inc., 2002 U.S. Dist. LEXIS 6825 (D. Del., Apr. 18, 2002)*

**DISPOSITION:**    [*1] Defendants' motion to stay pending patent reexamination granted. Plaintiffs' motion for leave to assert claim patent denied. Motions to dismiss denied.

**COUNSEL:** For Pegasus Development Corporation, Personalized Media Communications LLC, PLAINTIFFS: Rudolf E Hutz, Rudolf E Hutz, Connolly, Bove, Lodge & Hutz, Wilmington, DE USA.

For Directv Inc, Hughes Electronics Corporation, Thomson Consumer Electronics Inc, Thomson Multimedia, Inc, DEFENDANTS: Donald F Parsons, Jr, Mona A Lee, Morris, Nichols, Arsht & Tunnell, Wilmington, DE USA.

For Thomson Consumer Electronics Inc, DEFENDANT: Karen Jacobs Louden, Morris, Nichols, Arsht & Tunnell, Wilmington, DE USA.

For Philips Electronics North America Corporation, DEFENDANT: Steven J Balick, Steven T Margolin, Ashby & Geddes, Wilmington, DE USA.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory Moneta Sleet

**OPINION**

**MEMORANDUM AND ORDER**

**I. INTRODUCTION**

[*2]  On December 4, 2000, Pegasus Development Corporation ("Pegasus") and Personalized Media Communications, L.L.C. ("PMC") filed a complaint against several defendants, alleging infringement of six patents, including *U.S. Patent Nos. 4,965,825* ("the '825 patent") and 5,335,277 ("the '277 patent"). Since that time, the original scheduling order has been revised several times. Currently, fact discovery is scheduled to close on August 22, 2003, and a trial is scheduled for February of 2004.

On February 4, 2003 and March 14, 2003, respectively, the defendant Thomson Consumer Electronics, Inc. ("Thomson") filed with the Patent and Trademark Office ("PTO") a request for *ex parte* reexaminations of the '825 and '277 patents. The request for reexamination of the *'825 patent* was granted on April 10, 2003. [1] Presently before the court is a joint motion by the defendants to stay the litigation pending the completion of the patent reexaminations (D.I. 459). After careful consideration of the parties' submissions, and for the reasons detailed below, the court will grant the motion.

1    The court is not yet aware of a decision by the PTO regarding reexamination of the '277 patent.

[*3] **II. DISCUSSION**

The decision to stay a case is firmly within the discretion of the court. *Cost Bros., Inc. v. Travelers Indem. Co., 760 F.2d 58, 60 (3d Cir. 1985)*. This authority applies equally to patent cases in which a reexamination by

Case 1:07-cv-00226-JJF     Document 29-2     Filed 08/28/2007     Page 12 of 21

Page 2
2003 U.S. Dist. LEXIS 8052, *

the PTO has been requested. *Ethicon, Inc. v. Quigg, 849 F.2d 1422, 1426-27 (Fed. Cir. 1988)* ("Courts have inherent power to manage their dockets and stay proceedings, including the authority to order a stay pending conclusion of a PTO reexamination.") (internal citation omitted); *see also Emhart Indus. v. Sankyo Seiki Mfg., 1987 U.S. Dist. LEXIS 15033, 3 U.S.P.Q. 2d 1889, 1890 (N.D. Ill. 1987)* ("In passing the legislation establishing the reexamination proceeding, Congress stated its approval of district courts liberally granting stays within their discretion."); *Gould v. Control Laser Corp., 705 F.2d 1340, 1342 (Fed. Cir. 1983)* (citing legislative history of reexamination statute). In determining whether a stay is appropriate, the court is guided by the following factors: "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving [*4] party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set." *Xerox Corp v. 3Comm Corp., 69 F. Supp.2d 404, 406 (W.D.N.Y. 1999)* (citing cases); *cf. United Sweetner USA, Inc. v. Nutrasweet Co., 766 F. Supp. 212, 217 (D. Del. 1991)* (stating a similar test).

