## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

VOITH PAPER GMBH & CO. KG      :
     :     Civil Action No. 07-226-JJF
        Plaintiff,      :
     :
         v.      :
     :
JOHNSONFOILS, INC.      :
     :
        Defendant.      :

## DEFENDANT'S ANSWERING BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PROTECTIVE ORDER PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 26(c) PROHIBITING THE DISCLOSURE OF VOITH'S HIGHLY CONFIDENTIAL INFORMATION TO INDIVIDUALS ENGAGED IN COMPETITIVE BUSINESS PRACTICES FOR OR ON BEHALF OF VOITH'S COMPETITOR JOHNSONFOILS, INC.

George H. Seitz, III (DE #667)
Patricia Pyles McGonigle (DE #3126)
Kevin A. Guerke (DE#4096)
Seitz, Van Ogtrop & Green, P.A.
222 Delaware Avenue, Suite 1500
P.O. Box 68
Wilmington, DE 19899
(302) 888-0600

-and-

Anthony S. Volpe
Randolph J. Huis
Ryan W. O'Donnell
Volpe and Koenig, P.C.
United Plaza, Suite 1600
30 South 17th Street
Philadelphia, PA 19103
(215) 568-6400

*Attorneys for Defendant*
*JohnsonFoils, Inc.*

# TABLE OF CONTENTS

Page

I.    NATURE AND STAGE OF THE PROCEEDINGS ........................................... 1

II.   SUMMARY OF ARGUMENT ........................................................... 2

III.  STATEMENT OF FACTS ............................................................... 3

IV.   ARGUMENT ...................................................................... 6

    A.    Voith Failed To Show Good Cause For The Issuance Of A Protective Order ...................................................................... 7

        1.    Standard for a Protective Order ..................................... 7

        2.    Voith Has Failed to Meet Its Burden Of Establishing the Need for a Protective Order ......................................... 10

            a.    Voith's CBI Is Of No Value to a Patent Prosecutor ......... 10

            b.    Voith Had Failed to Establish That Any JohnsonFoils' Attorney is a Competitive Decisionmaker ................................................. 11

        3.    Prejudice to JohnsonFoils .......................................... 15

    B.    Voith's Proposed Protective Order Is Overly Broad ............................ 16

    C.    Voith's Motion For A Protective Order Is Yet Another Attempt To Stall The Discovery Efforts Of JohnsonFoils .................................. 18

    D.    JohnsonFoils Proposed Protective Order is Reasonable ....................... 19

V.    CONCLUSION ................................................................... 20

i

## TABLE OF AUTHORITIES

<u>Cases</u>                                                                                   <u>Page</u>

*AFP Advanced Food Prods. LLC v. Snyder's of Hanover Mfg., Inc.,*
    2006 U.S. Dist. LEXIS 426, No. 05-3006 (E.D. Pa. Jan. 6, 2006) .............9, 15

*Avocent Redmond Corp. v. Rose Electronics,*
    242 F.R.D. 574 (W.D. Wash. 2007) ...................................................... 13, 14, 16

*Brown Bag Software v. Symantec Corp.,*
    960 F.2d 1465 (9th Cir. 1992) ........................................................................10

*In re Sibia Neurosciences, Inc.,*
    1997 U.S. App. Lexis 31828 (Fed. Cir. Oct. 22, 1997) ............................2, 9, 13

*Interactive Coupon Mktg. Group, Inc. v. H.O.T. Coupons, LLC,*
    1999 U.S. Dist. LEXIS 12437 (N.D. Ill. Aug. 9, 1999) ....................................17

*MedImmune, Inc. v. Centocor, Inc.,*
    271 F. Supp. 2d 762 (D. Md. 2003) ...................................................................9

*Mikohn Gaming Corp. v. Acres Gaming, Inc..*
    1998 U.S. Dist. LEXIS 22251 (D. Nev. 1998)...................................................12

*Motorola, Inc. v. Interdigital Tech. Corp.,*
    1994 U.S. Dist. LEXIS 20714 (D. Del. Dec. 19, 1994)......................................12

*Oppenheimer Fund, Inc. v. Sanders,*
    437 U.S. 340 (1978) .........................................................................................7

*Pergo, Inc. v. Faus Group, Inc.,*
    2005 U.S Dist. LEXIS 40601 (E.D. N.C. Sept. 20, 2005) .................................13

*Photoprotective Technologies, Inc. v. Gallas,*
    2007 U.S. Dist. LEXIS 63265 (W.D. Tex. Aug. 27, 2007) .........................12, 14

*R.R. Donnelley & Sons Co. v. Quark, Inc.,*
    2007 U.S. Dist. LEXIS 424 (D. Del. Jan. 4, 2007)...........................................15

*Safe Flight Instruments Corp. v. Sundstrand Data Control, Inc.,*
    682 F. Supp. 20, 23 (D. Del. 1988) .................................................................15

*Shingara v. Skiles,*
    420 F.3d 301 (3d Cir. 2005) ......................................................................... 8, 15

*Smartsignal Corp. v. Expert Microsystems, Inc.,*
    2006 U.S. Dist. LEXIS 32305 (N.D. Ill. May 12, 2006 ................................... 13

*Trading Techs. Int'l, Inc. v. eSpeed. Inc.,*
    2004 U.S. Dist. LEXIS 19429 (N.D. Ill. Sept. 24, 2004) ................................... 9

*U.S. Steel Corp. v. United States,*
    730 F.2d 1465 (Fed. Cir. 1984)..................................................... 2, 8, 9, 12, 13

Rules Cited

Fed. R. Civ. P. 26(b)(2) ....................................................................... *passim*

D. Del. Local Rule 26.2 ..................................................................... *.passim*

35 U.S.C. §112................................................................................................ 2

37 C.F.R. 1.56 ............................................................................................... 2

37 C.F.R 1.98................................................................................................ 2, 11

37 C.F.R 1.540 ............................................................................................. 17

37 C.F.R. 1.535............................................................................................. 17

Defendant, JohnsonFoils Inc. ("JohnsonFoils"), hereby submits its Opposition to Plaintiff, Voith Paper, GMBH & Co., KG's ("Voith"), Motion For A Protective Order (D.I. No.52), Opening Brief in support thereof (D.I. No. 53), and Proposed Protective Order.

## I.    NATURE AND STAGE OF THE PROCEEDINGS

With the below corrections to Voith's mischaracterizing of the facts, JohnsonFoils accepts the factual allegations set forth in pages 1-3 of Voith's Opening Brief under the section "Nature And Stage Of Proceedings".

First, characterizing the deferred filing of JohnsonFoils' answer, affirmative defenses, and counterclaims on August 16, 2007 as a result of merely "unopposed extensions of time" is, at best, misleading. The belated filing was a result of a mutual assent to engage in settlement discussions, including a meeting in Chicago on June 28, 2007.

With regard to JohnsonFoils' early filing of deposition notices, no notice of service was filed and the notices were withdrawn. See Exhibit A. JohnsonFoils had already advised Voith that the notices were provided for advance notice to overseas witnesses in order to facilitate mutually agreeable scheduling which is a fact that most would see as a courtesy.

The following are in addition to Voith's presented facts:

On December 17, 2007, JohnsonFoils filed its "Motion to Compel Production of Documents In Response To Its First Set of Document Requests". D.I. 49.

On December 21, 2007, JohnsonFoils filed its "Motion For Leave To Amend Its Counterclaims". D.I. 54.

## II.    SUMMARY OF ARGUMENT

1.    Voith failed to make the required specific showing of good cause for the institution of a protective order.  The scope of Voith's claims to confidential business information ("CBI") is generic to any patent litigation in which damages are sought and Voith has made no showing of any specific risk of disclosure beyond the fact that Voith and JohnsonFoils are market competitors.  Such broad assertions fall well short of the required showing of a specific risk of harm.  The patents at issue admit that each and every element contained in their claims has been known in the art, in many instances for decades before the patent applications were filed.  In light of this admission of old technology, there is no risk of disclosing sensitive information to JohnsonFoils.  To the extent Voith has asserted a risk of disclosing trade secrets, such claims raise serious concerns about Voith's adherence to the required duty of disclosure required by 37 C.F.R. 1.56 and 1.98 during the prosecution of the asserted patents or to the obligation imposed by 35 U.S.C. §112.

2.    Voith's argument for a *per se* rule denying patent prosecuting attorneys access to confidential information is contrary to Federal Circuit precedent which requires an individualized factual showing of competitive decisionmaking before denying access to an attorney. U.S. Steel Corp. v. United States, 730 F.2d 1465 (Fed. Cir. 1984); See also In re Sibia Neurosciences, Inc., Docket No. 525, 1997

U.S. App. Lexis 31828, at *7-9 (Fed. Cir. Oct. 22, 1997) (unpublished). See Exhibit B.    Voith did not make any individualized factual showing of competitive decision-making by JohnsonFoils' patent prosecution counsel.

3.    Voith's motion for a protective order is yet another step in its repeated efforts to avoid complete and fair responses to JohnsonFoils' discovery requests. After delaying discovery with repeatedly unfulfilled promises to provide a draft protective order, Voith filed a motion to compel against JohnsonFoils, which insisted that JohnsonFoils, produce documents under Local Rule 26.2.  That motion was filed despite JohnsonFoils' repeated pleas to avoid duplicative discovery efforts and attempts to settle on a draft protective order. In response to Voith's demands, JohnsonFoils produced over two-hundred thousand (200,000) pages of documents pursuant to Rule 26.2.  In what can only be described as clear acts of bad faith, Voith has continually refused to produce any meaningful documents under Rule 26.2. which is the Rule Voith insisted should be the basis for JohnsonFoils' production.

4.    Voith's proposed protective order is overly broad and unjustified.  The order proposes to exclude JohnsonFoils' counsel who filed *ex-parte* reexamination proceedings before the USPTO.  Voith knows that the reexamination proceedings are *ex-parte proceedings based on publicly available documents* and JohnsonFoils has no future involvement in the proceedings. Additionally, Voith's blanket position that patent prosecution counsel must be barred is a generalization that has been rejected by the Federal Circuit.

3

III.    STATEMENT OF FACTS

JohnsonFoils served its First Set of Requests for Production of Documents and Things to Plaintiff on August 13, 2007.   Voith served its Objections and Responses to JohnsonFoils' First Set of Requests for Production of Documents and Things to Plaintiff on September 17, 2007. See Exhibit C.

On August 24, 2007, JohnsonFoils inquired of Voith about the status of the draft protective order which it had promised to circulate.   See Exhibit D.   On August 27, 2007, Voith confirmed that a proposed protective order would be forthcoming. See Exhibit E.

On September 20, 2007, JohnsonFoils again inquired into the status of the promised protective order and stated that it is ready to produce documents as soon as the terms are agreed. See Exhibit F.

On September 21, 2007, Voith confirmed that a draft protective order would be provided within a period of one (1) week. See Exhibit G.  Voith's September 21, 2007 letter further dictated that the Protective Order would have two levels of confidentiality: "Confidential" and "Highly Confidential." Voith did not send the protective order by September 28, 2007 as promised.

Voith's September 21, 2007 letter also scheduled a discovery conference between the parties for October 1, 2007 at 11:30 a.m. to resolve pending discovery issues.  While JohnsonFoils' counsel was prepared and ready to discuss this matter

4

with Voith at the agreed upon time and date, Voith's counsel neither attended this conference nor provided the courtesy of cancelling or rescheduling the conference.

On October 18, 2007, JohnsonFoils again inquired whether Voith intended to circulate the promised draft protective. See Exhibit H.

On November 7, 2007, Voith sent its first documents (VTH000001 – VTH 005391) in response to JohnsonFoils' discovery requests. See Exhibit I. While Voith asserted that the documents were to be treated as Attorneys' Eyes Only pursuant to Local Rule 26.2, it added preconditions outside of the scope of the Court's Rule. See Id.

On November 8, 2007, JohnsonFoils advised Voith that after receiving the accompanying unilateral demands, it would be returning the boxes, unopened, until a protective order was agreed upon. See Exhibit J.

On November 9, 2007, Voith filed a motion to compel documents responsive to Voith's discovery requests asserting JohnsonFoils should produce documents under Local Rule 26.2. D.I. 42.

On November 16, 2007, JohnsonFoils advised Voith that the proposed Protective Order was confusing, unworkable, and went well beyond the protections required in this litigation. JohnsonFoils provided Voith with its proposed protective order that same day. See Exhibits K and L.

As the parties were, and remain, unable to reach agreement on the terms of the protective order, on November 19 and 21, 2007 JohnsonFoils produced more

than 13,000 pages of documents pursuant to Local Rule 26.2.  <u>See</u> Exhibits M and N.

On November 19 and 26, 2007, JohnsonFoils requested that Voith immediately produce its documents in accordance with Local Rule 26.2, and without its extraneous limitations.  <u>See</u> Exhibits O and P.  Voith responded, on November 26, 2007, that it would only produce its documents in accordance with its unilaterally imposed restrictions which are well beyond the requirements of Local Rule 26.2. <u>See</u> Exhibit Q.

On November 21 and November 26, 2007, the parties exchanged e-mails regarding the protective order in which JohnsonFoils reiterated its position that it did not see the need for the restrictions on JohnsonFoils and reiterated the following points:

      1.    The subject matter of the patents-in-suit has long been public and there is little, if any, information to be produced that relates to current prosecution for patents that are near expiration;

      2.    Expressed a willingness on the part of JohnsonFoils to consider safeguards about who serves as the "party representative" and providing access to "in-house" counsel;

      3.    In order to mount a defense, JohnsonFoils must have people with knowledge of the industry to have access to documents in order to prepare its defense; and

4.      Requested that instead of restricting a universe of CBI documents that Voith identify specific documents with specific risks and use the provisions of Rule 26 with respect to those particular documents. <u>See</u> Exhibit P.

On December 7, 2007, JohnsonFoils wrote to Voith again requesting that it produce the requested documents pursuant to Local Rule 26.2 and advising Voith that a motion to compel would be filed if the documents were not forthcoming.

On December 17, 2007, JohnsonFoils filed its "Motion to Compel Production of Documents In Response To Its First Set of Document Requests". D.I. 49.

To date, JohnsonFoils has produced over two-hundred thousand (200,000) pages of documents pursuant to Local Rule 26.2. On December 31, 2007 and January 2 and 4, 2008 Voith produced approximately 7000 pages of documents pursuant to Rule 26.2. Based on the document numbers of the produced documents (VTH 1-637; VTH 22817-29898), it appears that over 20,000 pages of documents have been withheld, are not identified on any log, and are not likely to be produced without an Order of this Court.

IV.    ARGUMENT

A.      Voith Failed To Show Good Cause For The Issuance Of A Protective Order

1.      Standard for a Protective Order

Under the Federal Rules of Civil Procedure, courts construe discovery rules liberally to serve the purposes of discovery in order to provide the parties with information essential to the proper litigation of all relevant facts, to eliminate

7

surprise, and to promote settlement. <u>Oppenheimer Fund, Inc. v. Sanders</u>, 437 U.S. 340, 351 (1978). A court "for good cause shown" may, in certain circumstances, enter a protective order in the context of discovery. The party seeking a protective order bears the burden of showing good cause for the order to issue. Fed. R. Civ. P. 26. Good cause requires a party to show that disclosure will result in a clearly defined, specific and serious injury. Broad allegations of harm are not sufficient to establish good cause. <u>Shingara v. Skiles</u>, 420 F.3d 301, 306 (3d Cir. 2005).

Based on the facts known to JohnsonFoils, JohnsonFoils does not dispute that there is good cause to protect both parties' confidential business information ("CBI") pursuant to <u>Shingara v. Skiles</u>, 420 F.3d at 306. The parties dispute the scope of Voith's proposed protective order which seeks to limit access of JohnsonFoils' attorneys to Voith's CBI.

The scope of the protective order Voith seeks improperly limits access by JohnsonFoils' attorneys to confidential information under the principles set forth by the Federal Circuit in <u>U.S. Steel Corp. v. United States</u>, 730 F.2d 1465 (Fed. Cir. 1984). Risk of inadvertent disclosure of trade secrets exists where the factual circumstances show that an attorney acts as a competitive decisionmaker. <u>U.S. Steel Corp.</u>, 730 F.2d at 1468. Competitive decisionmaking refers to an attorney's activities, association, and relationship with a client that are such as to involve attorney's advice and participation in any or all of the client's decisions made in light of similar or corresponding information about a competitor. <u>Id</u>. A factual inquiry is required, and therefore the denial or grant of access cannot rest on a

general assumption that one group of lawyers is more likely or less likely to inadvertently breach its duty under a protective order. Id. To the contrary, the decision to deny access to discovered materials shall be done on a case-by-case and lawyer-by-lawyer basis. AFP Advanced Food Prods. LLC v. Snyder's of Hanover Mfg., Inc., 2006 U.S. Dist. LEXIS 426, No. 05-3006, 2006 WL 47374, at *2 (E.D. Pa. Jan. 6, 2006). See Exhibit R.

The Federal Circuit clearly requires an individualized factual showing of competitive decisionmaking before denying access to an attorney. U.S. Steel, 730 F.2d at 1468; See also In re Sibia Neurosciences, Inc., Docket No. 525, 1997 U.S. App. Lexis 31828, at *7-9 (Fed. Cir. Oct. 22, 1997) (unpublished). See Exhibit B. Outside counsel should not be denied access based on the generalization that they prosecute patents for the defendant. The facts, not the category, must decide the result. Id. Each case must be decided based on the specific facts involved therein. Id.; See also Trading Techs. Int'l, Inc. v. eSpeed, Inc., 2004 U.S. Dist. LEXIS 19429, No. 04 C 5312, 2004 WL 2534389, at *1 (N.D. Ill. Sept. 24, 2004) (rejecting a per se rule denying access to patent attorneys based on U.S. Steel and In re Sibia), MedImmune, Inc. v. Centocor, Inc., 271 F. Supp. 2d 762, 774 n.13 (D. Md. 2003) ("If shaping patent applications amounts to competitive decisionmaking, the Court has trouble imagining a patent prosecutor who would not meet that standard."). See Exhibit S. In addition to determining whether an attorney is a competitive decisionmaker, courts must also consider whether denying that attorney access to

confidential material would work a substantial hardship on that attorney's client. See U.S. Steel, at 1468.

Whether any amount of inadvertent disclosure of confidential information is acceptable is determined by balancing the potential injury to the party disclosing the confidential information against the need for access by the moving party. Brown Bag Software v. Symantec Corp., 960 F.2d 1465, 1470 (9th Cir. 1992).

### 2.    Voith Has Failed to Meet Its Burden Of Establishing the Need for a Protective Order

The party seeking a protective order bears the burden of showing good cause for the order to issue. Fed. R. Civ. P. 26(c).

### a.    Voith's CBI Is Of No Value to a Patent Prosecutor

Voith's motion attempts to create the appearance that highly sensitive technology is at risk of disclosure in this case. See Voith's Opening Brief at 16-17. However, at the outset, it is important to note that the Patents-in-Suit claim priority back to a 1990 application and are due to expire in September 2010. Moreover, the Patents-in-Suit admit that the elements recited in every claim are well known in the art, citing references dating back to as early as 1964. See the '805 Patent at col. 1, ln. 14, col. 2, ln. 45 attached hereto as Exhibit T. Clearly, there is very little that is secret about these inventions, and the technology is old and well known.

For these reasons, Voith cannot and does not point to any pending applications that claim priority from the Patents-in-Suit and cannot cite to any particular technology at risk. Instead, it relies on vague generalities and concludes,

without factual basis, that this so called technical CBI would permit JohnsonFoils to focus its pending patent applications and allow the holder of Voith's CBI to better formulate competitive bids. See Voith's Opening Brief at 16-17. This argument ignores the earlier stated fact that it is old technology at issue which at the time of the application in 1990 was neither new nor cutting edge. Moreover, any newly developed technology not covered under the Patents-in-Suit falls outside the scope of JohnsonFoils' discovery requests because it cannot be relevant to any claim or defense in this case. Voith does not identify any specific document request that would lead to the production of any such new technology related documents. Even if such requests would potentially encompass such new technology, JohnsonFoils has repeatedly advised Voith that it did  not see how such documents would be relevant and offered to address those instances on a case by case basis. Voith has repeatedly rejected this offer as being unwieldy.  However, Voith has never identified how many of its withheld CBI documents consist of technical CBI as opposed to economic CBI.

Even if such trade secrets exist in technical CBI responsive to JohnsonFoils' discovery requests, serious questions of fraud during the prosecution of the patents before the United States Patent and Trademark Office ("PTO") are implicated See 37 C.F.R. §§ 1.56 and 1.98. Voith had a duty to disclose such information during the prosecution of the Patents-in-Suit and now has an affirmative duty to disclose relevant prior art during the pending reexaminations of the Patents-in-Suit. As a

11

result, JohnsonFoils should not be prejudiced by Voith's inequitable conduct before the PTO.

> **b.    Voith Had Failed to Establish That Any JohnsonFoils' Attorney is a Competitive Decisionmaker**

As set forth previously, the inquiry on whether an attorney should be barred from patent prosecution focuses on whether the counsel can be considered a competitive decisionmaker. In other words, whether the attorneys' activities, associations and relationship with a client are such as to involve the attorney in any or all of the client's decisions (pricing, product design) made in light of similar or corresponding information about a competitor. U.S. Steel, at 1468.

Instead of submitting evidence that any of JohnsonFoils' attorneys who prosecute patents for JohnsonFoils are competitive decisionmakers, Voith relies on an argument that advocates a *per se* rule denying patent prosecuting attorneys access to confidential information. Although there are a few lower court decisions that may support this argument,[1] this approach has been rejected by a number of district courts. Photoprotective Technologies, Inc. v. Gallas, No. SA-06-CA-1122, 2007 U.S. Dist. LEXIS 63265 (W.D. Tex. Aug. 27, 2007)("Basing a "patent prosecution bar" solely on an attorney's practice of prosecuting patents on behalf of his client fails to consider the factual circumstances surrounding the attorney's activities, association and relationship with his client and the attorney's

---

[1]     Motorola, Inc. v. Interdigital Tech. Corp., No. Civ. 93-488-LON, 1994 U.S. Dist. LEXIS 20714, 1994 WL 16189689, at *7 (D. Del. Dec. 19, 1994); Mikohn Gaming Corp. v. Acres Gaming, Inc.. 1998 U.S. Dist. LEXIS 22251 (D. Nev. 1998). See Exhibits U and V.

involvement in his client's competitive decisionmaking.") (<u>See</u> Exhibit W); <u>Avocent</u> <u>Redmond Corp. v. Rose Electronics</u>, 242 F.R.D. 574, 579 (W.D. Wash. 2007) (denying the defendants' request for a "patent prosecution bar" provision where the defendants argued that "patent prosecution activities are 'competitive decisionmaking' activities because the 'objective of such activities is the issuance of patents designed to enjoin [d]efendants' products from the marketplace'" but failed to present evidence that the attorney prosecuting the plaintiff's patents advised the plaintiff in its competitive decisionmaking); <u>Smartsignal Corp. v. Expert</u> <u>Microsystems, Inc.</u>, No. 02-C-7682, 2006 U.S. Dist. LEXIS 32305 (N.D. Ill. May 12, 2006 (Rejecting per se rule that denies patent attorneys access to confidential information) (<u>See</u> Exhibit X); <u>Pergo, Inc. v. Faus Group, Inc.</u>, No. 5:05-CV-50, 2005 U.S Dist. LEXIS 40601 (E.D. N.C. Sept. 20, 2005) (Rejecting per se rule that denies patent attorneys access to confidential information) (<u>See</u> Exhibit Y). Moreover, the Federal Circuit clearly requires an individualized factual showing of competitive decisionmaking before denying access to an attorney. <u>U.S. Steel</u>, at 1468; <u>In re</u> <u>Sibia Neurosciences, Inc.</u>, 1997 U.S. App. Lexis 31828, at *7-9. <u>See</u> Exhibit B.

In its 34 page Opening Brief, Voith did not even attempt to make the individualized factual showing of competitive decisionmaking by JohnsonFoils' patent prosecution counsel required by the Federal Circuit. Voith takes special liberty in arguing that JohnsonFoils' lead counsel of record, Mr. Randolph J. Huis, has taken part in patent prosecution for JohnsonFoils. From the correspondence submitted as Exhibits in support of its motion, Voith is well aware that Mr. Huis,

13

although listed as lead counsel on the docket, is not the acting lead attorney for JohnsonFoils. More importantly, Voith has not made a single factual showing of any competitive decisionmaking on the part of Mr. Huis, or any other JohnsonFoils' attorney beyond the fact that counsel has participated in patent prosecution matters on behalf of JohnsonFoils. There is no evidence that counsel for JohnsonFoils has participated in product design, pricing, marketing or other competitive decisionmaking. These general averments of competitive decisionmaking are exactly the type courts have recognized as insufficient to warrant the exclusion of counsel under a protective order. <u>Photoprotective Technologies, Inc.</u>, U.S. Dist. LEXIS 63265 at *6 (Denying patent prosecution bar where defendants have presented no evidence about factual circumstances surrounding the attorney activity or about involvement in competitive decisionmaking); <u>Avocent Redmond Corp.</u>, 242 F.R.D. at 579 (Defendants not met burden of showing good cause where no evidence that suggests that patent prosecutors advise plaintiff in competitive decisionmaking). <u>See</u> Exhibit W.

Rather than make the required factual showing, Voith attacks the character of JohnsonFoils' attorneys' integrity by arguing that they concealed the extent of their involvement in patent prosecution activities.[2] Nothing could be further from the truth. JohnsonFoils never hid its attorneys involvement in patent prosecution

---

[2]     Voith also attempts to cast aspersions on JohnsonFoils by arguing that JohnsonFoils somehow tried to hide its relationship with its parent company AstenJohnson, Inc. by not filing a Rule 7.1 disclosure until December. This is nothing more than a make weight argument as it is well known in the papermaking industry that AstenJohnson is the parent company of JohnsonFoils. In fact, Voith has not even attempted to argue that it did not know that fact when it brought the instant action.

and much of that involvement is already of public record and easily accessible. At the same time, it was under no obligation to address Voith's unilateral demands for information in its letter writing campaign.

Other than an attempt to create an appearance of impropriety where none exists, Voith has offered no evidence that JohnsonFoils' attorneys have or would violate their duties owed to this Court and disclose or improperly use Voith's CBI. See Safe Flight Instruments Corp. v. Sundstrand Data Control, Inc., 682 F. Supp. 20, 23 (D. Del. 1988)(Counsel admitted to the bar of this Court are officers of the Court and are bound by the Code of Professional Responsibility). "A prosecution bar issued 'without some tangible reason or good cause other than the general threat of inadvertent misuse of discovered materials is the exact type of overly broad and generalized fear rejected in *Shingara* . . . .'" R.R. Donnelley & Sons Co. v. Quark, Inc., 2007 U.S. Dist. LEXIS 424 at *8 (D. Del. Jan. 4, 2007), quoting, AFP Advanced Food Prods. LLC v. Snyder's of Hanover Mfg., Inc., 2006 U.S. Dist. LEXIS 426, at *7 (E.D. Pa., Jan. 9, 2006). See Exhibits Z and R.

### 3.    Prejudice to JohnsonFoils

JohnsonFoils' lead trial counsel in this matter, Volpe and Koenig, P.C., has represented JohnsonFoils in intellectual property matters since the formation of AstenJohnson in 1999 and has represented AstenJohnson and its predecessors in interest for over twenty-five (25) years. Voith's unsupported allegations of harm pales in comparison to the prejudice to JohnsonFoils which would result from barring their attorneys, who are versed in the technology at issue, from examining

15

the entirety of Voith's discovery responses.    JohnsonFoils would likewise be prejudiced if it loses the benefit of Volpe and Koenig's experience and has to retain new attorneys and educate them on its technology. See Avocent Redmond Corp., 242 F.R.D. at 579 (exclusion of attorneys would work substantial hardship on Avocent because its litigator is familiar with litigating patents and has prosecuted patents of similar technology for plaintiff).

Given the age of the technology in question and the lack of showing of any competitive decisionmaking on the part of Volpe and Koenig's attorneys, the balance of hardships in this case clearly favor JohnsonFoils.


**B.    Voith's Proposed Protective Order Is Overly Broad**

Notwithstanding the fact that Voith has failed to establish good cause for prohibiting JohnsonFoils' attorneys from having access to the CBI as set forth in detail above at Section A, the provisions sought by Voith are overly broad.

Voith's generic claims to CBI do not provide adequate justification for the terms of the proposed protective order. Specifically, the proposed order contains the following provision:

> ...any of JohnsonFoils's counsel engaged in representing JohnsonFoils, either as of the date of this Order or anytime in the next three (3) years, in matters relating to the subject matter of this lawsuit that are pending, or will be pending, before the PTO, including without limitation patent prosecution and reexamination proceedings, shall be considered a Prohibited Person and be excluded from access to Voith's Confidential or Highly Confidential Information.

See Exhibit 8 to Voith's Opening Brief at page 9. As Voith well knows, JohnsonFoils' requests for reexamination of the patents-in-suit were filed on the strength of public documents and they are *ex parte* proceedings in which JohnsonFoils is not a party. Furthermore, since reexamination can only be requested on the basis of public documents, CBI cannot be the basis for a reexamination request.

When evaluating whether an attorney should have access to confidential materials, a court should balance the risk of inadvertent disclosure of trade secrets to competitors against the risk of impairing the process of litigation by denying access. Interactive Coupon Mktg. Group, Inc. v. H.O.T. Coupons, LLC, 1999 U.S. Dist. LEXIS 12437, No. 98 C 7408, 1999 WL 618969, at *2 (N.D. Ill. Aug. 9, 1999) (internal quotations omitted). See Exhibit AA. Pursuant to 37 C.F.R. §1.540, during *ex parte* reexaminations, third party submissions beyond the reply pursuant to §1.535 will not be considered. Because JohnsonFoils can have no involvement in the reexamination proceedings, any limitations placed on counsel who took part in the initial request is wholly unnecessary and unjustified.

Voith's proposed order also seeks to prevent representation in patent matters relating to the subject matter of the Patents-in-Suit. The Patents-in-Suit relate to "twin wire formers" which are used in the forming part of a papermaking machine. However, the term subject matter could be interpreted as including other parts of the papermaking machine such as the dryer and press sections as well as

17

papermaking fabrics all of which could be considered parts of a papermaking machine. This proposed restriction is overbroad on its face.

In addition, Voith seeks a three (3) year prosecution bar. This is despite the fact that the Patents-in-Suit are set to expire on September 9, 2010. Voith has not cited any case that supports such a lengthy prosecution bar and Voith has provided no justification for the proposed length.

Finally, the proposed protective order restricts JohnsonFoils' counsel from prosecuting applications based on "Confidential" and "Highly Confidential Information." Based on Voith's designations to date, these documents are expected to number in the tens of thousands of documents. Clearly, most of these documents will have little or no relation to the technology at issue.    Even if Voith could establish that some of JohnsonFoils' attorneys were competitive decisionmakers in the patent prosecution areas, the overwhelming majority of these documents would have little of no value to them.  In essence, Voith seeks to exclude JohnsonFoils' attorneys with patent prosecution experience for JohnsonFoils from having access to the universe of its CBI without a showing that any document bears a relationship to CBI that is relevant to any patent prosecution issue.

### C.    Voith's Motion For A Protective Order Is Yet Another Attempt To Stall The Discovery Efforts Of JohnsonFoils

The instant motion is yet another attempt by Voith to stall the production of any documents responsive to JohnsonFoils' discovery requests.  For over three (3) months Voith had delayed producing a proposed protective order despite repeated

promises to JohnsonFoils to do so. This protective order was requested by JohnsonFoils so that duplicative discovery efforts could be avoided in light of the vast quantity of responsive materials.

Voith's motion to compel ignored JohnsonFoils's attempts to avoid duplicative efforts and demanded JohnsonFoils produce immediately pursuant to Local Rule 26.2. Now, in perhaps the most transparent display of bad faith, after JohnsonFoils has produced documents in accordance with Voith's demands, Voith adopts the same argument and reasoning put forward by JohnsonFoils as to why a protective order should be put in place. See Voith's Opening Brief at page 33. Such a clear showing of gamesmanship exemplifies Voith's repeated showing of bad faith and unwillingness to participate fairly in the discovery process.

### D.    JohnsonFoils Proposed Protective Order is Reasonable

JohnsonFoils submitted an alternative Protective Order which is attached hereto as Exhibit BB. JohnsonFoils submits that this protective order is limited but addresses the parties' concerns regarding disclosure of CBI. To the extent Voith is concerned that in-house counsel or a corporate designee may be a competitive decisionmaker, JohnsonFoils advised Voith that it would be willing to address its concerns if and when they are specific rather than general. See Exhibit P.

## V.    CONCLUSION

Voith has failed to make an adequate showing of good cause both for the institution of a protective order, as well as for the provisions contained therein. Its efforts to burden JohnsonFoils are a clear misuse of the discovery process. Accordingly, JohnsonFoils respectfully submits that Voith's Motion for a Protective Order must be denied.

Dated:  January 9, 2008

Respectfully submitted,

Seitz, Van Ogtrop & Green, P.A.

/s/ Patricia P. McGonigle

George H. Seitz, III (DE #667)
gseitz@svglaw.com
Patricia Pyles McGonigle (DE #3126)
pmcgonigle@svglaw.com
Kevin A. Guerke (DE#4096)
kguerke@svglaw.com
222 Delaware Avenue, Suite 1500
P.O. Box 68
Wilmington, DE 19899
(302) 888-0600

-and-

Anthony S. Volpe
Randolph J. Huis
Ryan W. O'Donnell
Volpe and Koenig, P.C.
United Plaza, Suite 1600
30 South 17th Street
Philadelphia, PA 19103
(215) 568-6400

*Attorneys for Defendant*
*JohnsonFoils, Inc.*

20

## CERTIFICATE OF SERVICE

I, Patricia P. McGonigle, Esquire, hereby certify that on this 9th day of January 2008, I electronically filed the foregoing pleading with the Clerk of Court using CM/ECF which will send notification of such filing to counsel of record. Further, I caused a copy of the foregoing to be served upon the following counsel as noted

**Via Hand Delivery**
Adam W. Poff, Esquire
Young, Conaway, Stargatt & Taylor, LLP
1000 West Street, 17th Floor
P. O. Box 391
Wilmington, DE  19899

**Via Email**
Neil F. Greenblum, Esquire
Neal Goldberg, Esquire
Michael J. Fink, Esquire
Greenblum & Bernstein, PLC
1950 Roland Clarke Place
Reston, Virginia  20191

/s/ Patricia R. McGonigle

Patricia P. McGonigle (ID No. 3126)
pmcgonigle@svglaw.com

62775 v1

# EXHIBIT A

## Ryan O'Donnell

| | |
|---|---|
| **From:** | George H Seitz III [gseitz@svglaw.com] |
| **Sent:** | Thursday, August 23, 2007 4:45 PM |
| **To:** | MICHAEL FINK |
| **Cc:** | NEIL GREENBLUM; Ryan O'Donnell; apoff@ycst.com; CStover@ycst.com; Patricia P McGonigle; Randy Huis; Tony Volpe |

**Subject:** RE: Voith vs. Johnson Foils, USDC for Delaware: 1:07-cv-00226-JJF; Our Ref: J214720

Michael, in response to your letter, we will file a Notice tomorrow withdrawing the Motion.

Regarding the deposition notices, they were never filed in Court. You may consider them withdrawn. Tony, will be in touch with you about rescheduling.

Thank you.

*George H. Seitz, III*
*302-888-7602 (Direct)*
*302-888-0606 (Fax)*
*gseitz@svglaw.com (email)*

---

**From:** MICHAEL FINK [mailto:MFINK@gbpatent.com]
**Sent:** Thursday, August 23, 2007 1:39 PM
**To:** Tony Volpe
**Cc:** NEIL GREENBLUM; George H Seitz III; Ryan O'Donnell; apoff@ycst.com; CStover@ycst.com; Patricia P McGonigle; RHuis@volpe-koenig.com
**Subject:** Voith vs. Johnson Foils, USDC for Delaware: 1:07-cv-00226-JJF; Our Ref: J214720

Tony,

Attached is a letter requesting Defendant to withdraw the summary judgment motion which was recently filed.

Best regards,

Michael

Michael J. Fink, Esq.
Partner
Greenblum & Bernstein, P.L.C.
1950 Roland Clarke Place
Reston, Virginia 20191
Voice: (703) 716-1191
Facsimile: (703) 716-1180
email: mfink@gbpatent.com
http://www.gbpatent.com/

**********************************************************************
The information contained in this e-mail message is intended only for

the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and as such is privileged and confidential. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.
*************************************************************************

In rare cases, our spam scanners may eliminate legitimate email. Please advise us immediately if you receive an error notification from our server.

<<Letter requesting confer on SJ motion and Deposition Notices (00247247).PDF>>

# EXHIBIT B

LEXSEE 1997 U.S. APP. LEXIS 31828



Caution
As of: Jan 08, 2008

IN RE SIBIA NEUROSCIENCES, INC., Petitioner.

MISCELLANEOUS DOCKET NO. 525

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

*1997 U.S. App. LEXIS 31828*

October 22, 1997, Decided
October 22, 1997, Filed

**NOTICE:**      [*1] RULES OF THE FEDERAL CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:**     Reported in Table Case Format at: *1997 U.S. App. LEXIS 39712.*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Petitioner sought a writ of mandamus directing respondent, the United States District Court for the Southern District of California, to vacate its order relating to a protective order issued in litigation involving claims of patent infringement. Defendant in the underlying action opposed the petition and petitioner filed a motion for leave to reply to the defendant's opposition.

**OVERVIEW:** Petitioner's motion for a protective order, to prevent certain confidential information concerning pending patent applications from being disclosed to certain counsel for the defendant, was granted by the magistrate judge. The district court modified the protective order, allowing all counsel access to the petitioner's confidential information. Petitioner sought to have the modifications reversed. The court noted that mandamus relief was only available in extraordinary circumstances and that petitioner had the burden of showing that its right to the writ was clear and indisputable. The court observed that the denial or grant of access to defendant's counsel of petitioner's confidential or proprietary information could not be decided generally but, instead, had to be based on the specific facts of the case. The court found that the district court's order was well reasoned, discussed all of the relevant facts concerning the involvement of defendant's counsel in competitive decisionmaking, and established that the petitioner had not met its burden for obtaining mandamus relief.

**OUTCOME:** Petitioner's request for a writ of mandamus was denied, but its motion for leave to reply to defendant's opposition was granted.

**LexisNexis(R) Headnotes**

*Civil Procedure > Remedies > Writs > Common Law Writs > Mandamus*
[HN1] The remedy of mandamus is available only in extraordinary situations to correct a clear abuse of discretion or usurpation of judicial power. A party seeking such a writ bears the burden of proving that it has no means of attaining the relief desired and that the right

to issuance of the writ is "clear and indisputable."

*Civil Procedure > Discovery > Disclosures > General Overview*
*Trade Secrets Law > Civil Actions > Discovery*
*Trade Secrets Law > Civil Actions > Protection Orders*
[HN2] The discovery process in federal district courts is governed by *Fed. R. Civ. P. 26.* A party may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action. *Fed. R. Civ. P. 26(b)(1).* Protective orders guarding against discovery of certain information are available to protect against annoyance, embarrassment, oppression or undue burden, including discovery of a trade secret or other confidential research, development, or commercial information. *Fed. R. Civ. P. 26(c).*

*Civil Procedure > Discovery > Privileged Matters > General Overview*
*Civil Procedure > Discovery > Protective Orders*
[HN3] The factual circumstances surrounding each individual counsel's activities, association, and relationship with a party, whether counsel be in-house or retained, must govern any concern for inadvertent or accidental disclosure of confidential or privileged information. Involvement in "competitive decisionmaking" serves as the basis for denial of access. Involvement in competitive decisionmaking is shorthand for a counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor. Status as in-house counsel cannot alone create that probability of serious risk to confidentiality and cannot therefore serve as the sole basis for denial of access.

*Civil Procedure > Discovery > Privileged Matters > General Overview*
*Civil Procedure > Discovery > Protective Orders*
*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*
[HN4] Denial or grant of access to confidential or privileged information cannot rest on a general assumption that one group of lawyers are more likely or less likely inadvertently to breach their duty under a protective order. The facts, not the category, must inform the result and each case must be decided based on the

specific facts involved therein.

*Civil Procedure > Discovery > Privileged Matters > General Overview*
*Civil Procedure > Discovery > Protective Orders*
[HN5] The standard for grant or denial of access to confidential or privileged information is not counsel's regular contact with other corporate officials who make policy, or even competitive decisions, but advice and participation in "competitive decisionmaking."

**JUDGES:** Before ARCHER, Chief Judge, MAYER and PLAGER, Circuit Judges. PLAGER, Circuit Judge.

**OPINION BY:** PLAGER

**OPINION**

ON PETITION FOR WRIT OF MANDAMUS

*ORDER*

Sibia Neurosciences, Inc. petitions for a writ of mandamus to direct the United States District Court for the Southern District of California to vacate its order relating to a protective order. Cadus Pharmaceutical Corporation opposes. Sibia moves for leave to reply to Cadus's opposition. Cadus opposes.

*BACKGROUND*

This action involves Sibia's claim that Cadus infringes one of Sibia's patents and Cadus's counterclaim for a declaratory judgment of noninfringement, invalidity, and unenforceability of that patent and another Sibia patent. Both patents involve a technology described as "transcription-based assays."

During the course of discovery, Sibia sought to prohibit certain confidential information regarding its pending patent applications and research from being disclosed to Cadus's outside counsel who were also active in prosecuting patents on behalf [*2] of Cadus.

At a hearing held before the magistrate judge, one of Cadus's outside attorneys, Giulio A. DeConti, indicated that he was actively involved both in the patent litigation then before the district court and in prosecution of patents on behalf of Cadus. Mr. DeConti stated that the particular research area involved in the present matter -- cell surface receptors and protein and assay methods -- was one of

1997 U.S. App. LEXIS 31828, *2

wide-ranging applicability and that his law firm represented more than 50 different clients in patent prosecution matters in the biotechnology area, a good portion of which were involved with cell surface receptors. Mr. DeConti also stated that, in his patent prosecution work for Cadus, he generally would file the patent applications after market decisions had already been made by Cadus.

Following the hearing, the magistrate judge approved a protective order governing the discovery proceedings. That protective order included the following provision, which had been sought by Sibia:

> Information designated as CONFIDENTIAL - LITIGATION ATTORNEYS ONLY shall not be given, shown, made available or communicated in any way to any person or entity other than those persons [*3] described in [the order]. *In addition, however, with respect to [lawyers for the parties, member or employees of their firms, and independent contractors retained by the firms], such information shall not be provided to any persons who prosecute patent applications relating to cell surface receptors or proteins and assay methods relating to the same. Furthermore, all persons who receive information designated as CONFIDENTIAL - LITIGATION ATTORNEYS ONLY shall refrain from prosecuting patents in the area of cell surface receptors and assay methods relating to the same during the pendency of this litigation and until one year after the conclusion of this litigation, including appeals.* [Emphasis added.]

In approving the protective order, the magistrate judge relied on three cases, namely, *U.S. Steel Corp. v. United States*, 730 F.2d 1465 (Fed. Cir. 1984), *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465 (9th Cir. 1992), and a federal district court case, *Motorola, Inc. v. Interdigital Tech. Corp.*, 1994 U.S. Dist. LEXIS 20714 (D. Del. 1994). Specifically, the magistrate judge reasoned that, despite the assumption that Cadus's attorneys would not intentionally [*4] misuse confidential information, there was a high risk of inadvertent or unintentional disclosure of confidential

information by Cadus's outside counsel who were also involved in patent prosecution for Cadus. The magistrate judge noted that DeConti could not guarantee nondisclosure.

On review, the district court held that the magistrate judge's protective order was clearly erroneous and contrary to law. The district court modified the protective order by striking out the second and third sentences of the above-quoted paragraph from the protective order. In essence, the district court's order allowed access to confidential information for all of Cadus's outside counsel involved in this matter.

This petition followed.

*DISCUSSION*

[HN1] The remedy of mandamus in available only in extraordinary situations to correct a clear abuse of discretion or usurpation of judicial power. *See In re Regents of the Univ. of Cal.*, 101 F.3d 1386, 1387 (Fed. Cir. 1996). A party seeking such a writ bears the burden of proving that it has no means of attaining the relief desired, *see Mallard v. United States Dist. Court of the S. Dist. Of Iowa*, 490 U.S. 296, 309, 109 S. Ct. 1814, 104 L. Ed. 2d 318 (1989), and that the right to [*5] issuance of the writ is "clear and indisputable." *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 35, 66 L. Ed. 2d 193, 101 S. Ct. 188 (1980).

Sibia argues that the district court erred in modifying the magistrate judge's protective order. Sibia's argument is that Cadus's outside counsel, contemplated by the original protective order, occupy a unique role in connection with their client and that this unique role poses a high risk of inadvertent disclosure or misuse of confidential information. In response, Cadus argues that Sibia has not shown that Cadus's outside counsel are in fact engaged in "competitive decisionmaking" for Cadus.

[HN2] The discovery process in federal district courts is governed by *Fed. R. Civ. P. 26*. A party "may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." *Fed. R. Civ. P. 26(b)(1)*. Protective orders guarding against discovery of certain information are available to protect against "annoyance, embarrassment, oppression or undue burden," including discovery of "a trade secret or other confidential research, development, or commercial information." *Fed. R. Civ.*

P. 26(c).

Essentially, the magistrate judge's decision [*6] hinged on the risk of inadvertent disclosure. *See Brown Bag Software, 960 F.2d at 1471* (consideration must be given to "not only whether the documents could be locked up in cabinets, but also whether ... counsel could lock-up trade secrets in his mind, safe from inadvertent disclosure to his employer once he had read the documents.")

In *U.S. Steel, 730 F.2d at 1468*, we stated that "[HN3] the factual circumstances surrounding each individual counsel's activities, association, and relationship with a party, whether counsel be in-house or retained, must govern any concern for inadvertent or accidental disclosure." Involvement in "competitive decisionmaking" serves as the basis for denial of access. *Id.* We also stated that such involvement in competitive decisionmaking is "shorthand for a counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." *Id.* However, we also specifically held that "status as in-house counsel cannot *alone* create that probability of [*7] serious risk to confidentiality and cannot therefore serve as the *sole* basis for denial of access." *Id.* (emphasis added).

In a similar vein, we also stated in *U.S. Steel* that "[HN4] denial or grant of access, however, cannot rest on a general assumption that one group of lawyers are more likely or less likely inadvertently to breach their duty under a protective order." *Id.* Therefore, denying access to Cadus's outside counsel on the ground that they also prosecute patents for Cadus is the type of generalization counseled against in *U.S. Steel.* The facts, not the category, must inform the result. Our holding in *U.S. Steel* dictates that each case must be decided based on the specific facts involved therein.

At the evidentiary hearing before the magistrate judge, it became apparent that only one of Cadus's outside counsel would be directly affected by the specific provision of the protective order in question. That attorney, Mr. DeConti, stated that he had represented Cadus for several years in patent prosecution work. He also stated that he represented more than 50 clients on biotechnology matters, including the area involved in the underlying district court action. [*8] Significantly, he

stated that he was not involved in "competitive decisionmaking." The magistrate judge found that Mr. DeConti was very involved in the prosecution of patents for Cadus, but did not make any findings regarding outside counsel's involvement in "competitive decisionmaking," such as involvement in pricing or product design. However, in reviewing the magistrate judge's order, the district court held that none of the indicia of "competitive decisionmaking" was present here. *See Amgen, Inc. v. Elanex Pharm., Inc., 160 F.R.D. 134, 139 (W.D. Wash. 1994)* (motion for protective order was denied where in-house counsel was not involved in competitive decisionmaking); *Fluke Corp. v. Fine Instruments Corp., 1994 U.S. Dist. LEXIS 16286, 32 U.S.P.Q.2D (BNA) 1789, 1793 (W.D. Wash. 1994)* (motion for protective order denied where in-house counsel had no involvement in sales, competitive decisionmaking, or design and development of products decisions and where in-house counsel would not disclose confidential information to any non-legal employee of the client corporation).

Indeed, as we noted in an analogous case addressing the meaning of the term "competitive decisionmaking," [HN5] "the standard is not 'regular contact' [*9] with other corporate officials who make 'policy,' or even competitive decisions, but 'advice and participation' in 'competitive decisionmaking.'" *Matsushita Elec. Indus. Co., Ltd. v. United States, 929 F.2d 1577, 1580 (Fed. Cir. 1991).*

The district court's order was well reasoned and discussed the relevant facts, rules, and cases in holding that the magistrate judge's protective order was clearly erroneous and contrary to law." *See 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a).* Specifically, the district court found that there was no evidence that Cadus's outside counsel, particularly Mr. DeConti, was involved in competitive decisionmaking. The district court also noted that the magistrate judge's reliance on Mr. DeConti's inability to guarantee absolute assurance of nondisclosure by Cadus's outside counsel was in error. Moreover, the district court held that denying access to Cadus's outside counsel would pose a serious and unnecessary hardship, especially because Mr. DeConti had been Cadus's patent counsel for more than one year prior to the commencement of the patent action and because the testimony at the hearing before the magistrate judge reflected Mr. DeConti's crucial [*10] role in the patent litigation.

1997 U.S. App. LEXIS 31828, *10

Under these circumstances, Sibia has not demonstrated that its right to the issuance of a writ of mandamus is clear and indisputable and has thus not met the high burden for obtaining mandamus relief.

Accordingly,

IT IS ORDERED THAT:

(1) Sibia's petition for a writ of mandamus is denied.

(2) Sibia's motion for leave to reply to Cadus's opposition is granted.

FOR THE COURT

S. Jay Plager

Circuit Judge

Date OCT 22 1997

# EXHIBIT C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VOITH PAPER GMBH & CO. KG,<br>  a Company organized and existing under<br>  the laws of Germany,<br>            Plaintiff,<br><br>            v.<br><br>JOHNSONFOILS, INC.,<br>  a Delaware Corporation,<br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 07-0226-JJF |

### PLAINTIFF VOITH PAPER GMBH & CO. KG'S OBECTIONS
### AND RESPONSES TO DEFENDANT, JOHNSONFOILS, INC.'S FIRST SET OF
### REQUESTS FORPRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFF

Plaintiff Voith Paper GmbH & Co. KG ("Plaintiff") by and through its undersigned

attorneys hereby serves Defendant, Johnsonfoils, Inc., ("Defendant") with the following objections

and responses to Defendant's First Set of Requests for Production of Documents and Things to

Plaintiff ("Requests").

### GENERAL OBJECTIONS

Without waiving any of its specific objections, Plaintiff generally objects to Defendant's

Requests as follows. First, Plaintiff objects to Defendant's characterization of its Requests as

"Interrogatories Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure" (emphasis

supplied) as an impermissible attempt to impose burdens on Plaintiff in excess of those imposed by

Rule 26 and Rule 34 of the Federal Rules of Civil Procedure and the Court's Scheduling Order,

filed August 3, 2007 ("Scheduling Order"). Rule 33 confers no authority for serving document

requests.

Plaintiff further objects to Defendant's Requests as vague, overly broad, and unduly burdensome. For example, Defendant's Requests repeatedly use the term "subject matter of the Patents-in-Suit" without limiting that description to relevant information. If construed broadly, the requested "subject matter" impermissibly encompasses information that is not relevant to any issue in this case. In addition, Defendant's Requests fail to provide any limitation on the pertinent time period for the requested documents. As such, the requests are both overly broad and unduly burdensome. Defendant's Requests are further deficient in that they call for the production of documents that are plainly protected from disclosure by applicable privileges including the attorney-client communications privilege and the attorney work-product exemption. Plaintiff also objects to Defendant's requests in that they plainly seek to impermissibly require Plaintiff to produce documents and/or things that are not in Plaintiff's possession, custody, or control. Plaintiff further objects to Defendant's Requests to the extent that they purport to require Plaintiff to produce documents subject to third-party nondisclosure and/or confidentiality agreements. Plaintiff further objects that Defendant's Request appear include publicly available documents that Defendant could obtain with no greater burden than would be unjustly imposed on Plaintiff. For these reasons, and as further explained in the general and specific objections provided for each of Defendant's Requests, Plaintiff further objects to Defendant's Requests for impermissibly seeking to impose greater burdens on Plaintiff than warranted by the Federal Rules of Civil Procedure or the Court's Scheduling Order.

Without waiving any of the above stated general objections, Plaintiff objects – both generally and specifically - to each of Defendant's Definitions and Requests as follows.

## PLAINTIFF'S OBJECTIONS TO DEFENDANT'S DEFINITIONS

**Defendant's Definition 1.**    *"Plaintiff" means "Voith Paper GMBH & Co. KG," and includes any and all agents or affiliates or predecessors in interest, business entities, officers, directors, employees or others who have in the past or now act for or on behalf of Plaintiff.*

### Plaintiff's Objections to Defendant's Definition 1.

Plaintiff objects to this definition because it purports to include subject matter from an indefinite "past" far in excess of any relevant time period. Plaintiff further objects to this definition because the term "act for or on behalf of Plaintiff" is vague. Additionally, Plaintiff objects that the phrase "any and all agents or affiliates or predecessors in interest, business entities, officers, directors, employees or others who have in the past or now act for or on behalf of Plaintiff" is ungrammatical, unintelligible, incomprehensible, and vague.

Plaintiff further objects that this definition is an impermissible attempt to extend the scope of its discovery requests beyond that authorized by the Federal Rules of Civil Procedure in that it plainly seeks to encompasses individuals over which Plaintiff has no control.

**Defendant's Definition 2.**    *"Defendant" means "Johnsonfoils, Inc." and includes any and all agents or affiliates or predecessors in interest, business entities, officers, directors, employees or others that Plaintiff believes is or was in privity with Defendant.*

### Plaintiff's Objections to Defendant's Definition 2.

Plaintiff objects to this definition because its reference "others that Plaintiff believes is or was in privity with Defendant" is vague to the extent that it purports to depend on Plaintiff's beliefs. Plaintiff further objects to this definition for failing to provide any relevant time period to limit the class of included individuals. Plaintiff further objects that the qualification "in privity with Defendant" is vague and overly broad for failing to specify the limiting subject matter of the

3

required privity. Plaintiff objects to this definition for seeking to impermissibly impose on Plaintiff the burden of guessing the meaning of Defendant's definition of "Defendant." Plaintiff objects that Defendant's purported requirement that Plaintiff speculate as to the meaning of Defendant's terms in order to respond to Defendant's requests is unduly burdensome.

**Defendant's Definition 3.**    *As used herein, "person" or "persons" means any natural person and all legal entities.*

### Plaintiff's Objections to Defendant's Definition 3.

Plaintiff objects that this definition is overly broad and vague as to the intended meaning of "natural person" and "all legal entities" without specifying the relevant body of law with respect to which the defined "person" is either natural or having the status of a legal entity. As such, this definition plainly seeks to impermissibly impose on Plaintiff the burden of speculating as to the meaning of "person" in Defendant's Requests.

**Defendant's Definition 4.**    *The term "document" is used in the broadest sense of Rule 34 of the Federal Rules of Civil Procedure and it includes things or physical objects regardless of how they were generated or maintained.*

### Plaintiff's Objections to Defendant's Definition 4.

Plaintiff objects to this definition as overly broad in that it purports to define "document" to include "things or physical objects regardless of how they were generated or maintained." As such, the definition plainly and impermissibly seeks to extend the scope of Defendant's Requests to include documents that are not, and may never have been, in the Plaintiff's possession, custody, or control. Consequently, this definition plainly renders each of Defendant's Requests unduly burdensome.

4

**Defendant's Definition 5.**    *As used herein, the terms "and" and "or" shall be construed disjunctively or conjunctively as necessary in order to bring within the scope of the request all responses which might otherwise be construed to be outside of its scope.*

### Plaintiff's Objections to Defendant's Definition 5.

Plaintiff objects that this definition renders the meaning of "and" and "or" vague in that it fails to specify when defining either term conjunctively or disjunctively is "necessary." Plaintiff further objects that this definition is overly broad in that it purports to encompass all possible responses to Defendant's Requests – even responses irrelevant to the plain meaning of the Requests - by construing the terms "and" and "or." Plaintiff further objects that this definition impermissibly seeks to impose on Plaintiff the burden of speculating as to when a response "might otherwise be construed to be outside of [the] scope [of a request]." Plaintiff will not speculate as to the meaning of Defendant's Requests.

**Defendant's Definition 6.**    *As used in herein, the term "Complaint" means the Complaint filed by Plaintiff in Civil Action No. 07-0226-JJF.*

### Plaintiff's Objections to Defendant's Definition 6.

Plaintiff objects to this definition in that it purports to incorporate a definition of "Plaintiff" that, as explained in detail in the foregoing "Plaintiff's Objection to Defendant's Definition 1" is vague and overly broad. To the extent that this definition depends on the objected-to definition of "Plaintiff," any of the Requests incorporating this term are overly broad, vague, and unduly burdensome.

5

**Defendant's Definition 7.**   *As used herein, the "'805 Patent" refers to U.S. Patent No. 5,718,805 and any related application or patent anywhere in the world.*

### Plaintiff's Objections to Defendant's Definition 7.

Plaintiff objects to this definition because the phrase "anywhere in the world" is vague and ambiguous. Plaintiff further objects because the term "any related application" to the extent that the term "related" does not limited to applications that are "related" to the '805 patent in a way that is relevant. As such, this definition purports to impose on Plaintiff the burden of guessing Defendant's meaning of "related" and/or "anywhere in the world." Plaintiff will not speculate as to the meaning of Defendant's terms in responding to Defendant's Requests.

**Defendant's Definition 8.**   *As used herein, the "'168 Patent" refers to U.S. Patent No. 5,972,168 and any related application or patent anywhere in the world.*

### Plaintiff's Objections to Defendant's Definition 8.

Plaintiff objects to this definition because the phrase "anywhere in the world" is vague and ambiguous. Plaintiff further objects because the term "any related application" to the extent that the term "related" does not limited to applications that are "related" to the '168 patent in a way that is relevant. As such, this definition purports to impose on Plaintiff the burden of guessing Defendant's meaning of "related" and/or "anywhere in the world." Plaintiff will not speculate as to the meaning of Defendant's terms in responding to Defendant's Requests.

**Defendant's Definition 9.**   *As used herein, "Patents-in-Suit" both the '805 Patent and '168 Patent and any related application or patent anywhere in the world.*

### Plaintiff's Objections to Defendant's Definition 9.

Plaintiff hereby incorporates its objections to "Defendant's Definition 7" and "Defendant's Definition 8" as if fully set forth herein. Plaintiff further objects to the term "any related

application" to the extent that the term "related" fails to limit to the scope of the definition to any relevant issue. Plaintiff also objects to the phrase "anywhere in the world" because the purported location of the applications or patents purportedly within the scope of the definition is indeterminate. Thus, Defendant's Definition 9 purports to require Plaintiff to guess the meaning of the allegedly defined term. Plaintiff will not speculate as to the meaning of this term or the Requests incorporating this term.

**Defendant's Definition 10.** *As used herein, "Applicant" includes any person named as an inventor of the '805 or '168 Patent and any related application or patent anywhere in the world.*

### Plaintiff's Objection to Defendant's Definition 10.

Plaintiff hereby incorporates its objections to "Defendant's Definition 3," "Defendant's Definition 7," and "Defendant's Definition 8" as if fully set forth herein. Plaintiff further objects to the term "any related application" to the extent that the term "related" fails to limit to the scope of the definition to any relevant issue. Plaintiff also objects to the phrase "anywhere in the world" because the purported location of the applications or patents purportedly within the scope of the definition is indeterminate. Thus, "Defendant's Definition 10" purports to require Plaintiff to guess the meaning of the allegedly defined term. Plaintiff will not speculate as to the meaning of this term or the Requests incorporating this term.

## OBJECTIONS AND RESPONSES TO DEFENDANT'S DOCUMENT REQUESTS

### DEFENDANT'S REQUEST NO.1:

*All documents describing Plaintiff's organizational structure as it relates to the research, development, manufacturing, testing, marketing, exportation, importation, distribution, sale, and licensing of subject matter Plaintiff contends is covered by any claim of the Patents-in-Suit.*

7

**Plaintiff's Objections to Defendant's Request No. 1**

**General Objections to Defendant's Request No. 1**

Plaintiff hereby incorporates the foregoing General Objections as if fully set forth herein.

**Specific Objections to Defendant's Request No. 1**

Plaintiff hereby incorporates its objections to Defendant's Definition 1, Defendant's Definition 4, and Defendant's Definition 9 as if fully set forth herein. Plaintiff further objects that the term "organizational structure" is vague and ambiguous for failure to limit the meaning of "organizational" to a permissibly relevant scope. Plaintiff further objects to this request as undefined for relying on the purported "subject matter Plaintiff contends is covered" without reference to any particular Plaintiff's contention. As such, this request impermissibly purports to circumvent the limitations on contention interrogatories imposed by the Scheduling Order. Plaintiff further objects to this interrogatory for reliance on the vague and undefined term "subject matter." Plaintiff objects that the phrases "research . . . of subject matter," "development . . . of subject matter," "manufacturing . . . of subject matter," "testing . . . of subject matter," "marketing . . . of subject matter," "exportation . . . of subject matter," "importation . . . of subject matter," "distribution . . . of subject matter," "sale . . . of subject matter," and "licensing . . . of subject matter," are unintelligible for at least the reason that "subject matter" is not ordinarily understood to be the subject of, e.g. sale, manufacturing, testing, marketing, exportation, importation, distribution, or development. Plaintiff will not speculate as to the meaning of these phrases. Plaintiff further objects to this request as overly broad and unduly burdensome for failure to specify a time period that reasonably limits the scope of the request to issues relevant to this case.

8

**Plaintiff's Response to Defendant's Request No. 1**

Subject to the foregoing general and specific objections, Plaintiff will produce responsive organizational charts.

**DEFENDANT'S REQUEST NO.2:**

*All documents concerning Plaintiff's procedures and policies for generating, maintaining, and disposing of records (regardless of how they were generated or maintained), including, but not limited documents related to the subject matter of the Patents-in-Suit.*

**Plaintiff's Objections to Defendant's Request No. 2**

**General Objections to Defendant's Request No. 2**

Plaintiff hereby incorporates the foregoing General Objections as if fully set forth herein.

**Specific Objections to Defendant's Request No. 2**

Plaintiff hereby incorporates its objections to to Defendant's Definition 1, Defendant's Definition 4, and Defendant's Definition 9 as if fully set forth herein. Plaintiff further objects to this request because it is incomprehensible to the extent that it requests "records . . . including but not limited documents," without defining "limited documents." Plaintiff also objects to this request as it calls for the production of "records (regardless of how they were generated or maintained)" thus purporting to impose on Plaintiff the burden of producing records that Plaintiff neither generated nor maintained. Plaintiff further objects to this request to the extent that it calls for the production of documents protected by the attorney-client and work-product privileges. Plaintiff further objects to this request as overly broad and unduly burdensome for failure to specify a time period that reasonably limits the scope of the request to issues relevant to this case.

**Plaintiff's Response to Defendant's Request No. 2**

Subject to the foregoing general and specific objections, Plaintiff will produce non-privileged documents responsive to this request to the extent that the request is unobjected-to and is sufficient to identify documents subject to production in accordance with the Federal Rules of Civil Procedure and the Court's local rules.

**DEFENDANT'S REQUEST NO.3:**

*All documents establishing Plaintiff's alleged investment in the subject matter of the Patents-in-Suit.*

**Plaintiff's Objections to Defendant's Request No. 3**

**General Objections to Defendant's Request No. 3**

Plaintiff hereby incorporates the foregoing General Objections as if fully set forth herein.

**Specific Objections to Defendant's Request No. 3**

Plaintiff hereby incorporates its objection to Defendant's Definition 1, Defendant's Definition 4, and Defendant's Definition 9 as if fully set forth herein. Plaintiff further objects that this request is vague as to meaning of "alleged investment" in that it makes no reference to any specific allegation of investment. Plaintiff will not speculate as to the meaning of the "alleged invetment" in order to make sense of this request. Plaintiff also objects to the use of the term "establishing" as vague without reference to any criteria for determining whether a document establishes the asserted fact or not. Plaintiff further objects to this request as overly broad and unduly burdensome for failure to specify a time period that reasonably limits the scope of the request to issues relevant to this case.

10

**Plaintiff's Response to Defendant's Request No. 3**

Subject to the foregoing general and specific objections, Plaintiff will produce non-privileged documents responsive to this request to the extent that the request is unobjected-to and is sufficient to identify documents subject to production in accordance with the Federal Rules of Civil Procedure and the Court's local rules.

**DEFENDANT'S REQUEST NO.4:**

*All documents establishing Plaintiff's alleged sales associated with the subject matter of the Patents-in-Suit.*

**Plaintiff's Objections to Defendant's Request No. 4**

### General Objections to Defendant's Request No. 4

Plaintiff hereby incorporates the foregoing General Objections as if fully set forth herein.

### Specific Objections to Defendant's Request No. 4

Plaintiff hereby incorporates its objections to Defendant's Definition 1, Defendant's Definition 4, and Defendant's Definition 9 as if fully set forth herein.   Plaintiff further objects to this request as vague for reliance on the undefined term "alleged sales" without reference to any particular allegations.  Plaintiff further objects to this request as vague for failure to specify the meaning of "subject matter" in a way that reasonably limits the request to relevant documents. Plaintiff also objects to the use of the term "establishes" as vague in the absence of any reference to criteria for determining whether a document establishes the asserted fact or not.  Plaintiff further objects to this request as overly broad and unduly burdensome for failure to specify a time period that reasonably limits the scope of the request to issues relevant to this case.

11

**Plaintiff's Response to Defendant's Request No. 4**

Subject to the foregoing general and specific objections, Plaintiff will produce non-privileged documents responsive to this request to the extent that the request is unobjected-to and is sufficient to identify documents subject to production in accordance with the Federal Rules of Civil Procedure and the Court's local rules.

**DEFENDANT'S REQUEST NO.5:**

*All documents establishing Plaintiff's alleged costs associated with the subject matter of the Patents-in-Suit.*

**Plaintiff's Objections to Defendant's Request No. 5**

**General Objections to Defendant's Request No. 5**

Plaintiff hereby incorporates the foregoing General Objections as if fully set forth herein.

**Specific Objections to Defendant's Request No. 5**

Plaintiff hereby incorporates its objections to Defendant's Definition 1, Defendant's Definition 4, and Defendant's Definition 9 as if fully set forth herein. Plaintiff further objects to this request as vague for failure to define the term "cost" in a way that reasonably limits it to any relevant issue in this case. Plaintiff also objects to the request as vague and improper for use of the term "alleged costs" without reference to any particular allegation. Plaintiff further objects to this request as vague for failure to specify the meaning of "subject matter" in a way that reasonably limits the request to relevant documents. Plaintiff also objects to the use of the term "establishing" as vague in the absence of any reference to criteria for determining whether a document establishes the asserted fact or not. Plaintiff further objects to this request as overly broad and unduly burdensome for failure to specify a time period that reasonably limits the scope of the request to issues relevant to this case.

12

**Plaintiff's Response to Defendant's Request No. 5**

Subject to the foregoing general and specific objections, Plaintiff will produce non-privileged responsive documents to this request to the extent that the request is unobjected-to and is sufficient to identify documents subject to production in accordance with the Federal Rules of Civil Procedure and the Court's local rules.

**DEFENDANT'S REQUEST NO.6:**

*All documents establishing Plaintiff's alleged profits associated with the subject matter of the Patents-in-Suit.*

**Plaintiff's Objections to Defendant's Request No. 6**

**General Objections to Defendant's Request No. 6**

Plaintiff hereby incorporates the foregoing General Objections as if fully set forth herein.

**Specific Objections to Defendant's Request No. 6**

Plaintiff hereby incorporates its objections to Defendant's Definition 1, Defendant's Definition 4, and Defendant's Definition 9 as if fully set forth herein. Plaintiff further objects to this request as vague for failure to define the term "profits" in a way that reasonably limits it to any relevant issue in this case. Plaintiff also objects to the request as vague and improper for use of the term "alleged profits" without reference to any particular allegation. Plaintiff further objects to this request as vague for failure to specify the meaning of "subject matter" in a way that reasonably limits the request to relevant documents. Plaintiff also objects to the use of the term "establishing" as vague in the absence of any reference to criteria for determining whether a document establishes the asserted fact or not. Plaintiff further objects to this request as overly broad and unduly burdensome for failure to specify a time period that reasonably limits the scope of the request to issues relevant to this case.

13

**Plaintiff's Response to Defendant's Request No. 6**

Subject to the foregoing general and specific objections, Plaintiff will produce non-privileged responsive documents to this request to the extent that the request is unobjected-to and is sufficient to identify documents subject to production in accordance with the Federal Rules of Civil Procedure and the Court's local rules.

**DEFENDANT'S REQUEST NO.7:**

*All documents establishing Plaintiff's alleged revenue associated with licenses or sublicenses of the subject matter of the Patents-in-Suit.*

**Plaintiff's Objections to Defendant's Request No. 7**

    **General Objections to Defendant's Request No. 7**

Plaintiff hereby incorporates the foregoing General Objections as if fully set forth herein.

    **Specific Objections to Defendant's Request No. 7**

Plaintiff hereby incorporates its objections to Defendant's Definition 1, Definition 4, and Definition 9 as if fully set forth herein. Plaintiff further objects to this request as vague for failure to define the term "revenue" in a way that reasonably limits it to any relevant issue in this case. Plaintiff also objects to the request as vague and improper for use of the term "alleged revenue" without reference to any particular allegation. Plaintiff further objects to this request as vague for failure to specify the meaning of "subject matter" in a way that reasonably limits the request to relevant documents. Plaintiff also objects to the use of the term "establishing" as vague in the absence of any reference to criteria for determining whether a document establishes the asserted fact or not. Plaintiff also objects to this request as overly broad and unduly burdensome for failure to limit the scope of terms "licenses" and "sublicenses" to relevant issues. Plaintiff further objects to the request to the extent that it purports to request documents that are subject to obligations of

14

confidentiality to third parties. Plaintiff further objects to this request as overly broad and unduly burdensome for failure to specify a time period that reasonably limits the scope of the request to issues relevant to this case.

**Plaintiff's Response to Defendant's Request No. 7**

Subject to the foregoing general and specific objections, Plaintiff will produce non-privileged documents responsive to this request to the extent that the request is unobjected-to and is sufficient to identify documents subject to production in accordance with the Federal Rules of Civil Procedure and the Court's local rules.

**DEFENDANT'S REQUEST NO.8:**

*All Applicant generated documents associated with or related to the subject matter of the Patents-in-Suit.*

**Plaintiff's Objections to Defendant's Request No. 8**

    **General Objections to Defendant's Request No. 8**

Plaintiff hereby incorporates the foregoing General Objections as if fully set forth herein.

    **Specific Objections to Defendant's Request No. 8**

Plaintiff hereby incorporates its objections to Defendant's Definition 4, Defendant's Definition 9, and Defendant's Definition 10 as if fully set forth herein. Plaintiff further objects to this request as vague for failure to define the terms "associated with" or "related to" in a way that reasonably limits them to any relevant issue in this case. Plaintiff also objects to the request as vague and improper for use of the term "Applicant generated" without limiting the term "generated" to a meaning that is likely to encompass relevant documents. Plaintiff further objects to this request as vague for failure to specify the meaning of "subject matter" in a way that reasonably limits the request to relevant documents. Plaintiff also objects to this request to the

extent that it calls for documents protected by the work-product doctrine and/or the attorney-client privilege. Plaintiff further objects to this request as overly broad and unduly burdensome for failure to specify a time period that reasonably limits the scope of the request to issues relevant to this case.

**Plaintiff's Response to Defendant's Request No. 8**

Subject to the foregoing general and specific objections, Plaintiff will produce non-privileged documents responsive to this request to the extent that the request is unobjected-to and is sufficient to identify documents subject to production in accordance with the Federal Rules of Civil Procedure and the Court's local rules.

**DEFENDANT'S REQUEST NO.9:**

*All Applicant maintained files associated with or related to the subject matter of the Patents-in-Suit.*

**Plaintiff's Objections to Defendant's Request No. 9**

    **General Objections to Defendant's Request No. 9**

Plaintiff hereby incorporates the foregoing General Objections as if fully set forth herein.

    **Specific Objections to Defendant's Request No. 9**

Plaintiff hereby incorporates its objections to Defendant's Definition 4, Defendant's Definition 9, and Defendant's Definition 10 as if fully set forth herein. Plaintiff further objects to this request as vague for failure to define the terms "associated with" or "related to" in a way that reasonably limits them to any relevant issue in this case. Plaintiff also objects to the request as vague and improper for use of the term "Applicant maintained" without limiting the term "maintained" to a meaning that is likely to encompass relevant documents. Plaintiff further objects to this request as vague for failure to specify the meaning of "subject matter" in a way that

16

reasonably limits the request to relevant documents. Plaintiff also objects to this request to the extent that it calls for documents protected by the work-product doctrine and/or the attorney-client privilege. Plaintiff further objects to this request as overly broad and unduly burdensome for failure to specify a time period that reasonably limits the scope of the request to issues relevant to this case.

**Plaintiff's Response to Defendant's Request No. 9**

Subject to the foregoing general and specific objections, Plaintiff will produce non-privileged documents responsive to this request to the extent that the request is unobjected-to and is sufficient to identify documents subject to production in accordance with the Federal Rules of Civil Procedure and the Court's local rules.

**DEFENDANT'S REQUEST NO. 10:**

*All prior art known to Applicant to be associated with or related to the subject matter of the Patents-in-Suit.*

**Plaintiff's Objections to Defendant's Request No. 10**

**General Objections to Defendant's Request No. 10**

Plaintiff hereby incorporates the foregoing General Objections as if fully set forth herein.

**Specific Objections to Defendant's Request No. 10**

Plaintiff hereby incorporates its objections to Defendant's Definition 4, Defendant's Definition 9, and Defendant's Definition 10 as if fully set forth herein. Plaintiff further objects to this request as vague for failure to define the terms "associated with" or "related to" in a way that reasonably limits them to any relevant issue in this case. Plaintiff also objects to the request as vague and improper for use of the term "known to Applicant" without limiting the term "known" to a meaning that is likely to encompass relevant documents. Plaintiff further objects to this request

as vague for failure to specify the meaning of "subject matter" in a way that reasonably limits the

request to relevant documents. Plaintiff further objects to this request as overly broad and unduly

burdensome for failure to specify a time period that reasonably limits the scope of the request to

issues relevant to this case.

**Plaintiff's Response to Defendant's Request No. 10**

Subject to the foregoing general and specific objections, Plaintiff responds that all

responsive prior art is cited on the Patents-in-Suit.

**DEFENDANT'S REQUEST NO. 11:**

*All design, installation and manufacturing documentation in Applicant files associated with or*

*related to the subject matter of the Patents-in-Suit.*

**Plaintiff's Objections to Defendant's Request No. 11**

**General Objections to Defendant's Request No. 11**

Plaintiff hereby incorporates the foregoing General Objections as if fully set forth herein.

**Specific Objections to Defendant's Request No. 11**

Plaintiff hereby incorporates its objections to Defendant's Definition 4, Defendant's

Definition 9, and Defendant's Definition 10 as if fully set forth herein. Plaintiff further objects to

this request as vague for failure to define the terms "associated with" or "related to" in a way that

reasonably limits them to any relevant issue in this case. Plaintiff also objects to the request as

vague and improper for use of the term "Applicant files" without limiting the term "Applicant

files" to a meaning that is likely to encompass relevant documents. Plaintiff further objects to this

request as vague for failure to specify the meaning of "subject matter" in a way that reasonably

limits the request to relevant documents. Plaintiff also objects to this request as vague due to its

reliance on the undefined term "documentation." Plaintiff will not speculate as to the meaning of

18

this request. Plaintiff further objects to this request as overly broad and unduly burdensome for failure to specify a time period that reasonably limits the scope of the request to issues relevant to this case.

**Plaintiff's Response to Defendant's Request No. 11**

Subject to the foregoing general and specific objections, Plaintiff responds that there are no documents responsive to this request.

**DEFENDANT'S REQUEST NO. 12:**

*All documents associated with or related to Plaintiff's evaluation of any potential infringement by Defendant of the subject matter of the Patents-in-Suit.*

**Plaintiff's Objections to Defendant's Request No. 12**

**General Objections to Defendant's Request No. 12**

Plaintiff hereby incorporates the foregoing General Objections as if fully set forth herein.

**Specific Objections to Defendant's Request No. 12**

Plaintiff hereby incorporates its objections to Defendant's Definition 1, Defendant's Definition 4, and Defendant's Definition 9 as if fully set forth herein. Plaintiff further objects to this request as vague for failure to define the terms "evaluation" or "potential infringement" in a way that reasonably limits it to any relevant issue in this case. Plaintiff also objects to the request as vague and improper for use of the term "Plaintiff's evaluation" without reference to any particular evaluation. Plaintiff further objects to this request as vague for failure to specify the meaning of "subject matter" in a way that reasonably limits the request to relevant documents. Plaintiff further objects to this request as vague for failure to define the terms "associated with" or "related to" in a way that reasonably limits them to any relevant issue in this case. Plaintiff also objects to this request as overly broad and unduly burdensome to the extent that it calls for the

19

production of documents protected by either the attorney-client privilege or the work-product doctrine. Plaintiff further objects to this request as overly broad and unduly burdensome for failure to specify a time period that reasonably limits the scope of the request to issues relevant to this case.

**Plaintiff's Response to Defendant's Request No. 12**

Subject to the foregoing general and specific objections, Plaintiff will produce non-privileged documents responsive to this request to the extent that the request is unobjected-to and is sufficient to identify documents subject to production in accordance with the Federal Rules of Civil Procedure and the Court's local rules.

## DEFENDANT'S REQUEST NO. 13:

*All documents associated with or related to Plaintiff's evaluation of any potential infringement by any third party of the subject matter of the Patents-in-Suit.*

**Plaintiff's Objections to Defendant's Request No. 13**

### General Objections to Defendant's Request No. 13

Plaintiff hereby incorporates the foregoing General Objections as if fully set forth herein.

### Specific Objections to Defendant's Request No. 13

Plaintiff hereby incorporates its objections to Defendant's Definition 1, Defendant's Definition 4, and Defendant's Definition 9 as if fully set forth herein. Plaintiff further objects to this request as vague for failure to define the terms "evaluation" or "potential infringement" in a way that reasonably limits it to any relevant issue in this case. Plaintiff also objects to the request as vague, indefinite, and improper for use of the term "Plaintiff's evaluation" without reference to any particular evaluation. Plaintiff further objects to this request as vague for failure to specify the meaning of "subject matter" in a way that reasonably limits the request to relevant documents.

Plaintiff further objects to this request as vague for failure to define the terms "associated with" or "related to" in a way that reasonably limits them to any relevant issue in this case. Plaintiff also objects to this request as overly broad and unduly burdensome to the extent that it calls for the production of documents protected by either the attorney-client privilege or the work-product doctrine. Plaintiff further objects to this request as overly broad and unduly burdensome for failure to specify a time period that reasonably limits the scope of the request to issues relevant to this case. Plaintiff also objects to this request as unduly burdensome and oppressive as it purports to require Plaintiff to produce documents irrelevant to any issue in this case.

**Plaintiff's Response to Defendant's Request No. 13**

In view of the foregoing general and specific objections, no documents will be produced in response to this request.

**DEFENDANT'S REQUEST NO. 14:**

*All documents that Plaintiff contends support or tend to support the Complaint allegations.*

**Plaintiff's Objections to Defendant's Request No. 14**

**General Objections to Defendant's Request No. 14**

Plaintiff hereby incorporates the foregoing General Objections as if fully set forth herein.

**Specific Objections to Defendant's Request No. 14**

Plaintiff hereby incorporates its objections to Defendant's Definition 1 and Defendant's Definition 4 as if fully set forth herein. Plaintiff also objects to the request as vague and improper for use of the term "Plaintiff's contends" without reference to any particular contentions. Plaintiff further objects to this request as vague for reliance on the terms "support" or "tend to support" without reference to any criteria for those terms. Plaintiff also objects to this request as overly broad and unduly burdensome to the extent that it calls for the production of documents protected

21

by either the attorney-client privilege or the work-product doctrine. Plaintiff further objects to this request as unduly burdensome in that it purports to require Plaintiff to produce documents that are in the possession, custody, or control of Defendant, or documents that may be obtained by Defendant with less burden than would be incurred by Plaintiff. In particular, on information and belief, Defendant possesses ample documentation of its willful infringement of Plaintiff's patents.

**Plaintiff's Response to Defendant's Request No. 14**

Subject to the foregoing general and specific objections, Plaintiff will produce non-privileged documents responsive to this request to the extent that the request is unobjected-to and is sufficient to identify documents subject to production in accordance with the Federal Rules of Civil Procedure and the Court's local rules.

## RESERVATION OF RIGHTS

Further to the express and implied reservations of rights in the foregoing objections and responses, Plaintiff hereby reserves the right to compensation—including without limitation its costs and attorneys' fees—for expenses incurred in responding to Defendant's requests to the extent that those requests exceed the scope permissible under the Federal Rules of Civil Procedure and the Court's Local Rules.

Respectfully submitted,

Date: _____

By _____
Neal Goldberg, Esq.
Greenblum & Bernstein, P.L.C.
1950 Roland Clarke Place
Reston, VA 20191

22

## CERTIFICATE OF SERVICE

I hereby certify that a copy of Plaintiff Voith Paper GmbH & Co. KG's Objections And Responses To Defendant JohnsonFoils, Inc.'s First Set of Requests For Production of Documents And Things To Plaintiff was served on Attorneys for Defendant JohnsonFoils, Inc., via Electronic Mail and Federal Express:

> Anthony S. Volpe, Esq.
> Ryan W. O'Donnel, Esq.
> Randolph J. Huis, Esq.
> VOLPE AND KOENIG, P.C.
> United Plaza, Suite 1600
> 30 S. 17th Street
> Philadelphia, PA 19103
> (215) 568-6400
>
> George H. Seitz, III, Esq. (DE #667)
> SEITZ, VAN OGTROP & GREEN, P.A.
> 222 Delaware Avenue, Suite 1500
> P. O. Box 68
> Wilmington, DE 19899
> (302) 888-7602

Date:    September 17, 2007

_(signature)_

Neil F. Greenblum
Michael J. Fink
Neal Goldberg
GREENBLUM & BERNSTEIN, P.L.C.
1950 Roland Clarke Place
Reston, Virginia 20191
(703) 716-1191

– and –

Adam W. Poff (DE #3990)
YOUNG CONWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19899
(302) 571-6642

*Attorneys for Plaintiff Voith Paper & Co. KG*

# EXHIBIT D

# Ryan O'Donnell

| | |
|---|---|
| **From:** | Ryan O'Donnell |
| **Sent:** | Friday, August 24, 2007 3:58 PM |
| **To:** | MICHAEL FINK |
| **Cc:** | NEIL GREENBLUM; CStover@ycst.com; apoff@ycst.com; Pmcgonigle@svglaw.com; gseitz@svglaw.com; Randy Huis; Tony Volpe |
| **Subject:** | Voith vs. Johnson Foils, USDC for Delaware: 1:07-cv-00226-JJF |

Dear Michael:

We are writing to inquire whether you would agree to an extension of time until September 14, 2007 for JohnsonFoils to respond to Voith's first set of interrogatories and first requests for production of documents. These responses are currently due by August 28, 2007.

In addition, can you let us know if you intend to circulate a draft joint Protective Order.

Best regards,

Ryan

# EXHIBIT E

## Ryan O'Donnell

**From:**    NEAL GOLDBERG [ngoldberg@gbpatent.com]
**Sent:**    Monday, August 27, 2007 11:36 AM
**To:**    Ryan O'Donnell
**Cc:**    MICHAEL FINK; NEIL GREENBLUM; ORCHID RUSHENAS; apoff@ycst.com
**Subject:** Re: Voith vs. Johnson Foils, USDC for Delaware: 1:07-cv-00226-JJF, Johnsonfoils, Inc.'s request for an extension

Dear Ryan:

We have received your e-mail dated Friday, August 24, 2007 (see below). Responding to your request for a seventeen day extension ("August 28, 2007" to "September 14, 2007") to respond to PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION TO JOHNSONFOILS, INC. and PLAINTIFF'S FIRST SET OF INTERROGATORIES TO JOHNSONFOILS, INC., we would agree to provide you with the requested extension provided that you agree to provide us with a seventeen day extension for our responses to DEFENDANT JOHNSONFOILS, INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFF.

Responding to your other question, we are planning to circulate a draft joint protective order. Please note that under the Court's local rules, all information and documents provided prior to the entry of a stipulated protective order are strictly limited to litigation counsel.

Please confirm your agreement to the proposed extensions. If you have any questions, please feel free to give me a call.

Best regards,

Neal


Neal Goldberg
Greenblum & Bernstein, P.L.C.
1950 Roland Clarke Place
Reston, VA 20191
Tel: (703) 716 1191
Fax:(703) 716 1180
E-Mail: ngoldberg@gbpatent.com

*********************************************************************

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and as such is privileged and confidential. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

*********************************************************************

11/27/2007

**From:** Ryan O'Donnell [mailto:RODonnell@volpe-koenig.com]
**Sent:** Friday, August 24, 2007 3:58 PM
**To:** MICHAEL FINK
**Cc:** NEIL GREENBLUM; CStover@ycst.com; apoff@ycst.com; Pmcgonigle@svglaw.com; gseitz@svglaw.com; Randy Huis; Tony Volpe
**Subject:** Voith vs. Johnson Foils, USDC for Delaware: 1:07-cv-00226-JJF

Dear Michael:

We are writing to inquire whether you would agree to an extension of time until September 14, 2007 for JohnsonFoils to respond to Voith's first set of interrogatories and first requests for production of documents. These responses are currently due by August 28, 2007.

In addition, can you let us know if you intend to circulate a draft joint Protective Order.

Best regards,

Ryan



United Plaza, Suite 1600
30 South 17th Street
Philadelphia, PA 19103
Tel 215.568.6400 Fax 215.568.6499
www.volpe-koenig.com

_Notice:_ If you are not the named recipient of this transmission, please notify us immediately, by telephone, and delete or destroy any copy of this message. You should not disclose or use this information in any way. Disclosure or use of this information may expose you to criminal or civil liabilities. We apologize for the inconvenience and thank you for your attention to this notice.

11/27/2007

# EXHIBIT F



**Volpe and Koenig** P.C.

United Plaza, Suite 1600
30 South 17th Street
Philadelphia, PA 19103

Telephone: +1-215-568-6400
Facsimile: +1-215-568-6499
www.volpe-koenig.com

——————— BRINGING LAW TO YOUR IDEAS ———————

Anthony S. Volpe
avolpe@volpe-koenig.com

September 20, 2007

Michael J. Fink, Esquire
Greenblum & Bernstein, P.L.C.
1950 Roland Clarke Place
Reston, VA  20191

**VIA E-MAIL AND FACSIMILE**

Re:    Voith Paper GMBH & Co. KG v. JohnsonFoils, Inc.
       U.S.D.C. for the District of Delaware;  Civil Action No.  07-226-JJF

Dear Michael:

If your concern is language rather than privilege, we have several German speakers and will accept documents in German.  We still want to review Voith's discovery in Delaware and ask that you provide the expected volume of documents.

I concur that an agreement on a production format is beneficial.   I am on depositions until Thursday, but can talk next Friday. Please propose a time.

We will be ready to exchange documents once we have an agreed upon time and format.  However, we do ask that you provide a proposed protective order so we can get that resolved soon.

We look forward to hearing from you.

Very truly yours,

Volpe and Koenig, P.C.

By: _____
       Anthony S. Volpe

ASV/vag

cc: Benjamin P. Kota, Esquire (via E-Mail Only)
    Neil F. Greenblum, Esquire (via E-Mail Only)
    Adam Wyatt Poff, Esquire (via E-Mail Only)
    George H. Seitz, III, Esquire (via E-Mail Only)
    Patti McGonigle, Esquire (via E-Mail Only)

*Patents        Trademarks        Copyrights        Trade Secrets        Litigation        Licensing*

# EXHIBIT G

LAW OFFICES

# GREENBLUM & BERNSTEIN, P.L.C.

PATENT, COPYRIGHT AND TRADEMARK MATTERS

1950 ROLAND CLARKE PLACE

RESTON, VA 20191-1411

TEL: (703) 716-1191

FAX: (703) 716-1180

EMAIL: gbpatent@gbpatent.com

www.gbpatent.com

NEIL F. GREENBLUM
BRUCE H. BERNSTEIN
JAMES L. ROWLAND
ARNOLD TURK
MICHAEL J. FINK
STEVEN WEGMAN *
WILLIAM FIEPEZ *
STEPHEN M. ROYLANCE
ROBERT W. MUELLER
WILLIAM E. LYDDANE
WILLIAM S. BOSSNICK *
PAUL A. BRAIER, Ph.D.
P. BRANKO PEJIC *
JOHN PRETA *
HERIBERT F. MUENSTERER, Ph.D. °□
LINDA J. HODGE
JOSHUA M. POVSNER *
DANIEL B. MOON
PAUL T. LEE *
JOHN N. MAZZOLA □
JAMES KENNETH MOORE, JR.
ENOCH PEAVEY
ANDREW WRIGHT
KATRIN VENTER, Ph.D.
SAFET METJAHIC *
AZZA JAYAPRAKASH
JONATHAN MILLER *

NEAL GOLDBERG
STEVEN B. POLLICOFF *
FARID MAJIDUDDIN, Ph.D.

OF COUNSEL :
BRUCE H. STONER, JR.
ANDREW M. CALDERON
CHARLES S. MURRAY, JR.*
SEAN MYERS-PAYNE, Ph.D.
LESLIE J. PAPERNER *
RICHARD J. McGRATH
BARRY I. HOLLANDER

TECHNICAL ADVISORS :
THOMAS WEBER, Ph.D.
ZHIDONG HAO, Ph.D.
MONICA S. ULLAGADDI
BO BIN JANG Ph.D.
SARAH J. SMALL
WALTER SCHLAPKOHL, Ph.D.

——————

* ADMITTED TO A BAR
   OTHER THAN VA
° EUROPEAN PATENT ATTORNEY
△ KOREAN PATENT ATTORNEY
□ REGISTERED PATENT AGENT

September 21, 2007

**VIA EMAIL (PDF)**

Anthony S. Volpe
Volpe and Koenig, P.C.
United Plaza, Suite 1600
30 South 17th Street
Philadelphia, PA 19103

        Re:    *Voith v. JohnsonFoils.*; Our Ref: J214720

Dear Tony:

      In response to your letter of September 20, 2007, in which you provided your availability for a call to discuss pending discovery issues on Monday, October 1, 2007, let's schedule the call for 11:30 a.m. I will initiate the call.

      Also, as it appears from your letter that JohnsonFoils's documents are ready for production, please provide them to us as soon as possible. We prefer that documents be provided in their native format, *i.e.*, in accordance with Fed. R. Civ. P. 34(b).

      Responding to your request that we circulate a protective order, we are in the process of finalizing a draft and expect to provide it to you by early next week. We anticipate that the agreed protective order will have two levels of confidentiality: Highly Confidential and Confidential. The disclosure of Highly Confidential information will be limited to a party's litigation counsel and qualified experts. In accordance with the Court's rules, until a protective order is entered, all confidential documents will be treated as Attorneys' Eyes Only. Accordingly, the absence of a protective order does not suspend the obligation to produce documents.

      Additionally, please promptly provide a copy of the insurance policy (and any related documents) which you identified in JohnsonFoils's initial disclosures. We will maintain the documents as Attorneys' Eyes Only until entry of a stipulated protective order.

{J214720 00265023.DOC}

Anthony S. Volpe                    September 21, 2007                    Page -2-

    We are still in the process of gathering Voith's responsive documents and reviewing the documents for privilege. We are working diligently to complete the task, but as I informed you before, our task is complicated by the need to gather documents, many of which are in German, from overseas. I will let you know as soon as we have documents ready for production. As you have indicated that your responsive documents are ready for production, please provide them to us by next week.

                    Very truly yours,

                    GREENBLUM & BERNSTEIN, P.L.C.

                    Michael J. Fink

MJF/mis

cc:    Adam Poff, Esq.
       George H. Seitz, III, Esq.

{J214720 00265023.DOC}

# EXHIBIT H



**Volpe**
**and**
**Koenig**
P.C.

United Plaza, Suite 1600
30 South 17th Street
Philadelphia, PA 19103

Telephone: +1-215-568-6400
Facsimile: +1-215-568-6499
www.volpe-koenig.com

——————— BRINGING LAW TO YOUR IDEAS ———————

Ryan W. O'Donnell
RODonnell@volpe-koenig.com

October 18, 2007

Neil Goldberg, Esquire
Greenblum & Bernstein, P.L.C.
1950 Roland Clarke Place
Reston, VA 20191

**VIA E-MAIL**
**ORIGINAL TO FOLLOW**

Re:  *Voith Paper GMBH & Co. KG v. JohnsonFoils, Inc.*
     U.S.D.C. for the District of Delaware
     Civil Action No. 07-226-JJF

Dear Neil:

We write in response to your October 12, 2007 letter. We find your tone and accusations less than professional in view of counsels' exchanges regarding the manner and format for document production and the entry of a protective order. It would be a waste of the parties' time and expense to initially produce documents as attorneys' eyes only pursuant to Local Rule 26.2, and then duplicate this effort by performing a second review of these documents for the appropriate level of confidentiality pursuant to a protective order. Such duplication of efforts should be easily avoided by agreeing to the terms of the protective order beforehand.

As you recall, my August 24, 2007 e-mail inquired on whether you intend to circulate a draft protective order for this matter. Your August 27, 2007 response stated that you were planning to circulate a draft protective order -- which we have not received to date. Mr. Volpe's September 19 and 20, 2007 letters again requested whether you intend to circulate a proposed protective order, and Mr. Fink's September 21, 2007 response stated that we would have a draft "by early next week." Again, we did not receive a draft of the protective order within the time frame you provided. <u>We again ask if you intend to circulate a draft protective order, and, if so, we request that you do it as soon as possible as it will help resolve this matter without protracted letter writing campaigns.</u>

Your letter also ignores counsels' prior discussions regarding the format for document production. Mr. Fink initially raised the issue of the format and timing for document production in his September 20, 2007 letter, and Mr. Volpe responded on that date stating that JohnsonFoils will exchange documents once we have an agreed upon time and format. In addition, Mr. Volpe's letter stated that we would be available on October 1, 2007 to discuss this matter, and Mr. Fink's September

*Patents      Trademarks      Copyrights      Trade Secrets      Litigation      Licensing*



Neil Goldberg, Esquire                                          October 18, 2007
Page 2                                                          07-226-JJF


21, 2007 letter agreed to that date and stated that he would initiate the call. While Mr. Volpe and I were prepared to discuss this matter with you and/or Mr. Fink on October 1, 2007 (and still remain so prepared), we did not receive a call from you or Mr. Fink on October 1, 2007. In fact, we have not received the courtesy of any communication from you to reschedule this conference.

Your October 12, 2007 letter is premature and ignores your failure to advance the aforementioned issues. You also seemingly fail to consider that Voith has not produced any documents to date and that Voith's written discovery responses raise many of the same concerns identified in your October 12, 2007 letter.

We remain interested in resolving these issues in order to move forward with discovery in an organized manner. Tony and I will not be available for the remainder of this week, but will be generally available Monday through Wednesday next week (October 22-24, 2007) to discuss these issues.

Please propose a mutually convenient time to discuss the above matters.

Very truly yours,

Volpe and Koenig, P.C.


By: _____
        Ryan W. O'Donnell

RWO/ASV/cps

cc: Michael J. Fink, Esquire (via e-mail only)
    Adam Wyatt Poff, Esquire (via e-mail only)
    George H. Seitz, III, Esquire (via e-mail only)
    Patti McGonigle, Esquire (via e-mail only)

# EXHIBIT I

LAW OFFICES
# GREENBLUM & BERNSTEIN, P.L.C.
PATENT, COPYRIGHT AND TRADEMARK MATTERS
1950 ROLAND CLARKE PLACE
RESTON, VA 20191-1411
TEL: (703) 716-1191
FAX: (703) 716-1180
EMAIL: gbpatent@gbpatent.com
www.gbpatent.com

November 7, 2007

NEIL F. GREENBLUM
BRUCE H. BERNSTEIN
JAMES L. ROWLAND
ARNOLD TURK
MICHAEL J. FINK
STEVEN WEGMAN *
WILLIAM PIEPRZ *
STEPHEN M. ROYLANCE
ROBERT W. MUELLER
WILLIAM E. LYDDANE
WILLIAM S. BOSHNICK *
PAUL A. BRAIER, Ph.D.
P. BRANKO PEJIC *
JOHN PRETA *
HERBERT F. MUENSTERER, Ph.D. □ *
LINDA J. HODGE
JOSHUA M. POVSNER *
DANIEL B. MOON
PAUL T. LEE Δ
JOHN V. MAZZOLA □
JAMES KENNETH MOORE, JR.
ENOCH PEAVEY
ANDREW WRIGHT
KATRIN VENTER, □ *
AZZA JAYAPRAKASH
JONATHAN MILLER *

NEAL GOLDBERG
STEVEN B. POLLICOFF *
FAHD MAJIDUDDIN, Ph.D. □
SARAH J. SMALL

OF COUNSEL:
BRUCE H. STONER, JR.
ANDREW M. CALDERON
CHARLES S. MURRAY, JR.*
SEAN MYERS-PAYNE, Ph.D.
LESLIE J. PAPERNER *
RICHARD J. McGRATH
BARRY I. HOLLANDER

TECHNICAL ADVISORS:
THOMAS WEBER, Ph.D.
ZHIDONG HAO, Ph.D.
MONICA S. ULLAGADDI
BO BIN JANG Ph.D.
WALTER SCHLAPKOHL, Ph.D.

* ADMITTED TO A BAR
  OTHER THAN VA
□ EUROPEAN PATENT ATTORNEY
Δ KOREAN PATENT ATTORNEY
□ REGISTERED PATENT AGENT

VIA EMAIL(PDF) AND FEDERAL EXPRESS

Tony Volpe, Esq.
Volpe and Koenig, P.C.
United Plaza, Suite 1600
30 South 17th Street
Philadelphia, PA 19103

    Re:    *Voith Paper GmbH & Co. KG  v. JohnsonFoils, Inc.*
              *C.A. No. 07-0226-JJF.  Our Ref.: 214720.*

Dear Tony:

    Please find enclosed documents bearing production numbers within the range VTH 000001 – VTH 005391. Many of these documents are marked "HIGHLY CONFIDENTIAL," *i.e.*, the highest level of confidentiality which we proposed to you in our letter dated September 21, 2007, and which we specified in the proposed protective order which we provided to you on October 31. Pursuant to Del. R. 26.2 ("Rule 26.2"), all documents that we have designated CONFIDENTIAL or HIGHLY CONFIDENTIAL, and any information contained therein, are provided for **Attorneys' Eyes Only** and are strictly limited to attorneys who have entered an appearance in the above referenced litigation and, as necessary, their supervised employees. As required by Rule 26.2, any persons provided access to documents or information designated confidential or highly confidential by Voith "are under an obligation to keep such documents confidential and to use them only for purposes of litigating the case." Rule 26.2.

    Furthermore, until the terms of the protective order are agreed upon, the enclosed documents are provided subject to the additional precondition that <u>no</u> attorney at your firm involved in patent related matters before any patent granting authority or agency anywhere in the world relating to the subject matter of this lawsuit, including without limitation matters on behalf of JohnsonFoils, Inc. and/or its affiliated companies anywhere in the world, *e.g.*, AstenJohnson Inc., is permitted access to any documents designated "HIGHLY CONFIDENTIAL," or any information contained therein. Accordingly, any individual who views documents designated HIGHLY CONFIDENTIAL, or to whom any information contained therein is disclosed, is hereby noticed that they are precluded from participation in the above described patent related matters. These documents are provided subject the further precondition that any individual

Tony Volpe, Esq.                    November 7, 2007                    Page -2-

authorized to view confidential documents pursuant to Rule 26.2 who is provided access to documents designated CONFIDENTIAL or HIGHLY CONFIDENTIAL, or to whom any information contained therein is disclosed, is provided with a copy of this letter prior to any such disclosure.

In view of the remarkable assertion in your letter dated October 24, 2007, over a month after our confidentiality designations were originally proposed to you, that you "do not agree to [Voith's CONFIDENTIAL and HIGHLY CONFIDENTIAL] designations and are not bound to them without entry of a protective order," we insist that you confirm in writing your acceptance of the terms of this letter prior to reviewing the enclosed documents.

Very truly yours,

GREENBLUM & BERNSTEIN, P.L.C.

Neal Goldberg

Enclosure:    Documents bearing production numbers in the range VTH 000001 – VTH 005391 (by FedEx only)

# EXHIBIT J



## Volpe and Koenig P.C. ®

United Plaza, Suite 1600
30 South 17th Street
Philadelphia, PA 19103

Telephone: +1-215-568-6400
Facsimile: +1-215-568-6499
www.volpe-koenig.com

——— BRINGING LAW TO YOUR IDEAS® ———

Anthony S. Volpe
avolpe@volpe-koenig.com

November 8, 2007

Neal Goldberg, Esquire
Greenblum & Bernstein, P.L.C.                         **VIA UPS**
1950 Roland Clarke Place
Reston, VA  20191

Re:   *Voith Paper GMBH & Co. KG v. JohnsonFoils, Inc.*
      U.S.D.C. for the District of Delaware
      Civil Action No.  07-226-JJF

Dear Neal:

We received your November 7, 2007 letter and the boxes of documents.  After reading your letter and the unilateral demands in it, I instructed our mail room that the boxes were not to be opened or docketed.  The unopened boxes are being returned overnight as we do not accede to your demands.  As we said previously, we will provide comments on your draft protective order as soon as possible. When that is agreed, we will accept documents in accordance with it.

With respect to documents from Voith US as part of Plaintiff's responses to JohnsonFoils' requests for production, we are still awaiting your answer to our October 23, 2007 inquiry.  Will you stipulate that Voith US is either a party to this action or under the custody or control of Plaintiff and provide a separate identification of all documents produced from Voith US?

Very truly yours,

Volpe and Koenig, P.C.

By: _Anthony S. Volpe_
        Anthony S. Volpe

ASV/RWO/cps

cc: Michael J. Fink, Esquire (Letter only via e-mail only)
    Adam Wyatt Poff, Esquire (Letter only via e-mail only)
    George H. Seitz, III, Esquire (Letter only via e-mail only)
    Patti McGonigle, Esquire (Letter only via e-mail only)

*Patents        Trademarks        Copyrights        Trade Secrets        Litigation        Licensing*

# EXHIBIT K

## Ryan O'Donnell

| | |
|---|---|
| **From:** | Tony Volpe |
| **Sent:** | Friday, November 16, 2007 9:55 AM |
| **To:** | 'MICHAEL FINK' |
| **Cc:** | NEAL GOLDBERG; Poff, Adam; Ryan O'Donnell; George H. Seitz III Esquire (gseitz@svglaw.com); Patricia McGonigle Esquire (Pmcgonigle@svglaw.com) |

**Subject:** Voith vs. Johnson Foils, USDC of Delaware: 1:07-cv-00226-UNA (Our Ref. No. J214720)

Hello Michael:

We acknowledged receipt of the draft, approximately two months past it promised time, and advised that we would after we had an opportunity to review it. Unfortunately, we found you proposal unworkable and set about preparing our own draft. I hope to provide that by no later than close of business today.

Best regards,

Tony

Anthony S. Volpe, Attorney at Law
Volpe and Koenig, P.C.
www.volpe-koenig.com
215-568-6400

---

**From:** MICHAEL FINK [mailto:MFINK@gbpatent.com]
**Sent:** Wednesday, November 14, 2007 5:40 PM
**To:** Tony Volpe
**Cc:** NEAL GOLDBERG; Poff, Adam; Ryan O'Donnell
**Subject:** Voith vs. Johnson Foils, USDC of Delaware: 1:07-cv-00226-UNA (Our Ref. No. J214720)

Tony,

On November 1, 2007, we forwarded to you a proposed protective order. We have not yet received any indication from you whether you agree to the terms of the proposed protective order, or if you plan to propose modifications. If you agree to the proposed protective order, please confirm your agreement by signing it and returning it to us. Otherwise, let's schedule a time to discuss your proposed modifications.

Michael

Michael J. Fink, Esq.
Greenblum & Bernstein, P.L.C.
1950 Roland Clarke Place
Reston, Virginia 20191
Voice: (703) 716-1191
Facsimile: (703) 716-1180
email: mfink@gbpatent.com
http://www.gbpatent.com/

11/27/2007

*************************************************************************

The information contained in this e-mail message is intended only for
the personal and confidential use of the recipient(s) named above. This
message may be an attorney-client communication and as such is
privileged and confidential. If the reader of this message is not the
intended recipient or an agent responsible for delivering it to the
intended recipient, you are hereby notified that you have received this
document in error and that any review, dissemination, distribution, or
copying of this message is strictly prohibited. If you have received
this communication in error, please notify us immediately by e-mail,
and delete the original message.
*************************************************************************

In rare cases, our spam scanners may eliminate legitimate email. Please advise us
immediately if you receive an error notification from our server.

11/27/2007

# EXHIBIT L

## Ryan O'Donnell

| | |
|---|---|
| **From:** | Tony Volpe |
| **Sent:** | Friday, November 16, 2007 4:55 PM |
| **To:** | 'MICHAEL FINK' |
| **Cc:** | 'NEAL GOLDBERG'; 'Poff, Adam'; Ryan O'Donnell; 'George H. Seitz III Esquire (gseitz@svglaw.com)'; 'Patricia McGonigle Esquire (Pmcgonigle@svglaw.com)' |
| **Subject:** | Voith vs. Johnson Foils, USDC of Delaware: 1:07-cv-00226-UNA (Our Ref. No. J214720) |

**Attachments:** AstenJohnson Draft-20071116.doc

Hello Michael:

A proposed protective order is attached in word.

Best regards,

Tony

Anthony S. Volpe, Attorney at Law
Volpe and Koenig, P.C.
www.volpe-koenig.com
215-568-6400

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| VOITH PAPER GMBH & CO. KG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-226-JJF |
| | ) | |
| JOHNSONFOILS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**STIPULATION AND AGREED PROTECTIVE ORDER
GOVERNING DISCOVERY MATERIALS**

Plaintiff and   Defendant (hereinafter the "parties") file this Stipulation and Agreed Protective Order to preserve the confidentiality of certain commercially sensitive, confidential and/or proprietary information that has been or will be requested and produced in discovery in this matter.  The parties agree that a protective order concerning discovery materials is desirable to protect their rights and the rights of certain third parties.

It is therefore AGREED THAT:

1.     Plaintiff and Defendant shall have the right to designate  as "Attorneys Eyes Only" the documents, things and information produced during discovery in this matter ("Discovery Information") which the producing party believes contains its trade secret, research, development, commercial, financial,  proprietary or confidential information.

2.     All Produced Information designated as Attorneys Eyes Only shall be used by the party receiving it only in connection with the litigation and appeal of this action.  Discovery

- 1 -

Information designated as Attorneys Eyes Only shall not be used for any business, competitive or other purpose, and shall not be disclosed to any person or entity, except as provided herein.

3.    All Discovery Information a party desires to have designated as Attorneys Eyes Only shall be so designated at the time of its production.  In the event that a party receiving Discovery Information designated as Attorneys Eyes Only disagrees with that designation, that party shall have a right to seek an order from the Court, pursuant to a properly noticed motion, voiding the designation in whole or in part.  However, the party producing the Discovery . Information designated as Attorneys Eyes Only shall have the burden of showing entitlement to that designation under Federal Rule of Civil Procedure 26.  Until such a time as the Court rules that a particular document or set of documents designated as Attorneys Eyes Only are not subject to protection, the parties will continue to treat any such designated documents as protected under this Order. An inadvertent failure to designate Discovery Information as Attorneys Eyes Only may be corrected by providing the receiving party both written notice of the error and the properly designated Discovery Information as soon as practicable after the discovery of the inadvertent error.

4.    Information derived from Discovery Information designated as Attorneys Eyes Only and any information contained therein shall be used solely for the purpose of preparing for trial, the trial and appeal of this action and for no other purpose whatsoever, and shall not be disclosed to any person or entity except in accordance with the terms of this Stipulation and Agreed Protective Order.

5.    Discovery Information designated as Attorneys Eyes Only, copies thereof, and the information contained therein shall not be made available or disclosed to any person, except a single identified representative of each of the parties in this case, the retained and in-house

attorneys for the parties in this case, the employees of such attorneys and the Court. Any party representative or attorney in this case, and any regular employee of such attorney assigned to and necessary to assist in the conduct of this action who wishes to have access to Discovery Information designated as Attorneys Eyes Only shall be required as a prerequisite to such access to (a) have signed this Order as counsel of record or (b) have executed the Declaration attached hereto as Exhibit A.

Discovery Information designated as Attorneys Eyes Only, copies thereof, and the information contained therein shall not be made available to or disclosed to any potential expert until the party wishing to make such disclosure provides the producing party (i) a written notice identifying such individual and stating such individual's present occupation, employer and position, and all other business affiliations for the past ten (10) years, (ii) the most up-to-date copy of such individual's curriculum vitae, and (iii) an executed Declaration in the form attached hereto as Exhibit A. The producing Party shall have ten (10) business days following the date of the notice to object to the proposed disclosure. If the producing party has not objected in writing by the end of the ten days, the Discovery Information designated as Attorneys Eyes Only, copies thereof, and the information contained therein may disclosed in compliance with all applicable provisions of this Order. A timely objection from the producing party shall stay disclosure to the proposed individual.


6.      Discovery Information designated as Attorneys Eyes Only shall remain in the custody of counsel and expert witnesses and shall not be provided to other persons except as necessary to prepare for trial, the trial itself or appeal of this action pursuant to paragraph 4 above.

7.    In the event that counsel for either party determines that the prosecution of this action requires that Discovery Information designated as Attorneys Eyes Only be disclosed to persons not otherwise provided for herein, such counsel shall provide counsel for the other party written notice by facsimile or hand delivery of the intended disclosure, which notice shall specify with particularity the Discovery Information to be disclosed and the identity of the person.  This written notice shall be given not less than five (5) business days prior to intended disclosure.  If, within five (5) business days after receipt of such notice, a party objects in writing to such disclosure, the Discovery Information designated as Attorneys Eyes Only shall not be disclosed unless the Court so orders.

8.    All Discovery Information designated as Attorneys Eyes Only and any papers containing information contained in or derived from such documents that are filed with the Court shall be filed in sealed envelopes bearing the title of this action and shall be marked "CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER", to be opened only as the Court directs.

9.    In order to permit discovery to proceed without further delay, the parties agree that this Stipulation and Agreed Protective Order shall be effective from the date on which it is executed by counsel for the parties and shall apply and be enforceable from that date forward with respect to all discovery in this matter, including materials produced at any time after the commencement of this case.

10.    In the event that any Discovery Information designated as Attorneys Eyes Only or any information derived from it is used in depositions, the Discovery Information and the derived information shall not lose their Attorneys Eyes Only  status through such use, and the parties shall take all steps necessary to preserve that status during and after such use.  It shall be

- 4 -

the responsibility of the counsel requiring that Discovery Information be designated as Attorneys Eyes Only to advise the court reporter at the beginning of protected information of that status and the transcript shall be so designated. The transcript so designated shall be treated as Attorneys Eyes Only for a period of thirty (30) calendar days after the date on which the reporter forwards the complete transcript to counsel for the parties. Counsel requiring that transcript be designated as Attorneys Eyes Only shall notify counsel for the other party of any part of part of the transcript for which the designation is to continue within the period of thirty (30) calendar days. In the absence of timely notice, the designation shall be removed from the transcript.

11.     In the event that either party receives a third party subpoena or other form of legal process requesting Discovery Information designated as Attorneys Eyes Only, the party receiving such request will provide the other party written notice by facsimile or hand delivery that such a request was received and provide a copy of the request with the written notice. The party receiving the third party subpoena or other form of legal process shall not produce the requested documents for at least ten (10) business days after giving written notice by facsimile or hand delivery of the request to the other party, unless the other party states in writing that it does not intend to seek protection in connection with the third party subpoena or other form of legal process concerning those documents Attorneys Eyes Only.

12.     At the conclusion of this action, all documents Discovery Information designated as Attorneys Eyes Only, including all copies, extracts and summaries and all derived information taken, shall be returned to the producing party no later than thirty (30) days after the final non-appealable  judgment or settlement of this action.

13.    In the event additional parties are added to this litigation, each new party's counsel shall sign a duplicate original of the Stipulation and Agreed Protective Order and send it to all other counsel for the parties and cause same to be filed with the Court.

SO ORDERED this _____ day of   November 2007.


_____
J.

CONSENTED TO:

_____

_____

Attorneys for Plaintiffs

_____

_____

Attorneys for Defendant

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VOITH PAPER GMBH & CO. KG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-226-JJF |
| | ) | |
| JOHNSONFOILS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### DECLARATION

I, _____ , declare that:

1.      I have read a copy of the Stipulation and Agreed Protective Order Governing Discovery Materials entered in the above-styled lawsuit and I understand that I am bound by its terms.

2.      I hereby agree under penalty of contempt of court that I shall not disclose or use anything communicated to me except in accordance with the Stipulation and Agreed Protective Order Governing Discovery Materials.

3.      I hereby agree and submit to the exercise of the personal jurisdiction over me by the United States District Court for the District of Delaware  insofar as is necessary to enforce the Stipulation and Agreed Protective Order Governing Discovery Materials.

Name:_____

Place of execution:

Date:

EXHIBIT A

8

# EXHIBIT M



**Volpe and Koenig** P.C.

United Plaza, Suite 1600
30 South 17th Street
Philadelphia, PA 19103

Telephone: +1-215-568-6400
Facsimile: +1-215-568-6499
www.volpe-koenig.com

———————— BRINGING LAW TO YOUR IDEAS ® ————————

Anthony S. Volpe
avolpe@volpe-koenig.com

November 19, 2007

Michael J. Fink, Esquire                                        **VIA UPS**
Greenblum & Bernstein, P.L.C.
1950 Roland Clarke Place
Reston, VA  20191

Re:    Voith Paper GMBH & Co. KG v. JohnsonFoils, Inc.
       Civil Action No. 07-226

Dear Michael:

Enclosed is a CD containing document production bearing numbers JFI0000001-JFI0012601.  Please note these documents have been designated Attorneys' Eyes Only.

Very truly yours,

Volpe and Koenig, P.C.


By:_____
      Anthony S. Volpe

ASV/naf
Enclosure
cc:    Neil Goldberg, Esquire (letter only via e-mail)
       Adam Wyatt Poff, Esquire (letter only via e-mail)
       George H. Seitz, III, Esquire (letter only via e-mail)
       Patti McGonigle, Esquire (letter only via e-mail)

*Patents        Trademarks        Copyrights        Trade Secrets        Litigation        Licensing*

# EXHIBIT N



| | United Plaza, Suite 1600 | Telephone: +1-215-568-6400 |
| | 30 South 17th Street | Facsimile: +1-215-568-6499 |
| | Philadelphia, PA 19103 | www.volpe-koenig.com |

——————— BRINGING LAW TO YOUR IDEAS ®———————

Anthony S. Volpe
avolpe@volpe-koenig.com

November 21, 2007

Michael J. Fink, Esquire                                         **VIA UPS**
Greenblum & Bernstein, P.L.C.
1950 Roland Clarke Place
Reston, VA 20191

Re:    Voith Paper GMBH & Co. KG v. JohnsonFoils, Inc.
       Civil Action No. 07-226

Dear Michael:

Enclosed is a CD containing document production bearing numbers JFI0012602-JFI0013265.

Very truly yours,

Volpe and Koenig, P.C.

By: _____
       Anthony S. Volpe

ASV/naf
Enclosure
cc:    Neil Goldberg, Esquire (letter only via e-mail)
       Adam Wyatt Poff, Esquire (letter only via e-mail)
       George H. Seitz, III, Esquire (letter only via e-mail)
       Patti McGonigle, Esquire (letter only via e-mail)

*Patents        Trademarks        Copyrights        Trade Secrets        Litigation        Licensing*

# EXHIBIT O

## Ryan O'Donnell

| | |
|---|---|
| **From:** | Tony Volpe |
| **Sent:** | Monday, November 19, 2007 12:47 PM |
| **To:** | 'MICHAEL FINK' |
| **Cc:** | NEAL GOLDBERG; Poff, Adam; Ryan O'Donnell; gseitz@svglaw.com; Pmcgonigle@svglaw.com; John O'Malley |

**Subject:** RE: Voith vs. Johnson Foils, USDC of Delaware: 1:07-cv-00226-UNA (Our Ref. No. J214720)

Michael, the only lack of good faith is that reflected in your continuing effort to create the impression that we have refused to produce documents. What we have done is to ask you to do what you said you would do months ago so the production could be efficient and orderly. Instead, you have refused to produce the promised draft, have refused to consider any position other than your own by speaking over anyone who does not agree with you and accusing them of not attempting to resolve the issues. We did refuse to accept documents under your unilateral and unnecessary demands.

As to the protective order proposal you did finally provide, it goes well beyond anything necessary for this technology, especially in view of the near expiration date of the patents. To date, you still have not addressed our repeated inquiries about how documents will be produced.

We will be sending you, by UPS, a documents CD with about 12,000 pages, marked as Attorneys' Eyes Only under the court's standing order, as TIFF images. We expect you to produce Voith's documents immediately under the court's standing order without any of your additional unilateral demands.

We welcome your comments on our proposed protective order.

Regards,

Tony

---

**From:** MICHAEL FINK [mailto:MFINK@gbpatent.com]
**Sent:** Sunday, November 18, 2007 1:31 PM
**To:** Tony Volpe
**Cc:** NEAL GOLDBERG; Poff, Adam; Ryan O'Donnell; gseitz@svglaw.com; Pmcgonigle@svglaw.com
**Subject:** RE: Voith vs. Johnson Foils, USDC of Delaware: 1:07-cv-00226-UNA (Our Ref. No. J214720)

Tony,

As we have repeatedly stated, in accordance with the applicable local rules and customs in Delaware, Voith's counsel will maintain confidential documents which JohnsonFoil produces in response to Voith's discovery requests as Outside Counsel Eyes Only until a protective order is entered by the Court. This level of confidentiality exceeds the level of confidentiality set forth in your recently proposed protective order, so there is no good faith basis for not producing responsive documents. Please reconsider your refusal to produce any documents responsive to Voith's discovery requests until a protective order is entered by the Court.

Furthermore, it is unfortunate that you refused to cooperate with us by redlining the draft protective order we forwarded to you. If you are adamant about the provisions of your proposed protective order, it is unlikely that the parties will agree on many of the provisions,

but we should try to narrow the points in dispute.  Please let me know your availability on Monday, November 19, to discuss the protective orders.

Regards,
Michael

Michael J. Fink, Esq.
Greenblum & Bernstein, P.L.C.
1950 Roland Clarke Place
Reston, Virginia 20191
Voice: (703) 716-1191
Facsimile: (703) 716-1180
email: mfink@gbpatent.com
http://www.gbpatent.com/

***********************************************************************

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and as such is privileged and confidential. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.
***********************************************************************
In rare cases, our spam scanners may eliminate legitimate email. Please advise us immediately if you receive an error notification from our server.

_____

**From:** Tony Volpe [mailto:TVolpe@volpe-koenig.com]
**Sent:** Friday, November 16, 2007 4:55 PM
**To:** MICHAEL FINK
**Cc:** NEAL GOLDBERG; Poff, Adam; Ryan O'Donnell; gseitz@svglaw.com; Pmcgonigle@svglaw.com
**Subject:** Voith vs. Johnson Foils, USDC of Delaware: 1:07-cv-00226-UNA (Our Ref. No. J214720)

Hello Michael:

A proposed protective order is attached in word.

Best regards,

Tony

Anthony S. Volpe, Attorney at Law
Volpe and Koenig, P.C.
www.volpe-koenig.com
215-568-6400

12/14/2007

Case 1:07-cv-00226-JJF    Document 57-3    Filed 01/09/2008    Page 34 of 40

Voith vs. Johnson Foils, USDC of Delaware: 1:07-cv-00226-UNA (Our Ref. No. J214720)   Page 3 of 3



United Plaza, Suite 1600
30 South 17th Street
Philadelphia, PA  19103
Tel  215.568.6400  Fax 215.568.6499
www.volpe-koenig.com

*Notice:* If you are not the named recipient of this transmission, please notify us immediately, by telephone, and delete or destroy any copy of this message.  You should not disclose or use this information in any way.  Disclosure or use of this information may expose you to criminal or civil liabilities.  We apologize for the inconvenience and thank you for your attention to this notice.

12/14/2007

# EXHIBIT P

## Ryan O'Donnell

| | |
|---|---|
| **From:** | Tony Volpe |
| **Sent:** | Monday, November 26, 2007 9:26 AM |
| **To:** | 'NEAL GOLDBERG' |
| **Cc:** | Poff, Adam; Ryan O'Donnell; gseitz@svglaw.com; Pmcgonigle@svglaw.com; MICHAEL FINK; NEIL GREENBLUM |

**Subject:** RE: Voith vs. Johnson Foils, USDC of Delaware: 1:07-cv-00226-UNA (Our Ref. No. J214720)

Hello Neal:

I can only reiterate our previously stated position. We do not accept that there is highly sensitive information simply because you say there may be such information. This is similar to your rejection of our view that the patents are soon to expire and the related technology is old and admitted to be in the public domain. As we stated previously, you always have the right to seek protection under the rules for specific information by demonstrating the alleged risk to that specific information by disclosure under our proposed order.

As to a party representative, we believe it is necessary to our defense to have the benefit of open discussions with someone knowledgeable about the industry. Certain, this is a risk that Voith understood when it asserted the patents. To ask AstenJohnson to defend itself with out the benefit of access to the same information that is available to Voith is unreasonable.

In view of our impasse, we expect you to immediately produce Voith's discovery under the Court's standing order.

Best regards,

Tony

---

**From:** NEAL GOLDBERG [mailto:ngoldberg@gbpatent.com]
**Sent:** Wednesday, November 21, 2007 4:53 PM
**To:** Tony Volpe
**Cc:** Poff, Adam; Ryan O'Donnell; gseitz@svglaw.com; Pmcgonigle@svglaw.com; MICHAEL FINK; NEIL GREENBLUM; NEAL GOLDBERG
**Subject:** RE: Voith vs. Johnson Foils, USDC of Delaware: 1:07-cv-00226-UNA (Our Ref. No. J214720)

Tony:

As we have explained, Voith's proposed "Highly Confidential" and "Confidential" designations, and associated restrictions, are intended to protect Voith's *confidential* information from the risk of improper use, not, as your response suggests, to limit the disclosure of "subject matter [that] has long been public." That a document relates to a machine embodying the patented invention does not foreclose the real possibility that such a document also contains sensitive proprietary information that has never been disclosed. For at least that reason, as we explained in our last e-mail, the term of the patents-in-suit is irrelevant. As we have explained, the very real risk that an attorney involved in patent prosecution will inadvertently, and improperly, benefit from the disclosure of Voith's proprietary information outweighs any prejudice to JohnsonFoils from limiting the disclosure of Voith's confidential information to those of its litigation counsel who are precluded from prosecution on matters relating to the Patents-in-Suit.

In addition, we see no reason why it is necessary for a "party representative" or in-house counsel to have access to Voith's confidential information. Again, Voith has never proposed restricting anyone's access to information that "has long been public." The prejudice to a party of disclosing its proprietary information, whether technical or

12/14/2007

not, to a competitor is indisputable.  For that reason, we asked you, and we now ask you again, to explain why any prejudice to JohnsonFoils from our proposed restrictions outweighs the clear prejudice to Voith.  We appreciate your offer to limit "in-house counsel" to nonprosecuting attorneys, but, at least, your proposal would do nothing to address the prejudice to Voith of disclosing its non-technical, but still highly sensitive, proprietary business information.

We point out that we  have  always been willing to limit the use of our proposed "Confidential" and "Highly Confidential" designations to nonpublic documents and information.  Therefore, to the extent that your objection to our proposed confidentiality designations is based on your desire to circulate information that "has long been public," we ask that you withdraw your objection.

Finally, it is unfortunate that, without providing any explanation why JohnsonFoils believes it would be prejudiced by Voith's proposed confidentiality designations, you have refused our invitation to discuss these issues and have instead insisted that we "make the necessary showing under Rule 26."

Again, we urge you to reconsider our proposed confidentiality designations or provide a counter-proposal that addresses Voith's concerns.   To that end, we again invite you to discuss the terms of an agreed protective order in a teleconference at 4:00 p.m. on this coming Monday, November 26, 2007.

Regards,

Neal


Neal Goldberg
Greenblum & Bernstein, P.L.C.
1950 Roland Clarke Place
Reston, VA 20191
Tel: (703) 716 1191
Fax:(703) 716 1180
E-Mail: ngoldberg@gbpatent.com


*********************************************************************

The information contained in this e-mail message is intended only for
the personal and confidential use of the recipient(s) named above. This
message may be an attorney-client communication and as such is
privileged and confidential. If the reader of this message is not the
intended recipient or an agent responsible for delivering it to the
intended recipient, you are hereby notified that you have received this
document in error and that any review, dissemination, distribution, or
copying of this message is strictly prohibited. If you have received
this communication in error, please notify us immediately by e-mail,
and delete the original message.


*********************************************************************


---

**From:** Tony Volpe [mailto:TVolpe@volpe-koenig.com]
**Sent:** Wednesday, November 21, 2007 11:14 AM
**To:** MICHAEL FINK
**Cc:** NEAL GOLDBERG; Poff, Adam; Ryan O'Donnell; gseitz@svglaw.com; Pmcgonigle@svglaw.com
**Subject:** RE: Voith vs. Johnson Foils, USDC of Delaware: 1:07-cv-00226-UNA (Our Ref. No. J214720)

Michael:

The third and fourth paragraphs below exemplify why your proposal is unworkable. There is little, if any,

reason for your broad exclusion of any attorney who sees Voith's information from prosecuting patents. The subject matter has long been public and there is little, if any, information to be produced that relates to current prosecution of subject matter in patents that are near to expiration.

If you are concerned about who serves as the "party representative," we are willing to consider what you think are necessary safeguards. As to in-house counsel, I see no reason why such counsel should be excluded. In our specific case, the in-house general counsel is not a technical person and is not a patent prosecutor. If you want to exclude in-house patent prosecution personnel, we will consider your proposal.

For our part, we do not see your concerns as being realistic, but remind you that you are always free to make the necessary showing under Rule 26 for the protection of specific information.

You should not take the decision not to engage in the debate invited by the first two paragraphs of your message to in any way indicate agreement with your continued attempts to vilify our positions.

Best regards,

Tony

---

**From:** MICHAEL FINK [mailto:MFINK@gbpatent.com]
**Sent:** Tuesday, November 20, 2007 6:36 PM
**To:** Tony Volpe
**Cc:** NEAL GOLDBERG; Poff, Adam; Ryan O'Donnell; gseitz@svglaw.com; Pmcgonigle@svglaw.com
**Subject:** Voith vs. Johnson Foils, USDC of Delaware: 1:07-cv-00226-UNA (Our Ref. No. J214720)

Tony:

As explained in our previous correspondence, it is unreasonable for you to reject our Proposed Protective Order without providing any specific objections or proposed revisions. Your bald assertion that our Proposed Protective Order "goes well beyond anything necessary for this technology," is baseless and falls far short of a good faith effort to confer. Moreover, JohnsonFoils has requested confidential information that is ostensibly beyond strictly technical disclosures. In addition, the "near expiration date of the patents" is irrelevant to the terms of the Proposed Protective Order. Again, JohnsonFoils has requested information that is ostensibly beyond the technical practice of the patents in suit.

Despite your failure to reasonably confer with us regarding the terms of Voith's Proposed Protective Order, we remain willing to work with you in the hope that we can resolve our differences without the involvement of the Court. To that end, we have reviewed the protective order you sent to us on November 16 ("the JF Protective Order"). Although we are still in the process of evaluating the full extent of the differences between the JF Protective Order and Voith's Proposed Protective Order, we have reviewed your proposed confidentiality designation, and, for the reasons stated below, find it inadequate to reasonable protect Voith's confidential information from the risk of improper disclosure or use.

Unlike Voith's Proposed Protective Order, which provides for two levels of confidentiality "Confidential" and "Highly Confidential," the JF Protective Order provides for only one confidentiality designation: "Attorneys' Eyes Only." Ordinarily an "Attorneys' Eyes Only" designation provides the strongest protection available short of withholding the documents completely. However, JohnsonFoils' definition of "Attorneys' Eyes Only" is very broad, is not limited to attorneys, and does not bar attorneys with access to confidential information from prosecuting patent applications on subjects related to the patents-in-suit. *See* JF Protective Order, ¶5. Specifically, the JF Protective Order permits a "party

12/14/2007

representative," all in-house attorneys, and all outside counsel to review material marked "Attorneys' Eyes Only." The "party representative" appears to include at least any employee or executive of JohnsonFoils. The "in-house attorneys" appears to include any attorney regularly employed by JohnsonFoils, including its patent attorneys. Moreover, because the JF Proposed Protective Order also appears to permits disclosure to employees of such attorneys and individuals, even non-attorney patent agents would have access to Attorneys' Eyes Only information. Although the JF Protective Order states that Voith's confidential information would be used solely for the purposes of this litigation, it would be very difficult, if not impossible, to detect an improper use. In stark contrast to the JF Proposed Protective Order, Voith's Proposed Protective Order strictly limits material designated Highly Confidential to outside counsel retained for this litigation, and qualified experts, and further bars any outside counsel with access to Highly Confidential information from involvement in related patent matters for a period of three (3) years.

The extraordinarily broad disclosures permitted by your proposed "Attorneys' Eyes Only" designation, as described in detail above, pose an unacceptably high risk to Voith that its confidential information will be improperly disclosed or used. For example, we do not think it is reasonable to expect that a patent prosecutor who has seen technical information relating to Voith's paper machines and is working to draft claims to cover JohnsonFoils' competitors will not be influenced by that disclosure. Nor do we think it reasonable to expect that an in-house company representative or counsel considering a business plan or contract will not be influenced by prior exposure to details of Voith's-a direct competitor-confidential business and financial information. The JF Protective Order is unacceptable because it fails to account for these reasonable risks by balancing the harm to Voith against the prejudice to JohnsonFoils limiting the disclosure of Voith's confidential information as required. Indeed, JohnsonFoils has failed to articulate any prejudice that would result from the provisions of Voith's Proposed Protective Order.

To address Voith's reasonable interest in limiting the risk that its confidential information will be misused, we request that you reconsider the designations defined in Voith's Proposed Protective Order: "Highly Confidential," and "Confidential." To the extent that you do not agree with this proposal, please explain why JohnsonFoils would be prejudiced by the proposed limitations, and why JohnsonFoils believes that any asserted prejudice outweighs the risk to Voith that its confidential information will be improperly disclosed or used.

Please let us know when you are available to discuss these issues.

Best regards,

Michael J. Fink, Esq.
Greenblum & Bernstein, P.L.C.
1950 Roland Clarke Place
Reston, Virginia 20191
Voice: (703) 716-1191
Facsimile: (703) 716-1180
email: mfink@gbpatent.com
http://www.gbpatent.com/

*************************************************************************
The information contained in this e-mail message is intended only for
the personal and confidential use of the recipient(s) named above. This
message may be an attorney-client communication and as such is
privileged and confidential. If the reader of this message is not the
intended recipient or an agent responsible for delivering it to the

12/14/2007

intended recipient, you are hereby notified that you have received this
document in error and that any review, dissemination, distribution, or
copying of this message is strictly prohibited. If you have received
this communication in error, please notify us immediately by e-mail,
and delete the original message.
*************************************************************************

In rare cases, our spam scanners may eliminate legitimate email. Please advise us immediately if you
receive an error notification from our server.

**Volpe**
**Koenig**

United Plaza, Suite 1600
30 South 17th Street
Philadelphia, PA 19103
Tel 215.568.6400  Fax 215.568.6499
www.volpe-koenig.com

**Notice:** If you are not the named recipient of this transmission, please notify us immediately, by telephone, and delete or destroy any copy of this
message. You should not disclose or use this information in any way. Disclosure or use of this information may expose you to criminal or civil
liabilities. We apologize for the inconvenience and thank you for your attention to this notice.

12/14/2007

# EXHIBIT Q

Voith vs. Johnson Foils, USDC of Delaware: 1:07-cv-00226-UNA (Our Ref. No. J214720)   Page 1 of 7

## Ryan O'Donnell

| | |
|---|---|
| **From:** | NEAL GOLDBERG [ngoldberg@gbpatent.com] |
| **Sent:** | Monday, November 26, 2007 6:21 PM |
| **To:** | Tony Volpe |
| **Cc:** | NEIL GREENBLUM; Poff, Adam; MICHAEL FINK; Ryan O'Donnell; gseitz@svglaw.com; Pmcgonigle@svglaw.com; Stover, Chad; NEAL GOLDBERG |
| **Subject:** | RE: Voith vs. Johnson Foils, USDC of Delaware: 1:07-cv-00226-UNA (Our Ref. No. J214720) |
| **Importance:** | High |

Dear Tony:

We are disappointed that you have rejected Voith's Proposed Protective Order in its entirety and have, again, rejected our invitation to confer with us on the terms of an agreed protective order. We continue to believe that reaching agreement on a protective order that reasonably protects both parties' confidential information—such as Voith's Proposed Protective Order—is preferable to involving the Court.

This is especially true since JohnsonFoils apparently concedes that a prosecution bar is an appropriate means of limiting the risk that highly sensitive confidential information will be misused, but, instead, asserts, without basis, that Voith has no such highly sensitive information. Specifically, you state that "[JohnsonFoils] does not accept there is highly sensitive information simply because you say there may be such information." To the extent that your objection is based on the disputed existence of Voith's highly sensitive information, your concerns are fully addressed in paragraph fifteen (15) of Voith's Proposed Protective Order, entitled "Challenge of Designation," and providing a procedure for challenging a party's confidentiality designations.

Moreover, JohnsonFoils has never explained why disclosing Voith's highly sensitive information to a JohnsonFoils party representative is <u>necessary</u> to avoid a prejudice that outweighs the obvious prejudice to Voith. Any need JohnsonFoils may have for "open discussions with someone knowledgeable about the industry" can easily be satisfied, pursuant to Voith's Proposed Protective Order, by retaining a qualified expert. Furthermore, we strongly disagree with your assertion that "[disclosing highly sensitive information to a competitor] is a risk that Voith understood when it asserted the patents." Discovery is not a proper means for JohnsonFoils to inflict undue burdens and risks on Voith, including the unnecessary risk of competitive injury from the unnecessarily broad disclosure of Voith's highly sensitive information.

In response to your demand that Voith "immediately produce Voith's discovery" we remind you that Voith has already provided the requested discovery, and that you, without any prior conferral, returned the documents to Voith. Nonetheless, Voith will, again, provide discovery pursuant to the Court's Rule 26.2. However, Voith will only provide highly sensitive documents, *i.e.*, documents designated Highly Confidential and subject to the pending protective order dispute, subject to the following conditions. First, any documents designated Highly Confidential, or the information they contain or reflect, in whole or in part, shall not be disclosed to any attorney involved in matters pending, or potentially pending, before any patent granting authority anywhere in the world. Second, any individual to whom such highly confidential information is disclosed agrees to be bound by the terms of any prosecution bar, or other restrictions, subsequently entered by the Court or agreed by the parties. In light of your continuing refusal to confer, if you do not agree to these conditions by the close of business on Wednesday, November 28, 2007, we will withhold Voith's highly confidential documents pending

Case 1:07-cv-00226-JJF    Document 57-4    Filed 01/09/2008    Page 3 of 22

Voith vs. Johnson Foils, USDC of Delaware: 1:07-cv-00226-UNA (Our Ref. No. J214720)    Page 2 of 7

resolution of the parties' protective order dispute by the Court.

Also, apart from your refusal to agree with Voith's two proposed levels of confidentiality, including the proposed "Confidential" and "Highly Confidential" designations, you have not stated any disagreement with any other provision of Voith's Proposed Protective Order.  So that we may work to further narrow this dispute, please identify any other provisions of Voith's Proposed Protective Order for which you have an objection.   Furthermore, in light of the foregoing response to your objections to Voith's proposed confidentiality designations, please let us know if you are willing to agree on protective order provisions that protect each party's confidential information by substantially providing for a suitable prosecution bar and a limit on the disclosure of highly sensitive information to exclude disclosure to in-house counsel and party representatives.

Sincerely,

Neal

Neal Goldberg
Greenblum & Bernstein, P.L.C.
1950 Roland Clarke Place
Reston, VA 20191
Tel: (703) 716 1191
Fax:(703) 716 1180
E-Mail: ngoldberg@gbpatent.com

CONFIDENTIAL: SUBJECT TO ATTORNEY-CLIENT PRIVILEGE
**************************************************************

The information contained in this e-mail message is intended only for
the personal and confidential use of the recipient(s) named above. This
message may be an attorney-client communication and as such is
privileged and confidential. If the reader of this message is not the
intended recipient or an agent responsible for delivering it to the
intended recipient, you are hereby notified that you have received this
document in error and that any review, dissemination, distribution, or
copying of this message is strictly prohibited. If you have received
this communication in error, please notify us immediately by e-mail,
and delete the original message.


**************************************************************


---

**From:** Tony Volpe [mailto:TVolpe@volpe-koenig.com]
**Sent:** Monday, November 26, 2007 9:26 AM
**To:** NEAL GOLDBERG
**Cc:** Poff, Adam; Ryan O'Donnell; gseitz@svglaw.com; Pmcgonigle@svglaw.com; MICHAEL FINK; NEIL GREENBLUM
**Subject:** RE: Voith vs. Johnson Foils, USDC of Delaware: 1:07-cv-00226-UNA (Our Ref. No. J214720)

Hello Neal:

I can only reiterate our previously stated position. We do not accept that there is highly sensitive information simply because you say there may be such information. This is similar to your rejection of our view that the patents are soon to expire and the related technology is old and admitted to be in the public domain. As we stated previously, you always have the right to seek protection under the rules for specific

Voith vs. Johnson Foils, USDC of Delaware: 1:07-cv-00226-UNA (Our Ref. No. J214720)    Page 3 of 7

information by demonstrating the alleged risk to that specific information by disclosure under our proposed order.

As to a party representative, we believe it is necessary to our defense to have the benefit of open discussions with someone knowledgeable about the industry. Certain, this is a risk that Voith understood when it asserted the patents. To ask AstenJohnson to defend itself with out the benefit of access to the same information that is available to Voith is unreasonable.

In view of our impasse, we expect you to immediately produce Voith's discovery under the Court's standing order.

Best regards,

Tony

---

**From:** NEAL GOLDBERG [mailto:ngoldberg@gbpatent.com]
**Sent:** Wednesday, November 21, 2007 4:53 PM
**To:** Tony Volpe
**Cc:** Poff, Adam; Ryan O'Donnell; gseitz@svglaw.com; Pmcgonigle@svglaw.com; MICHAEL FINK; NEIL GREENBLUM; NEAL GOLDBERG
**Subject:** RE: Voith vs. Johnson Foils, USDC of Delaware: 1:07-cv-00226-UNA (Our Ref. No. J214720)

Tony:

As we have explained, Voith's proposed "Highly Confidential" and "Confidential" designations, and associated restrictions, are intended to protect Voith's *confidential* information from the risk of improper use, not, as your response suggests, to limit the disclosure of "subject matter [that] has long been public." That a document relates to a machine embodying the patented invention does not foreclose the real possibility that such a document also contains sensitive proprietary information that has never been disclosed. For at least that reason, as we explained in our last e-mail, the term of the patents-in-suit is irrelevant. As we have explained, the very real risk that an attorney involved in patent prosecution will inadvertently, and improperly, benefit from the disclosure of Voith's proprietary information outweighs any prejudice to JohnsonFoils from limiting the disclosure of Voith's confidential information to those of its litigation counsel who are precluded from prosecution on matters relating to the Patents-in-Suit.

In addition, we see no reason why it is necessary for a "party representative" or in-house counsel to have access to Voith's confidential information. Again, Voith has never proposed restricting anyone's access to information that "has long been public." The prejudice to a party of disclosing its proprietary information, whether technical or not, to a competitor is indisputable. For that reason, we asked you, and we now ask you again, to explain why any prejudice to JohnsonFoils from our proposed restrictions outweighs the clear prejudice to Voith. We appreciate your offer to limit "in-house counsel" to nonprosecuting attorneys, but, at least, your proposal would do nothing to address the prejudice to Voith of disclosing its non-technical, but still highly sensitive, proprietary business information.

We point out that we have always been willing to limit the use of our proposed "Confidential" and "Highly Confidential" designations to nonpublic documents and information. Therefore, to the extent that your objection to our proposed confidentiality designations is based on your desire to circulate information that "has long been public," we ask that you withdraw your objection.

Finally, it is unfortunate that, without providing any explanation why JohnsonFoils believes it would be prejudiced by Voith's proposed confidentiality designations, you have refused our invitation to discuss these issues and have instead insisted that we "make the necessary showing under Rule 26."

Again, we urge you to reconsider our proposed confidentiality designations or provide a counter-proposal that addresses Voith's concerns. To that end, we again invite you to discuss the terms of an agreed protective order in a teleconference at 4:00 p.m. on this coming Monday, November 26, 2007.

Voith vs. Johnson Foils, USDC of Delaware: 1:07-cv-00226-UNA (Our Ref. No. J214720)    Page 4 of 7

Regards,

Neal


Neal Goldberg
Greenblum & Bernstein, P.L.C.
1950 Roland Clarke Place
Reston, VA 20191
Tel: (703) 716 1191
Fax:(703) 716 1180
E-Mail: ngoldberg@gbpatent.com


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and as such is privileged and confidential. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**From:** Tony Volpe [mailto:TVolpe@volpe-koenig.com]
**Sent:** Wednesday, November 21, 2007 11:14 AM
**To:** MICHAEL FINK
**Cc:** NEAL GOLDBERG; Poff, Adam; Ryan O'Donnell; gseitz@svglaw.com; Pmcgonigle@svglaw.com
**Subject:** RE: Voith vs. Johnson Foils, USDC of Delaware: 1:07-cv-00226-UNA (Our Ref. No. J214720)

Michael:

The third and fourth paragraphs below exemplify why your proposal is unworkable. There is little, if any, reason for your broad exclusion of any attorney who sees Voith's information from prosecuting patents. The subject matter has long been public and there is little, if any, information to be produced that relates to current prosecution of subject matter in patents that are near to expiration.

If you are concerned about who serves as the "party representative," we are willing to consider what you think are necessary safeguards. As to in-house counsel, I see no reason why such counsel should be excluded. In our specific case, the in-house general counsel is not a technical person and is not a patent prosecutor. If you want to exclude in-house patent prosecution personnel, we will consider your proposal.

For our part, we do not see your concerns as being realistic, but remind you that you are always free to make the necessary showing under Rule 26 for the protection of specific information.

You should not take the decision not to engage in the debate invited by the first two paragraphs of your message to in any way indicate agreement with your continued attempts to vilify our positions.

Best regards,

12/14/2007

Voith vs. Johnson Foils, USDC of Delaware: 1:07-cv-00226-UNA (Our Ref. No. J214720)    Page 5 of 7

Tony

---

**From:** MICHAEL FINK [mailto:MFINK@gbpatent.com]
**Sent:** Tuesday, November 20, 2007 6:36 PM
**To:** Tony Volpe
**Cc:** NEAL GOLDBERG; Poff, Adam; Ryan O'Donnell; gseitz@svglaw.com; Pmcgonigle@svglaw.com
**Subject:** Voith vs. Johnson Foils, USDC of Delaware: 1:07-cv-00226-UNA (Our Ref. No. J214720)

Tony:

As explained in our previous correspondence, it is unreasonable for you to reject our Proposed Protective Order without providing any specific objections or proposed revisions. Your bald assertion that our Proposed Protective Order "goes well beyond anything necessary for this technology," is baseless and falls far short of a good faith effort to confer. Moreover, JohnsonFoils has requested confidential information that is ostensibly beyond strictly technical disclosures. In addition, the "near expiration date of the patents" is irrelevant to the terms of the Proposed Protective Order. Again, JohnsonFoils has requested information that is ostensibly beyond the technical practice of the patents in suit.

Despite your failure to reasonably confer with us regarding the terms of Voith's Proposed Protective Order, we remain willing to work with you in the hope that we can resolve our differences without the involvement of the Court. To that end, we have reviewed the protective order you sent to us on November 16 ("the JF Protective Order"). Although we are still in the process of evaluating the full extent of the differences between the JF Protective Order and Voith's Proposed Protective Order, we have reviewed your proposed confidentiality designation, and, for the reasons stated below, find it inadequate to reasonable protect Voith's confidential information from the risk of improper disclosure or use.

Unlike Voith's Proposed Protective Order, which provides for two levels of confidentiality "Confidential" and "Highly Confidential," the JF Protective Order provides for only one confidentiality designation: "Attorneys' Eyes Only." Ordinarily an "Attorneys' Eyes Only" designation provides the strongest protection available short of withholding the documents completely. However, JohnsonFoils' definition of "Attorneys' Eyes Only" is very broad, is not limited to attorneys, and does not bar attorneys with access to confidential information from prosecuting patent applications on subjects related to the patents-in-suit. *See* JF Protective Order, ¶5. Specifically, the JF Protective Order permits a "party representative," all in-house attorneys, and all outside counsel to review material marked "Attorneys' Eyes Only." The "party representative" appears to include at least any employee or executive of JohnsonFoils. The "in-house attorneys" appears to include any attorney regularly employed by JohnsonFoils, including its patent attorneys. Moreover, because the JF Proposed Protective Order also appears to permits disclosure to employees of such attorneys and individuals, even non-attorney patent agents would have access to Attorneys' Eyes Only information. Although the JF Protective Order states that Voith's confidential information would be used solely for the purposes of this litigation, it would be very difficult, if not impossible, to detect an improper use. In stark contrast to the JF Proposed Protective Order, Voith's Proposed Protective Order strictly limits material designated Highly Confidential to outside counsel retained for this litigation, and qualified experts, and further bars any outside counsel with access to Highly Confidential information from involvement in related patent matters for a period of three (3) years.

The extraordinarily broad disclosures permitted by your proposed "Attorneys' Eyes Only" designation, as described in detail above, pose an unacceptably high risk to Voith that its confidential information will be improperly disclosed or used. For example, we do not think it is reasonable to expect that a

Voith vs. Johnson Foils, USDC of Delaware: 1:07-cv-00226-UNA (Our Ref. No. J214720)    Page 6 of 7

patent prosecutor who has seen technical information relating to Voith's paper machines and is working to draft claims to cover JohnsonFoils' competitors will not be influenced by that disclosure. Nor do we think it reasonable to expect that an in-house company representative or counsel considering a business plan or contract will not be influenced by prior exposure to details of Voith's-a direct competitor-confidential business and financial information. The JF Protective Order is unacceptable because it fails to account for these reasonable risks by balancing the harm to Voith against the prejudice to JohnsonFoils limiting the disclosure of Voith's confidential information as required. Indeed, JohnsonFoils has failed to articulate any prejudice that would result from the provisions of Voith's Proposed Protective Order.

To address Voith's reasonable interest in limiting the risk that its confidential information will be misused, we request that you reconsider the designations defined in Voith's Proposed Protective Order: "Highly Confidential," and "Confidential." To the extent that you do not agree with this proposal, please explain why JohnsonFoils would be prejudiced by the proposed limitations, and why JohnsonFoils believes that any asserted prejudice outweighs the risk to Voith that its confidential information will be improperly disclosed or used.

Please let us know when you are available to discuss these issues.

Best regards,

Michael J. Fink, Esq.
Greenblum & Bernstein, P.L.C.
1950 Roland Clarke Place
Reston, Virginia 20191
Voice: (703) 716-1191
Facsimile: (703) 716-1180
email: mfink@gbpatent.com
http://www.gbpatent.com/

*********************************************************************
The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and as such is privileged and confidential. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.
*********************************************************************
In rare cases, our spam scanners may eliminate legitimate email. Please advise us immediately if you receive an error notification from our server.

Volpe
and
Koenig
P.C.

United Plaza, Suite 1600
30 South 17th Street
Philadelphia, PA 19103
Tel 215.568.6400 Fax 215.568.6499
www.volpe-koenig.com

12/14/2007

Voith vs. Johnson Foils, USDC of Delaware: 1:07-cv-00226-UNA (Our Ref. No. J214720)    Page 7 of 7

**Notice:** If you are not the named recipient of this transmission, please notify us immediately, by telephone, and delete or destroy any copy of this message. You should not disclose or use this information in any way. Disclosure or use of this information may expose you to criminal or civil liabilities. We apologize for the inconvenience and thank you for your attention to this notice.

12/14/2007

# EXHIBIT R

LEXSEE 2006 U.S. DIST. LEXIS 426



Caution
As of: Jan 08, 2008

**AFP ADVANCED FOOD PRODUCTS LLC, Plaintiff v. SNYDER'S of HANOVER MANUFACTURING, INC Defendant**

**CIVIL ACTION, NO. 05-3006**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2006 U.S. Dist. LEXIS 426*

**January 6, 2006, Filed; January 9, 2006, Entered**

**SUBSEQUENT HISTORY:** Complaint dismissed at *AFP Advanced Food Prods. LLC v. Snyder's of Hanover Mfg., 2006 U.S. Dist. LEXIS 35979 (E.D. Pa., May 31, 2006)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent holder filed suit against defendant alleged infringer seeking a temporary injunction against defendant. Defendant filed for a protective order pursuant to *Fed. R. Civ. P. 26(c)* seeking an order preventing plaintiff's attorneys litigating this case from prosecuting new patents for plaintiff regarding similar art.

**OVERVIEW:** Through its motion for protective order, defendant sought to prevent plaintiff's attorneys from using information they would acquire during discovery of this case in their subsequent legal practice. Defendant was not alleging any ethical violations of established rules of confidentiality, but was worried about the inadvertent use of discovered material. The court found that threat of inadvertently using information obtained through discovery, standing alone, was not enough to justify a protective order barring plaintiff's attorneys from prosecuting similar patents for two years. The court reasoned that there was no reason for it to believe that

plaintiff's attorneys would not strictly follow the adopted order and refrain from using, either inadvertently or intentionally, Confidential Attorney's Eyes Only information for the sole purpose of this litigation. The court also found that if, however, the misuse of discovered material became an issue during the course of this litigation, the protective order, pursuant to section 17, may be amended accordingly.

**OUTCOME:** The request for a protective order was granted. Plaintiff's objections were granted and portions of defendant's proposed protective order would be removed.

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Protective Orders*
*Evidence > Procedural Considerations > Burdens of Proof > Ultimate Burden of Persuasion*
[HN1] Under *Fed. R. Civ. P. 26(c)*, a court "for good cause shown" may, in certain circumstances, enter a protective order in the context of discovery. *Fed. R. Civ. P. 26(c)* places the burden of persuasion on the party seeking the protective order to prove the good cause. The party seeking the protective order must show that disclosure of the information sought to be protected

would result in a clearly defined, specific and serious injury. Broad allegations of harm are not specific to establish good cause.

### Civil Procedure > Discovery > Protective Orders

[HN2] Generally a court will balance the interests of seven, non-exclusive, factors before issuing a protective order. Those factors include: 1) whether disclosure will violate any privacy interests; 2) whether the information is being sought for a legitimate purpose or for an improper purpose; 3) whether disclosure of the information will cause a party embarrassment; 4) whether confidentiality is being sought over information important to public health and safety; 5) whether the sharing of information among litigants will promote fairness and efficiency; 6) whether a party benefitting from the order of confidentiality is a public entity or official; and 7) whether the case involves issues important to the public.

### Civil Procedure > Discovery > Protective Orders

[HN3] The threat of inadvertently using information obtained through discovery is not to be taken lightly. Inadvertence, like the thief-in-the-night, is no respecter of its victims. Inadvertent or accidental disclosure may or may not be predictable. To the extent that it may be predicted, and cannot be adequately forestalled in the design of a protective order, it may be a factor in the access decision.

### Civil Procedure > Discovery > Protective Orders

[HN4] The decision to deny access to discovered materials shall be done on a case-by-case, and lawyer-by-lawyer basis.

**COUNSEL:** [*1] For AFP ADVANCED FOOD PRODUCTS LLC, Plaintiff: ANTHONY S. VOLPE, RANDOLPH J. HUIS, VOLPE & KOENIG PC, PHILADELPHIA, PA.

For SNYDER'S OF HANOVER MANUFACTURING, INC., doing business as SNYDER'S OF HANOVER, INC., Defendant: JAMES H. LAUGHLIN, JR., JOHN P. MORAN, THOMAS S. VALENTE, HOLLAND & KNIGHT LLP, WASHINGTON, DC; MARNIE E. SIMON, STEVENS & LEE, PHILADELPHIA, PA.

For SNYDER'S OF HANOVER MANUFACTURING,

INC., Counter Claimant: MARNIE E. SIMON, STEVENS & LEE, PHILADELPHIA, PA.

**JUDGES:** LAWRENCE F. STENGEL, J.

**OPINION BY:** LAWRENCE F. STENGEL

**OPINION**

### MEMORANDUM

### STENGEL, J.

### January 6, 2006

Defendant Snyder's of Hanover Manufacturing, Inc., ("Synder's") filed for a protective order pursuant to *Fed. R. Civ. P. 26(c)* seeking, among other things, an order preventing the plaintiff's attorneys litigating this case from prosecuting new patents for the plaintiff regarding similar art. Both Snyder's and the plaintiff, AFP Advanced Foods Products ("AFP") agree on the necessity of a protective order generally, but disagree over two specific provisions.

### I. BACKGROUND of CASE

AFP brings this patent infringement case seeking a temporary injunction against [*2] Snyder's. AFP avers that Snyder's is willfully infringing upon their valid patent ( # 6,893,675 filed on May 17, 2005 and named "Acidified Imitation Cheese Sauce and Pudding Compositions and Method for Producing Such Compositions") through its production and sale of "Eatsmart Salsa Con Queso." Snyder's counterclaims requesting a declaratory judgment that the AFP patent ("675") is invalid and unenforceable.

### II. STANDARD for PROTECTIVE ORDERS

[HN1] "Under *Federal Rule of Civil Procedure 26(c)*, a court "for good cause shown" may, in certain circumstances, enter a protective order in the context of discovery." *Shingara v. Skiles, 420 F.3d 301, 305-06 (3d Cir. 2005)*. *Fed. R. Civ. P. 26(c)* places the burden of persuasion on the party seeking the protective order to prove the good cause. *Cipollone v. Liggett Group, 785 F.2d 1108, 1114 (3d Cir. 1986)*. The party seeking the protective order must show that disclosure of the information sought to be protected would result in a "clearly defined, specific and serious injury." *Shingara at*

*306* (citing *Pansy v. Borough of Stroudsburg, 23 F.3d 772, 786-87 (3d Cir. 1994))*. [*3] "Broad allegations of harm are not specific to establish good cause." *Id.* [HN2] Generally a Court will balance the interests of seven, non-exclusive, factors before issuing a protective order. *Id.* Those factors include:

> 1) whether disclosure will violate any privacy interests;

> 2) whether the information is being sought for a legitimate purpose or for an improper purpose;

> 3) whether disclosure of the information will cause a party embarrassment;

> 4) whether confidentiality is being sought over information important to public health and safety;

> 5) whether the sharing of information among litigants will promote fairness and efficiency;

> 6) whether a party benefitting from the order of confidentiality is a public entity or official; and

> 7) whether the case involves issues important to the public.

*Id.* (citing *Glenmede Trust Co. v. Thompson, 56 F.3d 476, 483 (3d Cir. 1995)*, and *Pansy, 23 F.3d 772 at 787-91*).

## III. DISCUSSION

### A. Contested Language

The language at issue in this motion for protective order appears in section 1. (f) and section 3. of Snyder's proposed order. Under section 1. (f) [*4] Snyder's defines "CONFIDENTIAL-ATTORNEY'S EYES ONLY" as "*personnel information* or sensitive CONFIDENTIAL information that the Designating Party in good faith believes will *harm its competitive position* if the information becomes known to a party other that the Designating Party." (Underlines added to highlight the contested language.) While section 3 states:

Information designated "CONFIDENTIAL-ATTORNEYS' EYES ONLY" may only be used for purposes of this litigation, and may only be disclosed to persons falling within the categories specified in Paragraphs 2(a), (b), (c) and (d)(ii)-(vi) of this Order, *who are not currently engaged and shall not engage during the course of this litigation and for a period of two (2) years following final disposition of this litigation (whether by judgment including exhaustion of all appeals, settlement, or otherwise) in the preparation or prosecution of patent application(s) related to low protein containing products, including but not limited to, cheese dips, including direct supervision or assistance thereof, on behalf of any party or any of their corporate parents, predecessors in interest, successors in interest, subsidiaries, joint [*5] ventures, affiliates, or any other entities partially or wholly under their control or ownership, and only in accordance with the procedures established under this court.*

The remaining language in the proposed order is uncontested by the parties.

### B. Should the Two-Year Ban be Granted?

Through its motion for protective order, Snyder's is seeking to prevent AFP's attorneys from using information they will acquire during discovery of this case in their subsequent legal practice. Snyder's is not alleging any ethical violations of established rules of confidentiality, but is worried about the inadvertent use of discovered material. AFP argues that the entire underlined language in section three (3) should be stricken.

Many courts have addressed similar issues. *See Mikohn Gaming Corp. v. Acres Gaming, Inc., 1998 U.S. Dist. LEXIS 22251, 50 U.S.P.Q.2d 1783 (D. Nev. 1998), Interactive Coupon Marketing Group, Inc. v. H.O.T.! Coupons, LLC, 1999 U.S. Dist. LEXIS 12437, No. 98 C 7408, 1999 WL 618969, at *2 (N.D. Ill. Aug. 9, 1999), Motorola, Inc. v, Interdigital Technology Corp., No.*

*03-488-LON, 1994 U.S. Dist. LEXIS 20714 (D. Del. Dec. 19, 1994)*, [*6] *Commissariat A L'Energie Atomique v. Dell Computer Corp., 2004 U.S. Dist. LEXIS 12782 (D. Del. May 25, 2004), In re Papst Licensing, 2000 U.S. Dist. LEXIS 6374, *11 (E.D. La. May 4, 2000)*, and *Chan v. Intuit, Inc., 218 F.R.D. 659 (N.D. Ca. 2003)*. None of their decisions is precedential nor has any applied the Third Circuit's standard for issuing a protective order in *Shingara.*

[HN3] The threat of inadvertently using information obtained through discovery is not to be taken lightly.

> Inadvertence, like the thief-in-the-night, is no respecter of its victims. Inadvertent or accidental disclosure may or may not be predictable. To the extent that it may be predicted, and cannot be adequately forestalled in the design of a protective order, it may be a factor in the access decision.

*U.S. Steel Corp. v. United States,730 F.2d 1465, 1468 (Fed. Cir. 1984)* (deciding whether in-house patent attorneys should be given access to confidential information through discovery in patent infringement cases). However, that threat, standing alone, under *Shingara* and *U.S. Steel*, is not enough [*7] to justify a protective order barring AFP's attorneys from prosecuting similar patents for two years. As further explained in *U.S. Steel*, [HN4] the decision to deny access to discovered materials shall be done on a case-by-case, and lawyer-by-lawyer basis. *Id.* In this case, there is no reason for the court to believe that AFP's attorneys will not strictly follow the adopted order and refrain from using, either inadvertently or intentionally, Confidential Attorney's Eyes Only information for the sole purpose of this litigation. Barring AFP's attorneys from prosecuting similar patents for two years following this suit, without some tangible reason or good cause other than the general threat of inadvertent misuse of discovered materials, is the exact type of overly broad and generalized fear rejected in *Shingara, U.S. Steel*, and *In re Sibia Neurosciences, Inc., Doc. No. 525, 1997 U.S. App. LEXIS 31828 (Fed. Cir. Oct. 22, 1997)* (unpublished). If, however, the misuse of discovered material becomes an issue during the course of this litigation, the protective order, pursuant to section 17, may be amended accordingly.

*C. Should the Language in Section 1. (f)* [*8] *be Altered?*

To the extent that it remains pertinent after this Court's ruling on the language above, I will adopt Snyder's original language regarding section 1. (f). The language suggested by AFP, "it or its employees or agents" instead of Snyder's proposed "its competitive position," appears overly broad. Limiting the distinction to the Designating Parties' competitive position, at this point in the litigation, is more in line with Snyder's showing of good cause that its competitive position is what's at stake, not the more broad "it or its employees or agents."

## IV. CONCLUSION

Based upon the Third Circuit's strict requirement on the moving party to show good cause before a protective order is issued, and given that the basis of Snyder's perceived threat is the possible inadvertent use of information, I believe the two-year ban is burdensome and unnecessary. At this point in the litigation, there is no reason for the Court to believe that the information sought through discovery is for anything other than the specific and legitimate purpose of litigating this case. An appropriate order adopting Snyder's proposed protective order without the two-year ban follows.

[*9] *ORDER*

**AND NOW**, this day of January, 2006, upon consideration of the defendant's motion for a protective order (Docket # 14) and the plaintiff's objections (Docket # 16), it is hereby **ORDERED** that the motion is granted in part and denied in part. The request for a protective order is granted; AFP's objections are granted as well and portions of Snyder's of Hanover's proposed protective order will be removed. The protective order approved by the Court will be ordered today as a separate docket entry.

BY THE COURT:

LAWRENCE F. STENGEL, J.

PROTECTIVE ORDER:

1. Definitions:

(a) "Discovery Material" means any and all documents, testimony, deposition transcripts, deposition

exhibits, interrogatory responses, admissions, and any other information produced or otherwise provided by a party or non-party to another party or non-party in connection with discovery in this litigation.

(b) "Designating Party" means any person or entity, whether a party to this lawsuit or not, who has designated documents or information as either "CONFIDENTIAL" or "CONFIDENTIAL-ATTORNEYS' EYES ONLY" under this Order.

(c) "Producing Party" means any person or entity, whether [*10] a party to this lawsuit or not, who has produced documents or provided information in this litigation or from whom documents or information have been requested.

(d) "Receiving Party" means any party who has received documents or information in this litigation.

(e) "CONFIDENTIAL" information means information that the Producing Party in good faith believes to be "confidential research, development, or commercial information" within the meaning of *Fed. R. Civ. P. 26(c)*, including, but not limited to, financial information, security measures, nonpublic technical information, ongoing research and development projects, unpublished patent applications and file wrappers, patent license agreements, or other non-public information.

(f) "CONFIDENTIAL-ATTORNEYS' EYES ONLY" information means personnel information or sensitive CONFIDENTIAL information that the Designating Party in good faith believes will harm its competitive position if the information becomes known to a party other than the Designating Party.

(g) "Confidential Discovery Material" means any Discovery Material that is designated as "CONFIDENTIAL" or "CONFIDENTIAL-ATTORNEYS' [*11] EYES ONLY," in accordance with the procedures set forth below, including but not limited to:

(i) Information furnished pursuant to *Rule 26 of the Federal Rules of Civil Procedure.*(ii) Information furnished or set forth in response to any discovery request made under *Fed. R. Civ. P. 31, 33, or 36,* provided that, prior to disclosure to the Receiving Party, the information or responses are plainly marked or otherwise identified by the Designating Party on each page as "CONFIDENTIAL" or "CONFIDENTIAL-ATTORNEYS' EYES ONLY."

(iii) Information set forth in documents made available for inspection by the Producing Party voluntarily or under *Fed. R. Civ. P. 33(d)* or *34* and that are identified at the time of inspection as containing or comprising "Confidential Discovery Material." The party producing information for inspection need not designate the information by stamping or labeling it as "CONFIDENTIAL" or "CONFIDENTIAL-ATTORNEYS' EYES [*12] ONLY" until copies are delivered to the inspecting party in response to the inspecting party requesting copies of the information. Making documents and things available for inspection shall not constitute a waiver of any claim of confidentiality, attorney-client privilege, or work-product immunity.

(iv) Information set forth in any copies of documents produced to the discovering party voluntarily or under *Fed. R. Civ. P. 33(d)* or *34*, provided that, prior to delivery of the copies to the Receiving Party, the copies are physically or digitally marked, as feasible, by the Designating Party as "CONFIDENTIAL" or "CONFIDENTIAL-ATTORNEYS' EYES ONLY." Each page, unit, or thing should be individually marked with the appropriate designation, as feasible.

(v) Information revealed by inspection of things or premises voluntarily or under *Fed. R. Civ. P. 34*, provided that, prior to the inspection, the party permitting inspection states in writing that its Confidential Discovery Material will be disclosed by the inspection and specifies in writing those parts of the things [*13] or those areas of the premises in which its "CONFIDENTIAL" or

"CONFIDENTIAL-ATTORNEYS' EYES ONLY" information will be revealed.

(vi) Information revealed during deposition upon oral examination under *Fed. R. Civ. P. 30* or pursuant to subpoena under *Fed. R. Civ. P. 45*, except that the information revealed during any particular deposition shall cease to be Confidential Discovery Material fifteen days after the deposition transcript is received by all parties (unless at the deposition or before the ten day period has expired, the witness, his employer, or his counsel states on the record at the deposition, or gives written notice before the ten day period expires that "CONFIDENTIAL" or "CONFIDENTIAL-ATTORNEYS' EYES ONLY" information of the witness or his employer is set forth in the transcript). In the case of non-party witnesses, either a party or the non-party witness may designate information revealed as its "CONFIDENTIAL" or

"CONFIDENTIAL-ATTORNEYS' EYES ONLY" information within fifteen days after the deposition transcript is received by all parties.

(vii) Any summary, digest, analysis, [*14] or comment on any Confidential Discovery Material identified in categories (i)-(vi) that is not immune from discovery due to attorney-client privilege or work product immunity.

(h) Confidential Discovery Material shall not include any information that:

(i) is or becomes publicly available without the Receiving Party's breach of any obligation owed to the Designating Party;

(ii) is lawfully in the possession of a party receiving such information without any confidentiality obligations at the time of disclosure; or

(iii) is lawfully disclosed by a third party that is not subject to any confidentiality obligations at the time of

disclosure.

2. Confidential Discovery Material designated "CONFIDENTIAL" may only be disclosed to the persons falling within the categories specified in Paragraphs 2(a), (b), (c), and (d) below:

(a) the Court and Court personnel involved with this case under seal as mandated by the Court's Local Rules;

(b) the parties' respective outside counsel of record in this action, including counsel's legal support staff and outside copying and graphics services as reasonably necessary to perform such services under the supervision [*15] of outside counsel of record;

(c) outside stenographic court reporters and language translators (including support staff as reasonably necessary); and

(d) the additional individuals listed in categories (i) through (vi) immediately below, provided such additional individuals-except for those in category (iii) with respect to the Confidential Discovery Materials identified in category (iii)-have read this Protective Order in advance of disclosure and signed an Undertaking in the form attached as Exhibit A, which shall be retained in the files of outside counsel with whom the additional individual is associated:

(i) A total of two persons who may be an officer, of, director of, or inhouse counsel to, each party, to the extent necessary to assist in the conduct of this litigation, and who are specifically designated by written notice to the other party identifying each such person by name and position;

(ii) any person retained by a party or its counsel of record as an independent consultant or testifying expert for purposes of this action who has no continuing relationship, other than as an expert or consultant, with any of the parties hereto or their affiliates, [*16] or any of their competitors, and retained in accordance with the provisions set forth in Paragraph 5 below;

(iii) a deponent or other witness who is named as an author or recipient of, has

previously seen the contents of, or has at any time been authorized to see the document or thing marked as Confidential Discovery Material that is to be disclosed to them;

(iv) paralegals, stenographic and clerical employees, and translators associated with the individuals enumerated in (d)(i)-(iii) above, but only as part of a disclosure to said individuals in accordance with this Protective Order;

(v) any person retained by a party to supervise the destruction of Confidential Discovery Material per Paragraph 14 below under the supervision of a party's outside counsel of record; and

(vi) such other individuals as the parties may agree to in writing or in a transcribed record.

(e) Any disclosure of "Confidential Discovery Material" to an individual listed in items (d)(i) through (iv) under Paragraph 2 above shall be limited to the information, documents and/or things that outside counsel believes are reasonably required for such individual to assist in this litigation.

[*17]   3.   Information   designated "CONFIDENTIAL-ATTORNEYS' EYES ONLY" may only be used for purposes of this litigation, and may only be disclosed to persons falling within the categories specified in Paragraphs 2(a), (b), (c), and (d)(ii)-(vi) of this Order.

4. Counsel shall exert their best efforts to identify materials or information protected by the attorney-client privilege, the work product doctrine, and/or any other privilege, before its disclosure. The inadvertent production of any document or thing by any Producing Party shall be without prejudice to any claim by the Producing Party that such material is protected by the attorney-client privilege, or protected from discovery as work product. No Producing Party shall be held to have waived any rights thereunder merely by inadvertent production made subsequent to the execution of this Order. If, within a reasonable time after materials are disclosed, a Producing Party asserts that such materials are protected by the attorney-client privilege, work

product doctrine, or any other claim of privilege, and were inadvertently produced, the Receiving Party shall take immediate steps to ensure that all known copies of such material [*18] are returned promptly to the Producing Party. The cost, if any, for excising such materials by the Receiving Party shall be borne by the Producing Party. Any party may thereafter contest such claims of privilege or work product as if the materials had not been produced, but shall not assert that a waiver occurred as a result of the production if the Producing Party has complied with the provisions of this paragraph.

5. Prior to showing any Confidential Discovery Material of the Designating Party to any of the individuals identified in Paragraph 2(d)(i) and 2(d)(ii) above, the party proposing the disclosure shall serve on the Designating Party: (i) a written notice identifying such individual and stating such individual's present occupation, employer and position, and all other business affiliations for the past 10 years, (ii) the most up-to-date copy of such individual's curriculum vitae, and (iii) an Undertaking in the form attached hereto as Exhibit A executed by such individual. The Designating Party shall have ten (10) calendar days to object to the disclosure of its Confidential Discovery Material to such individual. If at the end of the 10-calendar-day period no written [*19] objection has been received by the party that wishes to disclose the information, then the individual may receive copies of such Confidential Discovery Material upon compliance with all applicable provisions of this Protective Order. Such an objection, however, shall stay disclosure to the proposed recipient. If the Designating Party and party proposing disclosure are unable to resolve a disagreement, the party proposing to make the disclosure may thereupon seek leave of the Court to make the disclosure, notwithstanding the objection, by a noticed motion.

6. Any information designated as Confidential Discovery Material may not be offered into evidence at trial or any other proceeding unless the Designating Party is given reasonable notice and an opportunity to object and to seek a protective order. For the purposes of trial, designation of information in the pre-trial order shall be considered sufficient notice to a party with respect to the information referenced therein.

7. Counsel shall exert their best efforts to identify Confidential Discovery Material. The inadvertent designation, misdesignation, or non-designation of any

document or thing by any party or non-party [*20] shall be without prejudice to any claim the party or non-party has to preserve the confidentiality of inadvertently disclosed information. Provided that efforts to retrieve inadvertently designated documents are commenced within a reasonable period of time after their production, no Producing Party shall be held to have waived any rights thereunder by inadvertent disclosure. If within a reasonable time after materials are disclosed, a Producing Party asserts that such materials should be designated as "CONFIDENTIAL" or "CONFIDENTIAL-ATTORNEYS' EYES ONLY," and were inadvertently produced with a different designation, the Receiving Party shall take immediate steps to ensure that all known copies of such material are appropriately disclosed according to the provisions of this Order. The cost, if any, for redesignating such materials by the Receiving Party shall be borne by the Producing Party.

8. This Protective Order shall not prevent any party from moving this Court for an order dedesignating or re-designating Confidential Discovery Materials. The information shall remain Confidential Discovery Material and under the status given by the Designating Party unless and until the Court [*21] rules to the contrary. It shall be the burden of the Designating Party to prove that its designation is appropriate. Further, a Receiving Party is not obligated to challenge the propriety of a designation as Confidential Discovery Material at the time of the designation.

9. In the event of any accidental or inadvertent disclosure of Confidential Discovery Material other than in a manner authorized by this Protective Order, counsel for any party who knows or becomes aware of such disclosure shall immediately notify counsel for the Designating Party of all of the pertinent facts, and make every effort to prevent further unauthorized disclosure, including retrieving all copies of any Confidential Discovery Material a party has improperly disclosed from the recipient(s) thereof and securing the agreement of the recipients in writing not to further disseminate the Confidential Discovery Material in any form.

10. Each recipient of any Confidential Discovery Material produced in this litigation hereby agrees to be subject to the jurisdiction of this Court for the purposes of the implementation and enforcement of this Protective Order.

11. Confidential Discovery Material shall [*22] not be used or disclosed by any recipient for any purpose other than in connection with the above-captioned action and shall not be disclosed by the recipient to anyone other than those persons as designated in the appropriate section of Paragraphs 2 and 3 herein, unless and until the restrictions herein are removed by order of the Court or by written stipulation of the parties and Designating Party, subject to the approval of the Court.

12. Nothing herein shall bar or restrict any attorney from rendering advice to his or her client regarding this litigation and, in the course thereof, relying upon his or her examination of Confidential Discovery Material, provided, however, that in rendering such advice and in otherwise communicating with his or her client, the attorney shall not disclose the content of any Confidential Discovery Material to anyone not authorized to receive such information in accordance with this Protective Order.

13. This Protective Order shall not be deemed a waiver of:

(a) any party's right to object to any discovery requests on any grounds;

(b) any party's right to seek an order compelling discovery with respect to any discovery request;

(c) [*23] any party's right in any proceeding in this litigation to object to the admission of any evidence on any ground;

(d) any party's right to use and disclose its own documents and its own Confidential Discovery Material in its sole and complete discretion; or

(e) the status of any information as a trade secret or other confidential information.

14. This Protective Order shall be valid throughout the course of this litigation (defined to include all proceedings herein, appeals, and/or remands) and shall survive the termination of this litigation. Within one hundred twenty (120) days of the final non-appealable termination of this litigation, all documents and copies of documents (including any copies created by optical scanning) produced by the parties or by nonparties designated as containing Confidential Discovery Material shall be returned to the Designating Party or destroyed, except that counsel for each party may retain a copy of

any documents containing Confidential Discovery Material in this case, which shall be kept confidential in accordance with this Order. If destroyed pursuant to this provision, the person or persons who destroy such Confidential Discovery Material [*24] shall provide written certification to the Designating Party that such information has been properly destroyed. Notwithstanding the terms of this Paragraph 14, but subject to the terms of Paragraph 11, the parties to this Order shall be under no obligation to delete Confidential Discovery Material from securely stored backup media. The terms of this Protective Order shall survive and remain in full force after the termination of this lawsuit and the Court shall have jurisdiction over the parties, their attorneys, and all persons to whom Confidential Discovery Material has been disclosed for the purpose of enforcing the terms of this Protective Order and/or redressing any violation thereof.

15. The terms of this Protective Order may be applied to the documents, information and things received by any party from a non-party, at the election of either the party or the non-party.

16. Counsel for the parties to whom Confidential Discovery Material has been furnished shall be responsible for restricting disclosure in accordance with the provisions of this Protective Order and for securing execution of and retaining the Undertaking attached as Exhibit A as and when required under [*25] the provisions of this Protective Order.

17. This Protective Order may be modified or amended either by agreement of the parties or by further order of the Court Upon good cause shown.

BY THE COURT:

LAWRENCE F. STENGEL, J.

***ORDER***

**AND NOW,** this    day of January, 2006, on motion of the defendant and for the reasons set forth in this court's Memorandum and Order filed today in this case, the court enters the following protective order:

PROTECTIVE ORDER:

1. Definitions:

(a) "Discovery Material" means any and all

documents, testimony, deposition transcripts, deposition exhibits, interrogatory responses, admissions, and any other information produced or otherwise provided by a party or non-party to another party or non-party in connection with discovery in this litigation.

(b) "Designating Party" means any person or entity, whether a party to this lawsuit or not, who has designated documents or information as either "CONFIDENTIAL" or "CONFIDENTIAL-ATTORNEYS' EYES ONLY" under this Order.

(c) "Producing Party" means any person or entity, whether a party to this lawsuit or not, who has produced documents or provided information in this litigation [*26] or from whom documents or information have been requested.

(d) "Receiving Party" means any party who has received documents or information in this litigation.

(e) "CONFIDENTIAL" information means information that the Producing Party in good faith believes to be "confidential research, development, or commercial information" within the meaning of *Fed. R. Civ. P. 26(c)*, including, but not limited to, financial information, security measures, nonpublic technical information, ongoing research and development projects, unpublished patent applications and file wrappers, patent license agreements, or other non-public information.

(f) "CONFIDENTIAL-ATTORNEYS' EYES ONLY" information means personnel information or sensitive CONFIDENTIAL information that the Designating Party in good faith believes will harm its competitive position if the information becomes known to a party other than the Designating Party.

(g) "Confidential Discovery Material" means any Discovery Material that is designated as "CONFIDENTIAL" or "CONFIDENTIAL-ATTORNEYS' EYES ONLY," in accordance with the procedures set forth below, including but not limited to: [*27]

(i) Information furnished pursuant to *Rule 26 of the Federal Rules of Civil Procedure.*(ii) Information furnished or set forth in response to any discovery request made under *Fed. R. Civ. P. 31, 33,* or *36,* provided that, prior to disclosure to the

Receiving Party, the information or responses are plainly marked or otherwise identified by the Designating Party on each page as "CONFIDENTIAL" or "CONFIDENTIAL-ATTORNEYS' EYES ONLY."

(iii) Information set forth in documents made available for inspection by the Producing Party voluntarily or under *Fed. R. Civ. P. 33(d)* or *34* and that are identified at the time of inspection as containing or comprising "Confidential Discovery Material." The party producing information for inspection need not designate the information by stamping or labeling it as "CONFIDENTIAL" or "CONFIDENTIAL-ATTORNEYS' EYES ONLY" until copies are delivered to the inspecting party in response to the inspecting party [*28] requesting copies of the information. Making documents and things available for inspection shall not constitute a waiver of any claim of confidentiality, attorney-client privilege, or work-product immunity.

(iv) Information set forth in any copies of documents produced to the discovering party voluntarily or under *Fed. R. Civ. P. 33(d)* or *34*, provided that, prior to delivery of the copies to the Receiving Party, the copies are physically or digitally marked, as feasible, by the Designating Party as "CONFIDENTIAL" or "CONFIDENTIAL-ATTORNEYS' EYES ONLY." Each page, unit, or thing should be individually marked with the appropriate designation, as feasible.

(v) Information revealed by inspection of things or premises voluntarily or under *Fed. R. Civ. P. 34*, provided that, prior to the inspection, the party permitting inspection states in writing that its Confidential Discovery Material will be disclosed by the inspection and specifies in writing those parts of the things or those areas of the premises in which its "CONFIDENTIAL"

or "CONFIDENTIAL-ATTORNEYS' EYES [*29] ONLY" information will be revealed.

(vi) Information revealed during deposition upon oral examination under *Fed. R. Civ. P. 30* or pursuant to subpoena under *Fed. R. Civ. P. 45*, except that the information revealed during any particular deposition shall cease to be Confidential Discovery Material fifteen days after the deposition transcript is received by all parties (unless at the deposition or before the ten day period has expired, the witness, his employer, or his counsel states on the record at the deposition, or gives written notice before the ten day period expires that "CONFIDENTIAL" or "CONFIDENTIAL-ATTORNEYS' EYES ONLY" information of the witness or his employer is set forth in the transcript). In the case of non-party witnesses, either a party or the non-party witness may designate information revealed as its "CONFIDENTIAL" or

"CONFIDENTIAL-ATTORNEYS' EYES ONLY" information within fifteen days after the deposition transcript is received by all parties.

(vii) Any summary, digest, analysis, or comment on any Confidential Discovery Material identified in categories (i)-(vi) [*30] that is not immune from discovery due to attorney-client privilege or work product immunity.

(h) Confidential Discovery Material shall not include any information that:

(i) is or becomes publicly available without the Receiving Party's breach of any obligation owed to the Designating Party;

(ii) is lawfully in the possession of a party receiving such information without any confidentiality obligations at the time of disclosure; or

(iii) is lawfully disclosed by a third party that is not subject to any

confidentiality obligations at the time of disclosure.

2. Confidential Discovery Material designated "CONFIDENTIAL" may only be disclosed to the persons falling within the categories specified in Paragraphs 2(a), (b), (c), and (d) below:

(a) the Court and Court personnel involved with this case under seal as mandated by the Court's Local Rules;

(b) the parties' respective outside counsel of record in this action, including counsel's legal support staff and outside copying and graphics services as reasonably necessary to perform such services under the supervision of outside counsel of record;

(c) outside stenographic court reporters and [*31] language translators (including support staff as reasonably necessary); and

(d) the additional individuals listed in categories (i) through (vi) immediately below, provided such additional individuals-except for those in category (iii) with respect to the Confidential Discovery Materials identified in category (iii)-have read this Protective Order in advance of disclosure and signed an Undertaking in the form attached as Exhibit A, which shall be retained in the files of outside counsel with whom the additional individual is associated:

(i) A total of two persons who may be an officer of, director of, or inhouse counsel to, each party, to the extent necessary to assist in the conduct of this litigation, and who are specifically designated by written notice to the other party identifying each such person by name and position;

(ii) any person retained by a party or its counsel of record as an independent consultant or testifying expert for purposes of this action who has no continuing relationship, other than as an expert or consultant, with any of the parties hereto or their affiliates, or any of their competitors, and retained in accordance with the provisions set [*32] forth in Paragraph 5 below;

(iii) a deponent or other witness who

is named as an author or recipient of, has previously seen the contents of, or has at any time been authorized to see the document or thing marked as Confidential Discovery Material that is to be disclosed to them;

(iv) paralegals, stenographic and clerical employees, and translators associated with the individuals enumerated in (d)(i)-(iii) above, but only as part of a disclosure to said individuals in accordance with this Protective Order;

(v) any person retained by a party to supervise the destruction of Confidential Discovery Material per Paragraph 14 below under the supervision of a party's outside counsel of record; and

(vi) such other individuals as the parties may agree to in writing or in a transcribed record.

(e) Any disclosure of "Confidential Discovery Material" to an individual listed in items (d)(i) through (iv) under Paragraph 2 above shall be limited to the information, documents and/or things that outside counsel believes are reasonably required for such individual to assist in this litigation.

3. Information designated "CONFIDENTIAL-ATTORNEYS' EYES ONLY" may only be [*33] used for purposes of this litigation, and may only be disclosed to persons falling within the categories specified in Paragraphs 2(a), (b), (c), and (d)(ii)-(vi) of this Order.

4. Counsel shall exert their best efforts to identify materials or information protected by the attorney-client privilege, the work product doctrine, and/or any other privilege, before its disclosure. The inadvertent production of any document or thing by any Producing Party shall be without prejudice to any claim by the Producing Party that such material is protected by the attorney-client privilege, or protected from discovery as work product. No Producing Party shall be held to have waived any rights thereunder merely by inadvertent production made subsequent to the execution of this Order. If, within a reasonable time after materials are disclosed, a Producing Party asserts that such materials

are protected by the attorney-client privilege, work product doctrine, or any other claim of privilege, and were inadvertently produced, the Receiving Party shall take immediate steps to ensure that all known copies of such material are returned promptly to the Producing Party. The cost, if any, for excising such [*34] materials by the Receiving Party shall be borne by the Producing Party. Any party may thereafter contest such claims of privilege or work product as if the materials had not been produced, but shall not assert that a waiver occurred as a result of the production if the Producing Party has complied with the provisions of this paragraph.

5. Prior to showing any Confidential Discovery Material of the Designating Party to any of the individuals identified in Paragraph 2(d)(i) and 2(d)(ii) above, the party proposing the disclosure shall serve on the Designating Party: (i) a written notice identifying such individual and stating such individual's present occupation, employer and position, and all other business affiliations for the past 10 years, (ii) the most up-to-date copy of such individual's curriculum vitae, and (iii) an Undertaking in the form attached hereto as Exhibit A executed by such individual. The Designating Party shall have ten (10) calendar days to object to the disclosure of its Confidential Discovery Material to such individual. If at the end of the 10-calendar-day period no written objection has been received by the party that wishes to disclose the information, [*35] then the individual may receive copies of such Confidential Discovery Material upon compliance with all applicable provisions of this Protective Order. Such an objection, however, shall stay disclosure to the proposed recipient. If the Designating Party and party proposing disclosure are unable to resolve a disagreement, the party proposing to make the disclosure may thereupon seek leave of the Court to make the disclosure, notwithstanding the objection, by a noticed motion.

6. Any information designated as Confidential Discovery Material may not be offered into evidence at trial or any other proceeding unless the Designating Party is given reasonable notice and an opportunity to object and to seek a protective order. For the purposes of trial, designation of information in the pre-trial order shall be considered sufficient notice to a party with respect to the information referenced therein.

7. Counsel shall exert their best efforts to identify Confidential Discovery Material. The inadvertent

designation, misdesignation, or non-designation of any document or thing by any party or non-party shall be without prejudice to any claim the party or non-party has to preserve the [*36] confidentiality of inadvertently disclosed information. Provided that efforts to retrieve inadvertently designated documents are commenced within a reasonable period of time after their production, no Producing Party shall be held to have waived any rights thereunder by inadvertent disclosure. If within a reasonable time after materials are disclosed, a Producing Party asserts that such materials should be designated as "CONFIDENTIAL" or "CONFIDENTIAL-ATTORNEYS' EYES ONLY," and were inadvertently produced with a different designation, the Receiving Party shall take immediate steps to ensure that all known copies of such material are appropriately disclosed according to the provisions of this Order. The cost, if any, for redesignating such materials by the Receiving Party shall be borne by the Producing Party.

8. This Protective Order shall not prevent any party from moving this Court for an order dedesignating or re-designating Confidential Discovery Materials. The information shall remain Confidential Discovery Material and under the status given by the Designating Party unless and until the Court rules to the contrary. It shall be the burden of the Designating Party to prove [*37] that its designation is appropriate. Further, a Receiving Party is not obligated to challenge the propriety of a designation as Confidential Discovery Material at the time of the designation.

9. In the event of any accidental or inadvertent disclosure of Confidential Discovery Material other than in a manner authorized by this Protective Order, counsel for any party who knows or becomes aware of such disclosure shall immediately notify counsel for the Designating Party of all of the pertinent facts, and make every effort to prevent further unauthorized disclosure, including retrieving all copies of any Confidential Discovery Material a party has improperly disclosed from the recipient(s) thereof and securing the agreement of the recipients in writing not to further disseminate the Confidential Discovery Material in any form.

10. Each recipient of any Confidential Discovery Material produced in this litigation hereby agrees to be subject to the jurisdiction of this Court for the purposes of the implementation and enforcement of this Protective Order.

11. Confidential Discovery Material shall not be used or disclosed by any recipient for any purpose other than in connection [*38] with the above-captioned action and shall not be disclosed by the recipient to anyone other than those persons as designated in the appropriate section of Paragraphs 2 and 3 herein, unless and until the restrictions herein are removed by order of the Court or by written stipulation of the parties and Designating Party, subject to the approval of the Court.

12. Nothing herein shall bar or restrict any attorney from rendering advice to his or her client regarding this litigation and, in the course thereof, relying upon his or her examination of Confidential Discovery Material, provided, however, that in rendering such advice and in otherwise communicating with his or her client, the attorney shall not disclose the content of any Confidential Discovery Material to anyone not authorized to receive such information in accordance with this Protective Order.

13. This Protective Order shall not be deemed a waiver of:

(a) any party's right to object to any discovery requests on any grounds;

(b) any party's right to seek an order compelling discovery with respect to any discovery request;

(c) any party's right in any proceeding in this litigation to object to the admission [*39] of any evidence on any ground;

(d) any party's right to use and disclose its own documents and its own Confidential Discovery Material in its sole and complete discretion; or

(e) the status of any information as a trade secret or other confidential information.

14. This Protective Order shall be valid throughout the course of this litigation (defined to include all proceedings herein, appeals, and/or remands) and shall survive the termination of this litigation. Within one hundred twenty (120) days of the final non-appealable termination of this litigation, all documents and copies of documents (including any copies created by optical scanning) produced by the parties or by nonparties designated as containing Confidential Discovery Material shall be returned to the Designating Party or destroyed, except that counsel for each party may retain a copy of any documents containing Confidential Discovery Material in this case, which shall be kept confidential in accordance with this Order. If destroyed pursuant to this provision, the person or persons who destroy such Confidential Discovery Material shall provide written certification to the Designating Party that such information [*40] has been properly destroyed. Notwithstanding the terms of this Paragraph 14, but subject to the terms of Paragraph 11, the parties to this Order shall be under no obligation to delete Confidential Discovery Material from securely stored backup media. The terms of this Protective Order shall survive and remain in full force after the termination of this lawsuit and the Court shall have jurisdiction over the parties, their attorneys, and all persons to whom Confidential Discovery Material has been disclosed for the purpose of enforcing the terms of this Protective Order and/or redressing any violation thereof.

15. The terms of this Protective Order may be applied to the documents, information and things received by any party from a non-party, at the election of either the party or the non-party.

16. Counsel for the parties to whom Confidential Discovery Material has been furnished shall be responsible for restricting disclosure in accordance with the provisions of this Protective Order and for securing execution of and retaining the Undertaking attached as Exhibit A as and when required under the provisions of this Protective Order.

17. This Protective Order may be modified [*41] or amended either by agreement of the parties or by further order of the Court Upon good cause shown.

BY THE COURT:

LAWRENCE F. STENGEL, J.

# EXHIBIT S

LEXSEE 2004 U.S. DIST. LEXIS 19429



Caution
As of: Jan 08, 2008

## TRADING TECHNOLOGIES INTERNATIONAL, INC., Plaintiff, vs. eSPEED, INC., Defendant.

### No. 04 C 5312

### UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

*2004 U.S. Dist. LEXIS 19429*

**September 23, 2004, Decided**
**September 24, 2004, Docketed**

**SUBSEQUENT HISTORY:** Injunction denied by, Patent interpreted by *Trading Techs. Int'l v. eSpeed, Inc., 370 F. Supp. 2d 691, 2005 U.S. Dist. LEXIS 3001 (N.D. Ill., 2005)*
Motion denied by *Trading Techs. Int'l, Inc. v. CQG, Inc., 2005 U.S. Dist. LEXIS 26514 (N.D. Ill., Oct. 31, 2005)*
Summary judgment denied by *Trading Techs. Int'l, Inc. v. eSpeed, Inc, 2007 U.S. Dist. LEXIS 63386 (N.D. Ill., July 12, 2007)*

**DISPOSITION:** Protective order was denied.

**COUNSEL:** [*1] For TRADING TECHNOLOGIES INTERNATIONAL, INC., Plaintiff: Paul H. Berghoff, Leif R. Sigmond, Jr., Matthew J. Sampson, George I. Lee, Stephen Richard Carden, Brian Richard Harris, Jennifer M Swartz, McDonnell, Boehnen, Hulbert & Berghoff, Ltd., Chicago, IL, Steven F. Borsand, Trading Technologies International, Inc., Chicago, IL.

For ESPEED, INC., Defendant: George Carter Lombardi, Raymond C. Perkins, Andrew M. Johnstone, Winston & Strawn LLP, Chicago, IL.

**JUDGES:** JAMES B. MORAN, Senior Judge, U.S. District Court.

**OPINION BY:** JAMES B. MORAN

## OPINION

*MEMORANDUM OPINION AND ORDER*

The parties have advised the court that they agree (or virtually agree) on the terms of a protective order, with one significant exception: an attorney who is active for plaintiff in this litigation has also been involved in patent prosecutions for plaintiff in the past. Assuming that attorney, Steven F. Borsand, may be involved in Patent prosecutions for plaintiff in the future, a not unreasonable assumption, defendant wants to deny him access to its highly confidential material or bar him for a period of time from prosecuting patents on plaintiff's behalf. We deny that restriction.

Both plaintiff and defendant have [*2] cases upon which they can rely. We think, however that the Federal Circuit presented the better argument in *In re Sibia Neurosciences, 1997 U.S. App. LEXIS 31828.* Mr. Borsand, so far as we know, is primarily a litigator. He has, in the past, become incidentally involved in patent applications by, for example, participating in interviews at the PTO, where the applicant is seeking to persuade the patent examiner of the strength of its position. He there acts as an advocate, not as a drafter of specifications and claims, and certainly not as one involved in his client's

2004 U.S. Dist. LEXIS 19429, *2

decisions regarding pricing, marketing, product design or the like. We conclude that the risk of inadvertent misuse of confidential material is not great enough to justify the restrictions defendant proposes. And we have no reason to doubt that Mr. Borsand will conscientiously keep in mind and act to uphold his professional obligations.

JAMES B. MORAN

Senior Judge, U.S. District Court

Sept. 23, 2004.

# EXHIBIT T



US005718805A

# United States Patent [19]

## Egelhof et al.

[11] **Patent Number:** 5,718,805

[45] **Date of Patent:** *Feb. 17, 1998

[54] **TWIN WIRE FORMER**

[75] Inventors: **Dieter Egelhof; Klaus Henseler**, both of Heidenheim, Germany; **Werner Kade**, Neenah, Wis.; **Albrecht Meinecke**, Heidenheim, Germany; **Wilhelm Wanke**, Heidenheim, Germany; **Hans-Jürgen Wulz**, Heidenheim, Germany; **Rudolf Bück**, deceased, late of Heidenheim, Germany, by Else Bück, legal representative

[73] Assignee: **J. M. Voith GmbH**, Heidenheim, Germany

[ * ] Notice: The term of this patent shall not extend beyond the expiration date of Pat. No. 5,500,091.

[21] Appl. No.: **556,769**

[22] Filed: **Nov. 2, 1995**

### Related U.S. Application Data

[63] Continuation of Ser. No. 286,948, Aug. 8, 1994, Pat. No. 5,500,091, which is a continuation of Ser. No. 55,918, Apr. 29, 1993, Pat. No. 5,389,206, which is a continuation of Ser. No. 773,965, filed as PCT/EP90/01313, Sep. 8, 1990, abandoned.

[30] **Foreign Application Priority Data**

Aug. 22, 1989 [DE] Germany ............................ 39 27 597.3

[51] Int. Cl.⁶ ...................................... D21F 1/00

[51] Int. Cl.$^6$ ...................................... D21F 1/00

[52] U.S. Cl. .......................... **162/301; 162/300**

[58] Field of Search ...................... 162/203, 300, 162/301, 303, 348, 352

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,994,774 | 11/1976 | Halme et al. | 162/301 |
| 4,425,187 | 1/1984 | Armstrong et al. | 162/300 |
| 4,532,008 | 7/1985 | Creagan et al. | 162/203 |
| 4,609,435 | 9/1986 | Tissari | 162/352 |
| 4,769,111 | 9/1988 | Nevalainen et al. | 162/351 |
| 4,917,766 | 4/1990 | Koivuranta et al. | 162/301 |
| 4,925,531 | 5/1990 | Koski | 162/301 |
| 5,078,835 | 1/1992 | Schiel et al. | 162/352 |
| 5,185,064 | 2/1993 | Nyman | 162/301 |
| 5,389,206 | 2/1995 | Buck et al. | 162/301 |
| 5,500,091 | 3/1996 | Buck et al. | 162/301 |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0289445 | 4/1988 | European Pat. Off. . |
| 0296135 | 6/1988 | European Pat. Off. . |
| 0306759 | 8/1988 | European Pat. Off. . |
| 3138133 | 9/1981 | Germany . |
| 3321406 | 6/1983 | Germany . |
| 3329833 | 8/1983 | Germany . |
| 3628282 | 8/1986 | Germany . |
| 8806036.5 | 5/1988 | Germany . |
| 1125906 | 10/1965 | United Kingdom . |
| 8604368 | 7/1986 | WIPO . |
| 9102842 | 3/1991 | WIPO ...................................... 162/301 |

### OTHER PUBLICATIONS

Tappi Press "1989 Twin–Wire Seminar", Washington Hilton, Washington, D.C., Apr. 12–14, 1989, pp. iii, 103–114.

*Primary Examiner*—Karen M. Hastings
*Attorney, Agent, or Firm*—Ostrolenk, Faber, Gerb & Soffen, LLP

[57] **ABSTRACT**

In a twin-wire former for the production of a paper web, two wire belts (11 and 12) together form a twin-wire zone which is divided into three sections (I, II and III). In the first section (I) the two wires (11, 12) travel over a curved forming shoe (16), or a forming roll (40). They form there a wedge-shaped inlet slot (15) with which a headbox (10) is directly associated. In the second section (II), several resiliently supported strips (27) rest against the lower wire (11) and between each of said strips (27) a rigidly mounted strip (28) rests against the upper wire (12). In the third section (III) both wire belts (11, 12) pass over another curved forming shoe (23).

**5 Claims, 2 Drawing Sheets**





_Fig.1_



_Fig.2_

_Fig.3_



Fig.4



Fig.5

5,718,805

# 1

## TWIN WIRE FORMER

### RELATED APPLICATIONS

This is a continuing application of, and hereby incorporates by reference the entire disclosure of, application Ser. No. 08/286,948, filed Aug. 8, 1994 now U.S. Pat. No. 5,500,091, which is a continuing application Ser. No. 08/055,918, filed Apr. 29, 1993, issued Feb. 14, 1995 as U.S. Pat. No. 5,389,206, which is a continuing application Ser. No. 07/773,965, filed as PCT/EP90/01313 Sep. 8, 1990, now abandoned.

### BACKGROUND OF THE INVENTION

The present invention relates to a twin-wire former for the production of a fiber web, in particular a paper web, from a fiber suspension. The invention proceeds from the basis of the twin-wire former known from British Patent 1 125 906. The features indicated in the present claim include a twin wire former for producing a fiber web and particularly a paper web from a fiber suspension. Two web forming wire belts, in the form of endless loops, travel together to form a twin wire zone. The web travels between and along the path of the wire belts through the twin wire zone. The twin wire zone has three sections and the elements in those three sections are described below. The patent describes features that state, in other words, that the forming of the fiber web from the pulp suspension fed from the headbox takes place exclusively between two wire belts. Thus, there is no so-called single-wire pre-drainage path. In a first section of the twin-wire zone, the two wire belts together form a wedge-shaped inlet slot; a jet of pulp slurry coming from the headbox discharges into it. The jet strikes the two wire belts at a place where they pass over a curved drainage element; in the case of the aforementioned British patent, this is a stationary, curved forming shoe. Its curved wire guide surface is formed of a plurality of strips with drainage slots between them. This forming shoe is followed (in a second section of the twin-wire zone) by a drainage strip arranged in the other wire loop and, behind the latter, by a drainage strip arranged in the first-mentioned wire loop (and formed by a first suction box). Finally, in a third section of the twin-wire zone there are a plurality of stationary drainage elements developed as flat suction boxes.

It has been attempted for decades with twin-wire formers of the known type to produce fiber webs (in particular, paper webs) of the highest possible quality with relatively high operating speeds. Due to the forming of the web between two wires, the result, in particular, is obtained that the final fiber web has substantially the same properties on both sides (little "two-sidedness"). However, it is difficult to obtain as uniform as possible a distribution of the fibers in the final fiber web. In other words, it is difficult to obtain a good "formation" since while the web is formed, there is always the danger that fibers will agglomerate and form flocculations. Therefore, it is attempted to form a jet of pulp slurry which pulp slurry is as free as possible of flocculations in the headbox (for instance, by means of a turbulence producer). It is, furthermore, endeavored so to influence the drainage of the fiber suspension during the web-forming that "reflocculation" is avoided as far as possible or that, after possible flocculation, a "deflocculation" (i.e. a breaking up of the flocculations) takes place.

It is known that a curved drainage element arranged in the first section of the twin-wire zone and, in particular, a stationary curved forming shoe developed in accordance with the aforementioned British Patent 1 125 906 counter-

# 2

acts the danger of reflocculation. This is true also of the drainage strips arranged in the British patent in the second section of the twin-wire zone. Nevertheless, the danger of reflocculation is not completely eliminated in the arrangement according to said British patent. Since the number of drainage strips there is very small, a large part of the web-forming takes place in the region of the following flat-suction boxes. They, to be sure, are of high drainage capacity so that the web-forming can be completed in the region of the last flat suction boxes (i.e. the so-called main drainage zone, in which a part of the fiber material is still in the form of a suspension, terminates in the region of the flat suction box). The flat suction boxes, however, are not able to avoid reflocculation or to break up flocculations which have already occurred.

In order to control these last-mentioned difficulties, a web-forming device known under the name of "Duoformer D" has been developed (TAPPI proceedings 1988 annual meeting, pages 75 to 80). This known web-forming device is part of a twin-wire former which has a single-wire pre-drainage zone. In the twin-wire zone there are provided, in the one wire loop, a plurality of strips which are fixed in position but adjustably supported, namely, on the bottom of a suction box which drains in upward direction. Furthermore, a plurality of resiliently supported strips are provided in the other wire loop. By this resilience of the last-mentioned strips, the following result can be obtained: For example, upon an increase of the amount of suspension entering between the two wire belts, the flexibly supported strips can move away somewhat. In this way, the danger (which is present when only firmly supported strips are used) is eliminated of a backing up taking place in the fiber suspension in front of the strips. Such a backing up could destroy the fiber layers which have been formed up to then on the two wire belts. In other words, with this known web-forming device, a drainage pressure, once established, remains constant due to the resiliently supported strips even upon a change in the amount of suspension fed or upon a change in the drainage behavior of the fiber suspension. Therefore, automatic adaptation of the web-forming device to said changed conditions occurs.

With this known web-forming device, fiber webs of relatively good formation can also be formed. With respect to this, however, the demands have increased considerably recently, so that further improvements are desirable.

### SUMMARY OF THE INVENTION

The object of the invention is so to develop a twin-wire of the aforementioned kind that the quality of the fiber web produced is further improved, particularly with respect to its formation (cloudiness), and that the twin-wire former can easily be adapted to different operating conditions (for instance, with regard to quantity and drainage behavior of the fiber suspension).

This object is achieved by the features set forth below. In particular, there is a respective drainage strip above each of the two wire belts in the second section of the twin zone, and at least one of the two drainage strips is supported resiliently against the respective wire belt while the other may or may not be resiliently supported, and typically is rigidly supported against the respective wire belt. Preferably, there are at least two of the drainage strips and often more against each of the wire belts. The drainage strips against one belt are offset along the path of the wire belts with respect to the drainage strips against the other belt, providing a zig zag or staggered array, and the drainage strips against at least one of the belts are resiliently supported.

5,718,805

| 3 | 4 |

The inventors have found that a combination of known features, namely:

A. Twin-wire former without a single-wire pre-drainage zone or at least without a single-wire pre-drainage zone of any substantial length such as to cause any appreciable pre-drainage

B. Start of the drainage in the twin-wire zone at a preferably curved drainage element, for instance on a rotating forming cylinder or, even better, on a curved stationary forming shoe

C. Further drainage in the twin-wire zone between strips which are arranged along a "zig-zag" line, the strips which rest against the one wire belt being resiliently supported,

leads to an extremely high increase in the quality of the finished fiber web, so that it satisfies even the highest requirements. At the same time, the twin-wire former of the invention is insensitive to changes in the amount of suspension fed and to changes in the drainage behavior of the fiber suspension. Experiments have shown that it is possible by the invention to obtain both a high increase in quality with respect to the formation and also good values with regard to the retention of fillers and fines. In contradistinction to this, in the known double-wire formers it is constantly found that there is a strong reduction in the retention upon an improvement in the formation.

It was, furthermore, found in experiments that in the second section of the twin-wire zone the number of strips can be considerably reduced as compared with the "Duoformer D". However, this number is substantially greater than in the case of the twin-wire former known from Swiss Patent 1 125 906. It is advantageous to increase the distance between adjacent strips as compared with the "Duoformer D". In particular, the drainage strips above each one of the wire belts are of a thickness along the path of the wire belts and the spacing between adjacent strips above each wire belt is a minimum of about three times the strip thickness.

To be sure, from German OS 31 38 133, FIG. 3, a twin-wire former is known the twin-wire zone of which is provided in a first section with a curved stationary drainage element and in a second section with strips arranged along a "zig-zag" line, which strips may also be resiliently supported and there being a relatively large distance between them. However, in that case, in front of the twin-wire zone there is a single-wire pre-drainage zone in which the forming of the web starts initially only in a lower layer of the fiber suspension fed while the upper layer remains liquid and tends very strongly to flocculation. It has been found that these flakes cannot be broken up again to the desired extent in the following twin-wire zone. Another disadvantage is that the twin-wire zone is diverted by a guide roll (14b) behind the second section. This results (due to the so-called table-roll effect) in a further drainage which is uneven over the width of the web and thus in undesired variations in the quality of the web (recognizable, for instance, by disturbing longitudinal stripes).

## BRIEF DESCRIPTION OF THE DRAWINGS

Other developments of the invention will be explained below with reference to embodiments which are shown in the drawing. Each of FIGS. 1 to 5 shows-in simplified diagrammatic form-one of the different embodiments.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The twin-wire former shown in FIG. 1 has a substantially horizontally extending twin-wire zone; this zone comprises three sections I, II and III arranged one behind the other. The endless wire belts (lower wire 11 and upper wire 12), shown only in part, travel in the direct vicinity of a headbox 10 over, in each case, a breast roll 13 and 14 respectively, so that the two wire belts together form a wedge-shaped entry slot 15 at the start of the twin-wire zone. The jet pulp discharged by the headbox 10 comes into contact with the two wire belts 11 and 12 only at the place where the lower wire 11 in the first section I of the twin-wire zone travels over a stationary curved forming shoe 16. The curved travel surface thereof is formed of several strips 16' with drainage slits present between them. The distance between the two breast rolls 13 and 14 is variable. The forming shoe 16 can be operated with or without vacuum. Additionally, although it is preferable that the forming shoe 16 be curved, a straight forming shoe may also be used in certain situations.

In the second section II of the twin-wire zone, the two wire belts 11 and 12 (with the partially still liquid fiber suspension present between them) travel between a lower drainage box 17 and an upper drainage box 18. In the lower drainage box 17 there are a row of at least two strips 27 (preferably of approximately rectangular cross section) which are pressed from below resiliently against the lower wire 11. For this purpose, they are supported, for instance, on springs 24 (or pneumatic pressure cushions) on a, preferably water-permeable, plate. It is obvious that the force of the springs (or of the pressure prevailing in the pressure cushions) is individually adjustable.

The upper drainage box 18 is suspended on both the front and rear ends on vertically displaceable support elements as indicated diagrammatically by double arrows. On its lower side, there is a row of at least three strips 28 of preferably parallelogram cross section which rest against the upper side of the upper wire 12 and are rigidly attached to the box 18. Above the strips 28, a front vacuum chamber 21 and a rear vacuum chamber 22 are present in the drainage box 18.

Each of the upper strips 28 scrapes off water from the wire 12. Accordingly, the amount of water scraped off decreases in the direction of flow of the wire 12 from strip to strip. The drainage water from each of the strips 28 except the drainage water scraped off by the first strip may be drained away jointly. However, it is disadvantageous to also include the drainage water from the first strip 28 since this generally would disturb the operation of the other strips. Accordingly, a vertical channel 21a is positioned in front of the first upper strip 28 to carry away or collect the water scraped off by the first strip 28.

In the region of the forming shoe 16, a part of the water of the fiber suspension is led off downward; another part penetrates due to the tension of the upper wire 12-upwards through the upper wire and is deflected by the furthest in front of the strips 28 into the front vacuum chamber 21. The water passing upward between the upper strips 28 enters into the rear vacuum chamber 22. The water penetrating between the lower strips 27 through the lower wire 11 is led off downward. Between adjacent upper drainage strips 28 there is a minimum distance X of about three times the thickness Y of the strips. The same is true of the lower resiliently supported strips 27. It is important that each of the strips 27 and 28 lies in the region of a space between two opposite strips so that a "zig-zag" arrangement (i.e. non-opposing relationship) is present. Also, as seen in FIG. 1, the first one of the strips 28 is located upstream of the first one of the strips 27. The two wires 11 and 12 preferably travel on a straight path through section II. Gentle curvature of this section of the path is, however, also possible; see FIGS. 2 and 5. Differing from FIG. 1, the resiliently supported strips

5,718,805

### 5

could also be arranged in the upper box 18 and the firmly supported strips in the lower box 17. In the third section III of the twin-wire zone, both wire belts 11 and 12 travel over another preferably curved forming shoe 23 which (as shown) is arranged preferably in the lower wire loop 11. Behind it, an additional strip 29 with vacuum chamber 30 can be arranged in the loop of the upper wire 12. Furthermore, flat suction boxes 31 can be present in the loop of the lower wire. There (as is shown by dash-dot lines) the upper wire 12 can be separated by means of a guide roll 19 from the lower wire 11 and from the fiber web formed. Lower wire and fiber web then travel over a wire suction roll 20. The guide roll 19 can, however, also lie further back, so that the upper wire 12 is separated from the lower wire 11 only on the wire suction roll 20.

It is important that two drainage boxes 17 and 18 with the alternately resiliently and firmly supported ledge strips 27 and 28 lie not in the front or the rear sections but in the middle section II of the twin-wire zone, since only here can they develop their full effect, namely, intensive drainage of the fiber suspension fed while retaining the fine flocculation-free fiber distribution. This is achieved in the manner that the corresponding wire belt is imparted a slight (scarcely visible) deflection on each strip so that turbulence is constantly produced in the still liquid part of the fiber pulp. For success it is, however, also decisive that previously, in section I, a known pre-drainage towards both sides has already taken place and that this also takes place with the greatest possible retention of the flocculation-free condition of the fiber suspension.

For this two-sided pre-drainage, a stationary preferably curved forming shoe is provided in the first section I of the twin-wire zone (in accordance with FIGS. 1 and 3–5) whenever it is a question of satisfying the highest quality demands with respect to the formation. This effect of the forming shoe is due to the fact that at least the one wire belt travels polygonally from strip to strip, each strip not only leading water away but also producing turbulence in the pulp which is still liquid. With such a forming shoe, it is, however, difficult at times to obtain a stable operating condition upon the starting of the paper machine. Therefore, it may be advantageous to provide a known forming roll 40 in accordance with FIG. 2 in Section I instead of the stationary forming shoe and the breast roll lying in front of it. This possibility will be utilized when, in particular, the highest productivity is demanded from the paper manufacturing machine.

In the third section III, the aforementioned strip 29 can serve either solely to lead away water upwards or, in addition, for the further production of turbulence (for further improvement in quality). The latter is possible if a part of the fiber pulp is still in liquid condition at this place.

In FIGS. 1 to 3, the distance between the two wires 11 and 12 in the twin-wire zone has been shown greatly exaggerated. By this, it is intended to make it clear that the two wires 11 and 12 converge towards each other over a relatively long path within the twin-wire zone. This makes it clear that the process of web-forming on the first forming shoe 16 (in Section I) commences relatively slowly and is completed only in Section III. In this connection, the end of the main drainage zone in which the two wires converge towards each other (and thus, the end of the web-forming process) can lie approximately in the center of the wrapping zone of the second forming shoe 23, as is indicated, merely by way of example, in FIGS. 1 to 3. The end of the wire convergence is symbolically indicated there by the point E; the solids content of the paper web has reached there approximately

### 6

the value of 8%. This point can, however, also lie, for instance, on one of the flat suction boxes 31. Behind this point, it is attempted further to increase the solids content, if possible even before the separation of the two wires. One goal is, namely, for the separation of the wires to take place with the highest possible solids content of the web so that as few fibers as possible are torn out of the web upon the separation. The nature and number of the drainage elements necessary for this within the twin-wire zone may, however, differ greatly and is dependent, among other things, on the type of paper and the raw-material components thereof, as well as on the operating speed.

The embodiments shown in FIGS. 2 and 3 differ from the others primarily by the fact that the twin-wire zone rises substantially vertically upward in the direction of travel of the wires. In this way, the removal of the water withdrawn from the fiber suspension is simplified since the water can be discharged relatively uniformly towards both sides. No vacuum chambers are required in particular in the central section II of the twin-wire zone. To be sure, the forming roll 40 of FIG. 2 is, as a rule, developed as a suction roll. The forming shoes 16, 23, particularly those arranged in the third section III, can, if necessary, be provided with a suction device.

Further elements of the twin-wire former shown in FIG. 2 are water-collection containers 41, 42 and 43, guide plates 44 associated with the fixed strips 28, and a water removal strip 45. The other elements are provided with the same reference numbers as the corresponding elements in FIG. 1. The same is true with regard to FIG. 3. One possible modification of FIG. 3 can consist therein that, instead of the wire suction roll 20, a forming roll is provided, and instead of the guide roll 19 the wire suction roll. A similar arrangement is known from German Utility Model 88 06 030 (Voith File: P 4539). Aside from this exception and aside from the embodiment according to FIG. 2 (with forming roll 40), the invention will, however, be used whenever possible-so to design the twin-wire former that the relatively expensive forming roll (as to purchase and operation) can be dispensed with. Thus, as a rule, the wire suction roll 20 is present as the sole suction roll. Furthermore, in all embodiments of the invention it can be seen to it that no guide roll which deflects the twin-wire zone is present (and has the above-mentioned injurious table-roll effect) is present.

The embodiment of FIG. 4 differs from FIG. 1 among other things by the fact that, in the first section I of the twin-wire zone, a second curved stationary forming shoe 16a is arranged in the loop of the lower wire 11 behind and spaced from a first curved stationary forming shoe 16. Furthermore, in the loop of the upper wire 12 in the region between the two stationary forming shoes 16 and 16a there is provided an individual strip 50 which in known manner is part of a vacuum chamber 51. This vacuum chamber 51, similar to the upper drainage box 18 of FIG. 1, is suspended on its front and rear ends in vertically displaceable mounts. In this way, both the depth of penetration of the strip 50 into the path of travel of the upper wire 12 as well as the angle of attack of the strip 50 can be varied. With slight depth of penetration, the strip 50 serves solely for removal of water, while with greater depth of penetration it serves, in addition, for the production of turbulence in the suspension and, thus, for improvement of the formation. By the presence of two separate forming shoes 16 and 16a, the pre-drainage on both sides is temporarily interrupted; it is only continued after the strip 50 has removed from the upper wire 12 the water which has penetrated upward on the first forming shoe 16. In this way, higher operating speeds are possible.

5,718,805

7

Another difference from FIG. 1 is that, in the second section II of the twin-wire zone, the lower, flexibly supported strips 57 and the upper, firmly supported strips 58 are developed as individual strips. This means that each strip has its own supporting body 55/56. The lower strip-supporting bodies 55 are swingably mounted, the strip 57 being pressed resiliently by the force of springs 54 against the bottom of the lower wire 11. The supporting body 56 of each of the upper strips 58 is developed as vacuum chamber in the same way as that of the strip 50. The suspension of these vacuum chambers 56 corresponds to that of the vacuum chamber 51. It is important that each of the strips 57 and 58 rest with a same force of application (corresponding to the suspension pressure) against its wire belt 11 or 12. The strips 57 and 58 are adjusted in such a manner that a slight deflection of the wire belts takes place preferably on each strip. Due to the resilient supporting of the lower strips 57, the adjustment, once effected, is insensitive to changes in the quantity or quality of pulp, so that no backing up takes place in front of the strips and, nevertheless, an effective introduction of turbulence forces into the wire-zone takes place. In contradistinction to FIGS. 1 to 3, there is the possibility of adjusting each one of the strips 57/58 individually with respect to position in height and inclination relative to the travel path of the wire. In this way, one can even better control the quality of the paper produced, with respect to both the formation and the nature of its surface (printability). Differing from FIG. 4, the upper strips 58 could be supported resiliently and the lower strips 57 stationary. Another alternative could consist therein that not only the upper strips 58 but also the lower strips 57 are fastened in vertically displaceable mounts (as shown on the vacuum chamber 51). In such case, the springs 54 might possibly be eliminated.

Another difference between FIGS. 1 and 4 resides in the fact that in FIG. 4 the twin-wire zone rises in the direction of travel of the wires upwards with an inclination of, on the average, about 20° with respect to the horizontal. In this way, it is possible to keep the entire height of the twin-wire former relatively slight. In the third section III of the twin-wire zone, a flat forming shoe 23' is provided rather than a curved one, differing from FIG. 1. The separation of the upper wire 12 from the lower wire and the fiber web formed can take place, as in FIG. 1, on one of the flat suction boxes 31. Instead of this, however, the upper wire 12 can also be conducted up to the wire suction roll 20. There, as shown, it can wrap around a small part (or, alternatively, a larger part) of the circumference of the wire suction roll and then be returned via the reversing roll 19.

In the embodiment shown in FIG. 5, the twin-wire zone, as a whole, extends substantially in horizontal direction. The individual elements are substantially the same as in the embodiment of FIG. 4. However, there is the difference that the drainage strips 57 and 58 lying in the second section II of the twin-wire zone are arranged along a downwardly curved path of the wire. Accordingly, an upwardly curved forming shoe 16, 23 is provided in the first section I and in the third section III of the twin-wire zone. This embodiment is advisable, in particular, for the modernizing of existing Fourdrinier paper machines.

The embodiments shown have the feature in common that, in the second section II of the twin-wire zone, there are present preferably n flexibly supported strips 27/57 and n+1 rigidly supported strips. However, it is also possible to make the number of flexibly supported strips equal to or greater by one than the number of rigidly supported strips. Instead of a rigidly supported strip, a feed or discharge edge of a drainage box can also be provided. The minimum number n

8

of flexibly supported strips is two (see FIG. 4). However, three or four flexibly supported strips are preferred.

What is claimed is:

1. A twin-wire former for the production of a paper web from a fiber suspension, the twin wire former comprising:

first and second web forming wire belts, means for directing the wire belts to travel along a path together for forming a twin wire zone of the twin wire former, with the web between the wire belts as the wire belts travel along the path through the twin wire zone, neither wire belt defining a single wire predrainage zone;

each wire belt forming an endless loop;

the twin wire zone having a first section which includes a first drainage element at the start of the path through the twin wire zone, means for supporting the belts for forming a wedge shaped entrance slot into the first section, a fiber suspension supplying headbox having an outlet placed and directed for delivering fiber suspension from the headbox to the wedge shaped entrance slot of the first section of the twin wire zone;

the twin wire zone having a second section following the first section along the path of the belts through the twin wire zone in the second section, a plurality of first drainage strips are positioned for contacting the first wire belt; in the second section, a plurality of second drainage strips are positioned within the loop of the second wire belt and are for contacting the second wire belt; the first strips being shifted in position along the path of the wire belts with respect to the second strips so that the first and second strips are offset and in a non-opposing relationship; first support means for resiliently supporting the first drainage strips against the respective wire belt that the strips contact;

second support means supporting the second drainage strips rigidly against the second wire belt;

first means for collecting the water drained from the fiber suspension by the most upstream, one of the drainage strips;

second means separate from the first means for collecting the water drained from the fiber suspension by all of the other drainage strips; and

the twin wire zone having a third section following the second section along the path of the wire belts through the twin wire zone; a second drainage element in the third section for being engaged by one of the wire belts as the wire belts travel over the second drainage element, the twin wire zone being free of rolls which deflect the twin wire zone.

2. A twin-wire former for the production of a paper web from a fiber suspension, the twin wire former comprising:

first and second web forming wire belts, means for directing the wire belts to travel along a path together for forming a twin wire zone of the twin wire former, with the web between the wire belts as the wire belts travel along the path through the twin wire zone, neither wire belt defining a single wire predrainage zone;

each wire belt forming an endless loop;

the twin wire zone having a first section which includes a first drainage element at the start of the path through the twin wire zone, means for supporting the belts for forming a wedge shaped entrance slot into the first section, a fiber suspension supplying headbox having an outlet placed and directed for delivering fiber sus-

5,718,805

**9**

pension from the headbox to the wedge shaped entrance slot of the first section of the twin wire zone;

the twin wire zone having a second section following the first section along the path of the belts through the twin wire zone; in the second section, a plurality of first drainage strips are positioned for contacting the first wire belt; in the second section, a plurality of second drainage strips are positioned within the loop of the second wire belt and are for contacting the second wire belt; the first strips being shifted in position along the path of the wire belts with respect to the second strips so that the first and second strips are offset and in a non-opposing relationship; first support means for resiliently supporting the first drainage strips against the respective ware belt that the strips contact;

second support means supporting the second drainage strips rigidly against the second wire belt;

first means for collecting the water drained from the fiber suspension by the most upstream one of the drainage strips;

second means separate from the first means for collecting the water drained from the fiber suspension by all of the other drainage strips; and

the twin wire zone having a third section following the second section along the path of the wire belts through the twin wire zone: a second drainage element in the third section for being engaged by one of the wire belts as the wire belts travel over the second drainage element, the twin wire zone being free of any forming rolls.

3. A twin-wire former for the production of a paper web from a fiber suspension, the twin wire former comprising:

first and second web forming wire belts, means for directing the wire belts to travel along a path together for forming a twin wire zone of the twin wire former, with the web between the wire belts as the wire belts travel along the path through the twin wire zone, neither wire belt defining a single wire predrainage zone;

each wire belt forming an endless loop;

the twin wire zone having a first section which includes a first drainage element at the start of the path through the twin wire zone, means for supporting the belts for forming a wedge shaped entrance slot into the first section, a fiber suspension supplying headbox having an outlet placed and directed for delivering fiber suspension from the headbox to the wedge shaped entrance slot of the first section of the twin wire zone;

the twin wire zone having a second section following the first section along the path of the belts through the twin wire zone; in the second section, a plurality of first drainage strips are positioned within the loop of the first wire belt and are for contacting the first wire belt; in the second section, a plurality of second drainage strips are positioned within the loop of the second wire belt and are for contacting the second wire belt; the first strips being shifted in position along the path of the wire belts with respect to the second strips so that the first and second strips are offset and in a non-opposing relationship; first support means for resiliently supporting the first drainage strips against the respective wire belt that the strips contact, the last one of the second drainage strips being located downstream of the last one of the first drainage strips;

second support means supporting the second drainage strips rigidly against the second wire belt;

**10**

the twin wire zone having a third section following the second section along the path of the wire belts through the twin wire zone; a second drainage element in the third section for being engaged by one of the wire belts as the wire belts travel over the second drainage element, the second drainage element having an open surface to enable water to be drained through the wire belt in contact therewith; and

the twin wire zone being free of rolls which deflect the twin wire zone.

4. A twin-wire former for the production of a paper web from a fiber suspension, the twin wire former comprising:

first and second web forming wire belts, means for directing the wire belts to travel along a path together for forming a twin wire zone of the twin wire former, with the web between the wire belts as the wire belts travel along the path through the twin wire zone, neither wire belt defining a single wire predrainage zone;

each wire belt forming an endless loop;

the twin wire zone having a first section which includes a first drainage element at the start of the path through the twin wire zone, means for supporting the belts for forming a wedge shaped entrance slot into the first section, a fiber suspension supplying headbox having an outlet placed and directed for delivering fiber suspension from the headbox to the wedge shaped entrance slot of the first section of the twin wire zone;

the twin wire zone having a second section following the first section along the path of the belts through the twin wire zone; in the second section, a plurality of first drainage strips are positioned within the loop of the first wire belt and are for contacting the first wire belt; in the second section, a plurality of second drainage strips are positioned within the loop of the second wire belt and are for contacting the second wire belt; the first strips being shifted in position along the path of the wire belts with respect to the second strips so that the first and second strips are offset and in a non-opposing relationship; first support means for resiliently supporting the first drainage strips against the respective wire belt that the strips contact, the last one of the second drainage strips being located downstream of the last one of the first drainage strips;

second support means supporting the second drainage strips rigidly against the second wire belt;

the twin wire zone having a third section following the second section along the path of the wire belts through the twin wire zone; a second drainage element in the third section for being engaged by one of the wire belts as the wire belts travel over the second drainage element; and

the twin wire zone being free of any forming rolls.

5. A twin-wire former for the production of a paper web from a fiber suspension, the twin wire former comprising:

first and second web forming wire belts, means for directing the wire belts to travel along a path together for forming a twin wire zone of the twin wire former, with the web between the wire belts as the wire belts travel along the path through the twin wire zone, neither wire belt defining a single wire predrainage zone;

each wire belt forming an endless loop;

the twin wire zone having a first section which includes a single first drainage element at the start of the path

5,718,805

11

through the twin wire zone, means for supporting the belts for forming a wedge shaped entrance slot into the first section, a fiber suspension supplying headbox having an outlet placed and directed for delivering fiber suspension from the headbox to the wedge shaped entrance slot of the first section of the twin wire zone; said single first drainage element in the first section being a single forming roll having an open surface to enable drainage of water from the fiber suspension and being curved along the path of the belts through the twin wire zone, the single forming roll being engaged by one of the wire belts for curving the path of the belts around the single forming roll after the entrance of the suspension into the entrance slot;

the twin wire zone having a second section following the first section along the path of the belts through the twin wire zone; in the second section, a plurality of first drainage strips are positioned within the loop of the first wire belt and are for contacting the first wire belt; in the second section, a plurality of second drainage strips are positioned within the loop of the second wire belt and are for contacting the second wire belt; the first strips being shifted in position along the path of the wire belts

12

with respect to the second strips so that the first and second strips are offset and in a non-opposing relationship; first support means for resiliently supporting the first drainage strips against the respective wire belt that the strips contact;

second support means supporting the second drainage strips rigidly against the second wire belt; and

means for supplying a vacuum in the area of the second drainage strips;

the twin wire zone having a third section following the second section along the path of the wire belts through the twin wire zone; a second drainage element in the third section, for being engaged by one of the wire belts as the wire belts travel over the second drainage element, the second drainage element having an open surface to enable water to be drained through the wire belt in contact therewith; and

the twin wire zone apart from said single forming roll being free of rolls which deflect the twin wire zone.

* * * * *

# EXHIBIT U

LEXSEE 1994 U.S. DIST. LEXIS 20714

**MOTOROLA, INC., Plaintiff, vs. INTERDIGITAL TECHNOLOGY CORPORATION, Defendant.**

**Civil Action No. 93-488-LON**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1994 U.S. Dist. LEXIS 20714*

**December 19, 1994, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In a consolidation of two actions regarding patent claims, plaintiff moved to amend the protective order prohibiting counsel for defendant patent infringement claimant from using information from the present action in prosecuting future patent applications.

**OVERVIEW:** Plaintiff's declaratory action against defendant patent infringement claimant and defendant's patent infringement action against plaintiff, both arising out of patent claims, were consolidated. Defendant was represented by the same counsel who prosecuted patent applications for the Patent and Trademarks Office. Due to said counsel's dual roles, plaintiff requested that the court amend the protective order to prohibit any of said counsel who received confidential plaintiff information from prosecuting patents for defendant. The court granted the request, so amending the protective order for a term of one year from the conclusion of the subject litigation, and ordered defendant's counsel to set up Chinese walls to prevent patent application counsel from accessing said confidential information. Noting that the key inquiry was whether counsel was in a position creating a high risk of inadvertent disclosure, the court held that defendant's counsel was in such a position, that a remedy was necessary to prevent such disclosure, and that said remedy did not work unnecessary hardship on defendant, though any hardship was created by defendant by hiring said counsel.

**OUTCOME:** The court granted plaintiff's request to amend the protective order. The court amended said protective order to prohibit counsel of defendant patent infringement claimant who had already received information about plaintiff from prosecuting patent applications for defendant for one year after litigation ended, and ordered that Chinese walls be set up at said counsel's firm.

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Protective Orders*
[HN1] Access to confidential information should be denied or granted on the basis of each individual counsel's actual activity and relationship with the party represented, without regard to whether a particular counsel is in-house or retained.

*Civil Procedure > Discovery > Protective Orders*
[HN2] Status as in-house counsel cannot alone create that probability of serious risk to confidentiality and cannot therefore serve as the sole basis for denial of access. The critical inquiry is whether the attorney in question is in a position that creates a high risk of inadvertent disclosure. In discussing access for in-house counsel, courts look for involvement in competitive decision making or scientific research in determining whether an individual would have a difficult time compartmentalizing his knowledge.

*Civil Procedure > Discovery > Protective Orders*
[HN3] To the extent that inadvertent disclosure of confidential information may be predicted and cannot be adequately forestalled in the design of a protective order, it may be a factor in the access decision.

Case 1:07-cv-00226-JJF    Document 57-5    Filed 01/09/2008    Page 16 of 21

Page 2
1994 U.S. Dist. LEXIS 20714, *

*Civil Procedure > Discovery > Protective Orders*
[HN4] Courts consider the hardship to the client if counsel is disqualified or restricted in some manner from access to confidential information from the other party to an action.

**COUNSEL:** [*1] Jeffrey B. Bove, Esquire of Connolly, Bove, Lodge & Hutz, Wilmington, Delaware; Of Counsel: Gary M. Hoffman, Esquire and Howard N. Feldman, Esquire of Dickstein, Shapiro & Morin, Washington, D.C.; Attorneys for Plaintiff.

Richard K. Herrmann, Esquire of Bayard, Handelman & Murdoch, Wilmington, Delaware; Of Counsel: Robert G. Krupka, Esquire and Linda S. Resh, Esquire of Kirkland & Ellis, Chicago, Illinois; Attorneys for Defendant.

**JUDGES:** Joseph J. Longobardi, D.J.

**OPINION BY:** Joseph J. Longobardi

**OPINION**

*MEMORANDUM OPINION*

December 19, 1994

Wilmington, Delaware

Joseph J. Longobardi

**I. NATURE AND STAGE OF THE PROCEEDINGS**

This suit involves patent claims relating to the mobile telephone industry. On October 8, 1993, Motorola filed a civil action seeking declaratory relief, *Motorola, Inc., v. Interdigital Technology Corporation,* Civil Action ("C.A.") No. 93-488- *LON, 1994 U.S. Dist. LEXIS 20714.* On October 12, 1993 Interdigital Technology Corporation, ("ITC"), filed a patent infringement claim arising out of the same patents, *Interdigital Technology Corporation v. Motorola, Inc.,* C.A. No. 93-5430, in the Eastern District of Pennsylvania. On February 17, 1994, the Eastern District case was [*2] transferred to this Court and designated C.A. No. 94-73. On September 22, 1994, the two actions were consolidated, with 93-488 designated as the lead case.

Presently before the court is Motorola's letter of September 21, 1994, ("Motorola letter") and ITC's response letter of September 23, 1994, regarding the dual

roles performed by the firm Dickstein, Shapiro & Morin ("DS&M"). DS&M is lead trial counsel for ITC in this action, and as such is entitled by the protective order to receive Motorola's confidential information. DS&M also prosecutes patents for ITC in the PTO. Motorola seeks to amend the protective order in this case to ensure that no DS&M attorneys who prosecute patent applications for ITC in the patents in suit have access to Motorola's confidential information. On September 28, 1994, both parties argued this issue before the Court.

**II. FACTS**

On October 8, 1993, Motorola filed its claim in this present action. Docket Item ("D.I.") 1. One week later, on October 15, 1993, DS&M became attorneys of record for several ITC patent applications, "including four United States continuation or divisional applications which take their parentage from the patents in suit." [*3] D'Amico Affidavit, at 2-3. Prior to October 15, 1993, Kenyon & Kenyon had been attorney of record for these patent applications.

On March 4, 1994, a protective order was entered in this case. D.I. 35. The protective order provided that DS&M was to have access to Motorola's confidential information. [1] The protective order did not specifically deny access to DS&M attorneys who prosecuted patent applications for ITC. The Court accepts as true Mr. D'Amico's representation that to date, none of the DS&M attorneys who have drafted claim revisions to any of the four continuation/divisional applications had access to Motorola's confidential information while preparing those revisions. D'Amico Affidavit P 6.

> 1    "Confidential Information shall be given, shown, disclosed, made available or communicated only to: . . . (a). . . (i) Partners and associates of Dickstein, Shapiro & Morin, and stenographic, clerical, and/or paralegal employees of those attorneys whose functions require access to Confidential Information."

[*4] Motorola claims that, at the time the protective order was entered, Motorola "reasonably believed" that Kenyon & Kenyon was the law firm responsible for prosecuting any patent applications in this case. Motorola letter at 3. Moreover, Motorola alleges that on at least two occasions, DS&M concealed the fact that they were prosecuting patents for ITC. On February 9, 1994, both parties argued the issue of whether Mr. Bramson,

in-house counsel for ITC, should have access to Motorola's confidential information under the protective order. Motorola implies that DS&M should have disclosed its patent prosecution representation at that time. Later, on August 10, 1994, ITC and Motorola entered into a stipulation which enabled two lawyers from Cushman, Darby & Cushman ("CD&C") (co-counsel for ITC) to obtain access to confidential information under the protective order. As a condition for this access, the two CD&C attorneys agreed "to refrain from prosecution of patent applications directed to mobile digital telephone communication equipment and processes during the pendency of this case and until one year after the conclusion of this litigation." D.I. 69. Again, Motorola implies that ITC should [*5] have disclosed its patent prosecution representation at this time.

ITC denies these allegations of improper concealment. Mr. Hoffman of DS&M states, "during the course of the parties' negotiations over Robert Bramson's access to certain Motorola documents, I believe I told counsel for Motorola that DS&M was prosecuting patents for ITC." Hoffman Affidavit at 4, P7. With respect to the CDC stipulation, Mr. Hoffman states that ITC consented to the stipulation in order to save time and expense, not because it agreed with Motorola's position. Hoffman Affidavit at 4-5, P8. [2] Moreover, counsel for ITC seem to have been guided at all times by their belief that no restriction exists on an outside counsel's ability to prosecute patent applications involving the technology related to the patents at issue. D'Amico Affidavit P9; Hoffman Affidavit P3; D.I. 86, at 109 (Mr. Bove stating that in his mind, there was always a clear distinction between inside and outside counsel).

> 2    Mr. Hoffman's statement is supported by Mr. Bove's letter of August 8, 1994 to Mr. Hermann of Bayard, Handelman & Murdoch (local counsel for Motorola): "So the record is clear, we are providing this [CD&C] Stipulation at Motorola's request in order to avoid burdening the Court with what we perceive is a improper position taken by Motorola." ITC letter, Exhibit G.

[*6] For purposes of this opinion, the Court accepts as true the representations by ITC's various attorneys that there was no intentional concealment of DS&M's dual role. Nevertheless, an important issue is now before the Court which the Court is compelled to resolve.

### III. Discussion

In a patent case, maintaining the integrity of the protective order is an especially serious concern. "Courts dress technical information with a heavy cloak of judicial protection because of the threat of serious economic injury to the discloser of scientific information." *Safe Flight Instrument Corp. v. Sundstrand Data Control, Inc., 682 F. Supp. 20 (D. Del. 1988)*. Motorola argues that its confidential information will be inadequately protected if DS&M attorneys who have access to the confidential information also prosecute ITC patents. Motorola fears that it is impossible for DS&M attorneys to compartmentalize the knowledge gained from reviewing Motorola's confidential documents and that the confidential knowledge gained will inevitably be used in prosecuting ITC's patent applications. Such use would violate the protective order's prohibition against use of the confidential information for [*7] any use other than the present litigation.

To supports its contention that there is no prohibition against outside counsel performing these dual roles, ITC relies upon *In re Certain Amorphous Metal Alloys,* No. 337-TA-143 (U.S.I.T.C. 1983)., and its progeny, *In re Certain Magnetic Switches,* 1993 ITC LEXIS 143 (U.S.I.T.C. 1993). *Amorphous Metal* is factually similar to the present case. Two firms were acting as trial counsel for respondents and each firm had access to complainant's confidential information. The first firm assisted their client's in-house patent agents in preparing patent applications. The second firm did not prosecute their client's patent applications, but prosecuted patents for other clients in the same subject matter. *Amorphous Metal* at 1 n.2. Complainant argued that these firms could not possibly respect the protective order and still zealously prosecute the patent applications.

The International Trade Commission allowed both firms to gain access to the confidential information. The Commission based its decision upon the following factors: an in-house/outside counsel distinction, faith in the attorneys ability to respect the protective order while [*8] pursuing future patent prosecutions, the lack of a present conflict, and the burden to the clients if the attorney's were disqualified from the litigation. While *Amorphous Metal* formulates and addresses the important issues present in this dispute, the Court declines to reach the Commission's result. To some extent this is due to factual differences between *Amorphous Metals* and the

present case, but to some extent the Court simply disagrees with and declines to follow the Commission's reasoning.

"The goals of full disclosure of relevant information and reasonable protection against economic injury 'are in tension and each must be fairly balanced against the other.'" *Safe Flight, 682 F. Supp. at 23* (quoting *E.I. Du Pont de Nemours & Company v. Phillips Petroleum Company, 219 U.S.P.Q. 37 (D. Del. 1982)* (Latchum, J.)). After carefully weighing the relevant factors, which are discussed below, the Court holds that the DS&M attorneys who have received confidential information from Motorola under the protective order shall not prosecute any ITC patent applications relating to the broad subject matter of the patents in suit during the pendency of this case and until one year [*9] after the conclusion of the present litigation, including appeals.

**A. The In-house/Outside Counsel Distinction**

In their letter and at argument, Counsel for ITC present the Court with a general rule: courts split on whether inside counsel may receive confidential information while at the same time continue to prosecute patents, but outside counsel are always able to do both. In *Amorphous Metal,* the Commission gave its reasons for viewing in-house counsel differently from outside counsel:

> Traditionally and in the instant investigation, in-house counsel have been excluded from protective orders not because of an inherent untrustworthiness, but because of their close ties with the corporate client. Although in-house counsel serve as legal advisors, their employment often intimately involves them in the management and operation of which they are a part. The two roles of legal advisor and corporate official will often merge; when they do, the efficacy of the protective order is greatly diminished. Furthermore, because they are in regular contact with technical personnel, in-house counsel are in a significantly different position with regard to opportunities for inadvertent [*10] transmission of confidential information than are outside counsel.

*Amorphous Metal* at 5.

The Court declines to rest its decision upon a bright-line distinction between "in-house" and "outside" counsel. [HN1] Access to confidential information "should be denied or granted on the basis of each individual counsel's actual activity and relationship with the party represented, without regard to whether a particular counsel is in-house or retained." *U.S. Steel Corp. v. United States, 730 F.2d 1465, 1469 (Fed. Cir. 1984).* *U.S. Steel* was decided eight months after the Commission's opinion in *Amorphous Metal,* and involved a CIT decision which had relied upon a bright-line distinction to deny in-house counsel access to confidential information. The Federal Circuit held that [HN2] "status as in-house counsel cannot alone create that probability of serious risk to confidentiality and cannot therefore serve as the sole basis for denial of access." *U.S. Steel, 730 F.2d at 1469.*

The critical inquiry is whether the attorney in question is in a position that creates a high risk of inadvertent disclosure. In discussing access for in-house counsel, courts look for involvement in competitive [*11] decision making or scientific research in determining whether an individual would have a difficult time compartmentalizing his knowledge. *Carpenter Technology Corp. v. Armco, Inc., 132 F.R.D. 24, 27-28 (E.D. Pa. 1990)* (granting access to one individual and denying access to another individual based upon involvement in competitive decision making and scientific research); *U.S. Steel Corp. v. United States, 730 F.2d 1465, 1468 (Fed. Cir. 1984)* (discussing the need to retain outside counsel to gain access to confidential information if in-house counsel is involved in competitive decision making). These are activities which define the scope and emphasis of a client's research and development efforts. The process of prosecuting patent applications also involves decisions of scope and emphasis, as was argued by Mr. Krupka at the September 28 hearing: "They can make the claims read on new products and new directions where we project sales to be most critical. And they can forget about the ones that relate to products that are going to die." D.I. 86, at 126. [3]

> 3 *Amorphous Metal* did not address this aspect of the patent prosecution process. The Commission was satisfied that no danger existed because the outside counsel had no direct contact

with the client's technical personnel. *Amorphous Metal* at 6.

[*12] Moreover, this court has implied in the past that prosecution of patents could be grounds for denying access. In *Safe Flight Instrument Corp. v. Sundstrand Data Control Inc., 682 F. Supp. 20 (D. Del. 1988)* (Roth, J.), the Court denied plaintiff's request that defendant's in-house counsel be denied access: "The defendant has represented to this Court that its in-house counsel neither conduct scientific research *nor prosecute patents.* These attorneys simply do not face [plaintiff's president's] prospect of having to distil one's own thoughts from a competitor's thoughts during the course of future . . . work." [4] *Id.* The court also relied upon the fact that defendant's in-house counsel would be segregated to avoid "the possibility of conscious or unconscious abuse of confidential information." *Id. at 23.*

> 4    The Court had previously denied Plaintiff's request that Plaintiff's President be granted access because of the President's heavy involvement in research and decision making. *Safe Flight, 682 F. Supp. at 22.*

[*13] There can be no question that DS&M attorneys who receive confidential information and then later prosecute patents will have to distil and compartmentalize the confidential knowledge they have gained. The inquiry must shift, therefore, to the dangers of inadvertent disclosure and the possible protections that may exist against such disclosure.

## B. Inadvertent Disclosure

DS&M attorneys are prosecuting patents that are directly at issue in the present litigation. DS&M does not deny that it is theoretically possible for them to abuse the confidential information received, but argue that they understand their ethical duty and will act in conformance with it. The Commission adopted this position in *In re Certain Amorphous Metal Alloys,* No. 337-TA-143, at 3 (U.S.I.T.C. 1983): "In the event that a conflict is posed as a result of knowledge gained under a protective order, we would expect that counsel would refer the matter to other counsel. We therefore believe that it is appropriate to presume that respondents' counsel will respect the integrity of the confidential information released under a protective order."

The Court does not question the ethics of the DS&M

attorneys, [*14] nor does it doubt that DS&M attorneys would respond appropriately if a conflict were "posed" to them. The issue is not deliberate disclosure, however, but *inadvertent* disclosure. In *Safe Flight,* the Court denied Plaintiff's President access to defendant's confidential information because of the dangers posed by inadvertent disclosure. "Accepting that [plaintiff's president] is a man of great moral fiber, we nonetheless question his human ability during future years of research to separate the applications he has extrapolated from [defendant's] documents from those he develops from his own ideas." *Safe Flight, 682 F. Supp. at 22.*

"Inadvertence, like the thief-in-the-night, is no respecter of its victims. Inadvertent or accidental disclosure may or may not be predictable. [HN3] To the extent that it may be predicted, and cannot be adequately forestalled in the design of a protective order, it may be a factor in the access decision." *U.S. Steel Corp., 730 F.2d at 1468.* DS&M is currently prosecuting applications relating to the very patents at issue in this litigation. Attorneys who were to view Motorola's voluminous confidential information and then later prosecute the [*15] patents would have to constantly challenge the origin of every idea, every spark of genius. This would be a sisyphean task, for as soon as one idea would be stamped "untainted", another would come to mind. The level of introspection that would be required is simply too much to expect, no matter how intelligent, dedicated, or ethical the DS&M attorneys may be.

## C. Hardship to Client

[HN4] Courts have also considered the hardship to the client if counsel is disqualified or restricted in some manner. *See U.S. Steel Corp. v. United States, 730 F.2d 1465, 1469 (Fed. Cir. 1984)* ("forcing USS to rely on newly retained counsel would create an extreme and unnecessary hardship"); *Safe Flight Instrument Corp. v. Sundstrand Data Control, 682 F. Supp. 20, 22 (D. Del. 1988)* (denying access to Plaintiff's president would not unduly hamper plaintiff ability to assess litigation); *In re Certain Amorphous Metal Alloys,* No. 337-TA-143, at 3 (U.S.I.T.C. 1983) ("disqualification imposes too great a burden on respondents in this case"). ITC has urged the Court to consider the cost it will incur if DS&M's representation is limited in any way. *See* D.I. 86, at 110 (representations by Mr. [*16] Bove regarding ITC's concern regarding costs). ITC's hardship is certainly a factor to be balanced against Motorola's need to protect

1994 U.S. Dist. LEXIS 20714, *16

its confidential information, but it is just one factor.

It is important to note that DS&M has not been prosecuting these particular ITC patent applications for a long period of time. This is not a situation where a client decided that it would be efficient to retain trial counsel who had prosecuted the particular patent in the past. In fact, DS&M did not become attorney of record for these particular patent applications until one week after the filing of Motorola's suit. This creates the appearance of a situation where a client felt it would be efficient to have trial counsel prosecute the patent application in the future. This creates far too great a risk that any efficiency will be to some extent the result of inadvertent use of confidential information.

This conflict was created by ITC after the initiation of litigation, and could have been avoided altogether by ITC. Under these circumstances, the Court will take hardship into account in fashioning its remedy, but does not consider the hardship severe enough to deny relief altogether.

[*17] **D. Timing of the Remedy**

In *Amorphous Metal,* the Commission recognized that a danger existed, but decided that there was not a present conflict, only a mere possibility of future conflict. *Amorphous Metals* at 8. As a result of this conclusion, the Commission chose not to deny access, but rather indicated that it would investigate in the future if the complainant could "show that subject matter directly related to the confidential information appeared in a patent application after release under a protective order." *Amorphous Metal* at 6 n.13. In effect, the Commission promised to remedy the injury after it occurred, while complainant was asking the Commission to prevent the injury from occurring. Given the voluminous information supplied to date by Motorola under the protective order, the ongoing dual role of the DS&M attorneys, and the need to closely guard confidential information in the patent area, this Court believes a conflict exists at the present time and will act to prevent the possibility of injury to Motorola.

**E. Scope of the Remedy**

All DS&M attorneys or employees who have received confidential information from Motorola under the protective order [*18] in this case shall not prosecute any patent application for ITC relating to the broad

subject matter of the patents in suit during the pendency of this case and for one year after the conclusion of this litigation, including appeals.

This remedy is broad enough to protect Motorola's confidential information, yet seeks to minimize the hardship to both ITC and DS&M. The prohibition applies only to ITC patent applications that are the subject matter of this litigation, not all ITC patent applications. The prohibition applies only to patent prosecutions for ITC, not for all other clients. [5] Finally, there is a time limit on the prohibition similar to the limit requested by Motorola for the CDC attorneys. *See* D.I. 69.

> 5  The Court presumes that DS&M's ethical duty to its client, ITC, would prevent DS&M from prosecuting patent applications for other clients that are of similar subject matter as ITC's patents in this case. Therefore, Motorola's confidential information should not be threatened by any representation of a third party which DS&M may undertake.

[*19] DS&M has represented that to date, only Mr. D'Amico has worked on patent application matters and then subsequently reviewed confidential information. *See* D'Amico Affidavit. Because he has had access to Motorola's confidential information, he is subject to the Court's prohibition. Going forward, DS&M shall set up a Chinese Wall to separate the ITC patent application attorneys from the Motorola litigation attorneys who have received confidential information. This shall ensure that, with the exception of Mr. D'Amico, ITC shall continue to receive the same services from the same DS&M attorneys that ITC has received in the past.

***ORDER***

NOW, THEREFORE, for all the reasons stated by the Court in its Memorandum Opinion of December 19, 1994, IT IS ORDERED that:

1. The protective order, Docket Item 35, shall be amended to provide that any Dickstein, Shapiro & Morin ("DS&M") attorneys who have received confidential information from Motorola under the protective order shall not prosecute any InterDigital Technology Corporation patent applications relating to the broad subject matter of the patents in suit during the pendency of this case and until one year after the conclusion [*20] of the present litigation, including appeals.

1994 U.S. Dist. LEXIS 20714, *20

2. DS&M shall set up a Chinese wall to ensure that the          12/19/94
Court's order is effectively enforced.

    Joseph J. Longobardi, D.J.

# EXHIBIT V

LEXSEE 1998 U.S DIST. LEXIS 22251

**MIKOHN GAMING CORPORATION, Plaintiff, v. ACRES GAMING, INC., Defendant.**

**CV-S-97-1383-HDM(LRL)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA**

*1998 U.S. Dist. LEXIS 22251; 50 U.S.P.Q.2D (BNA) 1783*

**April 15, 1998, Decided
April 15, 1998, Received and Filed; April 23, 1998, Entered and Served**

**DISPOSITION:** [*1] Acres' motion to compel (# 36) granted in part and denied in part. Mikohn's Motion to Strike a Portion of Acres's Reply in Support of Motion to Compel; and for Sanctions (# 47) granted in part and denied in part.

**COUNSEL:** For MIKOHN GAMING CORPORATION, Plaintiff/Counterdefendant: STEVEN E. SHAPIRO (# 34), Mithcell, Silbergerg & Knupp, Los Angeles, CA.

For MIKOHN GAMING CORPORATION, Plaintiff/Counterdefendant: KRISTINA PICKERING, ESQ., JAMES J PISANELLI, ESQ., ADAM P SEGAL, ESQ., Schreck Morris, Las Vegas, NV.

For ACRES GAMING, INCORPORATED, Defendant/Counterclaimant: Keith E. Gregory, John E. Leach, Stewart C. Fitts, Woodburn & Wedge, Las Vegas, NV.

For ACRES GAMING, INCORPORATED, Defendant/Counterclaimant: MARK GERARD JACKSON (VP # 82), JERRY A. RIEDINGER (VP # 17), ALAN T. MCCOLLOM (VP # 19), RICHARD BAUM (VP # 21), MICHAEL BROADDUS (VP # 23), STEPHEN S. FORD (VP # 25), Perkins Coie, Seattle, WA.

For PLAINTIFF: BRENT RABOWSKY, Los Angeles, Ca.

For PLAINTIFF: BERNHARD KRETEN / VICTOR GALLO, Bernard Kreten & Associates, Sacramento, Ca.

For PLAINTIFF: BRUCE W. BENSON, Las vegas, NV.

For Casino Data Systems & Sunset Station Hotel & Casino, DEFENDANTS: LAWRENCE [*2] M. JARVIS (VP # 108), GREGORY C. SCHODDE (VP # 109), McAndrews Held & Malloy, LTD., Chicago, Illinois.

**JUDGES:** LAWRENCE R. LEAVITT, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** LAWRENCE R. LEAVITT

**OPINION**

**ORDER**

This case comes before the court on defendant Acres' Motion to Compel Discovery and for a Protective Order (# 36, filed December 23, 1997). The court has considered the motion, plaintiff Mikohn's Opposition (# 39, filed January 7, 1998), Acres' Reply (# 46, filed January 20, 1998), Mikohn's Motion to Strike a Portion of Acres's Reply in Support of Motion to Compel; and for Sanctions (# 47, filed January 23, 1998), Acres' Response to Mikohn's Motion to Strike a Portion of Acres's Reply in Support of Motion to Compel and for Sanctions (# 49, filed January 28, 1998), Acres' Submission of New Precedent in Support of Acres' Motion to Compel Discovery and for a Protective Order (# 51, filed February 2, 1998), Mikohn's Response to Submission of "New Precedent" by Acres Gaming Corporation in Support of Its Motion to Compel Discovery (# 55, filed February 4, 1998), Mikohn's Reply in Support of Motion to Strike a Portion of Acres's Reply in Support of Motion to Compel Discovery, and for Sanctions [*3] (# 56, filed February 9, 1998), the arguments presented by counsel

Page 2

1998 U.S. Dist. LEXIS 22251, *3; 50 U.S.P.Q.2D (BNA) 1783

during the telephone hearing on February 23, 1998, and Mikohn's Supplement in Support of Mikohn's Request for Entry of its Proposed Protective Order (# 62, filed February 24, 1998).

Also before the court is Mikohn's Ex Parte Discovery Plan and Scheduling Order (received January 12, 1998). The court has considered Mikohn's proposed discovery plan, Acres' Response (# 42, filed January 15, 1998), and the representations of counsel during the hearing on February 23, 1998.

## Motion to Compel Discovery and for a Protective Order (# 36)

The central issue underlying this dispute is whether one of Acres' law firms, Marger, Johnson, McCollom & Stolwitz ("the Marger firm"), should be denied access to Mikohn's confidential technical information during the course of this patent infringement action. The parties have agreed upon the basic contours of the protective order that will govern discovery in this case, with one major exception: Mikohn would deny the Marger firm access to the sensitive technical information that Mikohn deems highly confidential, such as software codes and hardware electrical designs, and would further [*4] deny the Marger firm the right to attend any depositions. Mikohn's proposal for a significantly more restrictive protective order is based on the Marger firm's dual role as Acres' outside litigation counsel *and* its patent prosecution counsel. Indeed, in its latter capacity the Marger firm is currently prosecuting certain patent applications for Acres that are the very subject matter of this litigation. Mikohn fears that if access to Mikohn's confidential technical information is given to the Marger firm in its role as litigation counsel, there would be a substantial risk that in its role as patent prosecution counsel the Marger firm would misuse the information to Mikohn's detriment. Whether the misuse were deliberate or inadvertent, the result, according to Mikohn, would be the same: Mikohn would be placed at a distinct and unfair competitive disadvantage.

Acres denies that the Marger firm's possession of Mikohn's confidential technical information would or could harm Mikohn's position in the marketplace. Acres also argues that denial of access to such information would undermine the Marger firm's ability to represent its client effectively, and would essentially "disqualify" [*5] it from the case. Acres' Reply (# 46) at 12. [1] Notwithstanding that it has retained a second firm,

Perkins Coie, as additional patent litigation counsel, Acres asserts that to be denied the litigation services of the Marger firm, and particularly of Alan McCollom, whose technical expertise in electrical engineering uniquely qualifies him as litigation counsel in this case, would deprive Acres of the benefit of the trust and confidence it has come to place in the Marger firm over the course of a long standing attorney-client relationship.

> 1   In other papers and at the hearing on this motion Mikohn has suggested that the Marger firm should be disqualified as litigation counsel in this case. No grounds for disqualification have been formally presented to the court, and none will be considered in this decision. The court here addresses only the scope of an appropriate protective order, irrespective of any conceivable grounds for the disqualification of the Marger firm.

*Fed.R.Civ.P. 26(c)* authorizes the court to [*6] protect a party from "undue burden or expense" in discovery by directing that "a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a designated way." The party seeking the protective order carries the burden of showing good cause for its issuance. *Jepson, Inc. v. Makita Elec. Works, Ltd, 30 F.3d 854, 858 (7th Cir. 1994).* Discovery orders are reviewed for abuse of discretion. *Ah Moo v. A.G. Becker Paribas, Inc., 857 F.2d 615, 619 (9th Cir. 1988).*

Where parties to a lawsuit are commercial competitors, and one of them moves for protection against misuse of its confidential technical information, the court must balance the risk to the moving party of inadvertent disclosure against the risk that the protective order will impair the prosecution or defense of the other party's claims. *Brown Bag Software v. Symantec Corp., 960 F.2d 1465, 1470 (9th Cir. 1992).* Even if the competitor's counsel acted in the best of faith and in accordance with the highest ethical standards, the question remains whether access to the moving party's confidential information would create [*7] "an unacceptable opportunity for inadvertent disclosure." *U.S. Steel Corp. v. United States, 730 F.2d 1465, 1468 (Fed. Cir. 1984).* In resolving this question, the key consideration is not whether the attorney is in-house or outside counsel, but whether the attorney is involved in "competitive decisionmaking," *i.e.*, whether "a counsel's

Page 3

1998 U.S. Dist. LEXIS 22251, *7; 50 U.S.P.Q.2D (BNA) 1783

activities, association, and relationship with a client [] are such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." *Id.* at n. 3.

In support of its position that the Marger firm does not engage in competitive decisionmaking as defined in *U.S. Steel*, Acres offers the affidavit of its longtime patent lawyer, Alan McCollom. McCollom asserts that his only association with Acres is as its outside patent counsel; he is neither a board member, officer nor employee of the company. He denies that he "participate[s] in Acres' marketing meetings or in Acres' product development or engineering meetings," or that he "advise[s] Acres regarding general nonlegal business strategies such [*8] as developing or marketing products." In short, he denies that he's "been involved in decisionmaking activities regarding product pricing, new product design or new product development." He states that his "involvement with Acres is limited solely to providing legal advice and counseling in the field of intellectual property." McCollom's representations are corroborated by the affidavit of Acres' board chairman and chief executive officer, John F. Acres.

At the hearing on this matter Acres argued additionally that Mikohn's unfounded fear of improper disclosure stems from a misapprehension of the type of use which the Marger firm could make of Mikohn's confidential information. Acres contends that Patent Office procedures governing the processing of patent applications make it impossible for the Marger firm to abuse the confidential information it receives from Mikohn. According to Acres, if it were to refine claims in its pending patent applications, or write new claims in re-issue proceedings, it would necessarily be limited to the specifications contained in its original applications. Because it would not be allowed to amend claims or add new claims regarding matters that were not [*9] already disclosed in its original patent application, Acres argues that it would be theoretically impossible for the Marger firm to exploit for its own competitive advantage the confidential information it would receive from Mikohn, even if it wanted to. In short, Acres argues that any confidential information it might receive from Mikohn would, in effect, be irrelevant to the application process.

Mikohn, however, points to *Motorola, Inc. v. Interdigital Technology Corp., 1994 U.S. Dist. LEXIS*

20714 (D.Del. 1994), in which the proper scope of a discovery-related protective order was considered in the context of a patent infringement action. [2] There, as here, the law firm representing one of the parties, Interdigital Technology Corp. ("ITC"), functioned as both lead trial counsel and patent prosecution counsel. At the time the case was pending, the firm was prosecuting several patent applications, four of which were related to the patents in suit. The issue presented to the court was whether ITC's counsel should have access to Motorola's confidential information. Motorola argued, as Mikohn does here, that it would be "impossible for [ITC's] attorneys to compartmentalize [*10] the knowledge gained from reviewing Motorola's confidential documents and that the confidential knowledge gained will inevitably be used in prosecuting ITC's patent applications." *Id.* at *6. As in *U.S. Steel*, the critical inquiry was "whether the attorney in question is in a position that creates a high risk of inadvertent disclosure." The answer to that question turns on whether the attorney is involved in competitive decisionmaking such that he "would have a difficult time compartmentalizing his knowledge." *Id.* at *10-11. Importantly, the court observed that "there can be no question that attorneys [for ITC] who receive confidential information and then later prosecute patents will have to distil and compartmentalize the confidential information they have gained." Id. at *13.

> 2 Neither *Brown Bag* nor *U.S. Steel* involved a patent infringement claim.

The court concluded that the potential harm to Motorola from inadvertent disclosure of its confidential information outweighed the hardship [*11] that would befall ITC if its counsel were disqualified or restricted in some fashion. To eliminate the risk of inadvertent disclosure and at the same time minimize the hardship to ITC, the court precluded ITC's trial attorneys from prosecuting its patent applications. Because ITC's trial attorneys had only recently begun to prosecute their client's patent applications, the court found that the resultant hardship on ITC would be minimal. *Id.* at *16-18.

As applied to the present case, the court finds *Motorola* persuasive. [3] The Marger firm is prosecuting patent applications that are not merely related to the patents in suit, they are part of the very core of this suit. Indeed, the Marger lawyers allege that these pending patents will be infringed by Mikohn's MoneyTime system

Page 4

1998 U.S. Dist. LEXIS 22251, *11; 50 U.S.P.Q.2D (BNA) 1783

as soon as they are issued. Hence, in light of the claims made in this lawsuit, the advice rendered by the Marger firm is intensely competitive. In an effort to distance himself from the type of competitive decisionmaking discussed in *U.S. Steel*, Mr. McCollom characterizes his patent prosecution work for Acres as merely "providing legal advice and counseling in the field of intellectual property." This [*12] description is so general as to be virtually meaningless. By Acres' own admission, it has made a considerable investment in Mr. McCollom's technical training. It therefore cannot be doubted that as patent prosecution counsel Mr. McCollom works very closely with and advises Acres on matters relating to product design. The legal and factual components of Mr. McCollom's advice regarding complex technology are so intertwined as to be inseparable. A bright line cannot be drawn between them. Were he given access to Mikohn's technology, Mr. McCollom would be in the "untenable position" of having to either refuse his client legal advice on competitive design matters or violate the protective order's prohibition against revealing Mikohn's technical information. *Brown Bag Software, 960 F.2d at 1471*. No matter how much good faith Mr. McCollom might exercise, it is unrealistic to expect that his knowledge of Mikohn's secret technology would not or could not influence the nature of his advice to Acres. This is so whether the advice relates to a pending application or a future application. Under such circumstances, he and the Marger firm would be in precisely the same position in [*13] which ITC's patent lawyers found themselves in *Motorola*:

> [ITC's attorneys are] currently prosecuting applications relating to the very patents at issue in this litigation. Attorneys who were to view Motorola's voluminous confidential information and then later prosecute the patents would have to constantly challenge the origin of every idea, every spark of genius. This would be a sisyphean task, for as soon as one idea would be stamped "untainted", another would come to mind. The level of introspection that would be required is simply too much to expect, no matter how intelligent, dedicated, or ethical the [] attorneys may be.

*Motorola, Inc. v. Interdigital Technology Corp., 1994 U.S. Dist. LEXIS 20714* at *14-15. For these reasons the

court concludes that if the Marger firm were given access to Mikohn's confidential information, the risk is great that Acres would gain an unauthorized and unfair competitive advantage.

　　3　Acres urges the court to follow *In Re Sibia Neurosciences, Inc., 1997 U.S. App. LEXIS 31828, 1997 WL 688174 (Fed.Cir. 1997)*, which is also a patent infringement case, but one in which the Federal Circuit let stand a district court order permitting trial/patent prosecution counsel for Cadus Pharmaceutical Corporation to have access to Sibia's confidential information. Mikohn objects to Acres' reliance on *Sibia* on the ground that the Federal Circuit deemed its opinion unsuitable for publication. The court agrees. For this reason alone *Sibia* should not be considered.

　　Even if the court in *Sibia* had deemed its opinion suitable for publication, there is another reason why this court would be disinclined to follow it. The case was before the circuit court on a petition for a writ of mandamus, in support of which Sibia had the difficult burden of making a "clear and indisputable" showing that the district court had engaged in "a clear abuse of discretion or usurpation of judicial power." Mikohn's burden here is not so onerous; it need only demonstrate "good cause" for its proposed protective order.

[*14] Acres argues that by denying the Marger firm access to Mikohn's confidential information the court would undermine the firm's ability to provide effective representation. Whether that is so remains to be seen. Even if it were, the court finds that the potential harm to Mikohn from unauthorized disclosure of its confidential information would clearly outweigh the burden Acres will experience without the assistance of the Marger firm as litigation counsel. As previously noted, Acres has also retained the experienced patent law firm of Perkins Coie, which has been involved in this litigation from its inception. The court is satisfied that Perkins Coie is quite capable of effectively representing Acres in this case. Hence, it can scarcely be said that the court's decision deprives Acres of the ability to defend itself or to press its claims. Equally importantly, Acres will continue to have the valuable services of the Marger firm as patent prosecution counsel.

**ORDER**

Page 5

1998 U.S. Dist. LEXIS 22251, *14; 50 U.S.P.Q.2D (BNA) 1783

IT IS ORDERED that Acres' motion to compel (# 36) is granted to this extent: Mikohn shall respond to Acres' discovery requests not later than May 8, 1998. In all other respects the motion is denied.

IT IS FURTHER [*15] ORDERED that Mikohn's proposed protective order shall be the protective order that governs discovery in this case.

IT IS FURTHER ORDERED that Mikohn's Motion to Strike a Portion of Acres's Reply in Support of Motion to Compel; and for Sanctions (# 47) is granted to the extent that the court has placed no reliance on *In Re Sibia Neurosciences, Inc.*, 1997 WL 688174 (Fed.Cir. 1997). In all other respects the motion is denied.

IT IS FURTHER ORDERED that the following Discovery Plan and Scheduling Order shall govern these proceedings:

1. In addition to the discovery subjects listed in Mikohn's proposed discovery plan, discovery may also be conducted on all patent issues in this case.

2. The last day of discovery shall be February 15, 1999.

3. Experts and their reports shall be disclosed not later than November 13, 1998.

4. Rebuttal experts and their reports shall be disclosed not later than December 31, 1998.

5. Pleadings may be amended and parties added until November 13, 1998.

6. The interim status report shall be filed on December 11, 1998.

7. Dispositive motions shall be filed by April 30, 1999.

DATED this 15th day of April, 1998.

**LAWRENCE R. LEAVITT**

[*16]    **UNITED    STATES    MAGISTRATE JUDGE**

# EXHIBIT W

1 of 1 DOCUMENT

**PHOTOPROTECTIVE TECHNOLOGIES, INC., and JAMES M. GALLAS, Plaintiffs/Counter-Defendants, v. INSIGHT EQUITY A.P. X, LP, dba VISION-EASE LENS; INSIGHT EQUITY A.P. X COMPANY LLC; THOMAS JOSEPH MORAVEC; and HIDEYO SUGIMURA, Defendants/Counter-Plaintiffs.**

**CIVIL ACTION NO. SA-06-CA-1122 OG (NN)**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS, SAN ANTONIO DIVISION**

*2007 U.S. Dist. LEXIS 63265*

**August 27, 2007, Decided**
**August 27, 2007, Filed**

**COUNSEL:** [*1] For Photoprotective Technologies, Inc., James M. Gallas, Plaintiffs: Anastassios Triantaphyllis, LEAD ATTORNEY, Triantaphyllis Law Firm, Houston, TX.

For Insight Equity A.P.X, LP doing business as Vision-Ease Lens, Insight Equity A.P.X Company LLC, Thomas Joseph Moravec, Hideyo Sugimura, Defendants: Christopher C. Campbell, David M. Young, Patrick A. Doody, LEAD ATTORNEYS, Goodwin Procter LLP, Washington, DC; Robert L. Soza, LEAD ATTORNEY, Jackson Walker, San Antonio, TX; Julia Wommack Mann, Jackson Walker, L.L.P., San Antonio, TX.

For Gale R. Peterson, Neutral: Gale R. Peterson, LEAD ATTORNEY, Cox Smith Matthews Incorporated, San Antonio, TX.

For Hideyo Sugimura, Insight Equity A.P.X, LP, Insight Equity A.P.X Company LLC, Thomas Joseph Moravec, Counter Plaintiffs: Christopher C. Campbell, David M. Young, Patrick A. Doody, LEAD ATTORNEYS, Goodwin Procter LLP, Washington, DC; Robert L. Soza, LEAD ATTORNEY, Jackson Walker, San Antonio, TX; Julia Wommack Mann, LEAD ATTORNEY, Jackson Walker, L.L.P., San Antonio, TX.

For Photoprotective Technologies, Inc., James M. Gallas, Counter Defendants: Anastassios Triantaphyllis, LEAD ATTORNEY, Triantaphyllis Law Firm, Houston, TX.

**JUDGES:** NANCY STEIN NOWAK, [*2] UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** NANCY STEIN NOWAK

**OPINION**

**ORDER DENYING MOTION FOR PROTECTIVE ORDER**

This order addresses the motion for protective order filed by the defendants in this case. I have jurisdiction to enter this order under *28 U.S.C. § 636(b)* and the district court's order referring all pretrial matters to me for disposition by order or to aid the district court by recommendation where my authority as a magistrate judge is statutorily constrained. [1]

    1 Docket entry # 23.

This case involves a dispute between the plaintiffs--Photoprotective Technologies, Inc. and James M. Gallas--and the defendants--Insight Equity A.P. X dba Vision-Ease lens, Insight Equity A.P. X Company LLC, Thomas Joseph Moravec, and Hideyo Sugimura--involving patents for polarized sun lenses containing melanin. The parties on each side of this dispute have alleged that the other side has misused confidential trade-secret information in order to claim patent rights. The defendants have asked for a protective

Case 1:07-cv-00226-JJF    Document 57-6    Filed 01/09/2008    Page 9 of 18

Page 2
2007 U.S. Dist. LEXIS 63265, *2

order similar to the one provided for in the local rules for this district, but with an additional provision that would bar the attorneys with access to an adversary's confidential materials from engaging in patent [*3] prosecution on behalf of their clients in this case for two years following the conclusion of this litigation. [2] Specifically, the defendants ask for the inclusion of the following provision:

> Attorneys of record for the parties in this litigation and employees of such attorneys to whom it is necessary that the material be shown for purposes of this litigation; provided, however, that under no circumstances shall any person who accesses such material participate, during the course of this litigation and for a period of two years following the final resolution of the litigation, in patent application, prosecution, reexamination, or reissue activities relating to polarization and/or melanin on behalf of any of the parties to this litigation or any of the inventors of the patents-in-suit in this litigation. [3]

The defendants maintain that this "patent prosecution bar" is needed because of the risk of intentional, knowing misuse of confidential information obtained during discovery, and because a substantial risk exists that inadvertent and irreparable misuse of confidential information will take place. [4] The plaintiffs oppose this additional provision. [5]

2  Docket entry # 21.
3  Docket entry # [*4] 24, p. 5.
4  Docket entry # 21, p. 6.
5  *See* docket entry # 22.

Under *Rule 26* of the Rules of Civil Procedure, a party may obtain discovery of all information "reasonably calculated to lead to the discovery of admissible evidence." [6] A court, however, can issue a protective order directing that "a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a designated way. . . ." [7] When a party asks for such protection, the requesting party bears the burden of showing the necessity of the protective order. [8] Courts considering a "patent prosecution bar" provision focus on the factual

circumstances surrounding each individual attorney's activities, association and relationship with his client and the attorney's involvement in his client's "competitive decisionmaking." [9] The term "competitive decisionmaking" is "shorthand for a counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." [10] "Competitive decisionmaking" [*5] involves more than an attorney's "regular contact" with his client's corporate officials "who make 'policy,' or even competitive decisions, but 'advice and participation' in 'competitive decisionmaking.'" [11]

6  *FED. R. CIV. P. 26(b)(1).*
7  *FED. R. CIV. P. 26(c)(7).*
8  *See In re Terra Int'l, 134 F.3d 302, 306 (5th Cir. 1998)*
9  *See In re Sibia Neurosciences, No. 525, 1997 U.S. App. LEXIS 31828 , 1997 WL 688174, at *2 (Fed. Cir. Oct. 22, 1997)* (explaining the need to determine whether an attorney is involved in competitive decisionmaking in deciding whether a patent prosecution bar provision is appropriate). *Compare Avocent Redmond Corp. v. Rose Electronics, 242 F.R.D. 574, 579 (W.D. Wash. 2007)* (denying the defendants' request for a "patent prosecution bar" provision where the defendants argued that "patent prosecution activities are 'competitive decisionmaking' activities because the 'objective of such activities is the issuance of patents designed to enjoin [d]efendants' products from the marketplace'" but failed to present evidence that the attorney prosecuting the plaintiff's patents advised the plaintiff in its competitive decisionmaking) *with Motorola, Inc. v. Interdigital Tech. Corp., No. Civ.A. 93-488-LON, 1994 U.S. Dist. LEXIS 20714, 1994 WL 16189689, at *7 (D. Del. Dec. 19, 1994)* [*6] (focusing on the risk of inadvertent disclosure of the plaintiff's confidential information and prohibiting the defendant's attorneys who had received such information from prosecuting patent applications relating to the broad subject matter of the patents in suit until one year after the conclusion of the litigation).
10  *U.S. Steel Corp. v. United States, 730 F.2d 1465, 1468 n.3 (Fed. Cir. 1984).*

2007 U.S. Dist. LEXIS 63265, *6

11  *Matsushita Elec. Indus. Co. v. United States, 929 F.2d 1577, 1580 (Fed. Cir. 1991).*

In this case, the defendants have presented evidence that the plaintiffs' attorney has prosecuted patents on behalf of the plaintiffs over an 18-year time period. [12] Although some courts have equated patent prosecution with competitive decisionmaking, [13] such practice is not necessarily dispositive. Basing a "patent prosecution bar" solely on an attorney's practice of prosecuting patents on behalf of his client fails to consider the factual circumstances surrounding the attorney's activities, association and relationship with his client and the attorney's involvement in his client's competitive decisionmaking. [14] In this case, no evidence was presented concerning "counsel's advice and participation in any or [*7] all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." [15] Because the defendants have presented no evidence about the factual circumstances surrounding attorney activity, association or relationship, or about involvement in client competitive decisionmaking, I DENY the motion (docket entry # 22) subject to re-urging upon a more fully developed record.

12  Docket entry # 21, exh. A.

13  *See Infosint S.A. v. H. Lundbeck A.S., No. 06 Civ. 2869, 2007 Dist. LEXIS 36678 (D.N.Y. May 16, 2007).*

14  *See In re Sibia Neurosciences, No. 525, 1997 U.S. App. LEXIS 31828, 1997 WL 688174, at *3.*

15  *U.S. Steel Corp., 730 F.2d at 1468 n.3.*

**SIGNED** on August 27, 2007.

NANCY STEIN NOWAK

UNITED STATES MAGISTRATE JUDGE

# EXHIBIT X

LEXSEE 2006 U.S. DIST. LEXIS 32305

**SMARTSIGNAL CORPORATION, a Delaware Corporation, Plaintiff, v. EXPERT MICROSYSTEMS, INC., a California Corporation, Defendant.**

**Case No. 02 C 7682**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2006 U.S. Dist. LEXIS 32305*

**May 12, 2006, Decided**

**SUBSEQUENT HISTORY:** Motion to strike denied by *Smartsignal Corp. v. Expert Microsystems, Inc., 2006 U.S. Dist. LEXIS 32369 (N.D. Ill., May 12, 2006)*

**COUNSEL:** [*1] For SmartSignal Corp, a Delaware corporation, Plaintiff: Christine A Abuel, Mark Warren Hetzler, Edward Emmett Clair, Robert Matthew Pipke, Steven C. Schroer, Fitch, Even, Tabin & Flannery, Chicago, IL; Sarah M Walkington, Jenner & Block, LLC, Chicago, IL.

For Expert Microsystems, Inc., a California corporation, Defendant: Keith P. Schoeneberger, LeBoeuf, Lamb, Greene & MacRae LLP, Chicago, IL; Mark L. Pettinari, Lanahan & Reilley, LLP, San Francisco, CA; Pamela Winston Bertani, Weintraub, Genshlea and Sproul, Sacramento, CA.

For SmartSignal Corp, a Delaware corporation, Counter Defendant: Christine A Abuel, Mark Warren Hetzler, Edward Emmett Clair, Robert Matthew Pipke, Fitch, Even, Tabin & Flannery, Chicago, IL; Sarah M Walkington, Jenner & Block, LLC, Chicago, IL.

**JUDGES:** MARTIN C. ASHMAN, United States Magistrate Judge. Virginia M. Kendall, Judge.

**OPINION BY:** MARTIN C. ASHMAN

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Defendant, Expert Microsystems, Inc., moves this Court to modify the stipulated protective order that Defendant and Plaintiff, SmartSignal Corp., previously agreed to in February 2003. This matter comes before this Court pursuant to *28 U.S.C. § 636(b)(1)(A)* [*2] and *Local Rule 72.1.* For the reasons that follow, Defendant's motion is denied.

**I. Background**

**A. Parties**

Defendant is in the business of providing software and systems for monitoring and controlling performance critical assets and related consulting services. Plaintiff is a company that provides methods and systems for monitoring and controlling equipment and systems, as well as related consulting services, and is a competitor to Defendant. The case at bar involves claims of patent infringement based on Defendant's use of the multivariate state estimation technique ("MSET") technology. (Def.'s Br., Bickford Decl., PP4-6.)

Venture Gain LLC is a small start-up company that focuses exclusively on the life science market. Venture Gain is a licensee of Plaintiff in the life science field. While there is no overlapping ownership, employees, or customers between Venture Gain and Plaintiff, Plaintiff's former CEO is now Venture Gain's CEO, Plaintiff's former Chief Scientist is now Venture Gain's Chief Scientist, and Mr. R. Matthew Pipke, Plaintiff's former Vice President of Technology, is now Venture Gain's Chief Technology Officer. Pipke is also a named inventor on several [*3] patents and applications assigned to Plaintiff. (Pl.'s Resp., Pipke Decl., PP6-7, 10-12.)

Mr. Mark Hetzler works at the law firm Fitch, Even, Tabin & Flannery ("FET&F") and represents Plaintiff in litigation against Defendant, including in the instant case, while simultaneously acting as patent prosecution counsel to Plaintiff for patent applications that involve technology similar to the technology at issue in this case. (Def.'s Br. at 9; Pl.'s Resp., Hetzler Decl., PP2, 15.)

**B. Procedural Background**

Plaintiff brought this action on October 25, 2002, against Defendant for infringement of *U.S. Patent No. 4,937,763* ("the *'763 patent*"). At the outset of litigation, on February 11, 2003, the parties entered into a stipulated protective order which simply stated that all confidential information designated under the protective order shall be used only for the purpose of preparing for and conducting this action (including appeals) and not for any business, research, development, or other purpose whatsoever. (Stipulated Protective Order, Docket Nos. 14-15.) The parties engaged in discovery until this case was stayed on August 15, 2003, due to Defendant's request for reexamination [*4] of the *'763 patent*. (Docket No. 19.) On January 27, 2005, this action was reinstated and the stay was lifted. (Docket No. 20.)

On January 3, 2006, Defendant moved this Court to modify the stipulated protective order in order to prohibit Pipke from access to confidential information produced by Defendant and to prohibit any attorney, including Hetzler, representing Plaintiff and having access to confidential information produced by Defendant from continuing to prosecute patent applications on behalf of Plaintiff or Venture Gain for the duration of this litigation, including all appeal periods, and for two years thereafter. (Def.'s Br. at 2.) Defendant argues that modification of the stipulated protective order is appropriate because Pipke and Hetzler are competitive decision-makers for Plaintiff, as (1) Pipke was Plaintiff's Vice President of Technology, is a named inventor on Plaintiff's patents, and is currently the Chief Technology Officer for Venture Gain, and (2) Hetzler prosecutes patent applications for Plaintiff, including those wherein Pipke is a named inventor. (Def.'s Br. at 11.) According to Defendant, unless the stipulated protective order is modified, disclosure during [*5] discovery of confidential information will be prejudicial to Defendant.

**II. Discussion**

**A. Modification Requires Good Cause.**

Under *Rule 26(c) of the Federal Rules of Civil Procedure*, a court may enter a protective order for good cause shown to protect a party from annoyance, oppression, undue burden or expense. *Fed. R. Civ. P. 26(c)*. Just as good cause is required to enter a protective order, good cause is required to modify a protective order. *Murata Mfg. Co. v. Bel Fuse, Inc., 234 F.R.D. 175, 179 (N.D. Ill. 2006)*. It is the burden of the party seeking to modify the protective order to demonstrate good cause. *Id.* This burden is especially high where a protective order is agreed to by the parties before its presentation to the court. *Am. Tel. & Tel. Co. v. Grady, 594 F.2d 594, 597 (7th Cir. 1978)*. When deciding whether to modify a protective order, courts consider the nature of the protective order, foreseeability at the time of issuance of the modification requested, parties' reliance on the order, and whether good cause exists for the modification. [*6] *Murata Mfg. Co., 234 F.R.D. at 179.*

In this case, the parties entered into a blanket protective order, which permits the parties to protect selected documents that they believe in good faith contain trade secrets and confidential commercial information. *Id.* Blanket protective orders are routinely entered into by parties in commercial litigation, especially in cases between competitors. Such orders are more difficult to modify when the parties have stipulated to them. *Am. Tel. & Tel. Co., 594 F.2d at 597*, especially where the proposed modification relates to a matter that was foreseeable at the time of the parties' original agreement. *Murata Mfg. Co., 234 F.R.D. at 180; Viskase Corp. v. W.R. Grace & Co., 1992 U.S. Dist. LEXIS 619, No. 90 C 7515, 1992 WL 13679, at *4 (N.D. Ill. Jan. 24, 1992.)* It follows that Defendant must make a strong showing of good cause before this Court will modify the stipulated protective order. The Court also notes that, in this case, Defendant's proposed modification would ultimately deny Plaintiff the counsel of its choosing, which is disfavored in our judicial system and requires a strong showing in and of itself. [*7] *Cummins-Allison Corp. v. Glory Ltd., No. 02 C 7008, 2003 U.S. Dist. LEXIS 23653, at *29-30 (N.D. Ill. Jan. 2, 2004)* citing *Owen v. Wangerin, 985 F.2d 312, 317 (7th Cir. 1993).*

**B. Defendant's Motion is Untimely.**

As an initial matter, the Court finds that Defendant's motion is untimely as (1) Defendant knew of Hetzler and FET&F's involvement with the underlying patent in this case as early as June 2000 but failed to raise the issue

2006 U.S. Dist. LEXIS 32305, *7

before stipulating to the protective order and then waited another three years to object, and (2) despite the fact that Defendant knew of Plaintiff's intention to go forward with Pipke as counsel, Defendant unreasonably waited several months before filing its motion. It follows that the doctrines of laches, equitable estoppel, and waiver operate to bar Defendant's motion.

1. Hetzlerand FET&F

Defendant had actual knowledge of Hetzler's role as patent attorney for Plaintiff as early as June 2000. Hetzler's law firm, FET&F, has counseled Plaintiff in its patent matters since 1999. (Pl.'s Sur-Reply, Hetzler Decl., P4.) On June 20, 2000, Hetzler filed a Petition to Accent Unintentionally Delayed Payment of Maintenance [*8] Fee with the U.S. Patent and Trademark Office on behalf of Plaintiff to reinstate the '763 patent. (Id., Ex. A.) This petition is a matter of public record, see 37 C.F.R. § 1.11, and lists both Hetzler and FET&F as the "payor" on its face. (Pl.'s Sur-Reply, Hetzler Decl., Ex. A.) Defendant had possession of this petition, as well as the accompanying letter that Hetzler submitted with the petition, prior to executing the stipulated protective order on February 5, 2003. (Id. P7.) The letter that Hetzler submitted with the petition was entitled "Petition to Accept Unintentionally Delayed Payment of Maintenance Fee (37 C.F.R. § 1.378(c))" and in it Hetzler explained that "delay in paying the maintenance fee for this patent was unintentional." (Id., Ex. A, EM 0114-0115.) Significantly, Defendant directly referenced Hetzler's petition and letter in its first set of interrogatories (sent to Mr. Hetzler) on January 24, 2003. (Id., Ex. B.) Interrogatory No. 29 of Defendant's first set of interrogatories reads: "State all facts that support the statement that the delay in paying the second maintenance fee for the '763 patent was 'unintentional,' within the meaning [*9] of 37 C.F.R. 1.137(b) and 1.378(c)." (Id.)

Defendant also had knowledge of FET&F's patent prosecution work for Plaintiff with regards to at least seven other patents filed in 2001 and 2002, in which the named inventor appoints "the practitioners associated with [the FET&F] Customer Number 22242 with full power of attorney" and requests that all correspondence be sent to FET&F. (Id., Ex. E.) While Defendant suggests that the public record for these patents only referenced attorney Perry J. Hoffman of the law firm Michael Best & Friedrich LLP, (Def.'s Reply at 5-7), Hoffman worked

for FET&F until 2002 and, in February 2003, public records still listed FET&F (including Hetzler) as having powers of attorney on Plaintiff's prosecution files. (Pl.'s Sur-Reply, Hetzler Decl., P11.) In short, the public record is replete with evidence of FET&F's work on behalf of Plaintiff well before the parties executed the stipulated protective order. Thus, Hetzler and FET&F's involvement in this case had been foreseeable for some time when the parties entered into the February 2003 stipulated protective order.

2. Pipke

Defendant learned of Pipke's [*10] role in June 2005, yet chose not to act until January 2006. On May 31, 2005, Hetzler, in his capacity as litigation counsel for Plaintiff, advised counsel for Defendant that Pipke was no longer employed as Plaintiff's Vice President of Technology but had rejoined FET&F on January 1, 2005, and would be filing an appearance in this action to serve as Plaintiff's outside counsel. (Pl's Resp., Hetzler Decl., P4 and Ex. A.) Pipke filed his appearance on June 1, 2005. (Docket No. 27.) Counsel for Defendant expressed concerns regarding a potential conflict due to Pipke's dual roles as a shareholder of Plaintiff and outside counsel for Plaintiff. Plaintiff agreed to deny Pipke access to Defendant's documents designated "confidential - attorneys' eyes only" in order to allow Defendant to follow up on its concerns. (Pl.'s Resp., Hetzler Decl., P5 and Ex. B.) On July 19, 2005, Hetzler informed Counsel for Defendant that, after investigating the issue, he saw no reason to restrict Pipke's access to "confidential - attorneys' eyes only" documents. (Id. P6 and Ex. C.) Counsel for Defendant reiterated her objections to Pipke's access to documents and raised Pipke's position with Venture Gain as an [*11] additional reason for barring him access to confidential materials. (Id. P7 and Ex. D.) In a July 22, 2005 letter, Hetzler argued that there was no competition between Venture Gain and Defendant. (Id. P8 and Ex. E.)

Defendant hired new counsel in August 2005, (Docket No. 30), but the dispute over Pipke's participation continued. A letter sent by Plaintiff on August 19, 2005, made clear that, unless Defendant filed a motion to modify the protective order, Plaintiff intended to grant Pipke access to confidential materials beginning on August 24, 2005. (Id. P10 and Ex. G.) Defendant responded on August 23, 2005, with a letter objecting to Pipke's access to confidential materials, as

well as Hetzler's role in prosecuting patent applications for Plaintiff. (Id., Ex. H.) The August 23, 2005 letter also questioned why FET&F should not be disqualified from representing Plaintiff and stated:

> Please provide us with your response no later than the close of business on Monday, August 29, 2005, so that we may consider your position before filing a motion to disqualify with the Court. As noted above, we intend to seek protection from the Court regarding your intention to provide Mr. Pipke [*12] with access to confidential and proprietary documents and information produced to SmartSignal's counsel in this litigation. However, we strenuously object to your unilateral dictating when the motion must be filed. We expect to file this motion no later than Friday, September 2, 2005 ....

(Id.) On August 25, 2005, Plaintiffs' counsel responded to the August 23, 2005 letter, dismissing Defendant's objections and restating Plaintiffs' intention of going forward with Pipke and Hetzler as their litigation counsel in this matter. (Id. P12 and Ex. I.)

Defendant did not file a motion on September 2, 2005. Plaintiff waited six weeks and then, beginning on October 13, 2005, moved forward with Pipke as its counsel. (Id. P14.) Several months later, on January 3, 2006, Defendant moved this Court to modify the stipulated protective order to prevent Pipke from accessing Defendant's confidential information. [1]

> 1    Defendant suggests that it filed this same motion on December 12, 2005, when it raised similar complaints about the involvement of Pipke and Hetzler in a separate lawsuit between Plaintiff and Defendant's President, Randall L. Bickford. The Court is not persuaded by motions filed in other cases, as (1) those motions are not before this Court, (2) there are differences between the two cases, and (3) Defendant's objection to Pipke and Hetzler in a separate case does not necessarily mean that Defendant objects to their participation in the case at bar. The Court does note, however, that December 12, 2005, is still several months after September 2, 2005, and only a few weeks before January 3, 2006.

[*13] 3. Laches, Estoppel, and Waiver Bar Modification

The doctrines of laches, equitable estoppel and waiver weigh heavily against granting Defendant's motion. "Laches addresses delay in the pursuit of a right when a party must assert that right in order to benefit from it." *Hot Wax, Inc. v. Turtle Wax, Inc., 191 F.3d 813, 820 (7th Cir. 1999).* For laches to apply. Plaintiff must show that Defendant demonstrated an unreasonable lack of diligence by not filing its motion sooner and that Plaintiff was prejudiced as a result. *Id.; Helene Curtis Indus., Inc. v. Church & Dwight Co., 560 F.2d 1325, 1334 (7th Cir. 1977)* cert den., *434 U.S. 1070, 98 S. Ct. 1252, 55 L. Ed. 2d 772 (1978).* To establish equitable estoppel Plaintiff must show that Defendant made misrepresentations upon which Plaintiff relied to its detriment. *Lewis v. Washington, 300 F.3d 829, 834 (7th Cir. 2002).* Finally, waiver occurs when a defendant manifests an intention or expressly declines to assert a right. *United States v. Woods, 301 F.3d 556, 560 (7th Cir. 2002).* Delay may constitute an effective waiver of a party's objection to an alleged conflict of interest. *See First Nat'l Bank of Elgin v. St. Charles Nat'l Bank, 152 Ill. App. 3d 923, 504 N.E.2d 1257, 1264, 105 Ill. Dec. 739 (Ill. App. Ct. 1987);* [*14] *Tanner v. Bd. of Trs. of Univ. of Illinois, 121 Ill. App. 3d 139, 459 N.E.2d 324, 329, 76 Ill. Dec. 687 (Ill. App. Ct. 1984),* appeal denied.

In this case, Defendant knew about Hetzler's patent work for years and Pipke's role as outside counsel for six months before filings its motion. Because Plaintiff reasonably interpreted Defendant's decision not to act as acquiescing to Hetzler and Pipke's participation in this case, and because Plaintiff relied heavily on Hetzler and Pipke to prepare its case over the last several months and years, laches applies. Similarly, given the clear and unequivocal disagreement between Defendant and Plaintiff regarding the appropriateness of Pipke's representation, Defendant's failure to act on its threat to file a motion "no later than Friday, September 2, 2005" could reasonably be interpreted by Plaintiff as a decision to drop its objections and reluctantly permit Pipke to participate in this case. Plaintiff relied on that representation when it began educating and relying upon Pipke in October 2005 and, under the principles of equitable estoppel, it is too late for Defendant to object now. Finally, Defendant's three-year delay in objecting to Hetzler and its six-month delay [*15] in objecting to Pipke constitutes waiver of its conflict of interest argument. *See In re Possession and Control of the*

*Comm'r of Banks and Real Estate of Indep. Trust Corp.,* 327 Ill. App. 3d 441, 764 N.E.2d 66, 99-100, 261 Ill. Dec. 775 (Ill. App. Ct. 2001) (finding objection to attorney conflict waived after seven-month delay); *First Nat'l Bank of Elgin,* 504 N.E.2d at 1264 (finding objection to attorney conflict waived after fifteen-month delay); *Tanner,* 459 N.E.2d at 329 (finding objection to attorney conflict waived after nine-month delay). *Compare to Cummins-Allison Corp., 2003 U.S. Dist. LEXIS 23653, at *12-13* (The court would be more receptive to waiver argument if movant had waited one year, and not just a few weeks, before filing motion to modify stipulated protective order.).

Plaintiff relied on Defendant's lack of action to its detriment. Since February 2003 and October 2005, respectively, Plaintiff has invested time and money so that Hetzler and Pipke could acquire the technical knowledge required to enforce the '763 patent and prepare this case for trial and Plaintiff would be prejudiced if it had to start over and train new attorneys at this [*16] time. For these reasons, Defendant waited too long to file its motion to modify the stipulated protective order.

**C. Even If Defendant's Motion Was Not Time Barred, Defendant Fails to Establish Good Cause For Modifying the Protective Order.**

Defendant argues that good cause exists to modify the stipulated protective order because in February 2003 it was unforeseeable that Plaintiff would hire two competitive decision-makers as outside counsel. Plaintiff argues that neither Hetzler, nor Pipke, is a competitive decision-maker in this case.

When evaluating whether an attorney should have access to confidential materials, a court should balance the risk of inadvertent disclosure of trade secrets to competitors against the risk of impairing the process of litigation by denying access. *Interactive Coupon Mktg. Group, Inc. v. H.O.T. Coupons, LLC, 1999 U.S. Dist. LEXIS 12437, No. 98 C 7408, 1999 WL 618969, at *2 (N.D. Ill. Aug. 9, 1999)* (internal quotations omitted). Risk of inadvertent disclosure of trade secrets exists where the factual circumstances show that an attorney acts as a competitive decision-maker. *U.S. Steel Corp. v. United States, 730 F.2d 1465, 1468 (Fed. Cir. 1984).* [*17] Competitive decision-making refers to an attorney's activities, association, and relationship with a client that are such as to involve attorney's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor. *Id. See also Matsushita Elec. Indus. Co., Ltd. v. United States, 929 F.2d 1577, 1580 (Fed. Cir. 1991)* (The standard is not regular contact with other corporate officials who make policy or even competitive decisions.). Because a factual inquiry is required, the denial or grant of access cannot rest on a general assumption that one group of lawyers is more likely or less likely to inadvertently breach its duty under a protective order. *U.S. Steel, 730 F.2d at 1468.* Rather, the decision to deny access to discovered materials shall be done on a case-by-case and lawyer-by-lawyer basis. *AFP Advanced Food Prods. LLC v. Snyder's of Hanover Mfg., Inc., 2006 U.S. Dist. LEXIS 426, No. 05-3006, 2006 WL 47374, at *2 (E.D. Pa. Jan. 6, 2006).*

1. Hetzler and FET&F

Defendant argues that Hetzler and his firm FET&F should be denied access to confidential materials [*18] because Hetzler acts as patent prosecution counsel to Plaintiff for patent applications involving technology similar to the confidential information disclosed by Defendant in this case. (Def.'s Br. at 8-9.) [2] In making this argument, Defendant relies on a few lower court decisions that denied access to patent attorneys based on the assumption that patent attorneys exposed to competitor's confidential information will have to constantly challenge the origin of every idea and every spark of genius when shaping a patent application, and will inevitably disclose confidential information at some point. *Interactive Coupon, 1999 U.S. Dist. LEXIS 12437, [WL] at *3; Motorola, Inc. v. Interdigital Tech. Corp., No. 03-488-LON, 1994 U.S. Dist. LEXIS 20714, at *15 (D. Del. Dec. 19, 1994). See also Cummins-Allison Corp., 2003 U.S. Dist. LEXIS 23653, at *23-27* (supporting these arguments but finding that they did not operate to bar attorneys at issue from receiving confidential information). These courts conclude that the level of introspection required to avoid inadvertent disclosure is simply too much to expect, no matter how intelligent, dedicated, or ethical [*19] the patent attorneys may be. *Motorola, Inc., 1994 U.S. Dist. LEXIS 20714, at *15. See also Cummins-Allison Corp., 2003 U.S. Dist. LEXIS 23653, at *22-24.*

> 2    Defendant claims that it has done extensive research into prediction model methods of many

types and holds trade secret technology and know-how into their formulation, calibration, and use that would be valuable and directly applicable to improving the prediction model methods used by Plaintiff and Venture Gain. Furthermore, Defendant claims to have an extensive body of related technology that enables the most effective use of prediction model technology for monitoring and controlling equipment and systems--a core business of Plaintiff--and also claims to be developing applications for its technologies in the infrastructure security information management and medical fields that overlap the business interests of Venture Gain. (Def.'s Br. at 7-8.)

Defendant's argument and case law in effect advocate a per se rule that denies [*20] patent attorneys access to confidential information and is inconsistent with Federal Circuit precedent. Despite the concerns raised in Defendant's cases, the Federal Circuit clearly requires an individualized factual showing of competitive decision-making before denying access to an attorney. *U.S. Steel, 730 F.2d at 1468. See also In re Sibia Neurosciences, Inc., Docket No. 525, 1997 U.S. App. Lexis 31828, at *7-9 (Fed. Cir. Oct. 22, 1997)* (unpublished). In *In re Sibia,* an unpublished case but one that offers valuable insight into the Federal Circuit's application of competitive decision-making to patent prosecution, the defendant's outside counsel represented the defendant in patent prosecution work and had represented more than fifty clients on biotechnology matters, including the area involved in the underlying action. *1997 U.S. App. LEXIS 31828 at *7.* Nevertheless, the Federal Circuit held that "denying access to [the defendant's] outside counsel on the ground that they also prosecute patents for [the defendant] is the type of generalization counseled against in U.S. Steel. The facts, not the category, must inform the result." *Id.* The *In re Sibia* [*21] Court then reiterated that, under *U.S. Steel,* each case must be decided based on the specific facts involved therein. Id. See also *Trading Techs. Int'l, Inc. v. eSpeed. Inc., 2004 U.S. Dist. LEXIS 19429, No. 04 C 5312, 2004 WL 2534389, at *1 (N.D. Ill. Sept. 24, 2004)* (rejecting per se rule denying access to patent attorneys based on *U.S. Steel and In re Sibia), MedImmune, Inc. v. Centocor, Inc., 271 F. Supp. 2d 762, 774 n.13 (D. Md. 2003)* ("If shaping patent applications amounts to competitive decision-making, the Court has trouble imagining a patent prosecutor who would not meet that standard.").

Persuaded by the reasoning in *In re Sibia,* the Court adopts that interpretation of competitive decision-making in the patent prosecution context and will not deny an attorney access to information without good cause based on the facts of the case. Thus far, there is no reason for the Court to believe that either Hetzler or FET&F will not strictly follow the stipulated protective order and refrain from using, either inadvertently or intentionally, Defendant's confidential information. Furthermore barring Hetzler or FET&F from prosecuting similar patents for two years [*22] following this suit, without some tangible reason or good cause other than the general threat of inadvertent misuse of discovered materials, is the exact type of overly broad and generalized fear rejected by the Federal Circuit in *U.S. Steel* and *In re Sibia.*

### 2. Pipke

Defendant argues that Pipke is a competitive decision-maker because he serves as Venture Gain's Chief Technology Officer and is a named inventor on several patents and applications assigned to Plaintiff. Defendant concludes that Pipke should be denied access to Defendant's confidential information. Plaintiff argues that Venture Gain is not a competitor of Defendant and Pipke is not a competitive decision-maker.

a. Defendant fails to show that Venture Gain is a competitor.

Defendant argues that Venture Gain is a competitor because (1) like Defendant, Venture Gain (according to its website) has business interests and applications in the areas of infrastructures security information management, (2) Venture Gain uses the same types of applications and technologies as Plaintiff (including Plaintiff's Similarity Based Modeling (SBM) technology), and (3) three of Plaintiff's former top executives formed and manage [*23] Venture Gain. (Def.'s Br. at 6-7.)

Defendant's only evidence of actual competition between itself and Venture Gain is text taken from Venture Gain's website. In paragraph 8 of his declaration, Pipke, in his capacity as Chief Technology Officer of Venture Gain, states that Venture Gain's website was developed before the founders of Venture Gain decided what business to pursue and therefore lists various areas or markets that Venture Gain might potentially entertain,

including genomics and pharmaceuticals, medical patient monitoring, infrastructure security information management, business intelligence, and process optimization. (Pl.'s Resp., Pipke Decl., P8.) Pipke goes on to explain that (1) Venture Gain's business activities have always been, since its inception and currently remain, exclusively in the life science area, (2) Venture Gain licensed the SBM technology for use only in the life science market and would be in breach of its license if it were to use SBM in any other market, and (3) Venture Gain's use of SBM technology and its business generally are directed outside of the equipment monitoring markets, precisely to avoid being competitive with Plaintiff (and concomitantly, [*24] with Defendant). (Id. PP7-8; Pl.'s Resp. at 14-15.) At oral argument, Defendant admitted that it did not know what "life science" includes and that it does not have a strong understanding of Venture Gain's business activities. These admissions, combined with the lack of evidence of competition between Defendant and Venture Gain, support the Court's opinion that Venture Gain's managers and officers more accurately describe Venture Gain's business activities than does Defendant, and that Venture Gain is not competing for business or clients with Defendant.

Defendant suggests that it does not matter whether it competes with Venture Gain for business because the companies use the same technology (i.e., the '763 patent) and therefore compete in the same market as far as technology is concerned. The Court disagrees. Just because Venture Gain has a license to use Plaintiff's patent does not mean that Venture Gain is in competition with every party that challenges that patent. Furthermore, even if technological advances related to the '763 patent help Venture Gain, Venture Gain has explicitly renounced any uses of the patent that would compete with Defendant. As Venture Gain is not a party [*25] to this lawsuit and does not have overlapping business interests with Defendant, its mere use of SBM technology and the '763 patent is not enough to make it a competitor

of Defendant as it pertains to Defendant's motion.

b. Pipke's former employment

Neither Pipke's former employment with Plaintiff, nor his status as a passive shareholder of Plaintiff, makes him a competitive decision-maker, as Defendant presents no evidence that Pipke exercises any control over Plaintiff or is involved in Plaintiff's business decisions. (Pl.'s Resp., Pipke Decl., PP4-5.)

**D. Protective Orders In Other Cases Are Not Relevant.**

Finally, the Court is not persuaded by Defendant's references to a protective order in the case of *SmartSignal Corp. v. Randall L. Bickford, Expert Microsystems, Inc., Guardian Estate Invs., LLC, and Intellectual Assets, LLC,* Civil Action No. 05 C 4608 (N.D. Ill.) (The "Bickford Case"). It appears that the protective order in the Bickford Case, entered on January 3, 2006, put restrictions on Hetzler and Pipke's access to confidential information for the duration of jurisdictional discovery but is to be reconsidered if federal jurisdiction is found to exist. (The [*26] Bickford Case, Docket No. 44.) Given its narrow focus, the protective order in the Bickford Case does not help to resolve the dispute now before the Court.

**III. Conclusion**

For the reasons stated above, Defendant's motion to modify the stipulated protective order is denied.

**ENTER ORDER:**

**MARTIN C. ASHMAN**

United States Magistrate Judge

Dated: May 12, 2006.

# EXHIBIT Y

LEXSEE 2005 U.S DIST. LEXIS 40601

**PERGO, INC., et al., Plaintiffs v. FAUS GROUP, INC. et al., Defendants**

**NO. 5:05-CV-50-FL(1)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NORTH CAROLINA, WESTERN DIVISION**

*2005 U.S. Dist. LEXIS 40601*

**September 20, 2005, Decided**
**September 20, 2005, Filed**

**SUBSEQUENT HISTORY:** Injunction denied by *Pergo, Inc. v. Faus Group, Inc., 401 F. Supp. 2d 515, 2005 U.S. Dist. LEXIS 28444 (E.D.N.C., 2005)*

**COUNSEL:** [*1] For Pergo, Inc., Plaintiff: Hayden J. Silver, III, Kilpatrick Stockton, Raleigh, NC; W. Swain Wood, Wood & Co. LLP, Raleigh, NC

For Pergo (Europe) AB, Plaintiff: Hayden J. Silver, III, Kilpatrick Stockton, Raleigh, NC; W. Swain Wood, Wood & Co. LLP, Raleigh, NC

For Faus Group, Inc., Defendant: Lee M. Whitman, Wyrick, Robbins, Yates & Ponton, LLP, Raleigh, NC

For Industrias Auxiliares Faus S.L., Defendant: Lee M. Whitman, Wyrick, Robbins, Yates & Ponton, LLP, Raleigh, NC

For Faus Group, Inc., Counter Claimant: Lee M. Whitman, Wyrick, Robbins, Yates & Ponton, LLP, Raleigh, NC

For Industrias Auxiliares Faus S.L., Counter Claimant: Lee M. Whitman, Wyrick, Robbins, Yates & Ponton, LLP, Raleigh, NC

For Pergo, Inc., Counter Defendant: Hayden J. Silver, III, Kilpatrick Stockton, Raleigh, NC; W. Swain Wood, Wood & Co. LLP, Raleigh, NC

For Pergo (Europe) AB, Counter Defendant: Hayden J. Silver, III, Kilpatrick Stockton, Raleigh, NC; W. Swain Wood, Wood & Co. LLP, Raleigh, NC

**JUDGES:** LOUISE W. FLANAGAN, Chief United States District Court Judge

**OPINION BY:** LOUISE W. FLANAGAN

**OPINION**

ORDER

This case comes before the court on defendants' motion to amend the protective order, [*2] filed September 7, 2005. Plaintiffs have responded to the motion, and in this posture the issues raised are ripe for ruling. For the reasons set forth below, defendants' motion to amend the protective order is denied.

STATEMENT OF THE CASE

A number of disputes concerning substantive and procedural issues already have arisen at this relatively early stage of the litigation. Many submissions have been placed on the record by the parties, and several orders entered by the court in preface to its consideration of the motion for preliminary injunction, scheduled now for hearing Friday. The court finds it useful at this juncture, and in advance of that hearing, to set forth in catalogue style a comprehensive statement of this case.

Plaintiffs initiated this action by complaint filed January 24, 2005, alleging patent and copyright infringement by defendants' FasTrim product. On May 5, 2005, plaintiffs filed a motion for preliminary injunction. On the same date, plaintiffs also moved for leave to file under seal documents in support of their motion for preliminary injunction. On May 23, 2005, this court denied without prejudice the motion for leave to file

under seal, and directed the parties [*3] to submit a consent proposed protective order in keeping with the requirements of Fourth Circuit authority and this court's practice.

On June 3, 2005, the parties filed a joint consent motion to allow limited expedited discovery on the issues relevant to the motion for preliminary injunction, and to extend time for defendants to respond to the motion for preliminary injunction. On June 7, 2005, the parties filed, as directed, a proposed consent protective order complying with the court's requirements. On June 9, 2005, the parties filed their joint report and proposed discovery plan, pursuant to *Fed.R.Civ.P. 26(f).*

On June 13, 2005, the undersigned granted the parties' joint motion for limited expedited discovery and for extension of time. The order provided, *inter alia,* that plaintiffs would provide responses to defendants' first set of expedited interrogatories and requests for production on or about June 8, 2005; that defendants would subsequently conduct a one-day deposition of Bengt Lundgren, Vice-President for Business Development and Product Development for plaintiff Pergo; that defendants would then file and serve upon plaintiffs' [*4] counsel their response to the motion for preliminary injunction; and that plaintiffs would then begin conducting depositions of those persons who submitted declarations in support of defendants' response to the motion for preliminary injunction. The order directed that discovery and briefing on the motion for preliminary injunction would conclude by July 25, 2005. The court also adopted the parties' proposed protective order.

On June 22, 2005, the court entered a case management order, acknowledging its earlier deadline for expedited discovery on the motion for preliminary injunction. The court also held therein that it would address remaining discovery deadlines and case management limitations subsequent to the resolution of the pending motion for preliminary injunction. The case management order also set forth this court's directives for motions and discovery practice, including the procedure to be followed in the event of discovery disputes.

Pursuant to that order, any motion to compel discovery is to be filed and served within thirty (30) days of the act or omission in discovery complained of, after good faith effort to resolve the matter, unless the time for filing such a motion [*5] is extended for good cause shown. The court in its order also directed that in addition

to briefing on the motion for preliminary injunction, both parties were to submit to the court proposed findings of fact and conclusions of law bearing on the preliminary injunction determination by July 25, 2005.

On June 24, 2005, defendants filed their response to the motion for preliminary injunction. On July 25, 2005, plaintiffs filed their reply. On August 1, 2005, defendants filed a document styled a "Supplemental Paper Pursuant to the Case Management Order." In the document, defendants argue that the court's order appeared to hold out the possibility of additional briefing and process on the issue of patent claims construction. Defendants sought such additional process. Defendants also argued that plaintiffs had raised new arguments in their reply brief.

Plaintiffs, in filing made August 3, 2005, opposed any further briefing and process on the issue of claims construction. Although defendants had not specified in their supplemental paper what additional discovery measures they were seeking, plaintiffs included in their response a copy of correspondence from defense counsel, indicating that [*6] defendants were seeking to conduct additional depositions, leave to file a surreply, and leave to file amended proposed findings of fact and conclusions of law.

The court conducted a telephonic conference with counsel on August 5, 2005. After considering the arguments raised, the court by order entered August 9, 2005, denied defendants' request for additional depositions and for leave to file a surreply. The court granted, however, defendants' request for leave to file amended proposed findings of fact and conclusions of law. The court also calendared this matter for a tutorial on the patented and allegedly infringing products at issue in this case, and for hearing on the motion for preliminary injunction.

On August 16, 2005, plaintiffs filed a consent motion for extension of time, in which plaintiffs sought to extend the time in which to file a motion to compel discovery, limited by the case management order to thirty (30) days from the date of the complained of act or omissions. In the motion, plaintiffs note that they served their first requests for production of documents on June 16, 2005. Pursuant to the case management order, defendants had thirty (30) days to respond to the [*7] requests, and plaintiffs then had thirty (30) days, or until August 17, 2005, to move to compel discovery. Plaintiffs indicated

that the parties were attempting to resolve the discovery difficulties without court intervention, and requested an additional thirty (30) days, or until September 16, 2005, in which to file a motion to compel if necessary. The court granted the motion by order entered August 24, 2005.

On September 1, 2005, upon request of the parties and pursuant to the discovery dispute resolution process set forth in its comprehensive case management order, the court conducted a telephonic conference regarding plaintiffs' objection to defendants' proposed submission of certain documents. Plaintiffs complained that defendants had delayed production of documents in question, and ultimately produce them subject to restrictions introduced then that would prevent plaintiffs' lead trial counsel, Thomas Pavelko, from having access to the documents.

The court determined during the course of the conference that the issue at hand was not susceptible to resolution without written briefing. Defendants filed the instant motion to amend the protective order on September 7, 2005. Plaintiffs [*8] filed their response to the motion on September 12, 2005. Hurricane conditions at or around the time set for hearing on the motion for preliminary injunction necessitated continuance of the tutorial and hearing to Friday, September 23, 2005

STATEMENT OF FACTS

As noted above, the parties submitted and this court approved an agreed upon protective order. Under the terms of this order, there are three levels of restricted information: (1) Highly Confidential & Attorneys' Eyes Only, (2) Highly Confidential, and (3) Confidential. Even under the most restrictive of these categories, Highly Confidential and Attorneys' Eyes Only, information so designated can be disclosed to outside counsel for any party to this action and any attorneys performing duties in connection with the prosecution or defense of this action. See Order (DE # 25) at 7 P 6(b).

Defendants assert that at time of submission of this agreed upon form of order, defendants felt it appropriate that Highly Confidential & Attorneys' Eyes Only documents and information should not be shared with attorneys who are, or will be, prosecuting patents for plaintiffs or other clients in the laminated wood flooring industry. [*9] Id. at 17 P 23. Plaintiffs disagreed, and defendants agreed to the protective order without this

provision, with the stated intent of seeking modification of the protective order "as soon as practicable." Id. at 18. The issue, expressly raised during preparation for the pending hearing on motion for preliminary injunction, is now before this court.

As part of plaintiffs' first set of requests for production of documents, plaintiffs requested all patent applications referring or relating to FasTrim, defendants' allegedly infringing product. Although defendants objected to the request, they agreed to produce documents responsive to the request that were not objectionable. Defendants did not raise, as grounds for the objection, any argument that the material requested should not be presented to any plaintiffs' counsel who also prosecuted patents on behalf of plaintiff or other clients.

Defendants did, eventually, produce a patent application relating to Fas Trim -- defendants' '029 patent application. According to plaintiffs, defendants did not produce the application on July 18, 2005, when responses to plaintiffs' first set of requests were due. In fact, defendants [*10] failed to disclose the existence of the '029 application until August 10, 2005, and failed to produce the application until August 31, 2005.

Defendants produced the application on condition that Thomas Pavelko, plaintiffs' lead counsel, and any other attorneys who prosecute patent applications for plaintiff Pergo, not be allowed access to the information. In other words, defendants produced the '029 application in discovery subject to a limitation on access not in place in this case by agreement of the parties or by order of the court.

Pursuant to the procedure set forth in the case management order for resolution of discovery disputes, plaintiffs requested and this court convened a telephonic conference, at which the court determined that further briefing was necessary to resolve the issue. Plaintiff, through counsel, suggested defendants who sought to limit the scope of the submission in discovery so as to exclude any provision of the '029 patent application to Mr. Pavelko, should brief first the issues in dispute. The court agreed. In furtherance of this, defendants moved to amend the protective order to contain the restrictions they already seek to enforce.

COURT'S DISCUSSION

[*11] Pursuant to *Fed.R.Civ.P. 26(c)(7)*, the court may enter a protective order directing that "a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a designated way." The party seeking to modify an existing protective order bears the burden of showing good cause for the modification. See *SmithKline Beecham Corp. v. Sunthon Pharmaceuticals, 210 F.R.D. 163, 166 (M.D.N.C. 2002)*(noting that "some courts even require a showing of compelling need, improvidence in consenting to the order, or some extraordinary circumstance" before permitting modification). In determining whether a modification is warranted, the court must balance the risk of inadvertent disclosure of confidential information against the risk that the protective order will impair the prosecution or defense of the opposing party's claims. See *Brown Bag Software v. Symantec Corp., 960 F.2d 1465, 1470 (9th Cir. 1992)*. Defendants here seek restriction of access to unpublished patent applications by trial counsel who also prosecute patent applications, arguing that sharing of confidential [*12] information with a patent prosecutor is likely to lead to misuse of the information and possibly to inadvertent public disclosure.

The scope of protective orders seeking to limit access to confidential information even by counsel in the case is governed by the principles set down by the Federal Circuit in *U.S. Steel Corp. v. United States, 730 F.2d 1465 (Fed.Cir. 1984)*. In that case, the Court of International Trade prohibited access to confidential information by one party's in-house counsel, while allowing access by retained counsel of other parties. The CIT found as a general assumption that "there is a greater likelihood of inadvertent disclosure by lawyers who are employees committed to remain in the environment of a single company." *Id., 730 F.2d at 1467-68*. The Federal Circuit reversed, holding that "denial or grant of access . . . cannot rest on a general assumption that one group of lawyers are more likely or less likely inadvertently to breach their duty under a protective order." *Id. at 1468*. The Federal Circuit also concluded, however, that "in a particular case, e.g., where inside counsel are involved in competitive decisionmaking, [*13] it may well be that a party seeking access should be forced to retain outside counsel or be denied the access recognized as needed." Id. The court explained that "competitive decision-making" serves as "shorthand for a counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." *Id. at 1468 fn. 3.*

Courts have varied in their approach to the issue of whether an attorney who prosecutes patents on behalf of a client is involved in "competitive decision-making" for that client. In *Mikohn Gaming Corp. v. Acres Gaming Inc., 1998 U.S. Dist. LEXIS 22251, 50 U.S.P.Q.2d (BNA) 1783, 1785 (D.Nev. 1998)*(quoting *Motorola Inc. v. Interdigital Technology Corp., 1994 U.S. Dist. LEXIS 20714, 1994 WL 16189689 at 4 (D.Del.)*(unpublished)), for example, the court held that "the critical inquiry is whether the attorney in question is in a position that creates a high risk of inadvertent disclosure." The Mikohn Court determined that defense counsel in the case were "prosecuting patent applications that [*14] are not only related to the patents in suit, they are part of the very core of this suit." Id. The court held therefore, "in light of the claims made in this lawsuit, the advice rendered by [defense counsel] is intensely competitive." *Id.* Because defendant had retained another law firm, one which had been involved in the case from the beginning and did not prosecute patents for defendant, the court held that the risk posed by allowing defense counsel access to plaintiff's trade information outweighed the possible impairment to defendant in losing the assistance of its chosen defense counsel. *Id. 1998 U.S. Dist. LEXIS 22251, 50 U.S.P.Q.2d (BNA) 1783, at 1786*. The Mikohn court therefore upheld the proposed protective order denying defense counsel access to plaintiff's trade information.

Although the Mikohn court relied heavily upon the reasoning expressed in Motorola, the two courts differed on the issue of the proper remedy. Both courts agreed, following the principles set down in U.S. Steel, that when counsel are involved in competitive decision-making, that it may be necessary and proper for a court to deny counsel access to confidential information belonging to an opposing party in litigation. The Motorola [*15] court concluded that because patent prosecuting attorneys may be involved in decisions affecting a client's scope and emphasis of research and development, such attorneys may be involved in competitive decision-making. *Motorola, 1994 U.S. Dist. LEXIS 20714, 1994 WL 16189689 at 4*. The Motorola court went on to conclude that because defense counsel in the case were prosecuting patents that were directly at issue in the litigation, the danger of inadvertent disclosure warranted measures to

protect the confidential information of plaintiff. See id.; see also *Mikohn, 1998 U.S. Dist. LEXIS 22251, 50 U.S.P.Q. at 1785 (D.Nev. 1998)*.

Unlike Mikohn, however, even after a particularized showing that counsel were simultaneously acting as trial litigators and prosecuting patents that were at issue in the trial, the Motorola court did not, as opposing counsel urged, prohibit access to confidential information by the trial counsel. Rather, the court ordered that trial counsel "who have received confidential information. . . under the protective order in this case shall not prosecute any patent application for [their clients] relating to the broad subject matter of the patents in suit during the pendency of [*16] this case and for one year after the conclusion of this litigation, including appeals." See *Motorola, 1994 U.S. Dist. LEXIS 20714, 1994 WL 16189689 at 6*.

In contrast, the court in *Medimmune Inc., v. Centocor, Inc., 271 F.Supp.2d 762, 773-74, (D.Md. 2003)*, concluded that in the absence of the type of particularized showing found in Motorola and Mikohn, the relief sought in restricting access to confidential information by certain counsel "amounts to a per se prohibition on the use of litigation counsel who also prosecute patents." In that case, defendants argued that because plaintiff's counsel was a competitive decision-maker for plaintiff counsel should be denied access to confidential information produced by defendants in the case. *Id. at 773*. The court found that other than counsel's status as a patent prosecutor for plaintiff, there were no indicators that warranted denying him access to confidential information in the suit. *Id. at 774*. The court noted that there was no evidence that counsel participated in product design, pricing, marketing, or other competitive decision-making. The Medimmune court concluded, "the Court views [*17] Olstein's role as one of patent prosecutor in the typical sense: he takes products that [plaintiff] has already developed and brings them before the Patent Office. To adopt the [defendants'] position would inexorably lead to the conclusion that no attorney, whether in-house or retained, could prosecute patents for a client while still working as litigation counsel for that client. Such a result would run contrary to Federal Circuit law." Id.; see also *Interactive Coupon Marketing Group, Inc. v. H.O.T. Coupons L.L.C., 1999 U.S. Dist. LEXIS 12437, 1999 WL 618969 at 3 (N.D.Ill. 1999)*(unpublished)("The court is not persuaded that it is appropriate to disqualify patent prosecution counsel from an active role in its client's litigation as a matter of course.").

Here, defendants argue that Thomas Pavelko, trial counsel for plaintiff Pergo in this case, has prosecuted Pergo's patents for numerous years and is a "key influence" in Pergo's patent portfolio strategy. See Plaintiff's Motion to Amend at 9. Defendants present no affidavits or other evidence in support of their assertion that Mr. Pavelko is a key influence and involved in Pergo's decision-making process. Nor do defendants present a [*18] showing that Mr. Pavelko, or any other counsel associated with this case, are currently involved in prosecuting patents relevant to the subject matter of this case. Instead, defendants note that plaintiff Pergo has numerous other patent applications pending, and numerous products and processes that "will likely be eligible for patent protection." Id.

In support of their opposition to defendants' motion to amend the protective order, plaintiffs submit the sworn declaration of Thomas Pavelko. In the declaration, Mr. Pavelko testifies that "during the course of my representations, I have never advised Pergo on or otherwise participated in or involved myself with Pergo's business decisions regarding issues of product pricing, product design, invention research or development, product marketing and/or sales." Pavelko Declaration P 6. Mr. Pavelko further testifies that he does not participate in competitive decision-making for plaintiff Pergo.

As noted above, the protective order in this case, as it now stands, permits information about current or future pricing or projected sales volumes, future products specification, or current or future strategic/business plan information, to be [*19] filed under the designation "Highly Confidential & Attorneys' Eyes Only." Protective Order P 2. Mr. Pavelko notes in his declaration that defendants have produced information under this designation and have not sought to preclude Mr. Pavelko's access to this confidential information. Pavelko Declaration PP 15-16. Mr. Pavelko further declares that "in accordance with Paragraph 3 of the Protective Order, I have used and will continue to use all documents designated by Faus as Highly Confidential & Attorneys' Eyes Only solely for the purpose of conducting the prosecution, defense or settlement of this action, and for no other purpose whatsoever." Id. at P 16.

Although courts have differed in what the appropriate scope of relief should be when a showing is made that there is an excessive danger of inadvertent

disclosure of confidential information, the cases presented to this court in parties' briefs have required such a showing. To grant defendants the relief they seek here, on the showing that they have made, would inevitably take the form of a *per se* rule that counsel may not serve as both patent prosecutors and litigation counsel for their clients. This court holds that such [*20] a result would run contrary to the principles set down by the Federal Circuit in U.S. Steel. See *U.S. Steel at 1468* ("Denial or grant of access, however, cannot rest on a general assumption that one group of lawyers are more likely or less likely inadvertently to breach their duty under a protective order."); see also *Medimmune, 271 F.2d at 774.* Having seen no sufficient showing to the contrary, this court determines that Thomas Pavelko is not involved in competitive decision-making for plaintiffs. Therefore, defendants have failed to show good cause to amend the protective order.

Having determined that defendants have not shown good cause for their proposed amendment to the protective order, this court briefly takes up plaintiffs' other arguments against the motion to amend. Plaintiffs argue, *inter alia,* that: defendants waived any objection to production of the '029 patent application by not stating such objections in their response to plaintiffs' first set of requests for production; defendants' withholding of the '029 application impaired plaintiffs in their reply to the motion for preliminary injunction; defendants violated the protective order as it [*21] now stands by attempting to withhold production of the '029 application and by eventually producing it subject to conditions not contained in the protective order; defendants unduly delayed in moving to amend the protective order; and finally that the entire motion is moot, given that the '029 patent application is scheduled to be published on September 15, 2005. Plaintiffs do not argue any of these points in depth, and so the court will also not address them in depth.

As to those issues dealing with defendants' delay in producing the '029 application and in moving to amend the protective order, the undersigned notes that plaintiffs submitted to this court, pursuant to their consent motion for an extension of time (DE # 55), that there was an ongoing dispute concerning defendants' production of information, and that the parties had been attempting to resolve this dispute without court intervention. While this court does not take the position that this consent motion waives plaintiffs' objections to defendants' actions, the undersigned does find that this extension of time, consented to by both parties, explains at least some of the delay between the point this dispute first arose [*22] and the filing of the instant motion to amend. While this court finds it unfortunate that attempts to resolve this dispute without court intervention were not successful, the undersigned does not intend to discourage such attempts at compromise.

As to the issue of whether defendants' '029 application has been, or soon will be, published and therefore not protectable as confidential information, this court points the parties to the procedural mechanism already included in the protective order for disputing the categorization of information. Paragraph 13 of the protective order, titled Objections to Designation, lays out the procedure to be followed if a party chooses to challenge the propriety of a restrictive designation. If plaintiffs determine that the '029 application has become public information, and defendants still seek to protect the '029 application as Highly Confidential & Attorneys' Eyes Only, plaintiffs may seek to have this restrictive classification removed. [1]

> 1 As defendants' motion to amend the protective order to add the designation Highly Sensitive Proprietary Information & Non-patent Prosecution Attorneys' Eyes Only is herein denied, the '029 application as disclosed to plaintiffs is not subject to this condition. Unless further motion is received, however, this court determines that the '029 application is subject to the most restrictive category currently supported by the protective order, that of Highly Confidential & Attorneys' Eyes Only.

[*23] CONCLUSION

For the above stated reasons, defendants' motion to amend the protective order is DENIED. Thomas Pavelko, trial counsel for plaintiffs, may review the '029 application produced to plaintiffs under the restriction Highly Sensitive Information & Non-patent Prosecution Attorneys' Eyes Only. That restriction not appearing in the protective order as it stands, it is stricken from the '029 application disclosure and replaced with the designation Highly Confidential & Attorneys' Eyes Only.

SO ORDERED this the 20th day of September, 2005.

2005 U.S. Dist. LEXIS 40601, *23

LOUISE W. FLANAGAN                          Chief United States District Court Judge

# EXHIBIT Z

LEXSEE 2007 U.S. DIST. LEXIS 424

**R.R. DONNELLEY & SONS COMPANY, Plaintiff, v. QUARK, INC., CREO, INC., EASTMAN KODAK COMPANY, and KODAK GRAPHIC COMMUNICATIONS COMPANY, Defendants.**

**Civil Action No. 06-032-JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2007 U.S. Dist. LEXIS 424*

**January 4, 2007, Decided**

**COUNSEL:** [*1] For R.R. Donnelley & Sons Company, Plaintiff: Rodger Dallery Smith, II, LEAD ATTORNEY, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE; Jack B. Blumenfeld, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For Creo Inc., Defendant: Frederick L. Cottrell, III, LEAD ATTORNEY, Richards, Layton & Finger, Wilmington, DE; Alyssa M. Schwartz, Gregory Erich Stuhlman, Richards, Layton & Finger, Wilmington, DE; Amy Elizabeth Evans, Cross & Simon, LLC, Wilmington, DE; Brian M. Koide, Pro Hac Vice; Clyde Findley, Pro Hac Vice; David M. Schnorrenberg, Pro Hac Vice; Jeffrey D. Sanok, Pro Hac Vice; Nathaniel Grow, Pro Hac Vice; Rodger Dallery Smith, II, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE.

For Eastman Kodak Company, Kodak Graphic Communications Company, Defendants: Frederick L. Cottrell, III, LEAD ATTORNEY, Richards, Layton & Finger, Wilmington, DE; Alyssa M. Schwartz, Gregory Erich Stuhlman, Richards, Layton & Finger, Wilmington, DE; Amy Elizabeth Evans, Cross & Simon, LLC, Wilmington, DE; Amy W. Ray, Pro Hac Vice; David M. Schnorrenberg, Pro Hac Vice; Rodger Dallery Smith, II, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE.

For Creo Inc., Eastman Kodak [*2] Company, Kodak Graphic Communications Company, Counter Claimants: Amy Elizabeth Evans, Cross & Simon, LLC, Wilmington, DE.

For R.R. Donnelley & Sons Company, Counter Defendant: Rodger Dallery Smith, II, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE.

**JUDGES:** Joseph J. Farnan, Jr., United States District Judge.

**OPINION BY:** Joseph J. Farnan, Jr.

**OPINION**

***MEMORANDUM ORDER***

Pending before the Court is Plaintiff's Motion for Protective Order. (D.I. 35.). The parties have attempted to reach an agreement on a proposed protective order, but three issues remain in dispute: whether two of Plaintiff's in-house employees should be granted access to information designated "Attorneys' Eyes Only;" the scope of the patent prosecution bar that will be imposed upon Plaintiff's outside counsel; and the scope of discovery that will be allowed. Plaintiff has submitted the pending Motion suggesting full access for its in-house employees, and a restricted patent prosecution bar. For the reasons discussed, the Court will grant in part and deny in part Plaintiff's Motion.

**I. Whether Plaintiff's In-House Employees Should Have Access to Information Designated "Attorneys' Eyes Only."**

A party's [*3] designation as "in-house counsel" cannot serve to automatically deny that party access to information deemed confidential. *U.S. Steel Corp. v. United States, 730 F.2d. 1465, 1467 (Fed. Cir. 1984)*. Rather, "[t]he factual circumstances surrounding each individual counsel's activities, association or relationship with a party . . . must govern any concern for inadvertent

or accidental disclosure." *Id.* Specifically, the court should consider "whether the attorneys are involved in competitive decision making of the company and should examine the risks and safeguards surrounding inadvertent disclosure of the protected information." *Affymetrix, Inc. v. Illumina, Inc., 2005 U.S. Dist. LEXIS 15482, at *6-7 (D. Del., July 28, 2005).*

In this case, one of the R.R. Donnelley employees for whom access is requested, Mr. Pasternak, is the company's Chief Patent Counsel, and the other, Mr. Theophilos, is the President of the Corporate Strategic Initiatives group. Plaintiff claims that both require access in order to be able to effectively "manage outside counsel and advise their client." (D.I. 35 at 4.) However, the risk of inadvertent disclosure cannot be overcome [*4] by the mere contention that access to confidential information is necessary for case management. *Intel Corp. v. VIA Tech., Inc., 198 F.R.D. 525, 528 (N.D. Ca. 2000).* Thus, unless in-house counsel's lack of access would impede a party's ability to litigate through outside counsel, the relevant inquiry remains whether the employee in question "is in a position that creates a high risk of inadvertent disclosure." *Id.; Commissariat A L'Energie Atomique v. Dell Computer Corp., 2004 U.S. Dist. LEXIS 12782 (D. Del. 2004).*

A. *Mr. Pasternak*

In the case of R.R. Donnelley's Chief Patent Counsel, Mr. Pasternak, [1] the balance weighs in favor of permitting his access to "Attorneys' Eyes Only" information. Mr. Pasternak has declared the role of Chief Patent Counsel is strictly to "supervise the legal decision-making related to R.R. Donnelley's intellectual property portfolio and its enforcement." (D.I. 35, Ex. C at 2.). Moreover, this position does not "report directly to any business person with direct responsibility for competitive decision-making." *Id.*

> 1    In its reply brief, Plaintiff informs the Court that Mr. Pasternak has left its employ and that a replacement for him will be named as soon as possible. Provided that the new Chief Patent Counsel has substantively the same role as Mr. Pasternak, he or she will be permitted access pursuant to this Order.

[*5] Generally, "unrebutted statements made by counsel asserting that he does not participate in competitive decisionmaking, which the court has no

reason to doubt, form a reasonable basis to conclude that counsel is isolated from competitive decisionmaking." *Intel, 198 F.R.D. at 529.* Accordingly, Mr. Pasternak will be afforded access to the information in question. *Affymetrix, 2005 U.S. Dist. LEXIS 15482, at *7.*

B. *Mr. Theophilos*

In contrast to the Chief Patent Counsel, Mr. Theophilos, in his role as President of Corporate Strategic Initiatives, advises R.R. Donnelley "on company-wide business initiatives and opportunities for growth," serving in a supervisory role in "research and development and applications engineering and other strategic initiatives of R.R. Donnelley." (D.I. 35, Ex. B at 2.) This competitive decision-making is the sort of disclosure risk that weighs heavily against granting access. [2] *Motorola, Inc. v. Interdigital Tech. Corp., 1994 U.S. Dist. LEXIS 20714, at *10-11 (D. Del., Dec. 19, 1994).* Furthermore, the only reason stated for allowing Mr. Theophilos access to attorneys' eyes only information is to enable [*6] him to manage outside counsel and advise R.R. Donnelley.

> 2    Plaintiff argues that this factor is negated, or at least tempered, by the fact that the parties in this case are not direct competitors in the sale of software for variable digital printing. Plaintiff does not deny, however, that Defendants' trade secrets and other sensitive information could potentially be of value to Plaintiff.

The Court concludes that the reasons offered for access are insufficient to overcome the risk of inadvertent disclosure inherent in permitting access. In the case of Mr. Theophilos, who is routinely engaged in strategic and competitive decision-making, inadvertent disclosure is a sufficiently tangible and specific threat to Defendants' interests to merit the issuance of a protective order under *Shingara.* Accordingly, the Court will deny Plaintiff's motion with respect to Mr. Theophilos.

II. The Scope of the Prosecution Bar

Defendants argue that a broad protective order preventing the firm of Plaintiff's [*7] outside counsel from prosecuting any patents involving any aspect of "variable digital printing" is necessary to protect Defendants from economic injury. Defendants contend that such a protective order is especially necessary considering certain tactics used by Plaintiff's patent prosecution firm, McCracken & Frank. In particular,

Defendants not that McCracken & Frank employ a technical specialist, Riyaz M. Asaria, who, according to Defendants, "poses a significant economic threat all by himself, as both an applicant of pending patent applications and a former RDD employee with questionable 'outside' credentials." (D.I. 38).

Plaintiff responded that McCracken & Frank will not have access to any sensitive material related to this litigation. Plaintiff further offered to amend its proffered Protective Order to permit access to confidential and attorneys' eyes only information only to "outside counsel employed by the parties with responsibility for this action who have entered an appearance" in the litigation. (D.I. 39 at 2.)

The Court agrees with Plaintiff that the risk to Defendants' economic interests is not such as would justify placing such a broad, and potentially onerous, patent [*8] prosecution bar on Plaintiffs' counsel. Given Plaintiff's offer to amend the Protective Order to exclude McCracken & Frank from access to any confidential or Attorneys' Eyes Only information, there is no tangible risk of injury to Defendants, aside from the general threat of inadvertent misuse of discovered information.

A prosecution bar issued "without some tangible reason or good cause other than the general threat of inadvertent misuse of discovered materials is the exact type of overly broad and generalized fear rejected in *Shingara* . . . ." *AFP Advanced Food Prods. LLC v. Snyder's of Hanover Mfg., Inc., 2006 U.S. Dist. 426, at *7 (E.D. Pa., Jan. 9, 2006).* Accordingly, the Court concludes that the balance of the *Shingara* factors weighs against issuing such a broad protective order.

**III. The Scope Of Discovery**

The Court will not limit discovery in this action to "systems and methods for processing imaging data before the data is actually printed by a press, e.g., software for processing or preparing variable printing data," as Defendant requests. (D.I. 38 at 1.) Plaintiff has been forthright regarding the type of discovery it intends to seek and the purposes [*9] for which it plans to seek that discovery. (D.I. 39 at 1-2.) If, during the course of discovery, Defendants encounter inappropriate, irrelevant or overbroad discovery requests from Plaintiff, they can file for an amendment to the Protective Order. Therefore, the Court will issue the protective order with the "software for" and "who have entered an appearance" language included.

NOW THEREFORE, IT IS HEREBY ORDERED that:

1. The parties shall, within **five (5) days** from the date of this Order, submit a Proposed Protective Order employing the "software for" and "who have entered an appearance" language and granting Thomas G. Pasternak access to Attorneys' Eyes Only information.

2. If Plaintiff wishes to substitute a different corporate officer for Thomas G. Pasternak in the Protective Order, Plaintiff shall submit a Declaration within **five (5) days** from the date of this Order affirming that the new officer performs substantially the same duties as Mr. Pasternak and is not involved in competitive decisionmaking before such substitution may be effected.

January 4, 2007

DATE

Joseph J. Farnan, Jr.

UNITED STATES DISTRICT JUDGE

# EXHIBIT AA

LEXSEE 1999 U.S. DIST. LEXIS 12437



Caution
As of: Jan 08, 2008

**INTERACTIVE COUPON MARKETING GROUP, INC. d/b/a COOLSAVINGS,
Plaintiff, v. H.O.T! COUPONS, LLC., Defendant.**

**No. 98 C 7408**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION**

*1999 U.S. Dist. LEXIS 12437*

**August 5, 1999, Decided
August 9, 1999, Docketed**

**DISPOSITION:** [*1] Plaintiff's motion to reconsider denied and its motion for clarification granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In a patent infringement suit, plaintiff corporation filed a motion to reconsider the opinion which barred plaintiff's patent prosecution counsel from reviewing defendant corporation's confidential information.

**OVERVIEW:** Plaintiff corporation sued defendant corporation for patent infringement. Defendant moved to disqualify plaintiff's counsel because counsel acted as both trial counsel and patent prosecution counsel for plaintiff and could be called as a witness during the trial. The court denied the motion but barred plaintiff's patent prosecution counsel from reviewing defendant's confidential information. Plaintiff filed a motion to reconsider the court's opinion. The court denied the motion. The court weighed the risk of inadvertent disclosure of trade secrets to competitors against the risk of impairing the litigation process and concluded that involvement in patent prosecution constituted involvement in competitive decisionmaking and/or scientific research so that it was appropriate to disqualify

the patent prosecution counsel. The court clarified its order by stating that all of plaintiff's attorneys who were privy to the confidential information obtained from defendant in discovery could not participate in the prosecution of any patent application for plaintiff during the pendency of the case and for one year after conclusion of the litigation.

**OUTCOME:** The court denied plaintiff's motion to reconsider the court's opinion that barred plaintiff's patent prosecution counsel from reviewing defendant corporation's confidential information because patent prosecution was competitive decisionmaking in the court's view.

**LexisNexis(R) Headnotes**

*Civil Procedure > Counsel > General Overview*
*Trade Secrets Law > Factors > General Overview*
[HN1] In evaluating whether counsel should have access, a court should balance the risk of inadvertent disclosure of trade secrets to competitors against the risk of impairing the process of litigation by denying access. A key factor in assessing the risk of inadvertent disclosure of trade secrets is whether counsel is engaged in

1999 U.S. Dist. LEXIS 12437, *1

competitive decisionmaking. Involvement in competitive decisionmaking refers to counsel's actual advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor.

*Civil Procedure > Counsel > General Overview*
*Patent Law > Inequitable Conduct > General Overview*
[HN2] Involvement in patent prosecution constitutes involvement in competitive decisionmaking and/or scientific research and creates a high risk of inadvertent disclosure. Like activities that define the scope and emphasis of a client's research and development efforts, the process of prosecuting patent applications also involves decisions of scope and emphasis.

*Civil Procedure > Counsel > General Overview*
*Patent Law > Inequitable Conduct > General Overview*
[HN3] In the court's view, competitive decisionmaking is not limited to decisionmaking about pricing and design but can extend to the manner in which patent applications are shaped and prosecuted.

**COUNSEL:** For INTERACTIVE COUPON MARKETING GROUP, INC. dba Coolsavings, plaintiff: Thomas G. Scavone, Christopher J. Lee, Sally Wiggins, David J. Sheikh, Niro, Scavone, Haller & Niro, Ltd., Chicago, IL.

For HOT COUPONS INC, defendant: Jeffrey Edward Schiller, James L. Komie, Schuyler, Roche & Zwirner, Chicago, IL.

For HOT COUPONS INC, defendant: J. Kevin Grogan, Marina F. Cunningham, McCormick, Paulding & Huber, LLP, Hartford, CT.

For HOT COUPONS INC, counter-claimant: Jeffrey Edward Schiller, James L. Komie, Schuyler, Roche & Zwirner, Chicago, IL.

For HOT COUPONS INC, counter-claimant: J. Kevin Grogan, Marina F. Cunningham, McCormick, Paulding & Huber, LLP, Hartford, CT.

For INTERACTIVE COUPON MARKETING GROUP, INC. dba Coolsavings aka Interactive Coupon Marketing Group, Inc., counter-defendant: Thomas G. Scavone, Christopher J. Lee, Sally Wiggins, David J. Sheikh, Niro, Scavone, Haller & Niro, Ltd., Chicago, IL.

**JUDGES:** JOAN B. GOTTSCHALL, United States District Judge.

**OPINION BY:** JOAN B. GOTTSCHALL

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Interactive Coupon Marketing Group, Inc. [*2] ("Coolsavings") has filed a motion to reconsider this court's Memorandum Opinion and Order of June 7, 1999 (the "Opinion"), which barred plaintiff's attorneys who are engaged in patent prosecution work from reviewing H.O.T. Coupons' confidential information produced in the course of this litigation. For the reasons stated below, plaintiff's motion to reconsider is denied and its motion for clarification is granted.

**BACKGROUND**

In the Opinion, the court set forth the factual scenario which underlies this litigation. Briefly, Coolsavings sues its competitor H.O.T. Coupons for patent infringement. H.O.T. Coupons moved to disqualify plaintiff's counsel because the firm acted as both trial counsel and patent prosecution counsel for Coolsavings and might be called as witnesses at trial. In the Opinion, that motion was denied and it is not challenged here. However, the court barred plaintiff's patent prosecution counsel from reviewing any of H.O.T. Coupons' confidential information. Coolsavings seeks review of that portion of the Opinion.

In the Opinion, the court relied on the declaration of Coolsavings' president, Hillel Levin, in assessing the extent of plaintiff's counsel's [*3] involvement in Coolsavings' affairs. In his declaration, Levin emphasized the critical role that the law firm Niro, Scavone, Haller & Niro ("Niro Scavone") plays as Coolsavings' counsel. Specifically he made the following statements:

> "Niro, Scavone, Haller & Niro is currently responsible for maintaining all of Coolsavings' intellectual property and has done so since almost the inception of the company . . . ." Decl. Hillel Levin (April 30, 1999) ("Levin Decl. I"), at P 3.

> Niro Scavone "has become intimately

Case 1:07-cv-00226-JJF     Document 57-8     Filed 01/09/2008     Page 4 of 15

Page 3
1999 U.S. Dist. LEXIS 12437, *3

familiar with Coolsavings' technology and business operations. Also, counsel has become involved with various licensing and litigation matters." *Id.* at P 4.

Niro Scavone "knows our personnel, they reviewed our documents, and participated in several high level management meetings regarding intellectual property. This history uniquely qualifies Niro, Scavone, Haller & Niro to represent Coolsavings in litigation matters involving its '648 patent." *Id.* at P 5.

In Coolsavings' motion to reconsider, it submitted a second declaration by Hillel Levin that presumably is intended to paint a different picture of Niro Scavone's role in Coolsavings' affairs. Levin [*4] explained that the firm's representation was limited to legal advice relating to intellectual property matters and stated that the firm has no involvement in business planning. Levin testified:

Niro Scavone "has become intimately familiar with CoolSavings' technology and business operations, but only in connection with its representation of CoolSavings on intellectual property matters, such as litigation, licensing and patent prosecution." Decl. Hillel Levin (June 21, 1999) ("Levin Decl. II"), at P 4.

Niro Scavone "does not act as CoolSavings' 'business advisors' or participate in CoolSavings' 'competitive business decisions.' Moreover, the Niro Scavone law firm does not participate in decisions about CoolSavings' pricing or design." *Id.* at P 5.

"While CoolSavings' personnel have met with attorneys at the Niro Scavone law firm, such meetings have been limited to discussions about CoolSavings' intellectual property, not general business planning or strategizing meetings." *Id.* at P 6.

"No one at the Niro Scavone law firm is a member of the CoolSavings' Board of Directors. To my knowledge, no one at the

Niro firm is related to anyone at CoolSavings." [*5] *Id.* at P 8.

## DISCUSSION

The issue to be decided is whether plaintiff's patent prosecution counsel at Niro Scavone should be denied access to H.O.T. Coupons' confidential information. [HN1] "In evaluating whether . . . counsel should have access, a court should balance the risk of inadvertent disclosure of trade secrets to competitors against the risk of impairing the process of litigation by denying access." *Thomas & Betts Corp. v. Panduit Corp., 1997 U.S. Dist. LEXIS 14899,* *41, No. 93 C 4017, 1997 WL 603880, *12 (N.D. Ill. Sep. 23, 1997)* (*citing Brown Bag Software v. Symantec, 960 F.2d 1465, 1470 (9th Cir. 1992).* A key factor in assessing the risk of inadvertent disclosure of trade secrets is whether counsel is engaged in competitive decisionmaking. *Brown Bag Software, 960 F.2d at 1470.* Involvement in competitive decisionmaking refers to counsel's actual "advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." *United States Steel Corp. v. United States, 730 F.2d 1465, 1468, n.3 (Fed. Cir. 1984)).*

H.O.T. Coupons argues [*6] that it is not necessary to find that Niro Scavone was involved in Coolsavings' business affairs because the firm's involvement in patent prosecution is enough to find that it was engaged in competitive decisionmaking. For this proposition, H.O.T. Coupons relies on two district court decisions that denied access to outside patent counsel engaged in patent prosecution work because the nature of patent prosecution work constituted involvement in competitive decisionmaking. *See Mikohn Gaming Corp. v. Acres Gaming Inc., 1998 U.S. Dist. LEXIS 22251, 50 U.S.P.Q.2D (BNA) 1783 (D. Nev. 1998); Motorola, Inc. v. Interdigital Tech. Corp., 1994 U.S. Dist. LEXIS 20714 (D. Del. 1994).* In *Mikohn,* the plaintiff sought to deny outside defense counsel access to plaintiff's confidential technical information during the course of the patent infringement action. Defense counsel testified that his only association with the defendant was as its outside patent counsel, providing counseling and legal advice in the field of intellectual property. *Mikohn, 50 U.S.P.Q.2D (BNA) at 1784.* He denied that he participated in marketing, product development, design, or pricing. [*7] *Id.* Although the court credited the attorney's statements, the court still denied access because the law firm was

prosecuting patent applications directly related to the patents-in-suit. *Id. at 1785.* The court concluded that the advice rendered by the firm was "intensely competitive." *Id.* The court also noted that the defendant had invested in the attorney's technical training and concluded that it "cannot be doubted that as patent prosecution counsel [the attorney] works very closely with and advises [defendant] on matters relating to product design." *Id. at 1786.* The court found that the risk of inadvertent disclosure outweighed the burden that the defendant would experience if the firm was denied access, particularly since the defendant had already retained additional outside counsel to litigate the action. *Id.*

In *Motorola,* defendant's attorneys were involved in patent prosecution and trial work for the defendant. The court held that [HN2] involvement in patent prosecution constituted involvement in competitive decisionmaking and/or scientific research and created a high risk of inadvertent disclosure. The court stated that, like activities that define the [*8] scope and emphasis of a client's research and development efforts, "the process of prosecuting patent applications also involves decisions of scope and emphasis . . . ." *Motorola, supra,* at *11. Further, the court concluded that the attorneys "who were to view Motorola's voluminous confidential information and then later prosecute the patents would have to constantly challenge the origin of every idea, every spark of genius. This would be a sisyphean task, for as soon as one idea would be stamped 'untainted', another would come to mind. The level of introspection that would be required is simply too much to expect, no matter how intelligent, dedicated, or ethical the . . . attorneys may be." *Id.* at *14-15. Accordingly, the court denied access to the attorneys because they prosecuted patents.

The court is not persuaded that it is appropriate to disqualify patent prosecution counsel from an active role in its client's litigation as a matter of course. However, in the case at bar, the Niro Scavone firm has represented and is likely to represent Coolsavings in the prosecution of numerous related patents, and it appears that the firm is deeply involved in representing [*9] the client in multiple, related infringement cases in the context of a fluid, developing technology. The court needs to ask whether the firm's prosecution activities are likely to be shaped by confidential information about competitors' technology obtained through the discovery process. The concern is whether the firm's involvement in developing a patent prosecution strategy will be informed by such

information to the competitors' detriment.

Coolsavings' submissions have not been helpful to the court. In his first declaration, Mr. Levin, in an obvious attempt to persuade the court that disqualification of the Niro Scavone firm would have a catastrophic impact on Coolsavings, suggested that the Niro Scavone firm was deeply involved in Coolsavings' business decisionmaking in the area of intellectual property; that is how the court interpreted his declaration, although with the wisdom of hindsight the declaration appears rather vague in spots. Then, in his second declaration, Mr. Levin attempts to persuade the court that the Niro Scavone firm is not involved in business decisions. This declaration, however, is even more vague than the first one and really says nothing. This court cannot [*10] make much sense of a statement like, "The Niro Scavone law firm has become intimately familiar with CoolSavings' technology and business operations, but only in connection with its representation of CoolSavings on intellectual property matters . . . ." [HN3] In this court's view, competitive decisionmaking is not limited to decisionmaking about pricing and design but can extend to the manner in which patent applications are shaped and prosecuted. *See U.S. Steel, 730 F.2d at 1468, n.3* (Involvement in competitive decisionmaking refers to counsel's actual "advice and participation in *any or all of the client's decisions* (pricing, product design, etc.) *made in light of similar or corresponding information about a competitor.*") (emphasis added). Levin's vague declaration does not provide a basis for reconsideration. Courts confronted with such vague statements have no choice but to assume disabling involvement. *See Carpenter Tech. Corp. v. Armco, Inc., 132 F.R.D. 24 (E.D. Penn. 1990)* (denying access to in-house attorney because his vague testimony that he had "no *direct* responsibility or authority over competitive decisions" led the court to assume [*11] that he had at least some involvement) (emphasis added).

Coolsavings has attempted to walk a fine line, using careful wording to try to persuade the court first of Niro Scavone's central involvement with Coolsavings' activities and then of its peripheral status. It has been too shrewd for its own good, convincing the court of nothing other than that the concerns raised by H.O.T. Coupons have not been answered. Accordingly, the motion to reconsider is denied. The court's order of June 7, 1999 is, however, clarified as follows: all of plaintiff's attorneys who are privy to confidential information obtained from

1999 U.S. Dist. LEXIS 12437, *11

defendant in discovery shall not participate in the prosecution of any patent application for plaintiff relating to the subject matter of the patents in suit during the pendency of this case and for one year after the conclusion of this litigation, including appeals.

    ENTER:

JOAN B. GOTTSCHALL

United States District Judge

DATED: August 5, 1999

# EXHIBIT BB

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| VOITH PAPER GMBH & CO. KG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-226-JJF |
| | ) | |
| JOHNSONFOILS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**STIPULATION AND AGREED PROTECTIVE ORDER
GOVERNING DISCOVERY MATERIALS**

Plaintiff and   Defendant (hereinafter the "parties") file this Stipulation and Agreed Protective Order to preserve the confidentiality of certain commercially sensitive, confidential and/or proprietary information that has been or will be requested and produced in discovery in this matter.  The parties agree that a protective order concerning discovery materials is desirable to protect their rights and the rights of certain third parties.

It is therefore AGREED THAT:

1.     Plaintiff and Defendant shall have the right to designate as "Attorneys Eyes Only" the documents, things and information produced during discovery in this matter ("Discovery Information") which the producing party believes contains its trade secret, research, development, commercial, financial,  proprietary or confidential information.

2.     All Produced Information designated as Attorneys Eyes Only shall be used by the party receiving it only in connection with the litigation and appeal of this action.  Discovery

- 1 -

Information designated as Attorneys Eyes Only shall not be used for any business, competitive or other purpose, and shall not be disclosed to any person or entity, except as provided herein.

3.    All Discovery Information a party desires to have designated as Attorneys Eyes Only shall be so designated at the time of its production.  In the event that a party receiving Discovery Information designated as Attorneys Eyes Only disagrees with that designation, that party shall have a right to seek an order from the Court, pursuant to a properly noticed motion, voiding the designation in whole or in part.   However, the party producing the Discovery Information designated as Attorneys Eyes Only shall have the burden of showing entitlement to that designation under Federal Rule of Civil Procedure 26.  Until such a time as the Court rules that a particular document or set of documents designated as Attorneys Eyes Only are not subject to protection, the parties will continue to treat any such designated documents as protected under this Order. An inadvertent failure to designate Discovery Information as Attorneys Eyes Only may be corrected by providing the receiving party both written notice of the error and the properly designated Discovery Information as soon as practicable after the discovery of the inadvertent error.

4.    Information derived from Discovery Information designated as Attorneys Eyes Only and any information contained therein shall be used solely for the purpose of preparing for trial, the trial and appeal of this action and for no other purpose whatsoever, and shall not be disclosed to any person or entity except in accordance with the terms of this Stipulation and Agreed Protective Order.

5.    Discovery Information designated as Attorneys Eyes Only, copies thereof, and the information contained therein shall not be made available or disclosed to any person, except a single identified representative of each of the parties in this case, the retained and in-house

attorneys for the parties in this case, the employees of such attorneys and the Court. Any party representative or attorney in this case, and any regular employee of such attorney assigned to and necessary to assist in the conduct of this action who wishes to have access to Discovery Information designated as Attorneys Eyes Only shall be required as a prerequisite to such access to (a) have signed this Order as counsel of record or (b) have executed the Declaration attached hereto as Exhibit A.

Discovery Information designated as Attorneys Eyes Only, copies thereof, and the information contained therein shall not be made available to or disclosed to any potential expert until the party wishing to make such disclosure provides the producing party (i) a written notice identifying such individual and stating such individual's present occupation, employer and position, and all other business affiliations for the past ten (10) years, (ii) the most up-to-date copy of such individual's curriculum vitae, and (iii) an executed Declaration in the form attached hereto as Exhibit A. The producing Party shall have ten (10) business days following the date of the notice to object to the proposed disclosure. If the producing party has not objected in writing by the end of the ten days, the Discovery Information designated as Attorneys Eyes Only, copies thereof, and the information contained therein may disclosed in compliance with all applicable provisions of this Order. A timely objection from the producing party shall stay disclosure to the proposed individual.

6.    Discovery Information designated as Attorneys Eyes Only shall remain in the custody of counsel and expert witnesses and shall not be provided to other persons except as necessary to prepare for trial, the trial itself or appeal of this action pursuant to paragraph 4 above.

7.    In the event that counsel for either party determines that the prosecution of this action requires that Discovery Information designated as Attorneys Eyes Only be disclosed to persons not otherwise provided for herein, such counsel shall provide counsel for the other party written notice by facsimile or hand delivery of the intended disclosure, which notice shall specify with particularity the Discovery Information to be disclosed and the identity of the person.  This written notice shall be given not less than five (5) business days prior to intended disclosure.  If, within five (5) business days after receipt of such notice, a party objects in writing to such disclosure, the Discovery Information designated as Attorneys Eyes Only shall not be disclosed unless the Court so orders.

8.    All Discovery Information designated as Attorneys Eyes Only and any papers containing information contained in or derived from such documents that are filed with the Court shall be filed in sealed envelopes bearing the title of this action and shall be marked "CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER", to be opened only as the Court directs.

9.    In order to permit discovery to proceed without further delay, the parties agree that this Stipulation and Agreed Protective Order shall be effective from the date on which it is executed by counsel for the parties and shall apply and be enforceable from that date forward with respect to all discovery in this matter, including materials produced at any time after the commencement of this case.

10.    In the event that any Discovery Information designated as Attorneys Eyes Only or any information derived from it is used in depositions, the Discovery Information and the derived information shall not lose their Attorneys Eyes Only  status through such use, and the parties shall take all steps necessary to preserve that status during and after such use.  It shall be

the responsibility of the counsel requiring that Discovery Information be designated as Attorneys Eyes Only to advise the court reporter at the beginning of protected information of that status and the transcript shall be so designated.  The transcript so designated shall be treated as Attorneys Eyes Only for a period of thirty (30) calendar days after the date on which the reporter forwards the complete transcript to counsel for the parties. Counsel requiring that transcript be designated as Attorneys Eyes Only shall notify counsel for the other party of any part of part of the transcript for which the designation is to continue within the period of thirty (30) calendar days. In the absence of timely notice, the designation shall be removed from the transcript.

11.    In the event that either party receives a third party subpoena or other form of legal process requesting Discovery Information designated as Attorneys Eyes Only, the party receiving such request will provide the other party written notice by facsimile or hand delivery that such a request was received and provide a copy of the request with the written notice.  The party receiving the third party subpoena or other form of legal process shall not produce the requested documents for at least ten (10) business days after giving written notice by facsimile or hand delivery of the request to the other party, unless the other party states in writing that it does not intend to seek protection in connection with the third party subpoena or other form of legal process concerning those documents Attorneys Eyes Only.

12.    At the conclusion of this action, all documents Discovery Information designated as Attorneys Eyes Only, including all copies, extracts and summaries and all derived information taken, shall be returned to the producing party no later than thirty (30) days after the final non-appealable  judgment or settlement of this action.

13.    In the event additional parties are added to this litigation, each new party's counsel shall sign a duplicate original of the Stipulation and Agreed Protective Order and send it to all other counsel for the parties and cause same to be filed with the Court.

SO ORDERED this _____ day of   November 2007.

_____
J.

CONSENTED TO:

_____

_____

Attorneys for Plaintiffs

_____

_____

Attorneys for Defendant

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

VOITH PAPER GMBH & CO. KG,    )
           )
      Plaintiff,    )
           )
      v.    )    C.A. No. 07-226-JJF
           )
JOHNSONFOILS, INC.,    )
           )
      Defendant.    )
_____)

## DECLARATION

I, _____, declare that:

1.    I have read a copy of the Stipulation and Agreed Protective Order Governing Discovery Materials entered in the above-styled lawsuit and I understand that I am bound by its terms.

2.    I hereby agree under penalty of contempt of court that I shall not disclose or use anything communicated to me except in accordance with the Stipulation and Agreed Protective Order Governing Discovery Materials.

3.    I hereby agree and submit to the exercise of the personal jurisdiction over me by the United States District Court for the District of Delaware insofar as is necessary to enforce the Stipulation and Agreed Protective Order Governing Discovery Materials.

Name:_____

Place of execution:

Date:

EXHIBIT A

8