UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VOITH PAPER GMBH & CO. KG., | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-226 (JJF) |
| | ) | |
| JOHNSONFOILS, INC., | ) | |
| | ) | |
| Defendant | ) | |

## SUPPLEMENTAL DECLARATION OF MICHAEL H. WALLER

I, Michael H. Waller, declare that the following is true and correct:

**Relevant Experience and Qualifications**

1.    I have prepared this Declaration in support of Plaintiff Voith Paper GMBH & Co.
KG's Supplemental Markman Brief.

2.    My relevant experience, qualifications and other pertinent information are set
forth in my first declaration.

3.    In forming my opinions on the meanings of certain words and phrases appearing
in the claims of U.S. Patents 5,718,805 and 5,972,168 (hereinafter referred to as
the '805 and '168 patents, respectively, or collectively as the "Patents-in-suit"), I
have reviewed the '805 and '168 patents and portions of the respective
prosecution histories.  I have also reviewed various dictionaries.  I also rely upon
my experience in the paper machine field.

4.    I have also read Defendant JohnsonFoils, Inc.'s Opening Claim Construction
Brief.  In this declaration, I address JohnsonFoils proposed person of ordinary
skill in the art and proposed claim constructions.

## Person of Ordinary Skill in the Art

5.    As I stated in my first declaration, I believe a person of ordinary skill in the art paper making machines as of 1989 was someone with an engineering degree and 1-3 years of experience working with paper making machines.

6.    JohnsonFoils' states that the person of ordinary skill in the art has no academic training and has familiarity with the components of the claimed combination as would be obtained from two years experience in paper making. JohnsonFoils' Brief, at p. 14. I disagree with JohnsonFoils that one of ordinary skill in the art would be at such a low level.

7.    Evaluating the consequences of combining the components as claimed requires an appreciation of the effect of the claimed combination on the complex process of paper web formation.

8.    For example, the patent describes processes in which the liquid fiber suspension center of the web must be agitated to prevent flocculation while taking care to avoid breaking the partially formed web and retaining additives.

9.    To appreciate the effect of paper machine components on this complex process requires an understanding of, for example, physics, chemistry, mechanics, and fluid dynamics, as would be obtained in a course of study for an engineering degree, with additional specialized training on applying that theoretical background to paper making.

10.    With such training, a person of ordinary skill would understand that changes in the specific geometry or shape of the paper forming path would influence the forces applied to the web during the formation process.

11.   Thus, in my opinion, the level of ordinary skill is what I stated in my first declaration, *i.e.*, "a person of ordinary skill in the art as of 1989 was someone with an engineering degree and 1-3 years of experience working with paper making machines."

**Other Claim Terms**

12.   A person of ordinary skill in the art would have understood the claim terms in accordance with their ordinary and accustomed meanings. The ordinary and accustomed meaning of each claim term is consistent with the words of the claims themselves, the specification, the prosecution history, and dictionaries relating to the paper making machine art.

13.   In the following paragraphs, I have interpreted the claim terms referenced in JohnsonFoil's Brief in accordance with their ordinary and accustomed meanings.

14.   **Following:** A person of ordinary skill in the art would have understood the term "following" as used in Patents-in-suit in its ordinary English sense of "coming after." JohnsonFoils' definition unnecessarily confuses this basic word by adding the concepts "sequence," "discrete physical space," and "previous section," each of which would require further explanation. For example, "discrete physical space" implies spaces that are isolated from one another.

15.   The patent specification contains no disclosure that objects that follow one another in a paper making machine are in spaces that are isolated from one another.

16.   Other than using the term "following" in the claims, the specification provides no support for requiring the use of these additional limiting concepts.

17.   Thus, a person of ordinary skill in the art would have understood the term "following" in the ordinary English sense of "coming after," which is consistent with the meaning of "following" in the context of the Patents-in-suit.

18.   **Neither wire belt defining a single wire predrainage zone**: In my first declaration, ¶74, I stated that one of ordinary skill in the art would understand the phrase "single wire predrainage zone" as the part of a single wire former or hybrid former in which the web is partially formed initially only in a lower layer of the fiber suspension while the upper layer remains liquid.