In this case, there are two plaintiffs, four defendants, and several counter claimants, as well as six patents comprising dozens of claims. In addition, the written submissions in this case have been particularly voluminous; the briefing on claim construction alone, for example, constitutes 576 pages. *See Report and Recommendation of Special Master Regarding Claim Construction at 2* (citing "copious briefing"). In these ways, the present suit is quite complex, although, perhaps, not extraordinarily so. The greater context of this suit is extraordinary, however: the plaintiffs have filed more than 300 related patent applications based upon an original patent application filed in 1981 and supplemented in 1987. Together, these applications contain an estimated 10,000 claims. Furthermore, as observed [*5] by the Special Master appointed in this case, the 1987 application alone constitutes over 300 columns of patent text and "is, by any measure, an extremely complex document." *Id.* at 2. These related applications may become relevant to the present case in respect to several issues including claim construction, enablement, adequacy of written description, indefiniteness, and inequitable conduct. *See id.* at 21. Thus, in this case, more than many, the court would benefit from a narrowing of the issues.

The reexamination process will serve this purpose. For example, the court will gain the benefit of the PTO's particular expertise, in that all prior art presented to the court will have been first considered by that agency. *See Braintree Laboratories, Inc. v. Nephron-Tech, Inc., 1997 U.S. Dist. LEXIS 2372, 1997 WL 94237, at *9 (D. Kan. 1997); Hamilton Indus., Inc. v. Midwest Folding Prod-*

*ucts Mfg., 1990 U.S. Dist. LEXIS 3138, 1990 WL 37642, at *1-2 (N.D. Ill. 1990).* Other potential efficiencies resulting from the reexamination process are numerous: (1) many discovery problems relating to the prior art may be alleviated; (2) the record of the reexamination likely would be entered at trial, reducing the [*6] complexity and length of the litigation; (3) the issues, defenses, and evidence will be more easily limited in pretrial conferences following a reexamination; (4) the outcome of the reexamination process may encourage a settlement without further involvement of the court; and (5) if the patent is declared invalid, the suit likely will be dismissed as to that patent. *Id.* These efficiencies will result in a reduced cost of litigation for the parties and more effective utilization of the limited resources of the court. *Id.*

Thus, a stay may result in a simplification or reduction of issues for the court's consideration, or it may dispense with the litigation entirely. These are considerable economies indeed, particularly in this case. Given the involved prosecution history of the various patents-in-suit and hundreds of related patents, the number of claim terms at issue, the inordinate amount of prior art references, and the PTO's conclusion that all of the challenged claims warrant reexamination, the court finds particular merit in permitting an additional layer of review by the PTO before expending further judicial resources. *See Digital Magnetic Systems, Inc. v. Ainsley,* [*7] *213 U.S.P.Q.290,290 (W.D.Okla. 1982)* ("Congress enacted the reexamination procedure to provide an inexpensive, expedient means of determining patent validity which, if available and practical, should be deferred to by the courts."); *Softview Computer Products Corp. v. Haworth, Inc., 2000 U.S. Dist. LEXIS 4254, 2000 WL 1134471, at *3 (S.D.N.Y. 2000)* ("The grant of a stay will maximize the likelihood that neither the Court nor the parties expend their assets addressing invalid claims."). Furthermore, the court notes that discovery is not complete, and the trial, although scheduled, is some nine months in the future. In light of all these factors, and considering that the reexamination process will proceed "with special dispatch," *35 U.S.C. 305,* the court concludes that a stay is the most compelling alternative.