19.   Once "single wire predrainage zone" is construed, in my opinion there is no need to further construe "neither wire belt defining a single wire predrainage zone" because the additional words are used in their ordinary English sense.

20.   If the Court decides that the entire phrase needs to be construed, a person of ordinary skill in the art would have understood the phrase to mean "neither wire belt defines a single wire predrainage zone, *i.e.* a zone in which the web is partially formed initially only in a lower layer of the fiber suspension while the upper layer remains liquid. *E.g.*, as in the first part of a hybrid former or in a Fourdrinier."

21.   JohnsonFoils' proposed construction changes the meaning of this claim phrase by dropping the word "zone" from "single wire predrainage zone."

22.   The omission of the term "zone" appears to exclude paper making machines in which any water is drained through a single wire belt, even if the paper making machine has no *zone* in which the web is partially formed on a single wire, as in a hybrid former or Fourdrinier.  This is contrary to the understanding of one of

ordinary skill in the art reading the Patents-in-suit. JohnsonFoils' proposed construction, by dropping the word "zone" from "single wire predrainage zone," collapses the distinction between single wire formers and twin wire formers.

23. **First Section:**    In my first declaration, ¶75, I stated that one of ordinary skill in the art would understand the phrase "First section" to mean the first forming section of a twin wire former where web formation begins.

24. JohnsonFoils' proposed construction of "First Section" incorrectly implies that the "First Section" is limited to the components expressly enumerated in the claim. I understand that the claim terms "comprises" and "includes" are open terms. One of ordinary skill in the art reading the Patents-in-suit would not understand the "First Section" as recited in the claims to be limited to the expressly enumerated elements, but rather open, *i.e.,* a section which does not exclude other components.

25. **A first drainage element at the start of the path through the twin wire zone:** In my first declaration, ¶76, I stated that one of ordinary skill in the art would understand the term "drainage element" as an "element which removes water from the fiber suspension or web at the start of the path through the zone where web formation occurs in a Twin Wire Former." JohnsonFoils' proposed construction improperly limits "drainage element" from its literal meaning to include only "a suction roll" or a "curved stationary forming shoe."

26. Although the specification discusses several preferred embodiments, no special meaning is given to the term "drainage element" apart from the understanding of that term to one of ordinary skill.

27.    The specification's discussion of examples of drainage elements, such as forming cylinders and shoes, does not limit the meaning of the term as used in the claims.

28.    One of ordinary skill in the art would interpret the specification's comment that a straight forming shoe may be used "in certain situations" as supporting the possible use of a straight forming shoe, not as disclaiming such an element. JohnsonFoils is incorrect that the absence of any further discussion of those "certain situations" amounts to a disclaimer of straight forming shoes.

29.    The specification's statement that "[t]o be sure, the forming roll 40 of Fig. 2 is, as a rule, developed as a suction roll" states only that in the preferred embodiment under discussion, Fig. 2, the forming roll is usually a suction roll. The specifications' statement about what practitioners normally use for a forming roll does not limit the term forming roll as generally used in the claims.

30.    JohnsonFoils' proposed construction also incorrectly adds the requirement that the drainage element "results in drainage from both sides of the twin wire zone." Although the patent specification states that drainage occurs towards both sides in the first part of the twin wire zone, '805 Patent, Col. 5:26-30, there is no suggestion in the specification that both directions of such drainage are accomplished by a single drainage element.

31.    One of ordinary skill in the art would know that, as in Twin Wire Formers, water is drained toward both wire belts in the twin wire zone.

32.    One of ordinary skill would construe the phrase "known pre-drainage towards both sides" to mean that water is drained towards both wire belts of a Twin Wire Former, and not to a particular quantity of drainage.

33.    The actual amount of drainage will vary depending on a number of factors including at least the speed of the wire belts, the structure of the wire belts, the composition of the fiber suspension, the headbox discharge rate, the path of the wire belts, and the drainage components used.

34.    **Means for supporting the belts for forming a wedge shaped entrance slot into the first section:** In my first declaration, ¶¶ 77 & 78, I stated how one of ordinary skill in the art would understand the phrases "means for supporting the belts for forming a wedge shaped entrance slot" and "wedge shaped entrance slot."