The court recognizes that a stay will cause further delay in a case that has suffered several delays already, as well as considerable distress to the plaintiffs. The court is sensitive to the plaintiffs' right to have their day in court. Nonetheless, for the reasons already mentioned, the court is convinced that a stay is appropriate in this particular case. In addition, [*8] the court reminds the plaintiffs that they affirmatively invoked the rights of the patent statute; they can hardly be heard now to complain of the rights afforded others by that same statutory framework. Thomson is legally entitled to invoke the

reexamination mechanism, and the PTO has determined that reexamination is warranted. There is nothing facially untoward in that. Moreover, the court notes that if, after reexamination, the plaintiffs' patents are again upheld, the plaintiffs' rights will only be strengthened, as the challenger's burden of proof becomes more difficult to sustain. *See Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc., 807 F.2d 955, 961 (Fed. Cir. 1986)* (holding that upon reissue, the burden of proving invalidity is 'made heavier') (quoting *Interconnect Planning Corp. v. Feil, 774 F.2d 1132, 1139 (Fed. Cir. 1985))*. In this light, and given the particular circumstances of this case, the court cannot find that the prejudice to the plaintiffs is undue.

Objecting to a stay, the plaintiffs also have complained of dilatory conduct by the defendants, who, in turn, have accused the plaintiffs of "burying" the PTO in claims and prior [*9] art references. *See, e.g.,* Mem. of Plaintiffs in Opp. to Defs.' Joint Motion to Stay (D.I. 488) at 5-22 (detailing ways in which the defendants allegedly "have repeatedly acted to complicate and delay the resolution of this litigation"); Defs.' Joint Brief in Support of Motion to Stay (D.I. 460) at 4 ("Many of the Harvey patents had vast numbers of cited prior art references of record, effectively burying the most relevant ones.") and 7 ("It appears that PMC sought to 'overwhelm' the PTO and the Courts.").

As a brief response to the accusation of dilatory conduct, the court notes that Thomson's request for reexamination of the *'825 patent* comprised 2,610 pages; its request regarding the '277 patent totaled 4,736 pages. It is presumed that such an effort requires an enormous expenditure of time and other resources; thus, the timing of Thomson's reexamination requests does not, necessarily, reflect undue delay. Furthermore, as noted above, Thomson was legally entitled to invoke the reexamination procedure when it did. As to the defendants' repeated complaint that the plaintiffs overwhelmed the PTO with prior art references during prosecution of the patents-in-suit, the implications [*10] of such alleged conduct will be explored at another time in the litigation, if necessary. At this stage in the process, the court is satisfied that the PTO has found "substantial new questions of patentability" raised by each of the cited references, and has determined that all of the challenged claims of the *'825 patent* necessitate a reexamination. *See* PTO's Decision Granting Reexamination, Supp. Appendix to Defs.' Joint Brief in Support of Motion to Stay (D.I. 467)

at 138. Although the court regrets a further delay in the present case, it is confident that the advantages of a stay outweigh the costs.

## III. CONCLUSION

Because the PTO's reexamination of one or more of the patents-in-suit may materially affect the issues in this case, the court will grant the defendants' motion to stay. The case is stayed pending a disposition of the PTO's reexamination of patent '825, and will be stayed pending reexamination of the '277 patent, if applicable. All pending motions will be denied without prejudice; the parties may refile them following the stay and upon the entry of a new scheduling order, if applicable.

Thus, for the aforementioned reasons, IT IS HEREBY ORDERED that: [*11]

1. The defendants' Motion to Stay Pending Reexamination by the U.S. Patent and Trademark Office (D.I. 459) is GRANTED. The proceedings are stayed from the date of this order until further notice.

2. The parties shall advise the court of any decision that results from the PTO's reexamination of the *'825 patent*, and any other decision of the PTO regarding reexamination of any of the other patents-in-suit.