35.    JohnsonFoils' proposed construction of "supporting the belts for forming a wedge shaped entrance slot into the first section" adds the language "into the first section" which, improperly incorporates additional structure into the recited function. The language "into the first section" specifies the structural orientation of the claimed means.

36.    **A fiber suspension supplying headbox having an outlet placed and directed for delivering fiber suspension from the headbox to the wedge shaped entrance slot:** As stated in my first declaration, a person of ordinary skill in the art would understand that a headbox is "[a] container at the beginning of the twin wire former which discharges the fiber suspension onto the wires," and that the "wedge shaped entrance slot" is "[t]he wedge shaped entrance slot is the wedge-shaped area between the two wires at the start of the twin wire zone where the two wires approach each other." Once these terms are construed, in my opinion there is no need to further construe "a fiber suspension supplying headbox having an

outlet placed and directed for delivering fiber suspension from the headbox to the wedge shaped entrance slot" because the additional words are used in their ordinary English sense.

37.    JohnsonFoils' proposed construction deviates from the plain meaning of the phrase by introducing an extra limitation: "only at the place where the lower wire in the first section of the twin wire zone travels over the stationary curved forming shoe or suction roll and forms a wedge shaped entrance."

38.    JohnsonFoils' improperly culls this limitation from a point in the specification that is clearly dedicated to describing preferred embodiments that illustrate, but do not limit, the claims:

> The jet pulp discharged by the headbox 10 comes into contact with the two wire belts ii and 12 only at the place where the lower wire ii in the first section I of the twin-wire zone travels over a stationary curved forming shoe 16.  Col. 4:6-10.

39.    JohnsonFoils omitted that this passage occurs in the section entitled "Detailed Description of the Preferred Embodiments" in the context of a discussion of the specific "twin-wire former shown in Fig. 1." *See* '805 patent, col. 3:63-67.

40.    JohnsonFoils' reliance on its proposed construction of "single wire predrainage zone" is also improper because, as explained earlier, that proposed construction is contrary to the understanding of one of ordinary skill.  As I explained in ¶¶ 21-22 above, JohnsonFoils' proposed construction, by dropping the word "zone" from "single wire predrainage zone," collapses the distinction between single wire formers and twin wire formers.

41.    One of ordinary skill in the art would have no reason to modify the meaning of this claim phrase based on other limitations in the claim.

42. **The twin wire zone having a second section following the first section along the path of the belts through the twin wire zone:** One of ordinary skill in the art would understand that apart from the term "twin wire zone," all of the other words in this phrase should be interpreted using their ordinary English meanings.

43. If the Court decides that the entire phrase needs to be construed, a person of ordinary skill in the art would have understood the phrase to mean "the zone where web formation occurs in a twin wire former having a second section following the first section along the path of the belts."

44. JohnsonFoils proposed construction of this phrase to include "wherein the components of the second section are not located in any other section" improperly excludes unrecited components from open limitations. Consistent with the specification, the claims require several recited components, including drainage strips, to be in the web forming section following the first section.

45. The positive recitation that particular drainage strips, or other components, are in the second section does not bar the use of other such strips or components in other sections. The excerpts from the specification cited by JohnsonFoils are not to the contrary.

46. Specifically referring to "the alternately resiliently and firmly supported ledge strips **27** and **28**" in a preferred embodiment, the specification states that these strips "lie not in the front or the rear sections but in the middle of section II of the twin-wire zone, since only here can they develop their full effect." '805 patent, Col. 5:15-30. Apart from being a description of a preferred embodiment, not a definition of claim language, this description says nothing about excluding

drainage strips from other sections and only specifies the preferred positioning of specifically recited strips.

47.    The specification expressly discloses the deployment of a drainage strips in section one. *See* '805 Patent, Fig. 4, element **50.**

48.    As described in the specification, the individual strip **50** is used to accomplish predrainage by removing water and for producing turbulence in the suspension. *See* '805 patent, Col. 6:50-66.