3. The plaintiffs' Motion for Leave to Assert Claim 15 of U.S. Patent 4,965,825 (D.I. 399) is DENIED without prejudice.

4. Thomson's Motion to Dismiss or in the Alternative for Summary Judgment (D.I. 376) is DENIED without prejudice.

5. Phillips' Motion to Dismiss for Lack of Standing (D.I. 396) is DENIED without prejudice.

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

Date: May 14, 2003

I

LEXSEE 2003 U.S. DIST. LEXIS 27397

**ST. CLAIR INTELLECTUAL PROPERTY CONSULTANTS, INC., Plaintiff, v. SONY CORPORATION, et al, Defendants.**

**Civil Action No. 01-557-JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2003 U.S. Dist. LEXIS 27397*

**January 30, 2003, Decided**

**SUBSEQUENT HISTORY:** Partial summary judgment denied by *St. Clair Intellectual Prop. Consultants, Inc. v. Sony Corp., 2003 U.S. Dist. LEXIS 3540 (D. Del., Feb. 21, 2003)*

**PRIOR HISTORY:** *St. Clair Intellectual Prop. Consultants v. Sony Corp., 2002 U.S. Dist. LEXIS 17871 (D. Del., Sept. 3, 2002)*

**COUNSEL:** [*1] For St. Clair Intellectual Property Consultants Inc., Plaintiff: Frederick L. Cottrell, III, LEAD ATTORNEY, Richards, Layton & Finger, Wilmington, DE.

For Sony Corporation, Sony Electronics Inc, Sony Corporation of America, Defendants: Josy W. Ingersoll, LEAD ATTORNEY, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

For Sony Corporation, Sony Electronics Inc, Sony Corporation of America, Counter Claimants: Josy W. Ingersoll, LEAD ATTORNEY, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

For St. Clair Intellectual Property Consultants Inc., Counter Defendant: Frederick L. Cottrell, III, LEAD ATTORNEY, Richards, Layton & Finger, Wilmington, DE.

**JUDGES:** Joseph J Farnan, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Joseph J Farnan

**OPINION**

*MEMORANDUM ORDER*

Pending before me is a Motion To Stay Pending The Outcome Of Reexamination Proceedings (D.I. 202) filed by the Defendants ("Sony"). The Plaintiff ("St. Clair") opposes the stay.

In considering Sony's motion, I have read the papers submitted by the parties, The Patent Act of 1980, Robert L. Harmon's discussion of the Reexamination Procedure in his treatise, *Patents and The Federal Circuit,* (5th ed. 2001), and the four [*2] (4) District of Delaware cases cited by the parties, *Freeman v. Minnesota Mining & Mftr. Comp., 661 F. Supp. 886 (D. Del. 1987); United Sweetener USA, Inc. v. Nutrasweet Co., 766 F. Supp. 212 (D.Del. 1991); Rohm & Haas Co. v. Brotech Corp., C.A. No. 90-109 (JJF), 1992 U.S. Dist. LEXIS 21721 (D.Del. July 16, 1992); and Gioello Enterprises, Ltd. v. Mattel, C.A. No. 99-375 (GMS), 2001 U.S. Dist. LEXIS 26158, 2001 WL 125340 (D.Del. Jan. 29, 2001)*

In support of its motion, Sony contends that "there is a liberal policy in favor of granting motions to stay proceedings pending the outcome of USPTO reexamination proceedings." *ASCII Corp. v. STD Entm't USA, Inc., 844 F. Supp. 1378, 1381 (N.D.Cal. 1994)*

Sony argues that a stay in this case is appropriate because: 1) St. Clair produces no products under the patents-in-suit, and therefore, money damages will be an adequate remedy for any delay a stay might cause; 2) a stay permitting reexamination has the potential to moot the entire action, or at least simplify it dramatically.

St. Clair responds that a stay is not warranted because: 1) Sony's request is made only to delay the case; 2) [*3] discovery is complete and the trial date weeks away and therefore, the delay that will result while the reexamination proceedings go forward will unduly prejudice St. Clair in the presentation of its case; 3) St. Clair argues a stay will not simplify the issues that the trial must resolve due to the "non-overlapping issues" between the reexamination and this litigation; and 4) St. Clair contends that cancellation of the patent claims is unlikely.