49.    JohnsonFoils' proposed construction also confusingly adds the concept from its construction of "following": "occupying a discrete physical space." This construction is misleading because it suggests that the second section occupies a space which is separated by some means from the first section. This concept is not only unnecessary, but no such separating structure is disclosed or described in the specification. One of ordinary skill would understand the term "following" to have its ordinary English meaning of "coming after."

50.    **A plurality of first drainage strips are positioned for contacting the first wire belt:** JohnsonFoils' proposed construction improperly limits the general meaning of these claim terms to exclude "forming shoe strips" and "feed or discharge edges of drainage boxes."

51.    JohnsonFoils' citation of the specification to support its proposed construction is misplaced. In describing a preferred embodiment, the passage cited by JohnsonFoils states that "[i]nstead of a rigidly supported strip, a feed or discharge end of a drainage box can also be provided." '805 Patent, Col 7:65-67. One of

ordinary skill would understand that this passage is enumerating structural substitutes for rigidly mounted strips.

52. One of ordinary skill in the art would understand that the positive recitation of possible substitutes for rigidly mounted strips does not constrain the "first drainage strips" in any way.

53. One of ordinary skill in the art, reading the cited passage, would not adopt a meaning for "a plurality of first drainage strips are positioned for contacting the first wire belt" different from its plain and ordinary meaning.

54. **A plurality of second drainage strips are positioned within the loop of the second wire belt and are for contacting the second wire belt:**  One of ordinary skill in the art would understand that apart from the term "wire belt" this claim phrase requires no further construction because the other words in the phrase would be understood by one of ordinary skill to have their plain and ordinary English meaning.

55. JohnsonFoils' proposed construction differs from this plain meaning, and also improperly adds a limitation not found in the claim: "[The second drainage strips] are not forming shoe strips." *See* JohnsonFoils' Brief at pp. 23-24.

56. **The first strips being shifted in position along the path of the wire belts with respect to the second strips so that the first and second strips are offset and in a non-opposing relationship:**  JohnsonFoils' proposed construction of this phrase lifts language from a part of the specification which describes an embodiment, but does not define the claim terms.

57. JohnsonFoils proposed construction suggests that every blade must have two opposing blades on either side: a condition which is actually inconsistent with every disclosed embodiment.

58. One of ordinary skill in the art would understand that in every disclosed embodiment the strips at the end on at least one side have only one opposing blade.

59. **First support means for resiliently supporting the first drainage strips against the respective wire belt that the strips contact:** JohnsonFoils proposed construction is incorrect because it adds claim words which recite additional structural limitations on the means-plus-function element. That this is the "first" such means is not necessary to understanding either the recited function or the corresponding structure.

60. One of ordinary skill in the art would understand that the claim language "the first drainage strips against the respective wire belt that the strips contact" provides a structural positioning of the claimed means and its intended purpose, but does not further elucidate the function.

61. One of ordinary skill in the art would understand that the proper means-plus-function limitation is "means for resiliently supporting" construed as proposed by Voith.

62. JohnsonFoils' proposed construction is also incorrect because it incorrectly identifies a "water permeable plate" as a resiliently supporting structure. In the passage cited by JohnsonFoils, the specification states the following:

> In the lower drainage box 17 there are a row of at least two strips
> 27 (preferably of approximately rectangular cross section) which

> are pressed from below resiliently against the lower wire **11**. For
> this purpose, they are supported, for instance, <u>on springs</u> **24** (<u>or
> pneumatic pressure cushions</u>) *on* a, preferably water-permeable,
> plate. It is obvious that the force of the springs (or of the pressure
> prevailing in the pressure cushions) is individually adjustable.
> '805 Patent, Col. 4:24-28 (emphasis added).

63.    The specification states that the resilient springs and pressure cushions are

preferably on a water permeable plate. '805 Patent, Col. 4:24-28. One of ordinary

skill in the art would understand that there is no suggestion in the specification

that a water permeable plate, itself, is structure corresponding to the "resiliently

supporting" function.

64.    **Second support means supporting the second drainage strips rigidly against**

**the second wire belt:** One of ordinary skill in the art would understand that the

recited function of this means-plus-function element is "supporting the drainage

strips rigidly."