Case 1:07-cv-00226-JJF    Document 29-2    Filed 08/28/2007    Page 16 of 21

Page 2
2003 U.S. Dist. LEXIS 27397, *

Courts typically cite three factors that should guide the exercise of a court's discretion when deciding whether a stay is appropriate: 1) whether the granting of a stay would cause the non-moving party to suffer undue prejudice from any delay or allow the moving party to gain a clear tactical advantage over the non-moving party; 2) whether a stay will simplify the issues for trial; and 3) whether discovery is complete and a trial date set.

Applying these factors in the context of the parties' arguments, I find that a delay in the commencement of the February 2003 trial will unduly prejudice St. Clair for the reasons it cites. I also find, as St. Clair contends, that it is unlikely the pending reexamination proceedings will do much to simplify [*4] the issues that need to be tried in this case. And finally, the fact that the instant motion was filed after the close of discovery and weeks before the commencement of the scheduled trial date is persuasive.

In addition to the three traditional factors, I have also considered whether a stay would substantially contribute to or result in a final disposition of this case or substantially contribute to a more efficient and less costly trial.

In this regard, I find that a stay will do neither because: 1) This case, like many, is about "the injunction." If successful at trial, St. Clair will aggressively seek an injunction against Sony. Sony will aggressively oppose St. Clair's efforts. In my view, the pending reexamination proceeding will not do much to contribute to this end game strategy. 2) The reexaminations requested by Sony, are more about the claim interpretation provided by me than any prior art contentions. 3) Lastly, I am persuaded that neither St. Clair nor Sony will be unduly prejudiced by proceeding to trial now, because I am convinced that a trial and appeal is what will finally resolve the parties' dispute.

NOW THEREFORE, FOR THE REASONS DISCUSSED, IT IS HEREBY ORDERED [*5] that Sony's Motion To Stay Pending The Outcome Of Reexamination Proceedings (D.I. 202) is ***DENIED.***

January 30, 2003

DATE

Joseph J Farnan

UNITED STATES DISTRICT JUDGE

**J**

LEXSEE 2000 U.S. DIST. LEXIS 11274

**SOFTVIEW COMPUTER PRODUCTS CORP. and ERGO VIEW TECHNOLO-GIES CORP., Plaintiffs, -against- HAWORTH, INC., Defendant.**

**97 Civ. 8815 (KMW)(HBP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2000 U.S. Dist. LEXIS 11274; 56 U.S.P.Q.2D (BNA) 1633*

**August 9, 2000, Decided**
**August 10, 2000, Filed**

**DISPOSITION:** [*1] Plaintiffs' application to stay this matter pending outcome of PTO's reexamination proceeding granted.

**COUNSEL:** For SOFTVIEW COMPUTER PRODUCTS CORP., ERGO VIEW TECHNOLOGIES CORP., plaintiffs: Philippe Bennett, Coudert Brothers, New York, NY.

For HAWORTH, INC., defendant: Stuart I. Friedman, Friedman, Wittenstein & Hochman, New York, NY.

For ERGO VIEW TECHNOLOGIES CORP., SOFT-VIEW COMPUTER PRODUCTS CORP., counter-defendants: Philippe Bennett, Coudert Brothers, New York, NY.

For HAWORTH, INC., counter-claimant: Stuart I. Friedman, Friedman, Wittenstein & Hochman, New York, NY.

**JUDGES:** HENRY PITMAN, United States Magistrate Judge.

**OPINION BY:** HENRY PITMAN

**OPINION:**

MEMORANDUM OPINION AND ORDER

PITMAN, United States Magistrate Judge:

I. Introduction

This matter has been referred to me for general pre-trial supervision and to report and recommend with respect to dispositive motions. By letters dated July 5 and July 24, 2000 plaintiffs seek to stay this action pending the outcome of a re-examination proceeding that is now pending before the United States Patent and Trademark Office ("PTO"). For the reasons stated below, the motion is granted and the matter is stayed pending the resolution [*2] of the re-examination proceeding.