65.    One of ordinary skill in the art would understand that the structure disclosed in the

specification for rigidly supporting drainage strips include guide plates, vacuum

chambers, and drainage boxes. *See* '805 patent, Col. 6:25-28 (guide plates); Col.

7:1-11 (vacuum chambers); Col. 4:29-36 (drainage box).

66.    One of ordinary skill would understand that these guide plates provide rigid

mounting structure for the fixed strips.

67.    In the embodiment described by Figure 1, the specification explains that "a row of

at least three strips 28 . . . are rigidly attached to the box 18." *Id.*, Col. 4:29-36.

68.    One of ordinary skill would understand that the drainage box is a rigid mounting

structure for the blades.

69. One of ordinary skill would understand that in the embodiments shown in Figures 4 and 5 of the '805 patent, the "vacuum chamber" structures 51 and 56 are described as "supporting bodies" for the rigidly mounted strips.

70. JohnsonFoils' proposed construction is wrong because it incorporates an unnecessary phrase "against the wire belt." One of ordinary skill in the art would understand that this phrase relates to the particular purpose of the means-plus-function element, not its meaning.

71. JohnsonFoils is further wrong because it includes the unnecessary word "second support" since this language is unrelated to the claimed function and merely states that the structure corresponding to this means-plus-function element is in addition to structure associated with some other support.

72. One of ordinary skill in the art would understand that the existence of another, different, support does not change the meaning of the means for supporting the drainage strips rigidly.

73. JohnsonFoils' assertion that there is no disclosed structure for rigidly supporting the drainage strips is based on the inclusion of extraneous words in the means-plus-function element and its inability to find those very words in the specification in passages describing the structures that rigidly support blades.

74. **First means for collecting the water drained from the fiber suspension by the most upstream, one of the drainage strips:** One of ordinary skill in the art would understand that the recited function is "collecting water." One of ordinary skill in the art would understand that the structure disclosed in the specification for collecting water includes various water collection chambers and channels.

*See, e.g.,* '805 patent, col. 6:25-26 ("Further elements of the twin-wire former shown in Fig. 2 are water-collection containers 41, 42 and 43."); '805 patent col. 4:44-47 ("Accordingly, a vertical channel 21a is positioned in front of the first upper strip 28 to carry away or collect the water scraped off by the first strip 28").

75.    One of ordinary skill in the art would understand that water collection chambers, water collection channels, and their equivalents, are within the scope of this limitation.

76.    JohnsonFoils' proposed construction incorrectly identifies the means-plus-function limitation by adding claim terms, "drained from the fiber suspension by the most upstream one of the drainage strips," relating to the source of the water collected by the means for collecting water. These words qualify the use of the claimed means in the claimed invention, but are not needed to understand the means-plus-function limitation itself. After adding these extraneous terms to the recited function "collecting water," JohnsonFoils errs by limiting the means for collecting water to a "vacuum chamber in a drainage box." The specification clearly discloses that channels also collect water. '805 patent col. 4:44-47.

77.    **Second means separate from the first means for collecting the water drained from the fiber suspension by all of the other drainage strips:** One of ordinary skill in the art would understand the means-plus-function limitation is "means for collecting water" as construed previously. The additional language in this phrase is not in need of construction since one of ordinary skill would recognize that the words have their plain and ordinary English meaning.

78. If the Court decides that the entire phrase needs to be construed, a person of ordinary skill in the art would have understood the phrase to mean "water collecting structure, such as containers or channels, different from the water collecting structure used to collect water from the most upstream strip, that collects the water drained from the other strips."

79. JohnsonFoils' failure to identify the water containing structure disclosed in the specification results from its inclusion of extraneous terms "drained from the fiber suspension by all of the other drainage strips" in its misidentification of the recited function of the means-plus-function limitation. The terms added to the recited function by JohnsonFoils' proposed construction specify only the source of the water collected and have nothing to do with water collection itself.

80. **The twin wire zone having a third section following the second section along the path of the wire belts through the twin wire zone:** One of ordinary skill in the art would understand that apart from the terms "twin wire zone" and "wire belts," this phrase does not require construction because one of ordinary skill would interpret this phrase to have its plain and ordinary meaning, *i.e.*, the zone where web formation occurs in a twin wire former having a third section following the second section along the path of the mesh belts.