II. Facts

In principal part, this is a patent infringement action. n1 Plaintiffs allege that defendant's patent, United States Patent No. *4,616,798* n2 (the " *'798* Patent"), is invalid and unenforceable and seek a declaratory judgment to that effect. Defendant denies the material allegations of the complaint and has asserted a counterclaim alleging that several of plaintiffs' products infringe the *'798* Patent. Five claims of the *'798* Patent are alleged to be in-fringed, namely Claims 31, 32, 33, 34 and 36. n3 Defendant has never sought injunctive relief against plaintiffs' alleged infringement.

n1 Plaintiffs have also asserted non-patent claims in which they allege that defendant is im-properly attempting to enforce a patent that it knows is invalid. See generally *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 174, 15 L. Ed. 2d 247, 86 S. Ct. 347 (1965).* Because this aspect of the case is depend-ent on the outcome of patent validity and in-fringement issues, I have bifurcated these claims and stayed discovery concerning them until the patent infringement and validity issues are re-solved (see Docket Item No. 54).

[*3]

2000 U.S. Dist. LEXIS 11274, *; 56 U.S.P.Q.2D (BNA) 1633

n2 The '798 Patent's subject matter is an adjustable support mechanism for computer keyboard shelves.

n3 In a Memorandum Opinion and Order dated December 10, 1999, I denied Haworth's application to assert that plaintiffs infringed twelve (12) additional claims. Haworth has appealed this decision to the Honorable Kimba M. Wood, United States District Judge, to whom this matter is assigned. That appeal is currently pending.

At some unspecified date in the first half of this year, Softview requested that the PTO commence a reexamination proceeding with respect to certain claims of the '798 Patent. The PTO granted the request on or about June 23, 2000, finding that there are "substantial new questions of the patentability of claims 1, 23, 24, 25, 26, 31, 32, 36, 37 and 38 . . ." (Exhibit F to the Letter of Philippe Bennett, Esq., dated July 24, 2000).

III. Analysis

A reexamination proceeding is an administrative proceeding conducted by PTO for the purpose of determining the validity of an existing patent. See *35 U.S.C. § 301*, et seq. A reexamination [*4] can be requested by any person at any time upon showing the existence of "prior art," "consisting of patents or printed publications which that person believes to have a bearing on the patentability of any claim of a particular patent." *35 U.S.C. §§ 301*, 302.

*Bausch & Lomb Inc. v. Alcon Lab., Inc., 914 F. Supp. 951, 952 (W.D.N.Y. 1996).*

One purpose of the reexamination procedure is to eliminate trial of the issue of patent claim validity (when the claim is canceled by the [PTO]), or to facilitate trial of that issue by providing the district court with the expert view of the PTO (when a claim survives the reexamination proceeding), *Gould v. Control Laser Corp., 705 F.2d 1340, 1342* (Fed. Cir.), cert. denied, *464 U.S. 935, 78 L. Ed. 2d 310, 104 S. Ct. 343 (1983); Ingro v. Tyco Industries, Inc., 1985 U.S. Dist. LEXIS 19300, 1985 WL 1649* at *1, *227 U.S.P.Q. (BNA) 69, 71 (N.D. Ill. 1985).* The procedure was intended "to provide an inexpen-

sive, expedient means of determining patent validity which, if available and practical, should be deferred to by the courts . . .," especially [*5] where the infringement litigation is in the early stages. *Digital Magnetic Systems, Inc. v. Ansley, 1982 U.S. Dist. LEXIS 12395, 1982 WL 52160,* at *1, *213 U.S.P.Q. (BNA) 290 (W.D. Okla. 1982).* As stated in the Digital Magnetic Systems case:

Parties should not be permitted to abuse the process by applying for reexamination after protracted, expensive discovery or trial preparation. Yet, in cases . . . which have not progressed beyond the initial litigation stages and in which the plaintiff has an adequate legal remedy, the reexamination procedure should be utilized.