81. JohnsonFoils' proposed construction of this claim language is misleading because it implies that the Third Section is limited to the components expressly enumerated in the claim. This is incorrect because the claimed Twin Wire Former *comprises*, and is not limited to, the enumerated elements. In addition, the third section of the claimed Twin Wire Former *includes* the enumerated components,

but—contrary to JohnsonFoils' proposed construction—does not *exclude* other components.  Both the claimed Twin Wire Former and its "third section" are *open*.

82.    Apart from incorrectly excluding elements found in the third section from other parts of the twin wire zone, JohnsonFoils' proposed construction also confusingly adds the concept from its proposed construction of "following": "occupying a discrete physical space." This proposed construction is misleading because it suggests that the third section occupies a space which is separated by some means from the first section. This concept is not only unnecessary, but no such separating structure is disclosed or described in the specification. One of ordinary skill would understand the term "following" to have its ordinary English meaning of "coming after."

83.    **A second drainage element in the third section for being engaged by one of the wire belts as the wire belts travel over the second drainage element:**  One of ordinary skill in the art would understand that apart from the terms "wire belts" and "drainage element" this claim language does not require construction because its terms would otherwise be understood by one of ordinary skill to have their plain and ordinary English meaning.

84.    If the Court decides that the entire phrase needs to be construed, a person of ordinary skill in the art would have understood the phrase to track the claim language: "a second drainage element in the third section for being engaged by one of the wire belts as the wire belts travel over the second drainage element."

85.    JohnsonFoils' proposed construction incorrectly limits the "second drainage element" to a "curved forming shoe." JohnsonFoils' Brief, p. 29. The specification passage cited by JohnsonFoils occurs in the context of a discussion of the preferred embodiment shown in Figure 1 and clearly states that it is describing a preferred embodiment, not defining the term "second drainage element":

> In the third section III of the twin-wire zone, both wire belts **11** and **12** travel over another *preferably curved forming shoe* **23** which (as shown) is arranged preferably in the lower wire loop 11. '805 patent, Col. 5:2-4 (emphasis supplied).

86.    One of ordinary skill in the art would understand that the specification elsewhere discusses other drainage elements, including straight forming shoes and flat suction boxes. '805 patent, Col 1:42-44.

87.    JohnsonFoils' proposed construction impermissibly imports this discussion of a preferred embodiment into the claim.

88.    **The twin wire zone being free of rolls which deflect the twin wire zone:** One of ordinary skill in the art would understand that apart from the term "twin wire zone" this claim language requires no further construction because one of ordinary skill would understand the other terms in this phrase to have their plain and ordinary English meaning.

89.    JohnsonFoils' proposed construction is incorrect because it deviates from the plain and ordinary meaning of the claim as would be understood by one of ordinary skill. There is no disclosure in the specification of a "deflection roll."

90.    The specification discusses various rolls, and the fact that rolls can deflect the twin wire zone.

91.    The addition of the word "entire" to modify "twin wire zone" is unsupported by the specification or prosecution history and does not help explain the term "twin wire zone."

92.    The prosecution history of the '805 patent discloses that the claims were limited to exclude rolls from the twin wire zone in order to distinguish prior art references which disclosed rolls that were entirely within the twin wire zone. *See* United States Patent No. 4,609,435 ("Tissari"); United States Patent No. 4,925,531 ("Koski").

93.    Such rolls are different from the four rolls that the wire belts contact just after they exit and just before they enter the twin wire zone as disclosed in the '805 patent. *See* '805 patent, Figures 1-5 (disclosing embodiments, each of which contains four rolls that the wires contact just as they enter and just as they leave the twin wire zone).

94.    Both Koski and Tissari disclose that the rolls contained within the twin wire zone are in addition to the rolls that the wires contact just as they enter and just as they leave the twin wire zone. *See* Koski (Figure 1); Tissari (Figures 1-6).[1]

95.    The prosecution history of the '805 patent confirms that it was only rolls entirely within the twin wire zone that were disclaimed.