Id.

*Snyder Seed Corp. v. Scrypton Sys., Inc., 1999 U.S. Dist. LEXIS 12149, 52 U.S.P.Q.2D (BNA) 1221, 1223 (W.D.N.Y. 1999).*

Although the reexamination procedure does not provide for an automatic stay of pending district court proceedings involving the same claims, see H.R. Rep. No. 1307 Part 1, 96th Cong., 2nd Sess. 4, reprinted in 1980 U.S.C.C.A.N. 6460, 6463, there is no question that a district court in which an infringement action has been filed has the discretion to stay the infringement action pending the outcome of the reexamination proceeding. [*6] *Ethicon, Inc. v. Quigg, 849 F.2d 1422, 1426-27 (Fed. Cir. 1988).* The following advantages have been found to result from a stay of district proceedings pending completion of reexamination proceedings:

1. All prior art presented to the Court will have been first considered by the PTO, with its particular expertise.

2. Many discovery problems relating to prior art can be alleviated by the PTO examination.

Case 1:07-cv-00226-JJF    Document 29-2    Filed 08/28/2007    Page 20 of 21

Page 3

2000 U.S. Dist. LEXIS 11274, *; 56 U.S.P.Q.2D (BNA) 1633

3. In those cases resulting in effective invalidity of the patent, the suit will likely be dismissed.

4. The outcome of the reexamination may encourage a settlement without further use of the Court.

5. The record of the reexamination would likely be entered at trial, thereby reducing the complexity and length of the litigation.

6. Issues, defenses, and evidence will be more easily limited in pre-trial conferences after a reexamination.

7. The cost will likely be reduced both for the parties and the Court.

*Emhart Indus. v. Sankyo Seiki Mfg., 1987 U.S. Dist. LEXIS 15033, 3 U.S.P.Q.2D (BNA) 1889, 1890 (N.D. Ill. 1982),* citing *Fisher Controls Co. v. Control Components Inc., 443 F. Supp. 581, 582 (S.D. Iowa 1977).* [*7] Accord *Snyder Seed Corp. v. Scrypton Sys., Inc., supra, 52 U.S.P.Q.2D (BNA) at 1223.* Courts have routinely stayed infringement actions pending the outcome of reexamination proceedings. E.g, *Snyder Seed Corp. v. Scrypton Sys., Inc., supra, 52 U.S.P.Q.2D (BNA) 1221; Bausch & Lomb Inc. v. Alcon Lab., Inc., supra, 914 F. Supp. 951; Sulzer, Inc. v. Black Clawson Co., 1995 U.S. Dist. LEXIS 8328, 93 Civ. 8721 (JGK), 1995 WL 363440 (S.D.N.Y. June 14, 1995); Brown v. Shimano American, 18 U.S.P.Q.2D (BNA) 1496 (C.D. Cal. 1991); Grayling Indus. v. GPAC, Inc., 1991 U.S. Dist. LEXIS 16750, 19 U.S.P.Q.2D (BNA) 1872 (N.D. Ga. 1991); Emhart Indus. v. Sankyo Seiki Mfg., supra, 3 U.S.P.Q.2D (BNA) 1889; Thomas & Betts Corp. v. Tishman Research Corp., 1986 U.S. Dist. LEXIS 17829, 86 Civ. 1926 (MJL), 1986 WL 13455 (S.D.N.Y. Nov. 17, 1986)*

In determining whether to grant a stay, courts have considered the following factors:

(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and [*8] whether a trial date has been set.

*Xerox Corp. v. 3Com Corp., 69 F. Supp. 2d 404, 406 (W.D.N.Y. 1999)* (citations omitted). See also Note, Reexamination Reality: How Courts Should Approach a Motion to Stay Litigation Pending the Outcome of Reexamination, 66 Geo. Washington L. Rev. 172, 178 (1997).