96.    During the prosecution of the '805 patent, Voith cancelled the originally filed independent claims 1-4 and rewrote original dependent claims 5 and 6 to

---

[1]    Although Figures 4–6 of Tissari do not expressly depict all of the rolls that the wires contact as they enter and leave the twin wire zone, they clearly show that the wires 10 and 20 are pressed together as they pass over rolls that are, consequently, clearly entirely within the twin wire zone.

incorporate the depended-from claim 1. *See* '805 patent, Prosecution History, Paper No. 8.

97. The amendment of original claim 5 resulted in a claim identical to claim 1 with the added limitation "the twin wire zone being free of rolls which deflect the twin wire zone." *Id.* The amendment of original claim 6 resulted in a claim identical to claim 1 with the added limitation "the twin wire zone being free of any forming rolls." *Id.*

98. In allowing claims 1-5 of the '805 patent, the examiner explained, in discussing claim 32 (issued claim 5), that the claim was allowable because, although it included a forming roll, "no other rolls which deflect the twin wire zone are present such as in Koski and Tissari." '805 patent, Prosecution History, Paper No. 10 (emphasis supplied).

99. **The twin wire zone being free of any forming rolls ('805 patent, Claim 2):** One of ordinary skill in the art would understand that apart from the terms "twin wire zone" and "forming roll" this claim language requires no further construction because one of ordinary skill would understand the other terms in this phrase to have their plain and ordinary English meaning.

100. The addition of the word "entire" to modify "twin wire zone" is unsupported by the specification or prosecution history and does not help explain the term "twin wire zone."

101. The prosecution history of the '805 patent discloses that the claims were limited to exclude rolls from the twin wire zone in order to distinguish prior art references

which disclosed rolls that were <u>entirely within</u> the twin wire zone. *See* ¶¶ 92-98 above.

102. **First drainage element at the start of the path through the twin wire zone ('805 patent, Claim 2):** This phrase should construed the same way as the identical phrase occurring in claim 1 of the '805 patent.

103. JohnsonFoils' proposed construction is based on JohnsonFoils' incorrect construction of the identical claim term of claim 1. JohnsonFoils' further limitation of this claim phrase based on the claim 2 limitation "the twin wire zone being free of any forming rolls" is incorrect because that limitation, although limiting the scope of claim 2, does not explain the meaning of "a first drainage element at the start of the path through the twin wire zone."

104. Apart from the terms explained in Voith's Opening Brief, legal terms of art such as the open terms "comprises" and "includes," and means-plus-function limitations, Claims 3, 4 and 5 of the '805 patent require no further construction.

105. Apart from the terms explained in Voith's Opening Brief and previously herein, the claims of the '168 patent require no further construction. One of ordinary skill would understand the remaining terms of the claims to have their plain and ordinary English meaning.

106. Although a "means for directing the wire belts" is not expressly recited in the '168 patent, one of ordinary skill would understand that some conventional means is employed so that the wire belts can "travel along a path together." Examples of such conventional means are disclosed in the specification and include rolls, shoes, strips, and other structures which determine the path the belts travel.

107. Claim 3 of the '168 patent expressly states that the wire belts are in contact with, engaged by, and supported with forming rolls, strips, and drainage elements. '168 patent, Cols. 8-9:49-37. One of ordinary skill would understand that forming components which contact or engage the wire belt also direct the wire belt. One of ordinary skill would readily understand the belt directing structural limitations of claim 3.

108. The specification discloses structure corresponding to these limitations. One of ordinary skill would understand that the rolls, drainage elements, and strips described in the specification contact, engage, and support the wire belts.

109. I disagree with JohnsonFoils' conclusion that "one of ordinary skill in the art would interpret claim 7 like claim 3, or find that [the differences] further limit the scope of claim 7." *See* JohnsonFoils' Brief, p. 37-38.

110. JohnsonFoils acknowledged that claim 7 recites a "stationary curved forming shoe" in the first section, and does not recite the "single forming roll" recited in claim 3. From this example, it is apparent that claims 3 and 7 are different, with neither claim being a further limitation of the other.

I, Michael H. Waller, declare under penalty of perjury that the foregoing is true and correct.

Date:  January 24, 2008

_Michael H. Waller_ (signature)

Michael H. Waller