Although I believe that this is a close case, on balance, I believe that the equities weigh in favor of a stay.

First, it does not appear that a stay would unduly prejudice the patentee. Although Haworth correctly notes that plaintiffs have not acted with dispatch in seeking reexamination and that plaintiffs have pursued an extremely burdensome discovery program, the cost to Haworth of the litigation to date will not be affected by the grant or denial of a stay; denying the stay will not, without more, entitle Haworth to recover fees it has already spent litigating this case. In addition, if the parties continue to litigate the validity of the claims in this Court, and the PTO subsequently finds that some or all of the claims in issue here are invalid, the Court will have wasted time and the parties will have spent additional funds addressing an invalid claim [*9] or claims. Thus, although the denial of a stay can have no effect whatsoever on past events, the grant of a stay will maximize the likelihood that neither the Court nor the parties expend their assets addressing invalid claims.

Second, although there has been a great deal of activity in this litigation to date, much remains to be done before the case is ready for trial. Discovery is not yet completed, extremely voluminous summary judgment motions have been served, the Markman n4 hearing has not yet been held and the Pretrial Order has not yet been prepared. In would be a serious waste of both the parties' and the Court's resources if the Markman and summary judgment proceedings went forward and the claims were subsequently declared invalid or were amended as a result of the reexamination proceeding.

n4 See *Markman v. Westview Instruments, Inc., 517 U.S. 370, 134 L. Ed. 2d 577, 116 S. Ct. 1384 (1996)*

Third, a stay will necessarily simplify the issues. If the reexamination proceeding invalidates [*10] or narrows a claim or claims, the issues at trial will be simplified. Similarly, if the reexamination proceeding reaffirms all the claims as issued, the Court will then have the benefit of the PTO's expert analysis of the prior art that allegedly invalidates or limits the claims. See Note, Reexamination Reality: How Courts Should Approach a Motion to Stay Litigation Pending the Outcome of Reexamination, supra, 66 Geo. Washington L. Rev. at 180-81 & nn. 82-83.

2000 U.S. Dist. LEXIS 11274, *; 56 U.S.P.Q.2D (BNA) 1633

Haworth claims that a stay would prejudice it because, until the action is resolved, plaintiffs will unfairly gain market share. Haworth explains that because plaintiffs are not paying it royalties, plaintiffs can unfairly price their products below Haworth's licensees and thereby gain market share at the expense of Haworth's licensees. This argument does not, however, establish harm to Haworth. If the patent is ultimately found to be valid and infringed, plaintiffs will be responsible to Haworth for damages -- perhaps treble damages, *35 U.S.C. § 284* -- for all the infringing mechanisms that it has sold. Thus, it does not appear that staying the action will result in an financial damage to Haworth. [*11] In addition, if found to be infringing, plaintiffs will be subject to injunctive relief, *35 U.S.C. § 283,* which would entirely eradicate their market share with respect to infringing products. Thus, Haworth's prejudice argument is unpersuasive.

IV. Conclusion

Accordingly, for all the foregoing reasons, plaintiffs' application to stay this matter pending the outcome of the PTO's reexamination proceeding is granted. The Clerk of the Court is directed to remove this matter from the active docket of the Court until the conclusion of the PTO's reexamination proceeding. Defendant is to advise my chambers promptly of the conclusion of the reexamination proceedings.

Dated: New York, New York

August 9, 2000

SO ORDERED

HENRY PITMAN

United States Magistrate Judge

## <u>CERTIFICATE OF SERVICE</u>

     I, Patricia P. McGonigle, Esquire, hereby certify that on this 28th day of August 2007, I electronically filed the foregoing pleading with the Clerk of Court using CM/ECF which will send notification of such filing to all counsel of record.


           /s/ *Patricia P. McGonigle*
           _____
           Patricia P. McGonigle (ID No. 3126)
           pmcgonigle@svglaw.com